COURT OF APPEALS CAUSE NO. 11-99-00001-CR

TRIAL COURT CAUSE NO. 11,154

| | | |
|---|---|---|
| STATE OF TEXAS | ) ( | IN THE DISTRICT COURT |
| | ) ( | |
| VS. | ) ( | PALO PINTO COUNTY, TEXAS |
| | ) ( | |
| RUSSELL DON JOHNSON | ) ( | 29TH JUDICIAL DISTRICT |

---

VOIR DIRE PROCEEDINGS

VOLUME 2 OF 5

DECEMBER 14, 1998

---

APPEARANCES:

ATTORNEY FOR STATE:

    Mr. Jerry Ray, District Attorney
    Palo Pinto County
    P.O. Box 340
    Palo Pinto, Texas   76484
    SBOT No. 16604500

ATTORNEY FOR DEFENDANT:

    Mr. Robert Watson
    Attorney at Law
    P.O. Box 1308
    Mineral Wells, Texas   76068
    SBOT No. 20961000

⸳⸱ FILED ⸳
IN COURT OF APPEALS
ELEVENTH DISTRICT

FEB 1 6 1999

SHERRY WILLIAMSON, CLERK
By _____ Deputy
TRAP 9

---

On the 14th day of December, 1998, the
above-entitled and numbered cause came on to be heard for
trial in the said Court, Honorable David Cleveland, Judge
Presiding, and the following proceedings were held, to wit:



1               I N D E X

2       VOLUME 2 - VOIR DIRE PROCEEDINGS

3                                                    PAGE

4   Voir Dire Examination by the State...................   3

5   Voir Dire Examination by the Defense.................  52

6   Jury seated..........................................  69

7

8   Reporter's Certificate...............................  73

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        2

KIM A. BROOKS, OFFICIAL COURT REPORTER

1           P R O C E E D I N G S

2                THE COURT:  Ladies and gentlemen, as your

3    name is called, please come forward and have a seat

4    beginning on the second row on the east end of the row.

5                (Jury panel seated in order.)

6                THE COURT:  In Cause No. 11,154, the State

7    versus Russell Don Johnson, is the State ready to proceed?

8                MR. RAY:  State's ready, Your Honor.

9                THE COURT:  Is the defendant ready?

10               MR. WATSON:  Yes, Your Honor, we're ready.

11               THE COURT:  Ladies and gentlemen, the State

12   is represented by Mr. Jerry Ray.  The defendant is

13   represented by Mr. Bob Watson.  The attorneys will now

14   conduct their Voir Dire examination.  Their questions are

15   not intended to embarrass you or needlessly pry into your

16   private affairs, but merely to test your qualifications.

17   Gentlemen.

18               MR. RAY:  May it please the Court?

19               THE COURT:  Yes.

20               MR. RAY:  Mr. Watson.  Good morning, ladies

21   and gentlemen, welcome to district court and what we call

22   criminal jury week.  Here in the district court Judge

23   Cleveland presides over the court, and the court has both

24   civil and criminal jurisdiction.  So part of the caseload

25   that is heard in this court would deal with divorces, car

3

1  wrecks, land titles, disputes that are what we call civil

2  matters; and then the other part of the docket, I don't

3  know that it's half and half, but close, involves the

4  handling of criminal cases.

5          More specifically, the district court is the

6  highest level trial court that we have in the state of

7  Texas.  So when you're going to have a trial, the case

8  cannot start in any higher court than we are in right

9  now.  And I say that to acquaint you with the fact that as

10 far as criminal cases are concerned, this court is where we

11 take up and consider the most serious crimes under Texas

12 law; and those are called felonies.

13         Some of the things that I discuss with you this

14 morning may, to some of you, be a little bit elementary,

15 things that you perhaps are already acquainted with.  Other

16 things, I hope, will be enlightening and may acquaint you

17 or educate you a little bit about the court system and the

18 kinds of cases that we try.  For those of you who have

19 heard or are already acquainted with some of the

20 information that I'll go over with you, I apologize for the

21 redundancy, but we need to do it; and the easy-to-see

22 reason for that is so that all of us are on the same page

23 and we make sure that everyone is acquainted with the same

24 parameters of the rules and the important things about how

25 a criminal case is tried.

4

1        This part of the trial is called Voir Dire.  Voir
2   Dire is a, I think, French term that is probably more
3   correctly pronounced Voir Dire.  But I'm from the country
4   and from Texas and there's just not any way I'm comfortable
5   saying Voir Dire, so I call it Voir Dire; and most everyone
6   around here does.  It simply means, when translated, to
7   speak the truth.  And this morning when Judge Cleveland
8   administered the oath to you as the jury panel and you took
9   that oath, that's basically what you were doing other than
10  being qualified as being eligible to serve as a juror here
11  in district court, but also to promise to speak the truth.
12        And I want to share with you at this point that I
13  try to frame the questions that I will ask the panel in a
14  very general way and not have to start with Mr. Allen here
15  as Juror Number One and go down the row and do the same
16  thing for everybody until we get to the back of the room.
17  I find that that's wasteful of your time.  And although
18  this is an important part of the trial, it is a way I try
19  to frame my questions to ask -- make a statement, say does
20  anybody have a problem with that or does anybody have a
21  question about that, and give you a chance to raise your
22  hand and then individually we'll take it up and deal with
23  it if there's a problem.  Hopefully that'll move things a
24  little faster that way.
25        In speaking the truth, the only important thing

5

1  is to understand that there are no wrong answers that you

2  would give back to myself or Mr. Watson who is the attorney

3  representing the defendant.  We have a job to do this

4  morning that is just part of the trial, and that is to go

5  through the process whereby 12 of you will be selected to

6  hear the case.  And the 12 of you who are impaneled will

7  take these 12 seats and be sworn to be the jury to hear the

8  case and the rest of you get to go home.  The bad news is

9  that the ones that stay get $12 a day and the ones that go

10  home only get $6 for showing up this morning.  So big

11  bucks, you know.

12       No, I appreciate you recognizing your civic duty

13  and being here.  When cases cannot be worked out, that's

14  what we have courtrooms for and that's what trials are

15  about.  And we need 12 jurors from citizens of this

16  jurisdiction to tell all of us what you find the facts to

17  be in the case.  So I hope that my questions this morning

18  won't embarrass anyone or pry needlessly.  They are just so

19  that Mr. Watson and I can do our jobs appropriately.

20       This is called jury selection, and really that's

21  a little bit of a misnomer.  For those of you who have

22  never been over here before and gone through the process,

23  it's really not a matter of being selected, it's a process

24  of elimination.  And part of that process, you already

25  rolled the dice or participated in the lottery wheel when

6

1    you went out for 30 minutes and they literally draw names

2    at random out of a box and that's how you were seated in

3    this order.  It's just luck of the draw.  Those of you

4    seated more towards the front of the room have a much

5    greater chance of being -- ending up on the jury than those

6    in the back.  And the reason I say that is because of this

7    procedure.

8          In a felony criminal case, each side is allowed

9    to make 10 strikes, meaning after Mr. Watson and I talk

10   with you-all this morning, I'll go off and make 10 strikes

11   from among you and Mr. Watson will do the same thing.  And

12   it doesn't mean you're a bad person, it just means for one

13   reason or another, one or the other of us has a preference

14   that ends up with someone being struck.  And if we don't

15   confer with each other, which we don't, and we don't

16   accidentally strike the same name, you can see that would

17   use up 20 names.  And then we turn in our 10 strikes each

18   and the clerk draws a line through those 20 people and then

19   starts with Juror Number One through ten and then eleven

20   through twenty on the second row.  And you can see that if

21   we're going to have the first 12 who don't have a line

22   drawn through their name become the jury, it takes at least

23   32 qualified jurors after we're through with the Voir Dire

24   portion this morning to have a panel remaining that is

25   sufficient in size to allow us to make our strikes and

7

1   still have 12 jurors left over.  So those of you at the

2   very back, not much chance that you'll end up on this jury;

3   but until we talk to you, we don't know how many in front

4   of you might for one reason or another become disqualified.

5          And, again, being disqualified doesn't make you a

6   bad person, it just means that some answer that you give to

7   one of the inquiries that Mr. Watson or myself feels is

8   important might throw you into a category that cannot

9   perhaps be fair and impartial in this case.  And, again, it

10  doesn't make you a bad person.  It's just a way that we

11  have of identifying people who, for example, maybe if you

12  know the defendant or the defendant's family and that puts

13  you in a spot where because of that social acquaintance you

14  can't bring to the table the level of objectivity that we

15  need, you might be disqualified and not make the final

16  draw.  So that's what we're doing this morning.

17         In doing this, we are finding out whether you

18  can, and more particularly whether you will, if selected as

19  a juror, be able to try the case under the rules and the

20  laws and the constitutional provisions that are attendant

21  to and form the framework and the foundation for every

22  trial.

23         For example -- I'll get more particular to ask

24  you about this later, but just to give you an example, a

25  person accused in our country, because of the Fifth

8

1    Amendment to the United States Constitution, has the right

2    to remain silent, to not -- doesn't have to testify or give

3    evidence against himself or herself.  That's an important

4    right, it's a constitutional right.  And yet, not very

5    often, but I would say a few times in my career as a

6    prosecutor and a trial lawyer before that, every once in a

7    while a juror just says, well, you know, the way I feel

8    about it is that if I were accused, I'd want to get up

9    there and tell my side of it, and, therefore, I think

10   everybody else that's accused, we ought to hear from them.

11   And it's okay to feel that way and even to have that

12   opinion, it just happens to run square flush opposite of

13   what one of the rules are.

14           So if truthfully, Voir Dire, speaking the truth,

15   you were to say back to me or to Mr. Watson, I understand

16   that's the rules and I just can't go by it because I bring

17   an opinion into the -- it's America, you can have your

18   opinion -- I bring this opinion, this position into the

19   courtroom, that's just how I feel and I want you to know it

20   and I can't go by that rule, well, you might be

21   disqualified.  But we need to find that out at this point.

22           Okay.  We begin each trial with a very important

23   beginning point, again, not only the trial itself, the fact

24   that you're entitled to have a jury trial, but this idea,

25   this constitutional notation of presumption of innocence is

9

1    afforded to any accused person in our country and certainly

2    in this state.  And the presumption of innocence is the

3    beginning point.  Any person accused of committing a crime

4    is presumed to be innocent at the beginning point, and

5    everyone who is going to remain eligible to be on the jury

6    has to be willing to let that be his or her starting point.

7            The presumption of innocence is enough that, by

8    itself, if the defendant doesn't put on any evidence,

9    doesn't testify, doesn't do anything, that presumption of

10   innocence alone could be enough at the end of a trial to

11   justify an acquittal rather than a guilty verdict because,

12   as the beginning point, it helps us to place the burden of

13   proof where the law requires it to be and that's on the

14   prosecutor, the State, to prove the case by the appropriate

15   legal standard.

16           The defendant has been indicted by a grand jury.

17   The indictment by a grand jury is nothing more than the

18   process by which the case is formally passed along to come

19   into the courtroom.  Somebody gets arrested, if it's a

20   felony case, the matters have to be presented to a grand

21   jury before you can go to the next stage.  But the fact

22   that somebody gets indicted by a grand jury constitutes no

23   evidence of guilt.  And the Court will instruct you that

24   you can't hold that against the defendant.  You can't chip

25   away at that presumption of innocence simply because an

                                                              10

1   accused person has been indicted by the grand jury.  That's

2   just the procedure that we have.

3        Is there anybody that has any problem with that?

4   In other words, the presumption of innocence goes like

5   this.  If I were to ask all of you right now, is there

6   anybody that has their mind made up about this case right

7   now, well, typically without the introduction I just gave,

8   almost everybody would want to take the position at that

9   point, why, no, I don't have my mind made up, I haven't

10  heard anything about the case.  I want to be a good juror.

11  I want to wait until I hear the evidence before I make up

12  my mind.

13       And it's sort of a trick question, but it helps

14  to underscore and to point out the importance of what I

15  just shared with you, and that is this beginning point

16  being presumption of innocence.  So if I were to ask you

17  right now how many of you have your minds made up right now

18  as we speak about the guilt or innocence of the defendant,

19  everybody unanimously should raise their hand, well, I

20  think he's innocent.  Because why?  The presumption of

21  innocence is our starting point.  You see how that works?

22       Anybody have a problem with that?  Is there

23  anybody who would not afford to the defendant in this case

24  the presumption of innocence that the law and the

25  constitution give?  Anybody have a problem with that?

11

1          (No response.)

2          Okay.  That's our beginning point then,

3  presumption of innocence.

4          In district court trying felony cases, there are

5  actually five levels of felony crimes.  And the

6  legislature, your elected representatives in Austin,

7  establish the schedule of different levels of crimes by

8  most serious to least serious, and they also set forth the

9  punishments that are possible to be assessed when somebody

10  does get convicted of one of those kinds of crimes.  Real

11  quickly I want to run through so that you can kind of

12  characterize the level of where it falls on the ladder of

13  the kind of case that we're going to be trying this week.

14          There are five levels of felony crimes.  Lowest

15  level of felony is called a state jail felony, it's kind of

16  a new thing that's only three or four years old, and it is

17  for low-level property crimes; forgery of somebody's check,

18  writing their name on there when they didn't give you

19  permission to; credit card abuse, charging something on

20  somebody's credit card without their permission; burglary

21  of a building, breaking into somebody's storage building

22  would be examples of state jail felonies; theft cases over

23  $1,500.

24          The lower, like, hot checks, $50, would be

25  downstairs in the county court.  You'd have to get up to

12

1    $1,500 value before you would reach the felony level, state

2    jail felony.  Those are some examples of state jail

3    felonies.

4           The state jails, as they're called, are different

5    than maximum security prisons.  It's a different kind of a

6    facility, not your county jail, which is across the street

7    over here.  It is facilities that are sprinkled throughout

8    the state as part of our Department of Corrections, but

9    they are called state jails.  They're cheaper to build,

10   more of a dormitory style rather than individual cubicles,

11   the lockdown cells like real prison has.  They have

12   requirements of fewer guards to prisoner ratios, so they're

13   less expensive to the taxpayers to operate those kind of

14   facilities as well as to build those kind of facilities.

15          Six months up to two years in a state jail

16   facility is the range of punishment and an option of a

17   $10,000 fine if someone is convicted of a state jail

18   felony.

19          Next up is third degree felonies.  Third degree

20   felonies have a range of punishment of from two to ten

21   years in prison and the option of a fine of up to $10,000.

22   Examples of third degree felonies, some of our drug

23   offenses are third degree felonies.  Possession of more

24   than one gram but less than four grams of cocaine or speed,

25   heroin, things like that, could be a third degree felony,

13

1    just an example, two to ten years in prison.

2         Second degree felonies, next up.  Second degree

3    felonies have a range of punishment of from two to twenty

4    years in prison and the same option of any amount not to

5    exceed $10,000.  Some second degree felonies -- aggravated

6    assault would be an example of a second degree felony.

7    Again, depending on the quantity and what the accused

8    person is doing with some drugs, depending on how much dope

9    there is, you could have some second degree felonies, also,

10   burglary of a habitation with the intent to commit theft.

11        Now, this is not breaking into somebody's storage

12   building, this is breaking into somebody's house or

13   entering someone's home without their permission with the

14   intent to steal from them.  And you usually know what they

15   intended to do because, like, if the VCR is missing or the

16   family silverware or TV or something like that, you know

17   that they entered without permission with the intent in

18   their mind of committing the crime of theft.  That's a

19   second degree felony, two to twenty years in prison.

20        Now, burglary of a habitation can be a first

21   degree felony, and that is if you enter someone's

22   habitation without their consent with the intent to commit

23   any other felony other than stealing from them.  So if you

24   enter with the intent to commit rape or you enter with the

25   intent to commit an aggravated assault or you enter with

14

1   the intent to commit robbery, you know, a confrontation

2   physically with somebody, then it would be a first degree

3   felony.  But burglary of a habitation with the intent to

4   commit theft is a second degree felony, two to twenty

5   years.  Those are some examples.

6         First degree felonies, five to ninety-nine or

7   life in prison is the range of punishment there with the

8   same option of fine of up to $10,000.  First degree

9   felonies include things such as aggravated kidnapping;

10  aggravated sexual assault, what we used to call rape is now

11  called aggravated sexual assault; aggravated robbery;

12  murder.  Those are some examples of first degree felonies.

13  And I gave you another one a few minutes ago, burglary of a

14  habitation with intent to commit any felony other than

15  theft.

16        So those are some examples of first degree

17  felonies.  They're the most serious crimes under Texas law,

18  and some of them are preceded by the word "aggravated",

19  meaning that you could have robbery, a second degree

20  felony, two to twenty years, and you could have aggravated

21  robbery which is a first degree felony which is five to

22  life and the fine business.

23        Now we're going to be trying -- well, let me not

24  get ahead of myself.  The last -- I said there were five,

25  and we've dealt with state jail felonies, third degree,

                                                          15

1   second degree, and first degree felonies.  Well, what more

2   could there be?  We have capital murder in the state of

3   Texas, that's called a capital felony.  There are only two

4   punishments for capital murder, either death by lethal

5   injection, the death penalty we have in Texas, or a life

6   sentence if the death penalty is not given or if the State

7   waives the death penalty.

8          So that's the five levels of felonies.  We are

9   going to be trying a first degree felony, it's called

10  aggravated robbery.  You remember a few seconds ago I

11  started to get ahead of myself and I said we have robbery,

12  which I don't think it's a real proper term, but lack of a

13  better way to distinguish, regular robbery as distinguished

14  from aggravated robbery?  What would be the difference

15  there?  Let's talk about that for a few minutes.

16         Robbery is different than theft.  For example, if

17  you're sitting on a park bench and I grab your camera and

18  run off with it, that would be a theft case.  I stole your

19  camera, and the value of the camera would determine whether

20  it's a misdemeanor or a felony.  It would have to get up

21  over $1,500 in value before we would get into felony

22  court.  Now, that's theft.

23         Okay.  How could that be turned into robbery?

24  Robbery is when you're in the act or course and scope of

25  committing a theft, but usually there's this element that

16

1   you do it when there's -- the victim is there, there's a

2   confrontation between people and one of two things happens,

3   either the person is injured or is placed in fear of

4   imminent bodily injury.

5           For example, if I don't touch you but I hold a

6   knife on you and say, give me your purse, okay, I'm

7   stealing from you when I take that purse, but that personal

8   confrontation -- by threatening someone, that

9   confrontational thing when the victim is there can turn it

10  into robbery.

11          Okay.  Now, that would be if someone is injured

12  or threatened with imminent bodily injury while this

13  stealing business, this theft business is going on, we

14  would have a robbery; and it would become a second degree

15  felony, two to twenty years in prison.  Are you with me so

16  far?  Stealing coupled with what?  Either an injury or a

17  threat, imminent bodily injury.  Okay.  That's two to

18  twenty years in prison.

19          A good example would be instead of sitting on a

20  park bench and it be a camera, let's have a lady walking

21  from K-Bob's, just having paid for her meal at the

22  restaurant, and she's walking out in the parking lot and a

23  thief runs by and grabs her to get her purse off of her arm

24  and wrenches her arm or knocks her down onto the pavement

25  and she feels physical pain.  Bodily injury is anything

17

1   that causes physical pain, not hurt your feelings, but

2   physically hurts you.  If you hit somebody and they can

3   truthfully say that hurt, that's regular bodily injury.

4        So in my example of the lady leaving K-Bob's and

5   walking to her car and the purse snatcher comes along and

6   he's trying to do a theft, but because of that meeting of

7   the victim and the perpetrator that results in an injury,

8   physical pain turns that purse-snatching theft into a

9   second degree felony, a robbery, just hurt ever so

10  slightly.  Robbery, two to twenty years.

11       Anybody think that's a dumb law or that it ought

12  to be -- that it ought not to be more serious when the

13  stealing happens and there's the danger of the physical

14  confrontation and hurting somebody?  Anybody think that's a

15  bad idea, bad concept, to up the ante, so to speak?  Raise

16  your hand if you do.

17                     (No response.)

18       Okay.  No hands are up.  All right.  That's

19  robbery, in the course and scope of stealing and you either

20  hurt somebody or threaten them.  Now, how could robbery,

21  two to twenty years in prison, get turned into aggravated

22  robbery, which is what we're going to try in this case, and

23  it be a first degree felony with a low of five years, a

24  high of ninety-nine years or life?  No practical difference

25  between ninety-nine years and life, not much difference,

18

1   but that's the way the statute reads.

2          Okay.  Here's how robbery becomes aggravated

3   robbery.  There are, generally speaking, three ways.  One

4   is if that bodily injury, physical pain, if it is elevated

5   to the extent of serious bodily injury.  There's a

6   different legal definition for serious bodily injury than

7   regular bodily injury.  Regular bodily injury would be what

8   I described earlier, feel physical pain, that hurt.  I

9   scratched my knee, you busted my elbow when I fell down

10  when you grabbed my purse; regular bodily injury.

11         Serious bodily injury -- the judge will give you

12  all of the legal definitions that you need, you don't have

13  to remember this word for word; I just want, for

14  discussion, for us to understand the difference between

15  robbery and aggravated robbery.  Serious bodily injury are

16  those kinds of injuries that either are capable of causing

17  death or the protracted loss of use or impairment of a

18  bodily member or organ.  So they're more serious injuries,

19  not just feeling physical pain, but those kind of

20  life-threatening or bodily-member injuries, such as if you

21  put somebody's eye out, that's the permanent loss or

22  impairment of a bodily member or organ.  So that would

23  easily be serious bodily injury.  If you shoot someone,

24  even if they live, but the bullet goes through and doesn't

25  hit vital organs, those would be serious bodily injury

19

1    because they are life-threatening.   There are some kinds of

2    broken bones and limbs that become serious bodily injury

3    because if the person doesn't heal entirely fully such that

4    they have the full use of that limb, then that can be

5    serious bodily injury.  Hitting someone in the head such

6    that they're knocked unconscious or have a cut on their

7    head or something to where because of how that particular

8    body part being so dangerous to be where the brain is to be

9    injured could be serious bodily injury.  But there's a

10    legal definition that the judge would give; and that's one

11    way that regular robbery, two to twenty years in prison,

12    becomes aggravated robbery, five to life, serious bodily

13    injury.

14        Okay.  And the interesting thing about robbery is

15    that you -- in aggravated robbery, you don't even have to

16    get anything stolen.  It's just while in the course and

17    scope of either stealing or attempting to steal from

18    somebody you hurt them.  Okay.  Serious bodily injury is

19    one way for aggravated robbery.

20        Another way is if you use or exhibit a deadly

21    weapon while committing the theft part of it.  And the

22    classic example would be if somebody went in to rob a bank

23    and they had a pistol and they point it at the clerk and

24    say, fill up the grocery sack with your bills and don't

25    push your alarm button or call 9-1-1.  You know, pointing

20

1    that gun or having that gun to exhibit a firearm is

2    automatically a deadly weapon.  Pointing -- even if nobody

3    gets shot, nobody gets hurt, does not feel physical pain,

4    but just that pointing -- raising the level of danger with

5    the weapon being present turns regular robbery into

6    aggravated robbery.

7           So you've got serious bodily injury or using --

8    use or exhibit a deadly weapon and that makes it

9    aggravated.  Anybody think that's a dumb law, that upping

10   the ante is not appropriate when the facts rise to the

11   level of hurting somebody more seriously or bringing that

12   weapon to the fray?  Anybody have a problem with that,

13   raise your hand.

14                    (No response.)

15          Okay.  What's the third way you could have

16   aggravated robbery?  We have -- in Texas law, and I think

17   in most states, we have a concept that involves this notion

18   that there are segments of our society that deserve to have

19   special protection.  For example, if Mr. Sudderth walked up

20   to Jerry Ray and popped me in the jaw and I said, that

21   hurt, caused physical pain, that would be an assault with

22   injury, and would be downstairs in Judge Mickey West's

23   court as a Class A misdemeanor.  I could risk up to a year

24   in the county jail -- or Mike could risk up to a year in

25   the county jail for doing an assault with injury.  But if

                                                        21

1   he did that to a child, it would jump up and become a

2   felony assault because the legislature says that children

3   can't fend for themselves as well as I can.  I doubt I'd do

4   very well against Mr. Sudderth, but I can better than

5   little kids.  So if that same regular bodily injury just

6   hurts but your victim falls in a special class of people,

7   it ups the ante and you're in felony court with a chance to

8   go to prison.  Anybody think that's a bad idea, that having

9   specially protected classes of citizens?

10                    (No response.)

11          Okay.  No hands are up.  Okay.  On the other end

12   of the spectrum, because of how life is, we have elderly

13   people who are also specially protected; that this life

14   runs like this bell curve where during the early years when

15   you're a kid, a child, you deserve special protection

16   because you're not big enough or old enough to take care of

17   yourself.  And then you go through the vast majority of

18   your life and you're not a child, and then at some point

19   for all of us, later for some, we start losing the ability

20   to fend for ourselves.  And it's an arbitrary line-drawing

21   thing, I think, as far as the legislature is concerned, but

22   they drew the line at age 65.

23          Now, just within the last year they've upped the

24   jury exemption from 65 to 70.  You heard Judge Cleveland

25   say, if anybody is over 70, you could claim your exemption

                                                        22

1   and you don't have to serve.  You can, but you don't have

2   to serve as a juror.  And they just moved that from 65 up

3   to 70 pretty recently.  But this special protected class of

4   people, elderly people, above 65 years of age is where the

5   law draws the line.  And it gets back on par with, like,

6   when you were a child.

7        So our discussion is about how does regular

8   robbery become aggravated robbery.  And we know serious

9   bodily injury does it and we know that use or exhibit a

10  deadly weapon does it and now the third way would be if you

11  do even regular bodily injury and the victim is 65 years of

12  age or older, it is classified as an aggravated robbery.

13  So that marriage of regular bodily injury with the victim

14  being 65 years of age or older ups it a notch, kicks it up

15  to a first degree felony, five to life.  Anybody have a

16  problem with that, with older victims being given special

17  protection or the punishment is upped, the prospect of

18  punishment goes up when you hurt little people and older

19  people?  Anybody think that's a bad idea?

20                    (No response.)

21        No hands are up.  Good, good.  Okay.  We're going

22  to be trying an aggravated robbery.  The name of the

23  defendant is Russell Don Johnson.  Mr. Johnson, would you

24  do me a favor and just stand up briefly and face the

25  panel?

                                                          23

1        (Defendant Johnson complies.)

2        Okay.  Thank you, Mr. Johnson.  I think the

3   evidence will show that Mr. Johnson is from Mineral Wells

4   area.  By the way, the court that you're in is called the

5   29th Judicial District Court.  And every court has a

6   jurisdiction, an area that it covers.  Ours is real

7   simple.  It covers all of Palo Pinto County; no more, no

8   less.  Some courts, like out in west Texas, they'll have

9   three or four counties that are all part of the same

10  judicial district and there's one judge and one district

11  attorney and they work in all four counties because

12  population is sparse and spread out.  But your court is for

13  Palo Pinto County.  And in order for this to be the court

14  of proper jurisdiction, we would have to show that the

15  crime charged occurred within that jurisdiction.  So we'll

16  have to prove to you that the conduct that we're charging

17  the defendant with occurred in Palo Pinto County.

18       Mr. Johnson is charged with an aggravated robbery

19  where it is alleged that over in Mineral Wells back last

20  summer, this past summer, July the 28th, on or about July

21  the 28th of 1998, over in Mineral Wells, he committed an

22  aggravated robbery of a person named Jimmie Ray

23  Pontremoli.  I think the evidence is going to show that

24  Mr. Pontremoli is in his 70s and he owns or is the

25  proprietor of an antique or junk-type store where people

24

1    can come in and find knickknacks and tools and wrenches and

2    screwdrivers and nuts and bolts and things like that.  And

3    he calls it -- I think he calls it a junk store.  But

4    anyways, he's the proprietor of a store over in Mineral

5    Wells.

6          And Russell Don Johnson is charged with while in

7    the course and scope of robbing him from some money that he

8    hit him with a pipe wrench, a 36-inch.  It's a -- not just

9    a hand-held wrench, but a heavy pipe wrench we'll bring to

10   court; and that in the process of doing that, the victim,

11   Mr. Pontremoli, suffered at least regular bodily injury,

12   in other words, a broken arm, broke his arm as he blocked a

13   blow to the head and fractured the part of his body where

14   he blocked the blow with it.

15         So we would have, at the least, with what we've

16   charged, at least regular bodily injury, certainly it hurt,

17   coupled with the age of over 71 would make those be the

18   elements of why the defendant is charged with aggravated

19   robbery.

20         You know, it's interesting that depending upon

21   the level of recovery from his injuries and depending upon

22   what the jury might find about that pipe wrench, this is

23   strangely enough one of those cases where all three of the

24   ways that I described how a robbery becomes an aggravated

25   robbery, all three of them might be present.  For example,

                                                        25

1    if Mr. Pontremoli has not been able to regain the full use

2    of his arm, then it could be serious bodily injury;

3    protracted loss of use or impairment of a body member or

4    organ, could have serious bodily injury.

5         It could be that the jury would find that the

6    pipe wrench is a deadly weapon.  You know, we have a law

7    that defines deadly weapons in Texas; that, first of all,

8    there's two categories, a, any firearm.  Any firearm is a

9    deadly weapon, per se.  The law says that, and you just

10   have to accept it.

11        And then paragraph two says anything else,

12   anything, which in the manner of its use or intended use is

13   capable of causing serious bodily injury or death.  So an

14   automobile that you drive to and from work, no

15   problem.  But if you run it up on the sidewalk at the mall

16   at 60 miles an hour, then in the manner of its use or

17   intended use it's darn sure capable of causing serious

18   bodily injury, try to run over somebody.  So a car can be a

19   deadly weapon.

20        A very famous case in Texas, a pair of lady's

21   pantyhose has been found to be a deadly weapon.  If you're

22   wearing them to work, no problem.  But when you wrap them

23   around somebody's neck and use it as a ligature to cut off

24   their oxygen supply, then a pair of pantyhose becomes a

25   deadly weapon and has been found to be so.

26

1        Almost always, knives are found to be a deadly

2   weapon if they are used in a cutting or stabbing-type

3   method; a stick that could poke somebody's eye out;

4   remember, protracted loss of use of a bodily member or

5   organ, capable of doing serious bodily injury; so any

6   weapon or implement that is capable of causing serious

7   bodily injury or death in the manner that it is used at

8   somebody's head.

9        So we could have a wrench as a deadly weapon

10  makes it aggravated.  We could have Mr. Pontremoli not

11  having the full use of his arm for a long time, serious

12  bodily injury, or regular bodily injury, it hurt to get hit

13  during this robbery and he's over 65.  You see where we

14  are?

15        In other words, those are the ways that you could

16  have aggravated robbery; and the way that we have alleged

17  in this case is regular bodily injury.  That's all we have

18  to prove.  Is there anybody that would require the State to

19  prove serious bodily injury if the law says that regular

20  bodily injury is enough as long as the victim is 65 or

21  older?  Anybody that would require the State to prove more

22  than the law requires the State to prove?  Anybody?

23                    (No response.)

24        Okay.  That's in a nutshell about robbery and

25  aggravated robbery.  We need to try the case based on the

27

1   evidence that's presented in the courtroom, not something

2   that you may have heard or think you know from outside the

3   courtroom.  So we kind of ask you to the extent possible to

4   wipe the slate clean, start fresh; and if you're on the

5   jury, swear to us that you have the ability to decide the

6   case based on what you see and hear in the courtroom and

7   not something else outside of the case.  So we have to ask

8   you some questions.  Does anybody know Russell Don

9   Johnson?

10                    (Jurors respond.)

11          Okay.  Let's see just a moment, see if I can get

12   my numbers right.  Number 29, okay.  And you would be Ms.

13   Gray; is that right?

14                    PROSPECTIVE JUROR GRAY:  Yes.

15                    MR. RAY:  Okay.  You're Mr. Wilmer, aren't

16   you?

17                    PROSPECTIVE JUROR WILMER:  Yes, sir.

18                    MR. RAY:  Anybody else by name or by sight

19   recognition know Russell Don Johnson?

20                    (No response.)

21          Okay.  Ms. Gray and Mr. Wilmer, from that answer,

22   everybody else in the room doesn't know the defendant.  And

23   so whatever it is that you know about him, we don't want

24   you sharing out loud.  Okay.  But I'm just going to ask you

25   the questions that I think are appropriate to determine how

                                                          28

```
 1    you know him and whether it would present any problem for
 2    you.  So, Ms. Gray, what's the nature of your acquaintance
 3    with the --
 4              PROSPECTIVE JUROR GRAY:  I don't know how to
 5    say it without --
 6              MR. RAY:  Well, let me do this, thank you
 7    for kind of warning me in advance.  Is there anything in
 8    the nature of your acquaintance with him that would
 9    interfere with your ability to be fair and impartial if
10    you're on the jury?
11              PROSPECTIVE JUROR GRAY:  Yes.
12              MR. RAY:  Okay.  Thanks.  Mr. Wilmer, the
13    nature of your familiarity with Mr. Johnson?
14              PROSPECTIVE JUROR WILMER:  Family wise and
15    stuff, I know some of his relatives.  I know his friends.
16    I've see him around.
17              MR. RAY:  Okay.  Would the acquaintance that
18    you have with Mr. Johnson or his family, friends, and so
19    forth be a situation that makes you where you could not be
20    fair and impartial to both sides if you were selected?  Or
21    could you put aside the fact that you know him -- you know,
22    small community --
23              PROSPECTIVE JUROR WILMER:  I probably
24    couldn't.
25              MR. RAY:  I'm sorry?
```

29

1                PROSPECTIVE JUROR WILMER:  I couldn't.

2                MR. RAY:  Could not put it aside?

3                PROSPECTIVE JUROR WILMER:  (Juror shakes

4  head.)

5                MR. RAY:  Okay.  Thanks.  See, that's what

6  we need.  There will be few questions, maybe somebody else

7  will have their hand up, maybe not, but we have to ask.

8  All right.  We want to try -- oh, yes, ma'am.

9                PROSPECTIVE JUROR BUTLER:  I don't think I

10  could be fair, I'm sorry.  If you need me to be, I'm

11  sorry.  I just don't think I could be fair, I really don't.

12                MR. RAY:  Well, let's talk about that --

13  Ms. Butler?

14                PROSPECTIVE JUROR BUTLER:  Uh-huh.

15                MR. RAY:  Before when I asked if everyone

16  agreed that the beginning point of the trial is the

17  presumption of innocence --

18                PROSPECTIVE JUROR BUTLER:  I know.

19                MR. RAY:  You do go along with the

20  presumption of innocence, do you not?  You presume --

21                PROSPECTIVE JUROR BUTLER:  But if they know

22  he did it, he did it, and I'm sorry.

23                MR. RAY:  Well, I understand, but nobody has

24  proven to you that he did.

25                PROSPECTIVE JUROR BUTLER:  I understand.

30

1          MR. RAY:  Would you make the State prove the

2    case before you found him guilty?

3          PROSPECTIVE JUROR BUTLER:  Do what?

4          MR. RAY:  Would you start with the

5    presumption of innocence and make me prove the case before

6    you found him guilty?

7          PROSPECTIVE JUROR BUTLER:  I guess I would,

8    uh-huh.

9          MR. RAY:  And if I told you that the burden

10   of proof that the State has is to prove the case beyond a

11   reasonable doubt, would you go along with that?

12         PROSPECTIVE JUROR BUTLER:  Yes, I would.

13         MR. RAY:  And require me to prove it the

14   right way?

15         PROSPECTIVE JUROR BUTLER:  Uh-huh.

16         MR. RAY:  Okay.  And, therefore, if you can

17   give this defendant, like you yourself would want if you

18   were accused of a crime, the presumption of innocence as

19   our starting point and make the State prove the case --

20         PROSPECTIVE JUROR BUTLER:  I could.

21         MR. RAY:  -- could you do that?

22         PROSPECTIVE JUROR BUTLER:  Uh-huh.

23         MR. RAY:  Another issue is that we don't

24   want to try a case with jurors who are concerned with who

25   they know or who they like.  For example, I'm fixing to ask

31

1   all of you if you know me and if you know Mr. Watson.   And

2   in the issue, the reason for the inquiry is this, that if

3   you are so angry with me over something that I've done, and

4   there may be somebody that is and, therefore, the State

5   doesn't have a fair shot, then you should tell us that.

6   And it's okay, I can take it.   On the flip side of that, if

7   there is someone who is so closely aligned with me that the

8   defense would not have a fair shake just because I'm the

9   prosecutor and they'd be stuck with a juror who can't be

10   fair and impartial because they are so aligned with me,

11   then you should tell us that.   So how many of you know me,

12   raise your hand.

13                    (Jurors respond.)

14        Good enough.   How many of you would consider --

15   well, how many of you have I, per chance, if anyone, done

16   any legal work before I started prosecuting?   I've been

17   prosecuting as your district attorney for six years now.

18   Before that, I practiced law in Mineral Wells for 19 years.

19   Is there anybody that I've done any legal work for?

20                    (No response.)

21        Okay.   No clients are out there.   Is there

22   anybody that considers themselves so -- such close social

23   friends with me, personal friends, that you would lose your

24   objectivity, you could not be fair to the other side?   If

25   anybody feels that way, it would help my ego a lot, but you

                                                          32

1   wouldn't be qualified.  Anybody feel that way?

2                    (No response.)

3            How many of you know Bob Watson, Robert Watson?

4                    (Jurors respond.)

5            An equal number.  Okay.  How many of you has

6   Mr. Watson done legal work for, if any?

7                    (Jurors respond.)

8            Okay.  Mr. Brooks, Mr. Sudderth.  Okay.

9   Mr. Brooks, the fact that Mr. Watson has represented you in

10  a legal matter, that usually means that there is an element

11  of trust or entrusting something that's relatively

12  important for someone to handle, and this attorney-client

13  relationship is different than just being passing

14  acquaintances.  Is there anything left over from that

15  attorney-client relationship that would put you in a

16  position where you could not be fair and impartial to both

17  sides?

18            PROSPECTIVE JUROR BROOKS:  No, sir.

19            MR. RAY:  Is there any chance that it would

20  put you in a bind?  For example, if Mr. Watson, in doing

21  his job, stood before the jury and advocated a certain

22  legal theory or factual scenario and you disagreed with

23  him,  would you have any problem voting against what he

24  advocates simply because he was your lawyer at one time?

25            PROSPECTIVE JUROR BROOKS:  No, sir.

                                                       33

1          MR. RAY:  Okay.  Good.  Mr. Sudderth, same

2    way, anything in that legal relationship that would

3    interfere with your ability to be fair?

4          PROSPECTIVE JUROR SUDDERTH:  No, sir.

5          MR. RAY:  How many of you would consider

6    yourself social friends with Mr. Watson and his wife,

7    Carol, and daughters, Nikki and Shelly?

8               (Juror responds.)

9          Okay.  Ms. Butcher.  Is there anything in that

10   social relationship that puts you in a spot that you

11   couldn't deal with that degree of impartiality that we

12   need?

13         PROSPECTIVE JUROR BUTCHER:  No, sir.

14         MR. RAY:  Okay.  Set that aside, and even

15   though you're friends with the one of the participants, you

16   could vote against a position that he advocated and still

17   be friends?

18         PROSPECTIVE JUROR BUTCHER:  (Juror nods

19   head.)

20         MR. RAY:  Okay.  Good.  Same thing applies

21   to some of the witnesses.  For example, it's not unusual at

22   all for one or more of you to be familiar with some people

23   who might testify during the trial.  And the idea is that

24   you, if you're one of the 12 jurors, you're what we call

25   the trier of fact.  You break all the ties if there are

                                                      34

1   any.  And usually there are disputes in a case or it

2   wouldn't be in court in the first place.

3          And so as the trier of fact, you have the right

4   to believe what somebody tells you or disbelieve what

5   somebody tells you or believe part of it and disbelieve

6   part of it.  And I don't think anybody would question that,

7   but where the problem arises is if you find yourself in a

8   spot where you can't give all of the witnesses an even

9   starting place.  Nobody gets a head start because you know

10  them or because they're a police officer or nobody gets a

11  behind start because you know them or don't like them or

12  like them or something like that.

13         So some of the witnesses that might testify,

14  Mr. Pontromeli, Jimmie Ray Pontromeli, anybody know

15  Mr. Pontromeli?  Okay.

16                 (Juror responds.)

17         THE COURT:  You have a name over here --

18  juror over here.

19         MR. RAY:  Oh, I'm sorry.

20         PROSPECTIVE JUROR BLANKENSHIP:  I bought

21  tools at his store.

22         MR. RAY:  Other than just walking in and

23  consummating the transaction, anything more to it?

24         PROSPECTIVE JUROR BLANKENSHIP:  No.

25         MR. RAY:  Is there anything in that that

                                                          35

1 would interfere with your ability to be fair and impartial?

2     PROSPECTIVE JUROR BLANKENSHIP:  No.

3     MR. RAY:  You would view his testimony just

4 like any other witness and give him the same starting

5 point?

6     PROSPECTIVE JUROR BLANKENSHIP:  Well, I will

7 say I would be more inclined to believe him than I will

8 the defendant.

9     MR. RAY:  Okay.  And why is that?  You don't

10 know the defendant, do you?

11     PROSPECTIVE JUROR BLANKENSHIP:  No.

12     MR. RAY:  Okay.  And we don't even know if

13 the defendant will testify, that's not up to me and not up

14 to you.

15     PROSPECTIVE JUROR BLANKENSHIP:  No.

16     MR. RAY:  Could you -- the fact that you've

17 bought tools in Mr. Pontromeli's place of business, is that

18 something you could set aside and listen to his testimony

19 and decide the credibility of the witnesses just like

20 everybody else?

21     PROSPECTIVE JUROR BLANKENSHIP:  I've talked

22 a little bit to the elderly gentlemen, and I would be more

23 inclined to believe anything that he would say than I would

24 any defendant's witnesses.

25     MR. RAY:  Okay.  You wouldn't believe him

36

1    if he said today is Wednesday, would you?

2                    PROSPECTIVE JUROR BLANKENSHIP:  Well, of

3    course not.

4                    MR. RAY:  All right.  I'm just trying to get

5    at the degree to which your --

6                    PROSPECTIVE JUROR BLANKENSHIP:  I have

7    talked to him a little bit, and I like his attitude.

8                    MR. RAY:  Okay.  Okay.

9                    PROSPECTIVE JUROR BLANKENSHIP:  I like him.

10                   MR. RAY:  But you don't know anything about

11   his personal life or anything like that?

12                   PROSPECTIVE JUROR BLANKENSHIP:  No.

13                   MR. RAY:  You don't know whether -- well, is

14   he somebody that you could listen to and judge his

15   credibility just based on what you hear in the courtroom?

16                   PROSPECTIVE JUROR BLANKENSHIP:  Yes, sir.

17                   MR. RAY:  A fellow named Jason Olivia Smith;

18   Michael Duane Blair, anybody know those guys?

19                        (No response.)

20           Okay.  Nobody.  Some police officers that might

21   testify; Mike McAllester, Kirby Wiggington, possibly Robert

22   Hemphill.  Some of you are going to know some of these

23   officers probably, raise your hands.

24                        (Jurors respond.)

25           The question is, the relevant question is, is the

                                                               37

1  fact that you know them or are acquainted with them, can

2  you give them an even starting point, neither a head start

3  or behind start, and judge their credibility just like you

4  would all the other witnesses?  Is there anybody who cannot

5  do that, raise your hand.

6                    (No response.)

7         Okay.  It's possible that Jack Hunter, juvenile

8  probation officer in Mineral Wells; Ron Edwards who is the

9  adult probation officer here in Palo Pinto, those guys

10 might testify.  Anybody know them?

11                   (No response.)

12        Okay.  Same inquiry of all of you.  Is there

13 anyone who could not judge their testimony and determine

14 their credibility on a fair and equal basis with the other

15 witnesses and wait until you the hear the testimony to

16 decide how you evaluate it?  Anybody have a problem with

17 that?

18                   (No response.)

19        Okay.  Love them so much or hate them so much

20 that you can't let them have a even starting point.

21 Anybody?

22                   (No response.)

23        Okay.  No hands are up.  A fellow named Henry

24 Williams from Weatherford might testify.  Anybody know

25 Henry Williams?

                                                         38

```
 1                    (No response.)
 2            A possibility that a couple of schoolteachers,
 3    Darrell Carey and Marcie Carroll might testify from out at
 4    Mineral Wells High School.  Anybody know those teachers?
 5                    (Jurors respond.)
 6            Okay.  Couple of you.  Anybody problems either of
 7    you as far as evaluating their testimony just like all
 8    other witnesses?
 9                    (Jurors shake heads.)
10            No and no.  Okay.  It's possible that Evelyn
11    Putman from Palo Pinto General Hospital and Dr. Robert
12    Allensworth might testify.  Anybody know those folks?
13                    (Jurors respond.)
14            Okay.  Three.  Any problems -- could you evaluate
15    their testimony just like all other witnesses?  Any
16    problems with that?
17                 PROSPECTIVE JUROR THOMAS:   (Juror shakes
18    head.)
19                 MR. RAY:  No.  Any problems, ma'am?
20                 PROSPECTIVE JUROR KOEHLER:   (Juror shakes
21    head.)
22                 MR. RAY:  Okay.  No.  Also, anyone know
23    John Arenz, A-r-e-n-z, who used to work in this
24    jurisdiction?  I think he lives over in the metroplex now.
25    Anybody know J.J. Arenz?
```

39

1                  (Jurors respond.)

2          Does that present any problem?  Could you judge

3    his testimony just like any other witness?

4                  PROSPECTIVE JUROR:  (Juror nods head.)

5                  MR. RAY:  Mr. Sudderth, same thing?

6                  PROSPECTIVE JUROR SUDDERTH:  No problem.

7                  MR. RAY:  In asking or answering a question

8    a few minutes ago, I asked, I believe it was Ms. Butler, if

9    she would put the burden -- if she's selected as a juror,

10   put the burden where the law puts it, and that is on the

11   State to prove the crime by the appropriate legal

12   standard.  Let's talk about legal standard, appropriate

13   legal standard.

14          In a civil case if you're going to win, all you

15   have to do is prevail by a preponderance of the evidence.

16   In other words, if everybody went in starting even at the

17   beginning and when you got through the jury felt like it

18   was ever so slightly tilted one way or the other, that's

19   the side that would win or carry the issue.  Preponderance

20   of the evidence, 51 to 49 is good enough.

21          In criminal law, it's not the same standard.  We

22   have to prove the case beyond a reasonable doubt.  That's

23   the standard.  It's not an impossible standard, it's not

24   beyond a shadow of a doubt like you've heard on Perry Mason

25   or television, it's not beyond all doubt, it's simply

                                                          40

1  beyond a reasonable doubt.  There's that word "reason," to

2  bring your good common sense into the jury box.

3       The judge will give you a definition of

4  reasonable doubt, and to paraphrase it, I think it'll go

5  something like it would be doubt that's based on a reason.

6  In other words, it has to be a reason for it, not just a

7  whimsical or frivolous type of an exercise, that would rise

8  to the level causing you to hesitate to act in the most

9  important of your own affairs.  So it must be doubt, it

10  must be based on a reason, and it has to be sufficient to

11  rise to the level to cause you to hesitate to act in the

12  most important of your own business.

13       Okay.  Anybody who would have any problem with

14  assigning and putting the State to that burden to prove all

15  of the elements of the crime beyond a reasonable doubt?

16  Anybody that would not?

17                 (No response.)

18       That business I mentioned earlier, the defendant

19  has the right to remain silent and not testify.  He has the

20  right to testify if he or she so chooses based on their

21  decision with the advice of their attorney.  But if they

22  choose not to, they don't have to.  I don't know what's

23  going to happen in this case, it's not up to me.  But the

24  important thing at this point in trial is asking you if the

25  defendant were to exercise the right to remain silent and

41

1   not testify, you are charged with the law that says you

2   cannot hold that as a circumstance against him for any

3   reason.   Is there anyone who would refuse to abide by that

4   instruction?   If he chooses to exercise the right to remain

5   silent, you can't hold it against him.   Anyone?

6                          (No response.)

7               Okay.   No hands are up.   So the State has to

8   prove the following elements, that on or about July 28th,

9   1998, in Palo Pinto County, Texas, the defendant, Russell

10  Don Johnson, intentionally, knowingly, or recklessly, while

11  in the course and scope of committing theft or attempting

12  to commit theft of property, money, caused bodily injury,

13  physical pain, to a person 65 years of age or older, Jimmie

14  Pontremoli.   Those would be just a verbal run-through of

15  the seven or eight things that the State would have to

16  prove, and they must prove each one of those things beyond

17  a reasonable doubt.   Okay.

18              First degree felony, range of punishment, life or

19  any term of years not less than five nor more than

20  ninety-nine and the option of also -- there is no option

21  about the five to ninety-nine or life, but there is an

22  option to fine or not assess a fine of any amount from zero

23  of up to $10,000.   That's the range of punishment.

24              In order to be qualified to sit on a jury, you

25  have to qualify at this part of the trial before we start

                                                              42

1   by being able to truthfully tell the Court and the trial

2   participants that you're the kind of person who can

3   reasonably and fairly consider the full range of punishment

4   all the way from the low of five years to a high of

5   ninety-nine years or life in prison in a proper case for it

6   with you getting to wait until you hear the evidence to

7   decide what within that range would be proper.

8          So, you know, some people would say -- or might

9   say -- I don't know that anybody will have a problem with

10  this, but some people might say, well, I just couldn't

11  consider a ninety-nine year prison sentence under any

12  circumstances or that I couldn't consider five years in an

13  aggravated robbery case under any circumstances.

14         And, see, we're not asking you to say that you

15  can consider the full range in this case because you

16  haven't heard the facts yet.  What we're asking, and all

17  that we are allowed to ask you at this point to qualify

18  you, is in an aggravated robbery case, any aggravated

19  robbery case, are you the kind of person who can reasonably

20  and fairly consider everything from a low of five years in

21  prison to a high of life in prison and a fine of up to

22  $10,000 in a proper case for it with you getting to wait

23  and hear the evidence and decide what's proper within that

24  range?

25         Is there anyone in the panel who cannot consider

43

KIM A. BROOKS, OFFICIAL COURT REPORTER

1    the full range of punishment from five years to ninety-nine

2    years or life in an aggravated robbery case?  Anybody who

3    cannot consider the full range of punishment?

4                        (No response.)

5         Okay.  No hands are up.  So all of you can -- are

6    telling us that you're qualified as it relates to the issue

7    of being able to consider the full range of punishment.

8              How many of you, if any, have ever been victims

9    of a crime involving violence where you were hurt or

10   threatened to be hurt?  Anybody?

11                       (Juror responds.)

12        Mr. Brooks.  How long ago was that?

13              PROSPECTIVE JUROR BROOKS:  Probably about

14   15.

15              MR. RAY:  Fifteen years ago?

16              PROSPECTIVE JUROR BROOKS:  Uh-huh.

17              MR. RAY:  Is there anything left over from

18   that that would impair your ability to be fair and

19   impartial?

20              PROSPECTIVE JUROR BROOKS:  No.

21              MR. RAY:  You could set that aside and base

22   this case based on its own merits?

23              PROSPECTIVE JUROR BROOKS:  Uh-huh.

24              MR. RAY:  How many of you have served on a

25   jury in a criminal case in felony court before?  I know

                                                              44

1    your cards will have it on there.

2                        (Jurors respond.)

3          Okay.   Ten or twelve.   For any of you that raised

4    your hands, is there anything left over from that

5    experience that presents any problem for you?   Anything

6    happen that gives you a sour taste or bad taste in your

7    mouth and you just aren't in a good frame of mind because

8    of something that happened on a previous jury?

9                        (Juror responds.)

10                  MR. RAY:   Something upsetting on a previous

11   juror.

12                  PROSPECTIVE JUROR BURGE:   (Juror nods head.)

13                  MR. RAY:   Is there something in that that

14   would prevent you from listening to this case and trying it

15   on its own merits, could you set aside whatever experience

16   you had before?

17                  PROSPECTIVE JUROR BURGE:   It was just

18   really -- I -- Mr. Ray, it just got to me emotionally, so

19   bad that --

20                  MR. RAY:   Sure, sure, well, these things are

21   serious.

22                  PROSPECTIVE JUROR BURGE:   -- I couldn't

23   sleep.

24             MR. RAY:   Sure.

25                  PROSPECTIVE JUROR BURGE:   It's still with

                                                        45

1   me, but --

2                     MR. RAY:  How long ago was that?

3                     PROSPECTIVE JUROR BURGE:  Oh, five years ago

4   probably.

5                     MR. RAY:  Ms. Burge, could you set that

6   aside and if you were selected, try this case based on its

7   own merits?

8                     PROSPECTIVE JUROR BURGE:  Yes, it's just --

9                     MR. RAY:  Well, I asked and you shared it

10   with me, and I appreciate it.

11                     PROSPECTIVE JUROR BURGE:  Yes, it's just

12   tough.

13                     MR. RAY:  Just tough, yeah.

14                     PROSPECTIVE JUROR BURGE:  Yes, yes.

15                     MR. RAY:  Well, I understand, I understand.

16   It's serious business.

17          Anyone on the jury panel have any bad experience

18   that has you upset with law enforcement, got a ticket that

19   you didn't think you deserve and you're mad about it or

20   just kind of upset about some way that you've been treated

21   by law enforcement?  Anybody?

22                     (No response.)

23          Okay.  I'm just about through.  The procedure

24   that we have, just so you'll know kind of how a trial goes

25   if you are selected, after the Voir Dire portion of the

                                                        46

1   trial is completed this morning and we make our strikes and

2   the jury is impaneled, it usually gets us to about midday

3   and then the judge usually has a lunch recess and this

4   afternoon we would start putting on evidence.

5          At the conclusion of the evidence, each side gets

6   to make jury arguments to close the case and then the jury

7   would retire to deliberate their verdict.  And if they were

8   to find the defendant not guilty, the trial is over.  If,

9   however, they render a verdict of guilty, then that

10  commences or starts what's called the second phase of a

11  trial, the punishment phase of the trial.

12         And the punishment phase of the trial is

13  different than the guilt/innocence phase in that during the

14  guilt/innocence phase, you're focused on the inquiry of did

15  the defendant do the crime, can the State prove its

16  case.  And then if a person is convicted, remembering what

17  he or she got convicted of, during the punishment phase of

18  the trial the focus changes to where you are for the first

19  time allowed to become acquainted with things such as

20  character, reputation, prior crimes convicted of, prior bad

21  acts, bad conduct and things that acquaint you with

22  something other than focusing on the crime itself.

23         And the law recognizes at that phase of a trial,

24  if you reach that phase of a trial, that in asking a jury

25  to assess punishment it's only fair to share with them, you

47

1    know, the rest of the story, if there is any more.  So

2    that's why we don't get to stop -- if there's a conviction,

3    we don't get to stop in the middle of a trial and ask you

4    if you can consider the full range of punishment, for

5    example.  I have to do that now and qualify you without

6    implying that there will be a conviction or acquittal or

7    any particular outcome.

8         Okay.  I've mentioned the witnesses, the law that

9    I think is relevant to the subject matter of our inquiry,

10   the trial today, and I've asked who knows the defendant,

11   who knows the lawyers, and so forth.  And I've tried to

12   touch bases -- even who's been a victim before, tried to

13   touch bases on things I thought were important to give you

14   a chance raise your hands.  A few of you did, and I

15   appreciate that.  But now in closing, I want to offer you

16   the opportunity to ask me a question.  And if it's

17   permitted and if I'm smart enough, I'll answer it.  If not,

18   I'll have the courage to tell you that I don't know the

19   answer and try to find out for you.  But does anybody have

20   any questions of me?

21              (Juror responds.)

22        Yes, ma'am.

23              PROSPECTIVE JUROR WALKER:  I worked at Mepco

24   Electric for about 11 years and his family all worked

25   there.  I don't know him, but I know the family members.

48

1      MR. RAY:  Okay.  Thanks.  I don't know all
2    of his family, I've met his mother and a brother of his.
3    Ms. Walker, is there anything in that relationship that
4    would impair your ability to be fair and impartial?
5          PROSPECTIVE JUROR WALKER:  No.
6          MR. RAY:  Could you set that aside and
7    decide the case based on its own merits?
8          PROSPECTIVE JUROR WALKER:  I feel like I
9    could.
10          MR. RAY:  Do you feel like that it might --
11    let's say there had been a conviction and we reach the
12    punishment phase of the trial and that you felt like stiff
13    punishment, serious punishment was appropriate based on the
14    evidence.  Would that put you in a bad spot because you
15    know the family having the courage to render a stiff
16    punishment if you felt like it was appropriate?
17          PROSPECTIVE JUROR WALKER:  I know the family
18    as an employer, I was in the personnel department, so it
19    was employee/employer relationship, not as a personal,
20    eat-out-together relationship.
21          MR. RAY:  So could you set that aside and
22    just decide the case based on its own merits?
23          PROSPECTIVE JUROR WALKER:  Uh-huh.
24          MR. RAY:  If you felt that the -- if there
25    had been a conviction and you felt that the evidence

                                                    49

1   warranted it, the facts and circumstances of the trial and

2   any criminal history, if any, reputation testimony, if you

3   felt it was appropriate to assess a life sentence, would

4   you have the courage to do that given the fact that you

5   know the family?  Would that get --

6               PROSPECTIVE JUROR WALKER:  If the evidence

7   was there.

8               MR. RAY:  You would have the courage to do

9   that and with the knowledge of the family and this

10  employee/employer relationship would not get in the way of

11  that?

12              PROSPECTIVE JUROR WALKER:  No.

13              MR. RAY:  Okay.  That's fine.  Anybody else

14  have any questions of me?  Anybody else know the family of

15  Mister -- or feel like you know the family of Mr. Johnson?

16                        (Juror responds.)

17              MR. RAY:  Okay.  Yeah, you've indicated

18  that.  I doubt we're going to get all the way back to you

19  so I don't belabor the point.

20               Is there anyone that has a special circumstance

21  such as a physical problem that you would like an

22  opportunity to share with -- you don't have to tell me

23  about it, but would like an opportunity or like me to write

24  your name down so that you could let Judge Cleveland know

25  about that at the recess?  Is there anybody that has a

50

1  problem that would make it difficult to sit for a couple of

2  hours?  Judge Cleveland always gives a lunch recess and a

3  break in the morning, a break in the afternoon.

4              PROSPECTIVE JUROR TUCKER:  Yeah, I had a car

5  accident, and so I can't sit all day.

6              MR. RAY:  Okay.  Can you sit for two hours

7  at a time --

8              PROSPECTIVE JUROR TUCKER:  For a little

9  while.

10              MR. RAY:  And then take a break and come

11  back?

12              PROSPECTIVE JUROR TUCKER:  Yes.

13              MR. RAY:  Okay.  Let's see, Ms. West, what

14  kind of work does your husband do?

15              PROSPECTIVE JUROR WEST:  He has a Texaco

16  station.

17              MR. RAY:  Oh, okay.  I saw station, I didn't

18  know what kind of station we were talking about.

19              PROSPECTIVE JUROR WEST:  Sorry about that.

20              MR. RAY:  Okay.  That's okay.  Thank you.

21  Mr. Allen, what kind of -- you're self-employed, what kind

22  of work do you do?

23              PROSPECTIVE JUROR ALLEN:  Dozer work.

24              MR. RAY:  I'm sorry?

25              PROSPECTIVE JUROR ALLEN:  Dozer work.

51

KIM A. BROOKS, OFFICIAL COURT REPORTER

1          MR. RAY:  Dozier, okay.  Mr. Flores, what

2     department do you supervise?

3          PROSPECTIVE JUROR FLORES:  Welding part of

4     it.

5          MR. RAY:  Welding, okay.  That's out at

6     PECO?

7          PROSPECTIVE JUROR FLORES:  Yes, sir.

8          MR. RAY:  Mr. Flegle, what kind of work do

9     you do when you have a job?

10          PROSPECTIVE JUROR FLEGLE:  Well, I was in an

11     auto accident.

12          MR. RAY:  Oh, I see.

13          PROSPECTIVE JUROR FLEGLE:  I'm under a

14     doctor's care right now.

15          MR. RAY:  Let's see, Mr. Brown, you're in

16     sales.  What kind of product?

17          PROSPECTIVE JUROR BROWN:  Just like

18     insurance, retirement plans.

19          MR. RAY:  Oh, okay.  That completes my

20     inquiries.  I appreciate you being here in response to your

21     jury summons and I appreciate you as being good citizens

22     and my thanks to you is extended without regard to any

23     verdict you may feel is appropriate if you are selected as

24     one of the jurors.  Thanks very much.

25          MR. WATSON:  If it please the Court,

52

1   Mr. Ray. Good morning, ladies and gentlemen. Going last

2   has its advantages and disadvantages. I guess the

3   disadvantage is Mr. Ray gets to do all the talking. The

4   advantage, you don't have to hear me talk as long as he

5   does. So there'll be a lot of things I will try to avoid

6   duplication, but some things I'll probably hit on again, I

7   apologize in advance for that.

8          One thing I want to clear up, make sure that I

9   understood, Mister -- is it Blankenship?

10          PROSPECTIVE JUROR BLANKENSHIP: Yes, sir.

11          MR. WATSON: You indicated you had purchased

12   some tools from Mr. Pontremoli?

13          PROSPECTIVE JUROR BLANKENSHIP: Yes.

14          MR. WATSON: And if I understood you

15   correctly, you stated that if he tells you something,

16   you're going to believe it regardless of what anybody else

17   says?

18          PROSPECTIVE JUROR BLANKENSHIP: No.

19          MR. WATSON: All right. Tell me what you

20   said.

21          PROSPECTIVE JUROR BLANKENSHIP: If he says

22   that this guy did it, then I'm more likely to believe him

23   than if this guy comes up and says that he didn't do it.

24          MR. WATSON: So in advance of any testimony,

25   you would lean toward him?

53

1   PROSPECTIVE JUROR BLANKENSHIP:  No, not in

2   advance of any testimony, but if the old man comes up here

3   and says that this guy did it, then I'm going to believe

4   him.

5   MR. WATSON:  Well, you're of the opinion

6   though that assuming those facts are stated, that you're

7   going to believe him regardless; is that right?

8   PROSPECTIVE JUROR BLANKENSHIP:  That's

9   right.

10   MR. WATSON:  And, Ms. Byrd, didn't you raise

11   your hand that you knew him too?

12   PROSPECTIVE JUROR BYRD:  Yes, sir.

13   MR. WATSON:  And is that in a customer-type

14   way like Mr. Blakenship or --

15   PROSPECTIVE JUROR BYRD:  No, sir.  Years ago

16   he -- if this is the same, I just knew him as

17   Mr. Pontremoli, if he -- he picked his grandsons up from

18   private sitter back in the '60s.

19   MR. WATSON:  Where you were having children

20   there as well or something?

21   PROSPECTIVE JUROR BYRD:  Yes.

22   MR. WATSON:  Okay.  Is there anything about

23   that --

24   PROSPECTIVE JUROR BYRD:  That's just casual

25   speaking and --

54

1          MR. WATSON:  All right.  You don't have a

2    similar problem that Mr. Blankenship does far as the

3    testimony, that type of thing?

4          PROSPECTIVE JUROR BYRD:  No.

5          MR. WATSON:  Is there anybody here in --

6    and I'll ask this generally without having to go down

7    specifically, that is 65 years of age or older that would

8    have a problem sitting in this type of case as a result of

9    Mr. Pontremoli's age, just feel like that you can identify

10   with him and would have a problem sitting as a juror in

11   this type of case?  Anybody at all that's 65 years of age

12   or older?

13               (No response.)

14        No one.  Okay.  You know, we ask these questions,

15   we don't know what the answers are going to be.  We're not

16   trying to pry.  We simply want to know what your thoughts

17   are.  Everybody has thoughts and feelings about cases of

18   various types and nature, and this is the only opportunity

19   we'll have to talk to you.  And we really appreciate, as

20   Mr. Ray stated, that you share with us what you think.

21        There's nothing wrong with having feelings or

22   thoughts about a particular case or particular individual.

23   It's just important that if we ask you questions about it,

24   that you tell us.  Is that fair?  Everybody agree with

25   that?

                                                        55

1          (No response.)

2          Okay.  Does everybody agree that the indictment

3    in this case is no evidence of guilt?  Anybody have any

4    problem with that?

5          (No response.)

6          I like to look at it as just basically is

7    permission for the State of Texas to present this case to

8    you.  Everybody agree that an indictment is no evidence of

9    guilt?

10         (No response.)

11         Okay.  And all of you indicated a moment ago that

12   all of you could consider in an aggravated robbery case the

13   full range of punishment.  Anybody here who could not do

14   that?

15         (No response.)

16         As we go along, if anybody -- in response to

17   another question or perhaps put in a different way, if

18   anybody has a different opinion about something, if you

19   would, raise your hand and share with me.  Is that fair?

20         (No response.)

21         Okay.  All right.  I believe Mr. Brooks is the

22   only one who indicated that he had been the victim of a

23   crime of some sort of assault.  Is he the only one?  Anyone

24   else that I did not see?

25         (No response.)

                                                      56

1       Okay.  Anybody here know anybody that was a

2  victim of a crime, a violent-type crime that would be a

3  problem for you sitting as a juror?  Anybody at all?  A

4  relative, neighbor, friend, anything like that?

5                     (No response.)

6       Okay.  Is there anybody here ever have been or

7  currently in the medical field in any way?

8                     (Jurors respond.)

9       Okay.

10              PROSPECTIVE JUROR:  I'm an EMT.

11              MR. WATSON:  Excuse me?

12              PROSPECTIVE JUROR:  I'm an EMT.

13              MR. WATSON:  Yes, sir.

14              PROSPECTIVE JUROR KOEHLER:  I work in the

15  laboratory in the hospital.

16              MR. WATSON:  Palo Pinto Hospital?

17              PROSPECTIVE JUROR KOEHLER:  Uh-huh.

18              MR. WATSON:  What is your name, sir?

19              PROSPECTIVE JUROR KOEHLER:  Steven Koehler.

20              MR. WATSON:  Taylor?

21              PROSPECTIVE JUROR KOEHLER:  You pronounce it

22  Koehler.

23              MR. WATSON:  Okay.  I'm sorry.  Anyone else?

24  Yes, sir.

25              PROSPECTIVE JUROR ROBERTSON:  I'm not in the

                                                        57

1  medical field, but I work at the hospital as a maintenance

2  person.

3          MR. WATSON:  Okay.  Yes, ma'am?

4          PROSPECTIVE JUROR DOYLE:  I don't work at

5  Palo Pinto, I work at Stephenville at the hospital.

6          MR. WATSON:  And what do you do there?

7          PROSPECTIVE JUROR DOYLE:  I work in dietary.

8          MR. WATSON:  And what is your name, please?

9          PROSPECTIVE JUROR DOYLE:  Charlotte Doyle.

10          MR. WATSON:  Doyle.

11          PROSPECTIVE JUROR DOYLE:  That's my maiden

12  name.  It's Tanner now, but they changed it.

13          MR. WATSON:  I was curious about that awhile

14  ago.  I thought they had them out of order, but they

15  didn't.  Okay.  Anyone that's raised your hand that either

16  works in the hospital or any particular capacity in the

17  medical field have any problem, would you automatically

18  believe someone who came up here and gave you some

19  testimony about medical that would possibly be in dispute?

20  Anybody have a problem with that?  You know, we all perhaps

21  have people that, due to any knowledge we may have, well,

22  if so-and-so knows something about a particular area, we'd

23  have a tendency to believe that.  And there's nothing wrong

24  with that, again, just as long as you share that.

25  Anybody -- any of you-all that have raised your hands

                                                      58

1  automatically believe someone in the medical field if they

2  testify in a certain way, anybody at all?

3                    (Juror responds.)

4              MR. WATSON:  Yes, sir.

5              PROSPECTIVE JUROR ROBERTSON:  I would think

6  that if a medical person said something, it would probably

7  be that way.

8              MR. WATSON:  Well, if it's in dispute,

9  though, would you automatically -- as opposed to a

10 layperson, would you automatically believe the person in

11 the medical field?

12             PROSPECTIVE JUROR ROBERTSON:  I don't know.

13             MR. WATSON:  Okay.  Anyone else?

14             PROSPECTIVE JUROR KELLER:  Well, let's back

15 up a little bit.  I got a little medical way back in the

16 military.

17             MR. WATSON:  What did you do, Earl?

18             PROSPECTIVE JUROR KELLER:  I was first

19 surgeon in the medical corp.

20             MR. WATSON:  Okay.  Does anybody here know

21 Jason Smith?  Mr. Smith, I think, is about 25 or 30 years

22 of age.  He is across the street in the county jail

23 apparently having been convicted of various felonies.

24 Anybody with that name ring a bell with you?

25                    (No response.)

                                                    59

```
 1              Jason Olivia Smith, I believe, or Oliver,
 2   perhaps, Olivia Smith.  Anybody know a person named Michael
 3   Duane Blair?  I think his -- you know Mr. Blair?
 4                  PROSPECTIVE JUROR BROWN:  Yes.
 5                  MR. WATSON:  Okay.  You're Mr. Brown?
 6                  PROSPECTIVE JUROR BROWN:  Yes.
 7                  MR. WATSON:  Do you know him as socially or
 8   school or --
 9                  PROSPECTIVE JUROR BROWN:  Just every once in
10   a while I see him and we say hi.
11                  MR. WATSON:  Did you work with him or
12   anything like that?
13                  PROSPECTIVE JUROR BROWN:  No.
14                  MR. WATSON:  I think his father's name was
15   Hoss Blair.  Does that ring a bell with anybody, that
16   nickname?
17                       (No response.)
18         Lives over there on Southeast 4th Avenue, I
19   think, 1215 Southeast 4th Avenue.  Anybody other than Mr.
20   Brown know Mr. Blair?
21                       (No response.)
22         Mr. Brown, is there anything about that knowledge
23   of Mr. Blair that will be a problem for you if he testified
24   in this case?
25                  PROSPECTIVE JUROR BROWN:  No.
```

60

1           MR. WATSON:  Okay.  Let me go over briefly

2  this list or these cards you filled out.  We have these

3  stapled together on a list.  I want to ask you -- Mr. Ray

4  hit some of these, I want to make sure I don't miss

5  anything here.  Mr. Allen, is that right?

6           PROSPECTIVE JUROR ALLEN:  Yes, sir.

7           MR. WATSON:  You served on a prior criminal

8  jury?

9           PROSPECTIVE JUROR ALLEN:  Yes, sir.

10          MR. WATSON:  Is there anything about that

11 service that would be a problem for you as far as sitting

12 as a juror today?

13          PROSPECTIVE JUROR ALLEN:  No.

14          MR. WATSON:  And, Ms. Carter, you've been on

15 a prior criminal jury; is that correct?

16          PROSPECTIVE JUROR CARTER:  That's correct.

17          MR. WATSON:  Would that be a problem for you

18 sitting in this case?

19          PROSPECTIVE JUROR CARTER:  No.

20          MR. WATSON:  Mr. Sims, you're self-employed,

21 sir?

22          PROSPECTIVE JUROR SIMS:  Yes.

23          MR. WATSON:  And what do you do?

24          PROSPECTIVE JUROR SIMS:  Used car

25 dealership.

61

1          MR. WATSON:  Mr. Bennett, you've been on a

2  prior criminal jury service.  Is that a problem for you?

3          PROSPECTIVE JUROR BENNETT:  No, sir.

4          MR. WATSON:  Anything about that -- I think

5  Ms. Burge indicated earlier --

6          PROSPECTIVE JUROR BURGE:  And, Mr. Watson,

7  excuse me, I didn't check my card.  I didn't realize it

8  was -- I just put civil.  I didn't realize that was

9  criminal until Mr. Ray brought it out.

10          MR. WATSON:  You've told us that's the main

11  thing.  But, you know, that's an example.  I'm not going to

12  ask her anything about that, and it doesn't really

13  matter perhaps, but that's an example of where somebody

14  could have -- having been on a trial jury could have a

15  problem.  And if that's the case, anyone other than Ms.

16  Burge, I appreciate you just tell me right now.  If you've

17  had some sort of dealing in a prior case, criminal case

18  that you don't want to deal with it, don't want to be

19  another juror, don't want to sit on another case, anybody

20  like that other than Ms. Burge, anybody like that at all?

21              (No response.)

22      Okay.  Ms. Butler, you're retired?

23          PROSPECTIVE JUROR BUTLER:  Uh-huh.

24          MR. WATSON:  And from what, ma'am?

25          PROSPECTIVE JUROR BUTLER:  We had Butler

62

KIM A. BROOKS, OFFICIAL COURT REPORTER

```
 1    Manufacturing Company.
 2                    MR. WATSON:  In Mineral Wells?
 3                    PROSPECTIVE JUROR BUTLER:  Yes, sir.
 4                    MR. WATSON:  Okay.  Do you have any
 5    relatives that are law enforcement officers?
 6                    PROSPECTIVE JUROR BUTLER:  No.
 7                    MR. WATSON:  James Allen?
 8                    PROSPECTIVE JUROR ALLEN:  Yes.
 9                    MR. WATSON:  There you are, I'm sorry.  Do
10    you have any relatives in law enforcement?
11                    PROSPECTIVE JUROR ALLEN:  No.
12                    MR. WATSON:  Linda Morris.  I'm sorry.  You
13    sat on a prior criminal jury; is that correct?
14                    PROSPECTIVE JUROR MORRIS:  (Juror nods
15    head.)
16                    MR. WATSON:  Is there anything about that
17    experience that will be a problem for you?
18                    PROSPECTIVE JUROR MORRIS:  No.
19                    MR. WATSON:  Okay.  Tim, same question to
20    you?
21                    PROSPECTIVE JUROR BEZIO:  Yes.
22                    MR. WATSON:  Would that be a problem for
23    you?
24                    PROSPECTIVE JUROR BEZIO:  No.
25                    MR. WATSON:  Mr. Brown, you indicated you
```

63

```
 1    have relatives that are in law enforcement; is that

 2    correct?

 3                    PROSPECTIVE JUROR BROWN:  Yes.

 4                    MR. WATSON:  Who is that?

 5                    PROSPECTIVE JUROR BROWN:  My mother.

 6                    MR. WATSON:  In Mineral Wells?

 7                    PROSPECTIVE JUROR BROWN:  Yes, sir.

 8                    MR. WATSON:  And what is her name?

 9                    PROSPECTIVE JUROR BROWN:  Pamela Darlene

10    Harrison.

11                    MR. WATSON:  I'm sorry?

12                    PROSPECTIVE JUROR BROWN:  Pam Harrison,

13    Pamela Harrison.

14                    MR. WATSON:  And who does she work for?

15                    PROSPECTIVE JUROR BROWN:  What's that?

16                    MR. WATSON:  Who does she work for?

17                    PROSPECTIVE JUROR BROWN:  Mineral Wells

18    Police Department.

19                    MR. WATSON:  Is she a patrolman?

20                    PROSPECTIVE JUROR BROWN:  Yes.

21                    MR. WATSON:  Jackie Barrett.  Yes, sir.

22    You've sat on a prior criminal jury, had prior criminal

23    jury duty.  Would that be a problem for you sitting in this

24    case today?

25                    PROSPECTIVE JUROR BARRETT:  (Juror shakes
```

64

```
 1   head.)
 2               MR. WATSON:  Milton Sheridan?
 3               PROSPECTIVE JUROR SHERIDAN:  Here.
 4               MR. WATSON:  Yes, sir.
 5               PROSPECTIVE JUROR SHERIDAN:  No problem.
 6               MR. WATSON:  Excuse me?
 7               PROSPECTIVE JUROR SHERIDAN:  No problem.
 8               MR. WATSON:  Okay.  Well, my question was
 9   going to be you're retired from what.  I'm sorry, I didn't
10   mean to jump the gun on you.
11               PROSPECTIVE JUROR SHERIDAN:  Military, the
12   whole raft of military justice, I've been through it.
13               MR. WATSON:  All right.  And your wife is
14   retired from what?
15               PROSPECTIVE JUROR SHERIDAN:  Just retired.
16               MR. WATSON:  Just retired, just quit, huh?
17   You stated you've been through the entire military justice
18   system.  Tell me what you did.
19               PROSPECTIVE JUROR SHERIDAN:  Company
20   commander, summary corp officer, trial counsel, defense
21   counsel, and special court marshal, on special marshal
22   board, on general court as a board member.  Does that cover
23   it?
24               MR. WATSON:  That's impressive, that's
25   impressive.
```

65

1            PROSPECTIVE JUROR SHERIDAN:  And also I

2    retired from teaching school, too, and a school

3    administrator.

4            MR. WATSON:  Was that in Palo Pinto County?

5            PROSPECTIVE JUROR SHERIDAN:  Erath.

6            MR. WATSON:  Erath.  All right.  Michael

7    Brooks?

8            PROSPECTIVE JUROR BROOKS:  Yes.

9            MR. WATSON:  You were on a criminal jury,

10   Mike?

11           PROSPECTIVE JUROR BROOKS:  Uh-huh.

12           MR. WATSON:  Would you have a problem

13   sitting on a case today?

14           PROSPECTIVE JUROR BROOKS:  (Juror shakes

15   head.)

16           MR. WATSON:  Walter Scott?

17           PROSPECTIVE JUROR SCOTT:  Yes.

18           MR. WATSON:  Mr. Scott, how are you today?

19   You've sat on a prior criminal jury?

20           PROSPECTIVE JUROR SCOTT:  Yes.

21           MR. WATSON:  Will this be a problem sitting

22   in this type of case today?

23           PROSPECTIVE JUROR SCOTT:  (Juror shakes

24   head.)

25           MR. WATSON:  Is there any reason why

                                                    66

1  anybody, any of you here today feels like you could not be

2  a fair juror in this case for a reason that I might not

3  have asked or something I might not have covered?  I'm

4  about through and I'm just curious.  We do all the talking

5  and I think it's important that y'all get an opportunity to

6  say something if you feel like we have not asked it.

7        PROSPECTIVE JUROR BUTLER:  I may not be a

8  fair juror, I don't know.  I don't know, but --

9        MR. WATSON:  Is there something about this

10  type of case?

11        PROSPECTIVE JUROR BUTLER:  Uh-huh, yes, it

12  is.

13        MR. WATSON:  Would you like to speak to the

14  judge about this?

15        PROSPECTIVE JUROR BUTLER:  No, I just --

16        MR. WATSON:  You just don't feel like you

17  could be a fair juror?

18        PROSPECTIVE JUROR BUTLER:  I just don't

19  think I would.  I don't know, I can't say.

20        MR. WATSON:  Is it the type of case?

21        PROSPECTIVE JUROR BUTLER:  Yes, sir.

22        MR. WATSON:  And the age of Mr. Pontremoli?

23        PROSPECTIVE JUROR  Yes, and the age of

24  the --

25        MR. WATSON:  So you cannot, as we speak,

67

KIM A. BROOKS, OFFICIAL COURT REPORTER

1  tell me that whatever problems you might have, you can't
2  say that you could set those aside then?
3           PROSPECTIVE JUROR BUTLER:  I don't think I
4  could, I might.  I'm not real sure, but I don't think so.
5           MR. WATSON:  Okay.  Then I'd ask the judge
6  to speak with you then, Mr. Butler.  Yes, sir, did you
7  raise your hand back there?
8           PROSPECTIVE JUROR MAXFIELD:  Yes.
9           MR. WATSON:  I don't think we'll get to you,
10 I'm not trying to shortchange you, Mr. Ray went through the
11 numbers earlier, I just don't think we'll get to you.
12          PROSPECTIVE JUROR MAXFIELD:  Yes, sir.
13 Thank you.
14          MR. WATSON:  Anyone else?  Ms. Gray?
15          PROSPECTIVE JUROR GRAY:  I already told him
16 why I couldn't be.
17          MR. WATSON:  Right.  Anyone else?  Anyone
18 besides these two ladies?
19                (No response.)
20      Okay.  Thanks.
21          THE COURT:  Ladies and gentlemen, we'll
22 recess until 10 minutes until 12:00, if you'll be in the
23 hall ready to come back in the courtroom at that time.
24 I'll like for the following members of the panel to remain
25 in the courtroom:  Jeanie Gray, Bobby Wilmer, Billie

                                                    68

```
 1  Butler, Michael Blankenship, and Dawana Tucker.  Thank you
 2  very much.
 3                     (Jury panel out.)
 4              THE COURT:  All right.  Ms. Gray,
 5  Mr. Wilmer -- we won't reach you, Mr. Wilmer, but I'll
 6  excuse you.  Ms. Butler and Mr. Blankenship, I'll excuse
 7  each of you.  Your checks will be mailed to you.  If you
 8  need a certificate for your employer, you may get on in the
 9  clerk's office.  Thank you very much.
10          And Ms. Tucker, I didn't understand your physical
11  problem, but we're not going to reach you so you may leave,
12  too.
13              PROSPECTIVE JUROR TUCKER:  Okay.  Thank you.
14              PROSPECTIVE JUROR WILMER:  So we don't have
15  to come back?
16              THE COURT:  That's right, you do not have to
17  come back.  Thank you.
18                   (Break was taken.)
19                   (Jury panel in.)
20              THE COURT:  Ladies and gentlemen, as the
21  clerk calls your name, please come have a seat in the jury
22  box.
23          MS. SLEMMONS:  Charles Robertson, Vickie
24  Williams, John Mitchell, Sharon Thomas, Janet Cook, Wanda
25  West, Lynda Morris, Guadalupe Flores, Kaye O'Mary, Steven
```

                                                           69

1  Koehler, Jackie Barrett, and Lyndel Butcher.

2            THE COURT:  Those of you not selected to

3  serve on this jury are excused for this jury call.  Your

4  checks will be mailed to you.  If any of you need a

5  certificate for your employer, you may get one in the

6  clerk's office.  I hope each of you have a merry Christmas

7  and a happy holiday season.

8            (Jury panel dismissed.)

9        All right.  Will you please stand to be sworn in

10  as a jury in this case?

11            (Jury sworn in.)

12            THE COURT:  All right.  Thank you.  Please

13  be seated.  At this time, ladies and gentlemen, I'll read

14  some instructions to you that the law requires I read to

15  each jury.  I'll ask that you carefully follow these

16  instructions throughout the trial.

17        Do not mingle with nor talk to the lawyers, the

18  witnesses, the parties, or any other person who might be

19  connected with or interested in this case except for casual

20  greetings.  They have to follow the same instructions.

21        Do not accept from nor give to any of those

22  persons any favors, however slight, such as rides, food, or

23  refreshments.  Do not discuss anything about the case or

24  mention it to anyone whomsoever, including your wife or

25  husband, nor permit anyone to mention it in your hearing

70

1   until you are discharged as jurors or excused from the

2   case.  If anyone attempts to discuss the case with you,

3   please report it to me.

4          Do not discuss the case among yourselves until

5   you have heard all of the evidence, the Court's charge, the

6   attorneys' arguments, and until I have sent you to the jury

7   room to consider your verdict.

8          Do not make any investigation about the facts.

9   Occasionally a juror privately seeks out information about

10  a case on trial.  This is improper.  All evidence must be

11  presented in open court so that each side may question the

12  witnesses and make proper objections.  This avoids a trial

13  based on secret evidence.  These rule apply to the jurors

14  the same as they apply to the parties and the Court.  If

15  you know of or learn anything about the case except from

16  the evidence admitted during the course of the trial,

17  please tell me.

18         Do not make personal inspections, observations,

19  investigations, or experiments nor personally view

20  premises, things, or articles not produced in court.  And

21  do not let anyone else do any of these things for you.

22         Do not tell other jurors your own personal

23  experiences nor those of other persons nor relate any

24  special information.  A juror may have special knowledge of

25  matters such as business, technical, or professional

71

1   matters.   You may have expert knowledge or opinions or you

2   may know what happened in this or some other lawsuit.   To

3   tell other jurors any of this information would be a

4   violation of the instructions.

5           And with that, we'll recess until one o'clock.

6   If you'll be either in the hall or in the jury room at

7   1:00, we'll get started.   Thank you very much.

8

9                   (Jury out at 12:02 p.m.)

10

11

12       (Whereupon, the proceedings were concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

72

THE STATE OF TEXAS      ) (

COUNTY OF PALO PINTO   ) (

 

I, Kim A. Brooks, Official Court Reporter for the 29th

Judicial District of Palo Pinto County, State of Texas, do

hereby certify that the above and foregoing contains a true

and correct transcription of all portions of evidence and

other proceedings requested in writing by counsel for the

parties to be included in the reporter's record in the

above-styled and numbered cause, all of which occurred in

open court or in chambers and were reported by me.

I further certify that this transcription of the

proceedings truly and correctly reflects the exhibits, if

any, offered by the respective parties.

I further certify that the total charges for the

transcript, including any exhibits, is $ 1130⁰⁰       .

WITNESS my hand this the 9th day of February,

1999.

 

 

_Kim A. Brooks_

Kim A. Brooks, CSR, RPR
Official Court Reporter
29th Judicial District
Palo Pinto County, Texas

 

Certification No: 4650
Date of Expiration: 12/31/99
Business Address: P.O. Box 187
                  Palo Pinto, Texas   76484
                  (940) 659-1226

73