COURT OF APPEALS CAUSE NO. 11-99-00001-CR

TRIAL COURT CAUSE NO. 11,154

| | | |
|---|---|---|
| STATE OF TEXAS | ) ( | IN THE DISTRICT COURT |
| VS. | ) (<br>) ( | PALO PINTO COUNTY, TEXAS |
| RUSSELL DON JOHNSON | ) ( | 29TH JUDICIAL DISTRICT |

TRIAL ON THE MERITS

VOLUME 4 OF 5

DECEMBER 14, 1998

APPEARANCES:

ATTORNEY FOR STATE:

    Mr. Jerry Ray, District Attorney
    Palo Pinto County
    P.O. Box 340
    Palo Pinto, Texas  76484
    SBOT No. 16604500

ATTORNEY FOR DEFENDANT:

    Mr. Robert Watson
    Attorney at Law
    P.O. Box 1308
    Mineral Wells, Texas  76068
    SBOT No. 20961000

FILED
IN COURT OF APPEALS
ELEVENTH DISTRICT

FEB 1 6 1999

SHERRY WILLIAMSON, CLERK
By _Reynolds_ Deputy
TRAP 9

On the 14th day of December, 1998, the

above-entitled and numbered cause came on to be heard for

trial in the said Court, Honorable David Cleveland, Judge

Presiding, and the following proceedings were held, to wit:



## I N D E X

## VOLUME 4 - TRIAL ON THE MERITS

|                                                    | PAGE |
|----------------------------------------------------|------|
| Opening Statement by the State....................... | 4    |

| STATE'S WITNESSES:        | Direct | Cross | Redirect | Recross |
|---------------------------|--------|-------|----------|---------|
| Kirby Wiggington          | 13     | 18    |          |         |
| Evelyn Putman             | 19     | 24    |          |         |
| Robert Allensworth, M.D.  | 25     | 32    |          |         |
| Jimmie Pontremoli         | 35     | 54    |          |         |
| Jason Smith               | 66     | 76    | 86       | 86      |
| Mike McAllester           | 89     |       |          |         |

| DEFENSE WITNESSES: | Direct | Cross | Redirect | Recross |
|--------------------|--------|-------|----------|---------|
| Dean Fowler        | 95     | 96    |          |         |
| George Holland     | 98     | 100   |          |         |
| Lonnie Johnson     | 101    | 102   |          |         |

| | PAGE |
|---|---|
| State Rests......................................... | 95 |
| Defense Rests....................................... | 103 |
| State/Defense Close................................. | 103 |
| Jury Charge read.................................... | 104 |
| Closing Arguments by the State...................... | 105 |
| Closing Arguments by the Defense.................... | 112 |
| Final Arguments by the State........................ | 118 |

2

KIM A. BROOKS, OFFICIAL COURT REPORTER

Jury out to deliberate.............................. 122
Verdict by the Jury.................................. 122
Reporter's Certificate............................... 124

\- - - - - - - - - - - - - - - - - - - - - -

## EXHIBIT INDEX

STATE'S

| NO. | DESCRIPTION | MARKED | OFFERED | ADMITTED |
|---|---|---|---|---|
| 1 | Photograph | 15 | 16 | 16 |
| 2 | Photograph | 15 | 46 | 46 |
| 3 | Photograph | 15 | 46 | 46 |
| 4 | Photograph | 15 | 16 | 16 |
| 5 | Photograph | 15 | 16 | 16 |
| 6 | Photograph | 15 | 16 | 16 |
| 7 | Photograph | 15 | 16 | 16 |
| 8 | 36-inch pipe wrench | 16 | 53 | 53 |
| 9 | Hosp. records | 21 | 23 | 23 |
| 10 | Hosp. records | 21 | 23 | 23 |
| 11 | Subpoena | 92 | 94 | 94 |

P R O C E E D I N G S

(Jury in at 1:03 p.m.)

1    THE COURT:  All right.  Would you read the
2    indictment, please?

3    MR. RAY:  May it please the Court?

4    THE COURT:  Yes.

5    (Indictment read by District Attorney.)

6    THE COURT:  How does the defendant plead?

7    THE DEFENDANT:  I plead not guilty, Your
8    Honor.

9    THE COURT:  Thank you, you may have a seat.
10   Does the State want to make an opening statement?

11   MR. RAY:  Yes, Your Honor.  Good afternoon,
12   ladies and gentlemen.  During the Voir Dire portion of the
13   trial this morning, we acquainted you in a very, very
14   general way with the subject matter that is going to be
15   involved in this trial.  We had to do that, you'll recall,
16   so that you would know what we had reference to in terms of
17   the event, alleged event, and who the named parties,
18   victim, witnesses and so forth would be.  But we didn't go
19   into a great deal of detail about it because at that point
20   in time we remained very general in an effort to determine
21   your qualifications.  We've done that now, and the 12 of
22   you have been seated and impaneled and sworn as the jury to
23   hear the case.

4

1   So we've reached the point in the trial where if

2   the parties elect to make an opening statement, they're

3   permitted to do so; don't have to, but can.  I want to

4   exercise that right or privilege to make an opening

5   statement to you, and I do that with a view only to provide

6   you with a kind of a brief road map or guide, if you will,

7   of what the State intends to present to you as evidence

8   with a view towards proving up the commission of the crime

9   that you just heard me read out of the charging

10  indictment.

11  I would say to you that what I say to you is not

12  evidence.  I'm not a witness, I'm a lawyer.  So all that

13  I'm doing is telling you what I feel will be the

14  presentation of evidence on the part of the State.  What I

15  say or what the other attorney might say to you is not

16  evidence, it doesn't prove anything to you; you have to

17  wait and get that from the witness stand.  But here's what

18  the State wants to show you with a view towards proving

19  that Russell Don Johnson committed aggravated robbery.

20  On July the 28th of 1998, about four or five, six

21  months ago, over in Mineral Wells, in Palo Pinto County,

22  State of Texas, specifically about the six or 700 block of

23  Southeast 6th Avenue -- if you were to head south from

24  NationsBank and go about six blocks, there's a four-way --

25  or seven blocks, there's a four-way stop there -- a little

5

1  place called Corner Stop Grocery, Russell's Quick Stop or

2  something is located on the opposite corner. Right in that

3  same block a man named Jimmie Pontremoli, who is seated

4  here on the front row over here, runs what he calls a junk

5  store, has knickknacks and tools and items for sale and

6  trade.

7         And the evidence is going to show that on --

8  during the morning hours of July the 28th, two men came

9  into the store, and turns out that they -- one of them is

10 Russell Don Johnson, the defendant, and the other one is

11 Jason Olivia Smith, who is seated here in the middle on the

12 first occupied row in the courtroom. And those two guys

13 came in the store, and I believe it was Jason was looking

14 for a ratchet, a little kind of a ratchet wrench and

15 located what he was looking for and asked Mr. Pontremoli

16 about it and was told the price would be around three to

17 four dollars, somewhere in that neighborhood. The

18 transaction was not completed.

19        The evidence is going to show that while they

20 were in there, Mr. Pontremoli made some remark about

21 Russell Don Johnson's pants. He had real baggy pants and

22 they were hung down real low and Mr. Pontremoli commented

23 that, you know, if you don't pull your pants up, your pants

24 are going to fall off, just a off-hand joking-type remark

25 that he could see the upper part of Mr. Johnson's

6

1   underwear; remembered they were kind of purplish in color,

2   just made a comment, if you don't pull your pants up, they

3   may fall down, fall off.  And the evidence is going to show

4   that Russell Don Johnson didn't like that, that he took

5   offense at Mr. Pontremoli making a comment about his baggy

6   britches.

7           In any event, Jason Smith indicated to Mr.

8   Pontremoli that he would need to go get the money to come

9   back and complete the transaction to buy the ratchet; and

10  that they left and they went to Jason Smith's dad and Jason

11  got a $10 bill from his dad and they went back to

12  Mr. Pontremoli's store a second time.  There wasn't much

13  time went by, just long enough to go get the $10; that when

14  they came in the second time, the transaction was

15  continued pertaining to the ratchet wrench, and Jason

16  brought the ratchet that he had picked out up to the

17  counter.

18          And Mr. Pontremoli will tell you that the agreed

19  sale price was three dollars and that he might have made a

20  dollar profit off of the deal if it had been finished -- if

21  the transaction had been finished and that when offered the

22  $10 in payment of the three-dollar purchase price, he

23  needed to make change.

24          He carries his change in his pocket, doesn't

25  operate out of a fancy cash register or computer-type deal,

7

1    he just carries it in his pocket, and that Mr. Pontremoli

2    can tell you, I forget exactly how he does his pockets, but

3    in one pocket he keeps a roll of one-dollar bills for

4    change, and that he usually starts off with around 25 ones

5    just to get him through making change and that in the other

6    pocket he keeps five-dollar bills and that he normally

7    starts with about $100 in fives.  So when beginning a day

8    of doing little small transactions he would have somewhere

9    around $125 on him.  And he said if he was fortunate enough

10   to have bills larger than a five, he would usually put

11   those in his wallet, but he kept the fives and ones in his

12   pants pocket to make change out of.

13           And to complete the transaction with Jason Smith,

14   the first thing he did, he reached in his pocket and pulled

15   out the wad of ones and counted out two dollars to Jason

16   Smith.  And, of course, that would get you from the

17   three-dollar purchase price up to five and you'd owe five

18   more dollars to complete the change; set the wad of ones

19   down, pulled out the wad of fives and was preparing to give

20   Jason the other five dollars that he owed him to make

21   change.

22           And about that time, Russell Don Johnson, who was

23   standing adjacent to the counter, reached over and picked

24   up what's called a 36, roughly a 36-inch pipe wrench. You

25   can screw it out and open the jaws wide, and you know how a

8

1  wrench will screw.  But this is called a 36, it's a 36-inch

2  pipe wrench, a big piece of metal, heavy piece of metal and

3  that Jason (sic) picked it up and swung it at

4  Mr. Pontremoli.  And Mr. Pontremoli saw Jason -- I mean,

5  saw Russell Don Johnson swinging the wrench at him and it

6  was coming towards his head and he just got his arm up in

7  between the wrench and his head when the blow was struck;

8  that he was hit on his left forearm, his bony part right

9  here, and he went to the ground.  He started bleeding.  The

10  money was scattered, and the two guys left.

11       Mr. Pontremoli gathered himself together and got

12  up off of the floor; and whether it's right or wrong, he

13  wanted to try to chase them and catch up to them.  He

14  locked the door and by the time he got around to where he

15  parked his car, they got away.  And so he ended up -- even

16  though his arm was injured, he drove to the police station

17  and reported the thing.

18       And the evidence is going to show that, I believe

19  the next day, Detective Wiggington, Kirby Wiggington went

20  back to the store after Mr. Pontremoli had been treated and

21  took some pictures that we'll offer into evidence so that

22  you can see kind of the layout of the store and where the

23  wrench was and where Mr. Pontremoli was standing and how he

24  holds his money; took some pictures kind of recreating the

25  scene of the crime and that he also took custody and

9

1  possession of the wrench.  We'll offer that into evidence.

2          Mr. Pontremoli had seen Jason Smith before, but

3  didn't know him by name, knew him by sight.  He did not

4  know Russell Don Johnson, was not familiar with him, but

5  saw him twice that day and did not know how to give a name

6  of the people who had been in the store or the man that had

7  hit him and robbed him.

8          The evidence is going to show that when

9  Mr. Pontremoli went back down to the store, he unlocked and

10  he went in and he started gathering his money together that

11  had flown on the floor, and he noticed that there was

12  somewhere in the neighborhood of $50 missing, that there

13  were some of the ones were gone and some of the fives were

14  gone and the rest was scattered around and some of them

15  even had blood on them.  He will tell you that he estimates

16  approximately $50 or so that was missing from his

17  change-making rolls.

18          And the evidence is going to show the next day

19  the police were of course working on this and the police

20  came in contact with Jason Smith about another matter, I

21  think driving while license suspended was the matter that

22  they were talking to Jason about, and Jason started telling

23  the policeman about what had happened the day before and

24  told him what all had happened.

25          And the evidence is going to show -- Jason is

                                                            10

1   going to testify and tell you what happened that day.   They

2   used up -- after they ran out of the store, they went over

3   to a fellow's house named Michael Blair.   And Russell

4   Johnson had the money and even showed them one of the bills

5   that had blood on it from where Mr. Pontremoli's arm was

6   bleeding, and I believe at that little session, counted

7   out, he gave -- Jason had run out of the store without the

8   ten dollars that was laying on the counter.   Russell Don

9   Johnson gave him his $10 back and kept the rest of the

10   money and that the -- when he counted it out, there was

11   approximately $60, I believe, when he counted it out there

12   at Michael Blair's.

13           We'll introduce some evidence from probably one

14   or two medical personnel.   Ms. Evelyn Putman is here, and

15   she brought the records of the hospital, she's the records

16   custodian.   She may not have to testify, but she might.

17   And we have the records from where Mr. Pontremoli went out

18   to the emergency room and got treated.   And I believe Dr.

19   Allensworth was the -- Robert, Dr. Robert Allensworth was

20   the emergency room physician on duty.   And he will be here

21   briefly just to tell you what he saw and observed, and the

22   results were that Mr. Pontremoli's arm was fractured where

23   the wrench hit.

24       And when we've offered that evidence to you, we will

25   have done so to demonstrate to you beyond a reasonable

                                                          11

1    doubt that Russell Don Johnson, on or about July the 28th,

2    1998, in Palo Pinto County, Texas, while in the course and

3    scope of committing theft of property, money, that he

4    caused bodily injury to Jim Pontremoli by striking him

5    with a wrench in the arm and that at that time Mr.

6    Pontremoli was over 65 years of age, actually 71 years of

7    age until next week when he'll be 72.

8           And if we've done that as I've indicated that we

9    will, we'll ask you to bring in a verdict of guilty, having

10   proved all of those elements.  Thank you very much.

11          THE COURT:  Does the defendant want to make an

12   opening statement?

13          MR. WATSON:  We have no comments at this time,

14   Your Honor.

15          THE COURT:  All right.  Who will you have sworn,

16   gentlemen?

17          MR. RAY:  The State has Mr. Jim Pontremoli, Mike

18   McAllester, Jason Smith, Kirby Wiggington.  And Ron Edwards

19   is also on our witness list, he's in the courtroom, Your

20   Honor.

21          THE COURT:  All right.  Each of you who are

22   going to testify, please --

23          MR. WATSON:  We've got one more.

24          THE COURT:  Each of you raise your right

25   hand.

                                                        12

1          (Witnesses sworn.)

2              THE COURT:  You want the Rule?

3              MR. WATSON:  Yes, sir.

4              THE COURT:  The Rule as to witnesses has

5      been called for, you will have to remain outside the

6      courtroom until called to testify.  Do not discuss this

7      case or your testimony with anyone nor permit anyone to

8      discuss it with you or in your presence.  You may talk to

9      the attorneys, but you'll have to do so one at a time.  Who

10     will the State have first?

11             MR. RAY:  Kirby Wiggington.  Call Detective

12     Kirby Wiggington.

13                 KIRBY WIGGINGTON,

14     a witness called on behalf of the State, duly sworn to tell

15     the truth, the whole truth, and nothing but the truth,

16     testified on his oath as follows:

17

18                 DIRECT EXAMINATION

19     BY MR. RAY:

20         Q     Would you state your name, please?

21         A     Kirby Wiggington.

22         Q     And how are you employed?

23         A     As a detective with the police department in

24     Mineral Wells.

25         Q     And how long have you been with the City of

                                                              13

```
 1   Mineral Wells Police Department?

 2       A    Since '95.

 3       Q    Are you a certified peace officer in the state of

 4   Texas?

 5       A    Yes, sir.

 6       Q    How long have you been so certified?

 7       A    Since 1993.

 8       Q    Okay.  What is your present job description or

 9   duty assignment?

10       A    I'm assigned to the detective division.

11       Q    Okay.  And how long have you been with the

12   detective's division?

13       A    Since June of this year.

14       Q    May I take it then that your duty assignment on

15   or about July the 28th of 1998 and the days thereafter was

16   the same as you've indicated to the jury that your job is

17   today?

18       A    Yes, sir.

19       Q    Is it true that when you are assigned to the

20   criminal investigations division or the detective's

21   department, that part of your job duties would be to

22   investigate crimes that are reported and that require

23   investigation?

24       A    Yes, sir.

25       Q    Directing your attention back to July the 28th of
```

                                                           14

1    1998, did you become aware of an opening investigation

2    involving an aggravated robbery of a man named Jim

3    Pontremoli over in the southeast part of Mineral Wells?

4         A    Yes, sir.

5         Q    What day or date after that investigation was

6    initiated did you become involved?

7         A    On July 29th of '98.

8         Q    So the next day after the robbery?

9         A    Yes, sir.

10        Q    And what did you do to help with the

11   investigation?

12        A    I took photographs of the scene where the robbery

13   took place and gathered physical evidence.

14                         (State's Exhibit Nos. 1, 2, 3, 4, 5,

15                          6, and 7 were marked for

16                          identification by the court reporter.)

17   BY MR. RAY:

18        Q    Detective Wiggington, let me hand you some

19   photographs that have been marked as State's Exhibits 1

20   through 7 and ask you if you can just generally identify

21   what State's 1 through 7 are?

22        A    Yes, sir.

23        Q    What are State's 1 through State's 7 inclusively?

24        A    They are the photographs that I took on July

25   29th.

                                                             15

1    Q    And at what location did you take those

2  photographs where the robbery scene --

3    A    Seven hundred block of Southeast 6th Avenue.

4    Q    In what town, county, and state?

5    A    Mineral Wells, Palo Pinto County, Texas.

6    Q    All right.  Do each of State's Exhibits 1 through

7  7 accurately depict the scene that they purport to show?

8    A    Yes, sir.

9    Q    And have they been tampered with or altered or in

10  any way made to not accurately reflect what you saw when

11  you looked through the lens?

12    A    No, sir.

13        MR. RAY:  Offer State's 1 through 7 after

14  tendering to counsel.

15        MR. WATSON:  Your Honor, I have no

16  objections to 1, 4, 5, 6 and 7; 2 and 3 I have a problem

17  with part of the photograph that may relate to this case in

18  general.  I don't know if this needs to be something

19  brought up outside the presence of the jury or maybe we can

20  approach.

21        MR. RAY:  Your Honor, we'll hold State's 2

22  and 3 at this time and we renew our offer to 1 and 4, 5, 6

23  and 7.

24        THE COURT:  All right.  They are admitted.

25            (State's Exhibit Nos. 1, 4, 5, 6, and 7

                                                      16

1                    were received into evidence.)

2               (State's Exhibit No. 8 was

3                    marked for identification by the court

4                    reporter.)

5  BY MR. RAY:

6       Q    Detective Wiggington, you indicated that you also

7  seized some physical evidence.  What was that described as?

8       A    A large pipe wrench.

9       Q    Let me hand you what's been marked for

10 identification by the court reporter as State's Exhibit No.

11 8.  Can you identify State's Exhibit 8?

12      A    That's the wrench that I got from the store

13 there.

14      Q    Okay.  And the evidence tags are still on it as

15 far as your handling of the evidence and so forth?

16      A    Yes, sir.

17      Q    Is it true, Detective Wiggington, that with

18 respect to State's Exhibit 1, that that would show the

19 front of Mr. Pontremoli's store and the street marker that

20 would show the hundred block and the avenue or street that

21 it's located on?

22      A    Yes, sir.

23      Q    And with respect to State's Exhibits 4, 5, 6, and

24 7, would it be accurate that those show various scenes

25 inside of Mr. Pontremoli's store that you took on July the

                                                           17

1    29th of 1998?

2         A    Yes, sir.

3         Q    And was the positioning of the things shown in

4    the photographs and the person that's depicted in those

5    exhibits based upon your interview with Mr. Pontremoli

6    about the circumstances under which the robbery occurred?

7         A    Yes, sir.

8         Q    And is the person shown in State's Exhibits --

9    let me see which numbers they are -- 4 and 5, who is that

10   individual?

11        A    Mr. Pontremoli.

12        Q    And is that how he looked and positioned himself

13   on July 29th, 1998?

14        A    Yes, sir.

15             MR. RAY:  May I publish the admitted

16   exhibits, Your Honor?

17             THE COURT:  Yes, sir

18             MR. RAY:  Pass the witness.

19

20                    CROSS-EXAMINATION

21   BY MR. WATSON:

22        Q    Did you talk to Mr. Pontremoli on July the 28th

23   of 1998?

24        A    No, sir.

25        Q    Just the next day is the only time you talked to

                                                        18

```
1    him?

2         A    Yes, sir.

3         Q    And what time of day did you visit with him?

4         A    I went to his store about 3:00 p.m.

5         Q    Okay.  Do you know what his hours are at the

6    store?

7         A    I believe they're varied, but I'm not sure.

8         Q    Do you know Mr. Pontremoli?

9         A    No, sir.

10        Q    Never seen him before?

11        A    Until that day?

12        Q    Yes, sir.

13        A    No, sir.

14             MR. WATSON:  That's all the questions I

15   have right now.

16             MR. RAY:  Nothing further of this witness.

17             THE COURT:  That's all.

18             MR. RAY:  Call Evelyn Putman.

19                  EVELYN PUTMAN,

20   a witness called on behalf of the State, duly sworn to tell

21   the truth, the whole truth, and nothing but the truth,

22   testified on her oath as follows:

23                  DIRECT EXAMINATION

24   BY MR. RAY:

25        Q    Good afternoon.
```

                                                        19

1          A      Hi.

2          Q      Would you state your name and spell both of your

3     names for the court reporter for the record purposes?

4          A      Evelyn Putman, E-v-e-l-y-n, P-u-t-m-a-n.

5          Q      Ms. Putman, where do you work?

6          A      Palo Pinto General Hospital.

7          Q      How long have you worked for PPGH?

8          A      Be 25 years next August.

9          Q      Okay.  What is your present job description or

10    duty assignment?

11         A      I'm the director of health information

12    management.

13         Q      How long have you been the director of the

14    information management?

15         A      Since 1983.

16         Q      All right.  Be 15 years?

17         A      Right.

18         Q      Within that general job description, do you have

19    duties that include being the records custodian for the

20    hospital?

21         A      Yes, sir.

22         Q      And the part of your job that deals with being

23    the records custodian, what does that entail?

24         A      We process all of the records, inpatient,

25    outpatient, everybody's medical records that comes through

                                                              20

```
 1   the hospital.
 2        Q    All right.  At my request and pursuant to a
 3   subpoena, did you research the official records of Palo
 4   Pinto General Hospital with a view towards obtaining and
 5   bringing to court the official records of the hospital
 6   regarding a patient named Jim or Jimmie Ray Pontremoli as a
 7   result of injuries treated that he received on July the
 8   28th of 1998?
 9        A    Yes, sir.
10        Q    And did you bring those to court with you?
11        A    Yes, sir.
12        Q    Do you have them -- well, let's pull them out and
13   then we'll get them marked.
14        A    Here's the records and there's the copies.
15                        (State's Exhibit Nos. 9 and 10 were
16                        marked for identification by the court
17                        reporter.)
18   BY MR. RAY:
19        Q    Is it true, Ms. Putman, that you brought the
20   original hospital records in two packets and that you made
21   a copy of each one of those packets to associate with the
22   original?
23        A    Yes, sir.
24        Q    Let me hand you what has been marked as State's
25   Exhibit 9 and State's Exhibit 10 and ask you if you will
```

                                                              21

1    identify what those two exhibits consist of?

2        A    State's Exhibit 9 is where the patient was seen

3    in the emergency room on July the 28th, 1998.  And State's

4    Exhibit No. 10, he came in as an outpatient and had x-rays

5    on October the 14th, 1998.

6        Q    A couple of months after the emergency room

7    treatment?

8        A    Yes, sir, yes, sir.

9        Q    Ms. Putman, before you hand those back to me, I

10   just want you to briefly here in open court quickly, unless

11   you need more time, compare those to the originals so that

12   I can ask you if State's Exhibit 9 and 10 are accurate,

13   true, copies, photocopies of the original documents that

14   they're copies of.

15       A    Yes, sir.

16            MR. RAY:  We offer 9 and 10 as copies of --

17   well, let me ask you a few more questions first.

18   BY MR. RAY:

19       Q    Ms. Putman, are these records reflected by

20   State's Exhibits 9 and 10 official records of Palo Pinto

21   General Hospital maintained in the ordinary course of

22   business of what the hospital does?

23       A    Yes, sir.

24       Q    And are they maintained and preserved by you as

25   the records custodian along with all of the other official

                                                            22

1  records of Palo Pinto General Hospital?

2      A      Yes, sir.

3      Q      Are the memoranda and written notations that are

4  made in those official records made at or near the time

5  that the events that they talk about actually occurred?

6      A      Yes, sir.

7      Q      And are they made by people who have personal

8  knowledge of the matters set forth in those documents?

9      A      Yes, sir.

10     Q      And would they include such things as patient

11  history gathered by the treating physician or emergency

12  room personnel and the like?

13     A      Yes, sir.

14             MR. RAY:  We'll offer 9 and 10 as copies of

15  the originals which were produced in open court.

16             MR. WATSON:  We have no objection, Your

17  Honor.

18             THE COURT:  They are admitted.

19                 (State's Exhibit Nos. 9 and 10 were

20                  received into evidence.)

21  BY MR. RAY:

22     Q      Ms. Putman, you did keep the originals, correct?

23     A      Yes, sir.

24     Q      And if the Court permits, you want to take those

25  back as the hospital records still intact?

23

1      A     Yes, sir.

2            MR. RAY:   I'll pass the witness.

3

4                    CROSS-EXAMINATION

5  BY MR. WATSON:

6      Q     Ma'am, what is nondisplaced fracture, do you

7  know?

8      A     I'm just the custodian of the records, you'd have

9  to ask physician about that.

10     Q     You don't know that?  Do you know what an

11 abrasion is?

12     A     Yes, sir.

13     Q     What is an abrasion?

14     A     It's a scrape or wound.

15     Q     Okay.  Look on page -- the second page of your

16 Exhibit No. 9 there where it says, "Physical examination."

17     A     Yes, sir.

18     Q     Go down to where it says, "Extremities."

19     A     Yes, sir.

20     Q     It says, second sentence, he does have a small

21 abrasion.  Is that the way that reads?

22     A     Yes, sir.

23     Q     Then the next two sentences after that, it

24 appears to be simply an abrasion by where he was actually

25 struck by the pipe wrench; is that correct?

                                                    24

1      A      Yes, sir.

2      Q      Did you see Mr. Pontremoli in the hospital?

3      A      No, sir.

4             MR. WATSON:  Okay.  That's all the

5   questions I have.

6             MR. RAY:  Nothing further of this witness.

7   We'd like to next call Dr. Robert Allensworth.

8             THE COURT:  That's all.  Thank you.

9             MR. RAY:  May she be excused, Your Honor?

10  Counsel, any objection?

11            MR. WATSON:  No.

12            THE COURT:  Yes, ma'am, you may leave.

13            ROBERT ALLENSWORTH, M.D.,

14  a witness called on behalf of the State, duly sworn to tell

15  the truth, the whole truth, and nothing but the truth,

16  testified on his oath as follows:

17

18                DIRECT EXAMINATION

19  BY MR. RAY:

20     Q      Would you state your name, please, sir?

21     A      Robert C. Allensworth.

22     Q      And what is your trade, occupation, or

23  profession?

24     A      I'm an emergency physician.

25     Q      And what, just briefly about your background,

                                                    25

1   education, training, that qualifies you to practice your

2   profession, Doctor?

3        A    I went to Southwestern Medical School in Dallas,

4   I got an internal medicine residency in Dallas and am board

5   certified in internal medicine.  And I've practiced

6   emergency medicine for 10 years full time.

7        Q    Directing your attention back to July the 28th of

8   1998, did you have any association with Palo Pinto General

9   Hospital in Mineral Wells, Texas?

10       A    Yes.

11       Q    And in what capacity was that?

12       A    Well, I have been working as an independent

13  contractor in the emergency department for Palo Pinto

14  General Hospital for about a year and half now at this

15  point.

16       Q    And so back in July, you would have been --

17       A    A little over a year.

18       Q    -- associated a year or so at that point?

19       A    Thirteen months, yes.

20       Q    Doctor, let me hand you some medical records that

21  have been admitted into evidence --

22       A    Uh-huh.

23       Q    -- already with particular reference to State's

24  Exhibit No. 9.  Do you recognize a signature at the bottom

25  of the fist page of that exhibit?

26

1      A     Yes, that's my signature.

2      Q     To whom does State's Exhibit No. 9 relate as the

3  patient?

4      A     The patient here is Jimmie R. Pontremoli.

5      Q     And with your signature affixed to that exhibit,

6  would it be correct for us to assume or conclude that you

7  were the treating physician to Mr. Pontremoli as a patient

8  on the occasion that is reflected by State's Exhibit 9?

9      A     Yes.

10      Q     And what was the date of that treatment, Doctor?

11      A     On July 28th of 1998.

12      Q     Is part of your treatment procedure to gather a

13  patient history?

14      A     Yes.

15      Q     Can you tell us whether or not the official

16  records of the hospital as part of that patient history

17  indicate anything about your patient's age, Mr.

18  Pontremoli's age?

19      A     Yes.

20      Q     And how old of a gentleman was he on July 28th of

21  1998?

22      A     Seventy-one years old.

23      Q     Dr. Allensworth, would you tell the jury what you

24  saw upon presentation and what your diagnosis was and

25  treatment recommendations pertaining to Mr. Pontremoli in

                                                          27

1    question?

2         A    Sure.  As best as -- of course, why we have the

3    medical record, I refer back to that because I can't

4    remember every patient.  I do remember that I saw a

5    gentleman that was struck in the arm and apparently is

6    Mr. Pontremoli.  According to the record here, he's a

7    71-year-old white male who states he was assaulted by

8    another man that was wielding about a 36-inch pipe

9    wrench.  And Mr. Pontremoli had said that the man was

10   getting ready to strike him in the head with the pipe

11   wrench when he raised his arm to try to deflect the blow

12   and he was struck in the left forearm with the pipe wrench.

13        Q    Okay.

14        A    He came to the emergency department later on

15   after that and was complaining of pain in the area of the

16   left forearm.  And when I saw him, it says here that as far

17   as the left forearm itself, he had an abrasion over the

18   midforearm, (demonstrating), right around there over the

19   area of the ulna with a large hematoma which is a

20   collection of blood underneath the skin.  The area was

21   tender to palpation.

22             And an x-ray was obtained that was reviewed by

23   me, and the x-ray was showing a nondisplaced fracture of

24   the left ulna with a large hematoma.

25        Q    All right.  And the left ulna would be what part

                                                          28

1    of the human body?

2         A    It's one of the two forearm bones, the one that's

3    most likely broken when struck with a blunt object when

4    you're attempting to shield your head.

5         Q    Doctor, upon your examination and diagnosis on

6    July 28th of 1998, was there anything that you saw,

7    observed, diagnosed, or treated that was inconsistent with

8    the patient history provided to you by Mr. Pontremoli?

9         A    No.

10        Q    I want to direct your attention, Dr. Allensworth,

11   to the exhibit that is here in front of you that has been

12   marked as State's Exhibit No. 8.

13        A    Uh-huh.

14        Q    First of all, does State's Exhibit 8, from your

15   observation of same, generally fit the description of what

16   your patient told you on that date when he was providing

17   patient history as to the weapon?

18        A    Yes, sir.

19        Q    And is there anything about State's Exhibit No. 8

20   from weight and characteristics that would be inconsistent

21   with a weapon that could cause the injury that you treated

22   on Mr. Pontremoli?

23        A    No, not at all.

24        Q    Is State's Exhibit 8, if swung with force, an

25   instrument that is capable of causing serious bodily injury

29

1    or death if it struck a human being in the head, for

2    example?

3        A    Yes, yes.

4        Q    Someone who was struck with an instrument like

5    State's Exhibit 8 in the area of the ulnar part of the

6    forearm, would that cause physical pain, Doctor?

7        A    Yes.  Depends, of course, on the strength of the

8    blow, but, you bet, that's a large wrench.  I wouldn't want

9    to be struck with it -- by it.

10            MR. WATSON:  Your Honor, I'll object to that

11   as nonresponsive and ask the Court to instruct the jury to

12   disregard that.

13            THE COURT:  All right.  I'll sustain the

14   objection.  So instructed.

15   BY MR. RAY:

16       Q    Dr. Allensworth, let me hand you a picture,

17   State's Exhibit 4, ask you to look at the individual

18   depicted in there.  Does that jog your memory -- I know you

19   see a lot of patients.

20       A    I do.

21       Q    But does that look anything like the gentleman

22   you treated on the 28th?

23       A    I believe so, but I must say I see a lot of

24   patients in the emergency department.

25       Q    I understand, Doctor, no problem.  What

                                                            30

1  recommendation did you make for treating Mr. Pontremoli's

2  injuries, Doctor?

3      A    I called up initially his private physician, Dr.

4  Evans, but I don't believe he was on call that day, so I

5  called up Dr. Dave, who is the orthopedic surgeon at Palo

6  Pinto General, and spoke with him.  We put a long splint

7  on, generally one that goes from the upper arm on down and

8  immobilized the entire arm, put him in a splint, gave him

9  some pain medication and had him followup either with Dr.

10  Dave or Dr. Evans, the physician of his choice.

11      Q    Sure.  And did that complete your treatment of

12  Mr. Pontremoli so far as you know or remember?

13      A    Yes, other than giving him a tetanus prophylaxis

14  and some IV antibiotics because of the small abrasion that

15  he did have over the forearm itself.

16      Q    All right.  Let me see that exhibit just for a

17  second, Doctor.

18      A    Sure.

19      Q    What is a nondisplaced fracture, Doctor, as

20  distinguished from, say, a displaced fracture?

21      A    Fractures of the bones are basically broken down

22  into two types of fractures.  The ones that are displaced

23  are the ends of the bones have space in between them; and

24  nondisplaced fracture which, I guess in layman's term, is

25  known as a crack or cracked bone or a -- what people

31

1  typically called fracture, but where the bone ends are in

2  good opposition to each other.

3      Q    And what is an abrasion?

4      A    An abrasion is a scrape.

5      Q    I believe that the record shows that sutures were

6  not necessary.  Is that consistent with your recollection?

7      A    Correct.

8      Q    But was the injury one that at a time approximate

9  to when it occurred that it bled some?

10     A    That -- I believe that it had some bleeding, but

11 I can't -- I couldn't say to what degree at this point.

12     Q    Okay.  And a hematoma is what?

13     A    That's a collection of blood underneath the skin,

14 generally from -- typically due to blunt force that tends

15 to disrupt the blood vessels and you have venous bleeding

16 that collects under the skin and is commonly referred to as

17 a goose egg.

18         MR. RAY:  I'll pass the witness.

19

20              CROSS-EXAMINATION

21 BY MR. WATSON:

22     Q    Did you say that the -- is that your testimony

23 that whatever was wrong with Mr. Pontremoli's arm did not

24 bleed?  Is that what you're saying?

25     A    I'm saying I don't know to what degree of

                                                    32

1    bleeding because an abrasion can be anything from just a

2    very small scrape to a deeper abrasion where you don't have

3    a full thickness tear of a skin that would require

4    suturing, but you can have a certain amount of bleeding,

5    like, when a, oh, somebody that plays softball or baseball

6    if they slide into the base and they get a strawberry.  So

7    I just can't say to what degree of bleeding there was.

8         Q    Well, when you say he does have a small abrasion,

9    is that the type of thing that would ordinarily bleed?

10        A    My point is the degree of bleeding, I don't know

11   from my recollection how much bleeding.  An abrasion,

12   you'll have a very -- some bleeding, the question is how

13   much.  And again, a small abrasion like when you're shaving

14   your neck, if you get a small partial thickness cut of the

15   neck, that is an abrasion, it's not something that requires

16   suturing or cut -- closing the wound, but it does have some

17   bleeding, it's just not much bleeding.

18        Q    Okay.  As far as the wounds you saw on

19   Mr. Pontremoli's arm, are we talking about something that's

20   going to bleed all over everybody that's within proximity

21   to him or -- based on your experience?

22        A    Usually not -- certainly not with spurting of

23   blood like an arterial bleed.  If he touches the person to

24   them, then some of the blood can be transferred off, but

25   it's not -- an abrasion is not a wound that bleeds heavily,

33

1    no.

2         Q     Would this be the type of wound that would drip

3    blood off of it, for example?

4         A     Potentially, potentially, not for very --

5         Q     But you don't know?

6         A     I don't know if in Mr. Pontremoli's case.  Again,

7    it depends on the degree of the abrasion itself.

8         Q     Okay.  Did anybody take any blood from

9    Mr. Pontremoli at the hospital or do you know?

10        A     Let me check the record here.  I did not order

11   any blood from him.  Occasionally I will say that when a

12   patient is seen in the emergency department and they are

13   given IV antibiotics, when we start the angiocath into the

14   vein, to try to save a second or third stick, we can

15   potentially draw blood at that time before we actually pass

16   the antibiotics into the vein.

17        Q     My question is:  Was it drawn for a particular

18   purpose is what I mean.  Was any blood drawn from his

19   person?

20        A     Not that I am aware of.  If I may --

21        Q     Sure.

22        A     -- let me check the records here and see.  No,

23   sir, I don't see any -- I don't see any record of any blood

24   drawn for a particular purpose, and I did not order any

25   blood drawn on him.

                                                          34

1        Q      Okay.  Was Mr. Pontremoli able to verbalize with

2   you?

3        A      Yes.

4        Q      Like we're talking right know?

5        A      Yes.

6               MR. WATSON:  That's all the questions I

7   have.

8               MR. RAY:  Nothing further.  May this witness

9   be excused?

10              THE COURT:  Yes, that's all.  Thank you,

11  Doctor.

12              THE WITNESS:  Okay.  Thank you.

13              MR. RAY:  Call Jim Pontremoli.  Your Honor,

14  I'm not sure he heard you say raise your hand.

15              THE COURT:  He didn't.  I'll --

16                   JIMMIE RAY PONTREMOLI,

17  a witness called on behalf of the State, duly sworn to tell

18  the truth, the whole truth, and nothing but the truth,

19  testified on his oath as follows:

20

21                   DIRECT EXAMINATION

22  BY MR. RAY:

23       Q      Would you state your name full name, please, sir?

24       A      Jimmie Ray Pontremoli.

25       Q      Mr. Pontremoli, If you could scoot up just a

                                                            35

```
 1    little bit, this is a microphone and it'll help kind of

 2    carry your voice a little bit.  Okay.  Thanks.

 3              Would you spell your first name?

 4    A    Do what, sir?

 5    Q    Would you spell your first name?

 6    A    It's J-i-m-m-i-e.

 7    Q    Okay.  And are you the same person who sometimes

 8    is called Jim as a short of Jimmie?

 9    A    Yes, yes.

10    Q    And what's your middle name?

11    A    Ray.

12    Q    And spell that for us.

13    A    R-a-y.

14    Q    And your last name?

15    A    P-o-n-t-r-e-m-o-l-i.

16    Q    And if I pronounce that Pontremoli, am I being

17    pretty close to right?

18    A    That's correct.

19    Q    Mr. Pontremoli, where do you live?

20    A    1910 Southeast 13th Street.

21    Q    In what town?

22    A    Mineral Wells.

23    Q    How old are you, sir?

24    A    Well, I'm 71, three more days I'll be 72.

25    Q    Back in July, July the 28th of -- earlier this
```

36

1    year, 1998, were you also 71 years of age on that day?

2        A    Yes, sir.

3        Q    Mr. Pontremoli, what kind of work or business do

4    you do?

5        A    It's a junk store, sell mostly tools and buy

6    junk.

7        Q    Okay.  How long have you been doing that line of

8    work?

9        A    Nine years.

10       Q    What did you do before that?

11       A    I was a rig supervisor in the oilfield.

12       Q    Okay.  Do you have a place of business where you

13   do your tools and junk business?

14       A    Yeah, on 700 block of Southeast 6th Avenue.

15       Q    All right.  Can you tell us what town and county

16   and state your business is located in?

17       A    Mineral Wells, Palo Pinto County, Texas.

18       Q    All right.  Mr. Pontremoli, I want to go back to

19   the day of July 28th of 1998.  Did anything unusual or

20   extraordinary happen to you on that day?

21       A    Yes, sir, I was robbed and my left arm was broke.

22       Q    All right.  At what location did you get robbed

23   and your arm get broken?

24       A    In the 700 block of -- 700 Southeast 6th Avenue.

25       Q    And that's at your business location?

                                                              37

1    A    Yes, sir.

2    Q    That you previously indicated that is in Palo

3  Pinto County, Texas, right?

4    A    Yes, sir.

5    Q    At the time that you before were robbed and had

6  your arm broken, how many people were in the store with you

7  at that time?

8    A    Two.

9    Q    Okay.  And were they male or female?

10   A    Male.

11   Q    Okay.  Had you seen either one or both of them

12 earlier that day?

13   A    When I broke my arm?  Yes, sir.

14   Q    Had you seen them earlier that day?

15   A    Yes, sir.

16   Q    Tell us when you first saw them.

17   A    Well, the first time was just -- they came in,

18 wanted a -- the boy, the one that didn't hit me, wanted to

19 buy a crescent wrench -- no, I'm sorry, a socket.  I showed

20 him where they was and he went back there and picked out

21 the one he wanted.

22   Q    Did y'all talk about price for the wrench that he

23 wanted?

24   A    Yes, sir.  He asked me -- I told him about two,

25 three dollars.

38

1    Q    And did he have the money to pay you right then?

2    A    No, he didn't.  He said he had to go get some.

3    Q    All right.  When they came in, you said that the

4    fellow looking for the ratchet wrench was not the one that

5    hit you, right?

6    A    Right.

7    Q    With regard to the one that hit you, is he in the

8    courtroom today?

9    A    He is.

10    Q    Would you point at him and say out loud something

11    that he's wearing so that we'll know who you're pointing

12    at?

13    A    He's wearing a white, long-sleeved sweater

14    T-shirt.

15            MR. RAY:  Let the record reflect that the

16    witness has identified the defendant, Russell Don Johnson.

17    BY MR. RAY:

18    Q    Mr. Pontremoli, had you ever seen the fellow that

19    was looking for the ratchet wrench, had you ever seen him

20    before?

21    A    Yes, sir, I had seen him before.

22    Q    Did you know him by name?

23    A    No, sir.

24    Q    To your knowledge had you ever seen Russell Don

25    Johnson before the day he hit you?

                                                          39

```
 1       A    No, not that I know of.

 2       Q    And you didn't know him by name?

 3       A    No, sir.

 4       Q    When they were in the store, did you make any

 5  comment about any clothes that Mr. Johnson was wearing?

 6       A    The first time they came in, I did.

 7       Q    What did you say, if you recall?

 8       A    Well, his pants was hanging down about four

 9  inches below his purple drawers, and I asked him what would

10  happen if he dropped his pants.  And the other boy said,

11  well, he'd pull them up.  And he did pull them up and

12  that's all that was said.

13       Q    Did you mean anything ugly by saying that?

14       A    Well, no.

15       Q    When the other fellow that was dealing with you

16  on the ratchet wrench transaction said they'd have to go

17  get the money, did they leave?

18       A    Yes, sir.

19       Q    Did they come back?

20       A    Yes, sir.

21       Q    About how long were they gone, if you know?

22       A    Oh, I didn't look at my watch.  I would say

23  between 15 and 25 minutes, something like that.

24       Q    Less than a half hour?

25       A    Yeah.
```

40

1    Q    And was this in the late morning of July 28th,

2  1998?

3    A    No, it was about 12:30 that they came back.

4    Q    When they came back, what happened as far as the

5  fellow that was wanting to buy the ratchet?

6    A    Well, he walked back there where I showed him

7  where they was, he picked up the same ratchet that he

8  had -- that he had looked at and brought it up to the

9  counter.

10   Q    Okay.

11   A    I told him -- well, he asked me what I wanted, I

12 told him I wanted three dollars for it.

13   Q    All right.  Mr. Pontremoli, when you run your

14 store down there, do you have -- operate out of a cash

15 register or not?

16   A    No, sir, I don't have one.  Well, I have one, but

17 it don't work.

18   Q    How do you make change, where do you keep the

19 money to make change with?

20   A    Well, I keep my five dollar bills in the left

21 pocket, my one dollar bills in my right pocket.

22   Q    Do you have kind of a habit of how much you start

23 off the day with?

24   A    Well, yes, sir, in my pocket.  I used --.

25   Q    So how do you start off -- how many ones do you

41

KIM A. BROOKS, OFFICIAL COURT REPORTER

```
1    start off with?
2         A    About 25.
3         Q    And how many -- how much money in fives?
4         A    About one hundred.
5         Q    $100?
6         A    $100, yes.
7         Q    So you'd start off with around 20 fives and 25
8    ones, is that about right?
9         A    Yes, sir.
10        Q    That would be about $125, right?
11        A    Yes, sir.
12        Q    When the other fellow brought the ratchet up to
13   the counter and you told him it would be three dollars,
14   what kind of money did he offer to pay with?
15        A    A $10 bill.
16        Q    All right.  How much change would you have owed
17   him?
18        A    Seven dollars.
19        Q    And how many ones and fives would that be?
20        A    Three ones and one five.
21        Q    When you were making change for him, what did you
22   do to make change?
23        A    Well, I gave him three one-dollar bills --
24        Q    Are you sure it was three?
25        A    Well, I give him three, yes.  I laid what other I
```

42

KIM A. BROOKS, OFFICIAL COURT REPORTER

1    had remaining on the counter.

2         Q    Okay.  Let's think about that, back up and do

3    that math.  If I give you a $10 --

4         A    I'm sorry, two dollars, two dollars.  I'm sorry,

5    I'm not very smart.

6         Q    That's all right.  You got your one dollar bills.

7    Which pocket do you keep your ones in?

8         A    In my right.

9         Q    Did you deal with the ones first?

10        A    Yes, sir.

11        Q    Okay.  And after you handed him two ones, what

12   did you do with the wad that was left over?

13        A    I laid them on the counter.

14        Q    And then what did you do to finish making change?

15        A    Well, I got the fives out of my pocket and gave

16   him five dollars.

17        Q    Did you finish the transaction before something

18   happened?

19        A    No, sir.

20        Q    What happened to stop you from finishing the

21   deal?

22        A    Well, I got hit.

23        Q    Okay.  And you've indicated that Russell Don

24   Johnson is the one that hit you?

25        A    Yes, sir.

43

1    Q    What did he hit you with?

2    A    Thirty-six inch pipe wrench.

3    Q    All right.  And where had that pipe wrench been

4  before Mr. Johnson hit you with it?

5    A    It was laying -- I got some tools on the counter,

6  and the pipe -- bread pans on it and it was laying on it.

7    Q    All right.  Let me show you some pictures, Mr.

8  Pontromeli.  They've been marked on the back as State's

9  Exhibit No. 3, that's what that SX-3 means, and on the back

10  of this one, SX-2, State's Exhibit 2.  Let me ask you if

11  you recognize what's in those photographs, 2 and 3?

12    A    Yes, sir.

13    Q    What's primarily shown in State's Exhibits 2 and

14  3?

15    A    Well, in 2 is the counter where I was standing

16  behind and over here to the right is bread pans with a

17  36-inch pipe wrench laying on it.

18    Q    And then 3, what does it show?  Is it just a

19  large close-up?

20    A    Yes.

21    Q    What does it show?

22    A    Thirty-six inch pipe laying on the bread pan.

23    Q    All right.  Do you remember the day after you got

24  robbed, this will be July the 29th, the next day, a tall,

25  thin detective named Wiggington coming down there to the

                                                        44

1  store with you?

2       A     Yes, sir.

3       Q     Did he take some pictures?

4       A     Yes, sir.

5       Q     And did you show him the pipe wrench that you got

6  hit with?

7       A     Yes, sir.

8       Q     And what happened to the pipe wrench?

9       A     He took it with him.

10      Q     All right.  Would you look at this exhibit that's

11  right in front of you here, State's Exhibit No. 8?

12      A     Uh-huh.

13      Q     And ask you if that looks like anything you

14  recognize?

15      A     That is it.  You can see where I put oil on here

16  to where -- where you could turn it.

17      Q     Is State's Exhibit 8 that you turned over to

18  Detective Wiggington what Mr. Johnson hit you with on July

19  28th of 1998?

20      A     Yes, sir, yes, sir.

21      Q     Let me show you another picture.

22            MR. RAY:  Your Honor, I want to go ahead and

23  complete that offer on State's Exhibit --

24  BY MR. RAY:

25      Q     Well, let me ask this:  After you got hit, where

45

1   did the pipe wrench end up?

2       A    Laying on the counter.

3       Q    Okay.  How did it get back over where the

4   detective took the pictures?

5       A    I put it back over there.

6       Q    You put it back there.  Where was it before

7   Mr. Johnson hit you with it?

8       A    Laying on the pipe racks -- pipe --

9       Q    So State's Exhibit 2 and 3 would show how it was

10  situated before he swung it and hit you?

11      A    Yes, sir.

12              MR. RAY:  We'll  offer State's 2 and 3.

13              MR. WATSON:  We have no objections, Your

14  Honor.

15              THE COURT:  They're admitted.

16                  (State's Exhibit Nos. 2 and 3 were

17                   received into evidence.)

18  BY MR. RAY:

19      Q    Mr. Pontremoli, handing you State's Exhibit 1,

20  what does State's Exhibit 1 show?

21      A    Shows the front and the door open on the junk

22  store on 6th Avenue.

23      Q    All right.  Let me hand you State's Exhibit 4 and

24  ask you who that gentleman is that's shown in that picture?

25      A    Well, that is me.

46

1    Q    Mr. Pontremoli, this picture was taken the next

2  day, what is that that's shown on your left arm in the

3  picture there?

4    A    It's the -- what they call it a stall in the

5  emergency room, it's a cast, but --

6    Q    All right.  Did you go -- well, tell me this.

7  Using State's Exhibit No. 6 -- I tell you what, can you

8  stand up and come over here in front of the jury so we can

9  use that.

10    A    Sorry.

11    Q    That's all right.  Using State's Exhibit 6 and

12  let's hold it up where the jury -- step back a little bit,

13  Mr. Pontremoli.  Using State's Exhibit 6, can you hold that

14  out to your side and point to where the fellow buying the

15  ratchet wrench was standing when you got hit?  Where was

16  the follow that didn't hit you?

17    A    Standing right in front of me, kind of to my

18  right on this side of the counter.

19    Q    All right.  So were you behind the counter?

20    A    Yes, sir.

21    Q    Okay.  State's Exhibit No. 4, what's that in your

22  hands?

23    A    It's money.

24    Q    Would State's Exhibit 4 show how you're situated

25  behind the counter making change when Mr. Johnson hit you

47

1    on July 28th?

2        A    Yes.

3        Q    Now, let's go back to 6. You've indicated that

4    the fellow that didn't hit you was standing right across

5    the counter from you, right?

6        A    Right.

7        Q    Okay.  Where was Russell Don Johnson standing?

8        A    He was standing where those bread pans are at.

9    Well, there should be some bread pans right here, where

10   the --

11       Q    Would this picture show anywhere both where he

12   was standing and where the wrench was?

13       A    No, but the one that's got that picture of that

14   tool there would.

15       Q    Well, I think the jury is looking at that one.

16   Thanks.  Now, there's one you might can use.  Now, we're

17   looking, for the record, at State's Exhibit No. 6.  Hold

18   that up and make sure the jury can see it.

19       A    Oh, I'm going to.  He was standing right here at

20   the end of these pipe -- bread pans.

21       Q    And where was the wrench?

22       A    Laying right there on the pipe.  He had his back

23   to me.

24       Q    And then what did you first see?

25       A    Well, I couldn't see him pick the tool up, but

48

1    when he turned around all he had to do -- was turn around

2    and he was swinging it.  And when I seen it, I raised my

3    arm up and hit me right (demonstrating).

4         Q    Okay.  Why don't you come back and sit down up

5    here now that you've shown them the pictures.

6              Mr. Pontremoli, when Russell Don Johnson swung

7    the pipe wrench at you, what part of your body was it

8    headed towards?

9         A    My head.

10        Q    All right.  And did you deflect it or block the

11   blow with your arm?

12        A    Yes, sir.  When I see him turn around with it, I

13   stuck my hand like this and that's where it hit me.

14        Q    And did you go out to the emergency room and get

15   some treatment?

16        A    After I went to the police station, yes, sir.

17        Q    Yeah.

18        A    Yes, sir.

19        Q    And what did they do to help treat your arm?

20   Dr. Allensworth told us that he treated you out there, and

21   you had a fractured arm.  What did they do to help you?

22        A    Well, he x-rayed it, put ice packs on it.  And he

23   determined it was broke or cracked or whatever and he --

24   then he put that stall on me.

25        Q    The thing inside the sling, the cast?

                                                          49

1      A      It's just like a cast.

2      Q      And it's shown in these pictures of you the next

3 day, right?

4      A      Yeah.  And then he referred me to Dr. Evans and

5 Dr. Evans referred me to Dr. Dave.

6      Q      Dave?

7      A      Dave, yeah.

8      Q      And they took care of you?

9      A      Yes, sir.

10     Q      Okay.  Mr. Pontremoli, how is your arm doing

11 now?  We're about five months down the road or so, how are

12 you doing?

13     A      Well, this doesn't hurt where it broke.

14     Q      Yes, sir.

15     A      But I don't -- I don't have motioning, I can't

16 hardly use it.

17     Q      I understand.  I understand.  When Russell Don

18 Johnson hit you with this 36, did that hurt you?

19     A      You bet.

20     Q      Did you feel physical main?

21     A      You bet.

22     Q      Did you bleed some?

23     A      I did, bled a lot.

24     Q      What happened -- you indicated you was making

25 change and you set your wad of ones down and you were

50

1    holding the fives when he hit you.  What happened to you,

2    where did you end up?

3         A    I was knocked to the floor.

4         Q    Did you lose control of the money?

5         A    Well, I dropped it on the counter and on the

6    floor, what was left.

7         Q    You didn't lose consciousness, did you?

8         A    (Witness shakes head.)

9         Q    And it didn't get all the way to your head, your

10   armed blocked it, right?

11        A    Well, I don't know, I had a sore spot up there,

12   so might have been my arm right here.

13        Q    Might have drove your arm into your head?

14        A    Yeah.

15        Q    Mr. Pontremoli, after you were able to get up off

16   the floor, what did you try to do?

17        A    Well, I got up and I went to the door and I tried

18   to -- they was getting in the car when I got to the

19   door and was fixing to drive off and I had to go around --

20   around the building where my car was parked.  By the time I

21   got it unlocked, got the door locked, I went down toward

22   Oak, I didn't see them anymore, so I went to the police

23   station.

24        Q    All right.  When you got to the door to your

25   store, did you lock the door?

51

1        A       Yes, sir.

2        Q       And you left whatever was left of your money

3    laying where it fell, right?

4        A       Right.

5        Q       Okay.  After you went to the police station, did

6    you end up going back to your store with one of the

7    officers that afternoon?

8        A       I didn't go -- he left before I did, and he was

9    over on the opposite corner over there in that junk store,

10   and he was talking to that man over there.

11       Q       The police?

12       A       The police did, yes.

13       Q       Okay.  When you got back to your store, was the

14   door still locked?

15       A       Yes, sir.

16       Q       Had anybody broken in or disturbed anything?

17       A       No.

18       Q       When you got back in there, did you gather up

19   your money?

20       A       Yes, sir.

21       Q       Are you able to estimate for us how much of your

22   money was missing or how much of it was left?

23       A       Well, I'm going to say between 50 and $60 was

24   gone.

25       Q       Do you know about how many ones were left from

                                                          52

```
 1   where they were all scattered?
 2        A    Oh, I think about 15.
 3        Q    And about how many fives did you have left over?
 4        A    Well, it was about 10 or 12.  I didn't count
 5   them, but that was about what there was.
 6        Q    Estimate.  Okay.  So you'd had somewhere around
 7   $75 left that was scattered there?
 8        A    Yes.
 9        Q    Was there anything on any of the bill or bills?
10        A    Blood.
11        Q    Okay.  Was that blood on there before Russell
12   Johnson hit you with this pipe wrench?
13        A    No, sir.
14                  MR. RAY:  We'll offer State's 8, Your Honor.
15                  MR. WATSON:  No objection.
16                  THE COURT:  It's admitted.
17                      (State's Exhibit No. 8 was
18                       received into evidence.)
19   BY MR. RAY:
20        Q    Would it be fair to say that State's Exhibit 8 is
21   somewhat rusted, in other words, not a smooth surface?
22        A    Well, no, that's an old-timey 36, that's the
23   reason I still had it because it was so old.
24        Q    Yes, sir.
25        A    I didn't even -- I hadn't even tried to sell it.
```

                                                        53

1      Q    I understand.  Other than the making a kind of a

2  joke or a comment about baggy britches, did you do anything

3  to Russell Johnson that would cause him to want to hurt

4  you?

5      A    Well, not unless that offended him, I don't know,

6  that's all I said to the boy or the man.

7      Q    All right.  And you didn't know what his name

8  was, did you?

9      A    No, sir.

10     Q    Was his hair as short now as it was then?

11     A    No, sir.

12     Q    As the police investigation unfolded, did they

13  come show you some pictures?

14          MR. WATSON:  Your Honor, I'm going to object

15  to that, that's something that needs to be taken up outside

16  the presence of the jury.

17          THE COURT:  All right.  I'll sustain that

18  objection.

19  BY MR. RAY:

20     Q    Mr. Pontremoli, did you ever get any of the

21  money back that was missing?

22     A    No, sir.

23          MR. RAY:  I'll pass the witness.

24

25

                                                          54

1                              <u>CROSS-EXAMINATION</u>

2    BY MR. WATSON:

3         Q    Mr. Pontremoli, do you wear glasses?

4         A    No, sir.

5         Q    Have you ever worn glasses?

6         A    Have I ever worn, every day, all time?  No, sir.

7         Q    Have you ever worn glasses at all?

8         A    No.

9         Q    Are you a drinking man, Mr. Pontremoli?

10        A    No, sir.

11        Q    How long -- the first time you're saying the two

12   people that were in your store initially, how long were

13   they in there the first time?

14        A    Which time?

15        Q    The first time?

16        A    Oh, probably 10 minutes, maybe not that long.

17        Q    Excuse me?

18        A    I'd say maybe 10 minutes, maybe not that long.

19        Q    Well, give me your best guess how long you think

20   they were in there.

21        A    Ten minutes.

22        Q    And you talked to a gentleman about buying a

23   socket or a wrench of some sort; is that right?

24        A    Yes.

25        Q    And he indicated he did not have any money;  is

                                                              55

1    that right?

2         A    That's right.

3         Q    Did he tell you that he had to go get some money?

4         A    Yes, sir.

5         Q    Did he say where he was going to go?

6         A    No, sir.

7         Q    And he had been in your store before?

8         A    I said I had seen him before, I don't know where

9    I seen him.  I -- I think -- to be exact, I think I saw him

10   going into that corner store across the street.

11        Q    And what do they sell there?  Are you talking

12   about the convenience store?

13        A    Huh?  Yeah.

14        Q    Okay.  Now, on July the 28th, what time did you

15   go to work that day?

16        A    About nine o'clock.

17        Q    And do you -- do you have a bank account or do

18   you just deal strictly in cash?

19        A    Strictly cash.

20        Q    So any receipts you have, you just put them in

21   your pocket?

22        A    Any what?

23        Q    Any money you take in from sales, you just put it

24   in your pocket?

25        A    Yes, sir, I don't take in all that much.

```
 1        Q     But do you keep any records of this or do you
 2   just stick it in --
 3        A     Yes, I have a record of it.
 4        Q     You don't have a cash register ticket, though, do
 5   you?
 6        A     No, sir, they broke into it and they tore it up
 7   to get in the door -- the drawer.
 8        Q     Do you make a record of every sale you make?
 9        A     Do I make what?
10        Q     A record, do you write it down?
11        A     Yes, sir.
12        Q     Okay.  When you buy things for your store, do you
13   keep a record of that?
14        A     I just -- all I buy is aluminum cans.
15        Q     Well, do you keep a record of that?
16        A     Yes, sir.
17        Q     Okay.  Where do you get your inventory, do people
18   periodically people bring you stuff to buy down there?
19        A     Yes, sir.
20        Q     And when they do that --
21        A     Five pounds at a time, maybe six pounds, that's
22   the reason I have one dollar bills.
23        Q     But you don't buy any of the inventory, you only
24   buy metal cans; is that right?
25        A     That's all -- all that was already there.
```

                                                                57

1          Q     The inventory?

2          A     Yes, sir.  I haven't bought anything to sell in a

3    long, long, long time.

4          Q     Okay.  And where do you get your bank roll

5    together?  Where do you do this, at home?

6          A     What do you mean, get it together?

7          Q     Before you go to work every day?

8          A     I don't -- you keep talking about a bank roll and

9    wad of money.  I go to the bank to get some change.

10         Q     Well, whatever you want to call it.  Do you go to

11   the bank every morning about nine o'clock?

12         A     No, no, I may not go to the bank two times a

13   week.  I don't do that much business.

14         Q     Well, on the day we're talking about, July the

15   28th, where did you have your money before you went to the

16   store?  Where was your money before you went to the store?

17         A     In my house.

18         Q     Okay.  So you have a place there at the house

19   where you keep your money?

20         A     No, it was laying on the table.

21         Q     Okay.  Did you count it before you went to work?

22         A     No, I had just went to the bank the day before

23   and I knew how much change I got, yes.

24         Q     Did you count it before you went to work?

25         A     Well, no, I didn't count it, but it was still in

58

1    one of those little things the bank gives you.

2         Q    Did you have any sales before that day, before

3    you saw the two guys you say that came to your store?

4         A    Yes, sir, in fact they were there when they drove

5    up in their car.  And I think they sold me about 15 pounds

6    of cans.

7         Q    No.  Did you have any sales, I said, not any

8    purchases.

9         A    Oh, no, sir, I didn't have any sales, no.

10        Q    And you bought how many pounds of cans?

11        A    Oh, I'm going to say about 15 pounds of can.

12        Q    How do you pay per pound?

13        A    Twenty-five cents.

14        Q    Is that aluminum?

15        A    That's right.

16        Q    When the first time we're talking about, where

17   was the -- we'll say the other guy you're talking about

18   that's not here, where was he in the story?  What did he do

19   the first time?

20        A    He walked back there where those ratchets was.

21        Q    Okay.

22        A    And this -- the other man followed him around

23   there.  And I walked back there and showed him where they

24   were.  And they didn't have -- he didn't have any money and

25   they left.

59

1      Q    Did you have any conversation with Mr. Johnson

2 any?

3      A    Just what I said while ago.

4      Q    The first time, did you have any conversation

5 with him?

6      A    That's when I asked him about his pants, yes,

7 sir, that was the conversation.

8      Q    Did he say anything to you?

9      A    No, he didn't.

10      Q    Okay.  So you were -- there was a one-sided

11 conversation?

12      A    The other man did.  The other man -- when I asked

13 him what happened if he dropped his pants, well, the other

14 boy said he would pull them up and he did.

15      Q    Where was this young man standing when you made

16 the comment about his pants?

17      A    Walking right beside of me.

18      Q    Inside?

19      A    Yes, walking back toward the counter.

20      Q    Okay.  Do you have any idea whereabouts this pipe

21 wrench made contact with your hand or your arm, whereabouts

22 on the wrench, do you know?

23      A    I have no idea where the exact part of it.  He

24 had it in his hand there on the end and he could have hit

25 me with any part of it, I don't know.

                   60

```
 1        Q    Okay.

 2        A    I -- it happened too fast to know exactly where

 3   he hit me with it, where it hit my arm.

 4        Q    How much did you bleed?

 5        A    A whole bunch.

 6        Q    Do you know -- are you saying that somebody took

 7   some money out of your store that day?

 8        A    Am I saying somebody took some out?

 9        Q    Yes, sir.

10        A    Yes, sir.

11        Q    All right.  Do you know whether or not you bled

12   on any of that money that was taken?

13        A    Did I have any what?

14        Q    Do you know whether or not you bled on any of the

15   money that was taken?

16        A    Well, I didn't know it until I picked some of it

17   up right on the counter that had blood on it, I didn't know

18   it.

19        Q    Do you know whether or not you bled on some of

20   the money that would have been taken from your store?

21        A    Well, no, I didn't see it.

22        Q    You don't know that, do you?

23        A    No, I don't.

24        Q    Okay.  What time of day is this supposed to have

25   happened?
```

61

1      A      About 12:30.

2      Q      Okay.  Did you see Mr. Johnson take any money

3  from your store?

4      A      No, sir.

5      Q      Did you see the other fellow take any money from

6  your store?

7      A      No, sir, I was on the floor.

8      Q      And you stated awhile ago that the hairstyle was

9  different from Mr. Johnson; is that what you're saying, at

10  that time?

11      A      When, the first time?

12      Q      Yes, sir.

13      A      Than now?

14      Q      Yes, sir.

15      A      Well, yeah, it's different.  He had some hair on

16  him.

17      Q      Was it longer?

18      A      It wasn't like a hippie, but it was longer than

19  usual.

20      Q      It wasn't like a what?

21      A      Well, you know, hippie I think they used to call

22  them.

23      Q      I'm sorry, I didn't hear what you said.

24      A      Oh, you've heard of hippies.

25      Q      I didn't hear you say that, I didn't know what

62

1    you said, I'm sorry.

2         A     Oh, okay.

3         Q     Do you normally stay inside your building waiting

4    on customers to come in?

5         A     If anybody goes in there, I do, yes.

6         Q     Well, I mean, when you go in at nine o'clock to

7    open up or whenever you open up, do you stay inside until

8    you leave?

9         A     Not inside because I buy cans outside.

10        Q     Okay.  Well, where do you normally -- when you're

11   waiting on customers, nobody's there, where are you

12   normally situated?

13        A     When there's nobody there in the inside or

14   sitting out in the front reading the paper.

15        Q     Do you ever sit out in your car?

16        A     You saw me.

17        Q     Right, that's the reason I asked.

18        A     I was fixing to leave when you come up there.

19        Q     But you don't normally sit out in your car?

20        A     No, sir.

21        Q     When did you discover that some of your money was

22   missing?

23        A     When I picked it up.

24        Q     Well, did you count it before you went to the

25   police station?

63

1      A      No, sir, I left it laying on the floor and on the

2   counter when I went to the police station.

3      Q      My question is:  When did you discover that you

4   think you had some money missing?

5      A      When I got back.

6      Q      And you don't know how much money you had before

7   this incident happened; is that right?

8      A      Well, I think pretty close to what I had -- no --

9   to the exact dollar, no.

10     Q      The second time you're talking about, how long

11  were these two individuals in the store?

12     A      Just long enough to the other man walked back

13  there and got that ratchet, brought it up there to the

14  counter, and we was in the process of closing a deal when

15  Mr. Russell hit me with a 36.

16     Q      And you said the other guy had a $10 bill?

17     A      Sir?

18     Q      You said the other fellow had a $10 bill?

19     A      Yes, that's what he gave me and I was going to

20  give him seven dollars back.

21     Q      And after you got hit, what did the other fellow

22  do?

23     A      Same thing that he did, run.

24     Q      What kind of hair did the other guy have, do you

25  remember?

                                                          64

1      A     Yeah, he had black hair and a hair -- facial hair

2  on his face.

3      Q     His hair -- top of his head, how long was his

4  hair, what did it look like?

5      A     Well, sir, I don't know how long it was, it

6  wasn't no -- it wasn't as short as yours.

7      Q     It was not as short as mine?

8      A     Not as shorts as yours, not that day.  And he had

9  a full beard or mustache, whatever you want to call it.

10     Q     Was it hanging on his shoulders?

11     A     No, sir, it was not.

12     Q     So it was longer than mine?

13     A     Well, yeah, it was a little bit longer than

14  yours, but I didn't measure it.

15     Q     I'm trying to figure out if I was a hippie by

16  your standards.

17     A     Well, you ain't.  You might have been back in

18  them days, but you're not now.

19     Q     As far as -- did you have any conversation with

20  either Mr. Ray or any of the police officers about the

21  description of the people that came into your store?

22     A     No, sir.

23     Q     You've never had a discussion with either his

24  office or the police department about what these people

25  looked like?

                                                          65

1    A    No, I didn't discuss it with them.

2             MR. WATSON:  That's all the questions I have

3    right now.

4             MR. RAY:  Nothing further of this witness,

5    Your Honor.

6             THE COURT:  That's all, thank you.

7             MR. RAY:  Call Jason Smith.

8             JASON SMITH,

9    a witness called on behalf of the State, duly sworn to tell

10   the truth, the whole truth, and nothing but the truth,

11   testified on his oath as follows:

12

13                   DIRECT EXAMINATION

14   BY MR. RAY:

15   Q    Would you state your name, please?

16   A    Jason Edward Olivia Smith.

17   Q    Sit up a little closer to that microphone,

18   Mr. Smith, and it'll pick up your voice a little and help

19   us all to hear you.  Mr. Smith, do you know a fellow named

20   Russell Don Johnson?

21   A    Yes, sir.

22   Q    Is he in the courtroom today?

23   A    Yes, sir.

24   Q    Would you point at him and give some verbal

25   description of an article of clothing that he's wearing so

66

1    we'll know who you're pointing at?

2        A    (Pointing)  He's right there wearing a

3    sweatshirt.

4                MR. RAY:  Let the record reflect that the

5    witness has identified the defendant, Russell Don Johnson.

6    BY MR. RAY:

7        Q    Mr. Smith, for the last month or so, where have

8    you been residing?

9        A    At Palo Pinto, in jail over there.

10       Q    Okay.  How long have you been in jail?

11       A    Since October.

12       Q    Okay.  Have you been convicted of one or more

13   felony offenses?

14       A    Yes.

15       Q    And what have you been convicted of?

16       A    For arson and forgery.

17       Q    And is it true that you've already come to court

18   and pled guilty?

19       A    Yes, sir.

20       Q    And you're waiting to go serve your sentences in

21   those cases?

22       A    Yes, sir.

23       Q    All right.  Have you ever been convicted of any

24   other felonies other than the arson case and the forgery?

25       A    No, sir.

                                                          67

1      Q     Okay.   Have I or anyone else made any threats

2 against you in connection with your testimony today?

3      A     No, sir.

4      Q     Have I or anyone else made any promises to you

5 regarding your testimony today?

6      A     No.

7      Q     You understand that you've taken an oath to tell

8 the truth?

9      A     Yes, sir.

10     Q     And is that what you promise to do?

11     A     Yes, sir.

12     Q     How long have you been knowing Russell Don

13 Johnson?

14     A     About three or four years.

15     Q     I want to direct your attention, Jason, to --

16 excuse me, Mr. Smith, to July the 28th of 1998, about five

17 or six months ago, okay.   Did you have an occasion to be

18 with or around Russell Don Johnson on that date?

19     A     Yes, sir.

20     Q     Are you familiar with a junk store or tool

21 variety-type junk store located in the -- about the 700

22 block of Southeast 6th Avenue in Mineral Wells?

23     A     Yes, sir.

24     Q     Did you have an occasion to go to that store on

25 July 28th of 1998?

68

1      A     Yeah, I went there to get a ratchet.

2      Q     Did you go there one or more times on that date?

3      A     I went up there twice.

4      Q     Okay.  The first time that you went in that

5 store, who went in with you?

6      A     Russell.

7      Q     And you're talking about Russell Don Johnson --

8      A     Yes, sir.

9      Q     -- the defendant here to my left?

10      A     Yes, sir.

11      Q     You indicated that you were looking for a

12 ratchet.  I want to show you a picture, Mr. Smith, State's

13 Exhibit No. 4 is marked on the back.  Will you look at the

14 tools and items laying there on the counter and see if you

15 recognize anything that would approximate what you were

16 shopping for?

17      A     It's right there.

18      Q     Is that immediately to that man's left arm is --

19      A     Yes.

20      Q     -- what kind of thing you were shopping for that

21 day?

22      A     Yes, sir.

23      Q     And you call that a ratchet?

24      A     Yes, sir.

25      Q     When you went in the first time, did you see and

69

```
 1    hear and observe an older gentleman that's depicted in

 2    State's Exhibit 4?

 3         A    Yes, sir.

 4         Q    And is he the proprietor of that place that you

 5    went?

 6         A    Yes, sir.

 7         Q    Did the owner there, Mr. Pontremoli -- it's in

 8    evidence that that's his name is Mr. Pontremoli.  Did you

 9    know his name --

10         A    It's Jim.

11         Q    Just knew him as Jim?

12         A    Yeah.

13         Q    Did he make any comment about Russell Johnson?

14         A    Yeah.

15         Q    His attire or anything that you heard?

16         A    Yes, sir.

17         Q    What kind of comment did he make?

18         A    He told him that he better pull up his pants

19    before they fell off.

20         Q    Was Russell -- did Russell have on, like, baggy

21    pants or something?

22         A    Yes, sir.

23         Q    And what, if anything, did Russell do after the

24    old guy made that comment?

25         A    Well, on the way to my house to get the money to
```

                                                               70

```
 1   pay for the ratchet, he was calling him a sorry mother --
 2   you know.
 3        Q    MF?
 4        A    Yes.
 5        Q    So was Russell upset about the comment that the
 6   old man made?
 7        A    Yeah, he appeared to be, yeah.
 8        Q    When you went in the store the first time with
 9   Russell, did you find the kind of ratchet you were looking
10   for?
11        A    Yes, sir.
12        Q    And did you talk to the owner about an
13   approximate price?
14        A    Yes.
15        Q    And what area or ballpark were y'all talking
16   about?
17        A    Around three dollars, somewhere around in there.
18        Q    Did you have the money on you to make the buy?
19        A    No, no, sir.
20        Q    Okay.  What did you have to do?
21        A    I had to go borrow it from my parents.
22        Q    Okay.  And did you do that?
23        A    Yes, sir.
24        Q    And about how long did it take you to go get the
25   money?
```

71

1    A    About 15, 20 minutes.

2    Q    And in what denomination of money did you get

3  from your -- was it your mom or dad or who?

4    A    From my mom.

5    Q    And how much money was it?

6    A    I borrowed $10 from her.

7    Q    And when you got the $10, what did you do next?

8    A    I went back to the store and bought the ratchet

9  from Jim.

10    Q    When you went in the store the second time, who,

11  if anyone, went in with you?

12    A    Russell.

13    Q    Okay.  And, again, you're talking about the

14  defendant, Russell Don Johnson?

15    A    Yes, sir.

16    Q    Did you offer to pay for the purchase price?

17    A    Yes, sir.

18    Q    And what happened about making change?

19    A    Well, I gave him a ten and he gave me a couple of

20  ones and then he was getting -- he was giving me the rest

21  of it and I was facing him and he said, what are you doing?

22  I was, like, waiting on my change.  And I turned around and

23  Russell had a big old pipe in his hand and the next thing I

24  know --

25    Q    Pipe?

72

1      A     Yes.

2      Q     What kind of implement?

3      A     Big old pipe wrench thing.

4      Q     And when Mister -- when Jim, Mr. Pontremoli was

5   making change, was it apparent that he had a bit of money

6   there?

7      A     Yes.

8      Q     Some cash?

9      A     Yes, sir.

10     Q     What happened to Mr. Pontremoli?

11     A     He got hit and he fell on the ground.

12     Q     And who hit him?

13     A     Russell.

14     Q     Okay.  You may not be able to identify it

15  exactly, but I want you to look at State's Exhibit No. 8

16  here and ask you if the implement that Russell Don Johnson

17  used to hit Mr. Pontremoli was similar to State's Exhibit

18  8?

19     A     Yes, sir.

20     Q     Mr. Smith, after Russell hit Mr. Pontremoli and

21  Mr. Pontremoli went to the floor, what, if anything,

22  happened to some or part of the money that was there?

23     A     Russell picked it up and we ran out.

24     Q     After y'all ran out, where did you go?

25     A     Back to Michael Blair's house.

73

1    Q    When you went to Michael Blair's house, did you

2  have a chance to observe Russell do anything or say

3  anything about the money?

4              MR. WATSON:  Your Honor, excuse me, I'm

5  going to object to anything that happened after anybody

6  left that store.  Any particular offense would have been

7  completed at that time, I think that's immaterial, that's

8  not relevant to the charge in this indictment.

9              THE COURT:  All right.  Overruled.

10 BY MR. RAY:

11   Q    Well, did Russell Don Johnson do or say anything

12 over there at Michael Blair's house pertaining to the money

13 that he had grabbed from Mr. Pontremoli's store?

14   A    He was counting it, and there was a little bit of

15 blood on one of them.

16   Q    Did he make any comment about a little bit of

17 blood being on there?

18   A    No, he just showed it to me and Michael.

19   Q    Okay.  And do you recall about how much money he

20 counted out there in that --

21   A    It was $60.

22   Q    And did you get any of the money?

23   A    He gave me back the 10 that I gave to Jim.

24   Q    You had handed Mr. Pontremoli $10 --

25   A    Yes.

74

1    Q    -- and you left with without it?

2    A    Yes.

3    Q    And without the ratchet?

4    A    No, I took the ratchet with me.

5    Q    I'm sorry?

6    A    I took the ratchet with me when I left, you know,

7  because I gave him the $10.

8    Q    Okay.  And the handling of the money was that

9  Russell gave you your $10 back; is that right?

10    A    Yes, sir.

11    Q    And you didn't get any more of the money or

12  anything out of it?

13    A    No.

14    Q    After that had happened, did you have an occasion

15  to be talking to the police?

16    A    Yes, I got arrested for driving with suspended

17  license.

18    Q    And that's a misdemeanor, right?

19    A    Yes, sir.

20    Q    And when you were talking to the police, what, if

21  anything, came up about the robbery and how did that come

22  up?

23    A    Well, I told them about it because I told my mom

24  about it and she told me that, you know, it'd be better for

25  me to tell them, rather, you know --

75

Case 4:16-cv-01067-Y   Document 12-9   Filed 02/17/17   Page 76 of 142   PageID 290

1      Q     And so when they were talking to you about the

2 driving without a license, you told the police about it?

3      A     Yeah, I told Mike McAllester.

4      Q     Did you know when y'all went back down there the

5 second time to get the ratchet that Russell was going to do

6 anything to Mr. Pontremoli?

7      A     No.

8      Q     Did you -- you did know that Russell was kind of

9 PO'd about the comment about his baggy britches, right?

10      A     Uh-huh, yes, sir.

11      Q     Did you grab any of the money when Russell hit

12 the man and he went down?

13      A     No, I just had my ratchet.

14            MR. RAY:  Pass the witness.

15

16                    CROSS-EXAMINATION

17 BY MR. WATSON:

18      Q     What was the ratchet for?

19      A     To fix a starter on my car.

20      Q     And what kind of parts were involved in fixing

21 that starter?

22      A     I had to take it off because it was jammed, it

23 wouldn't engage into the flywheel.

24      Q     Did it require the purchase of any parts?

25      A     No.  I just had to take it off and get it

                                                        76

1    unstuck.

2         Q     Had you done that previous?

3         A     Yeah.

4         Q     What did you use to do it previously?

5         A     Used a screwdriver to pop it back out and I

6    borrowed a friend of mine's ratchet.

7         Q     What did you think the ratchet was going to cost

8    you?

9         A     I don't know, I figured about two, three dollars.

10        Q     Why did you go down there without any money?

11        A     Because I wanted to make sure how much it was so

12   I could tell my mom so I could get the money for it.

13        Q     Well, you knew basically what it was going to

14   cost, didn't you?

15        A     Well, I had a pretty good idea.

16        Q     You knew it wasn't going to be a 20, 30-dollar

17   deal, didn't you?

18        A     Yeah, but I wasn't for sure.  And I wasn't even

19   for sure he had a ratchet down there, you know.

20        Q     How far -- did you have to go to your mother's

21   home?

22        A     Yes, sir.

23        Q     How far does she live from Mr. Pontremoli's

24   store?

25        A     She lives over behind the movie theater.

                                                              77

1    Q    What did you tell her the money was for?

2    A    I was -- told her I was getting a ratchet so I

3 could try to fix my starter.

4    Q    Were you employed at that time?

5    A    Yes, sir.

6    Q    Where were you working?

7    A    I was working for Kevin Lagle putting in

8 sprinkler systems.

9    Q    What kind of money were you making?

10    A    I made about -- well, if we worked all week, I'd

11 make about 160, 170 something like that.

12    Q    Did you work that week?

13    A    I worked two days that week.

14    Q    What day of the week is this supposed to have

15 happened, July 28th?

16    A    I'm not sure.

17    Q    You had no money?

18    A    No.

19    Q    Did you have a paycheck a few days from that date

20 or do you recall?

21    A    No.

22    Q    You don't remember or you didn't have a paycheck?

23    A    No, I didn't have a paycheck.

24    Q    Did you have one coming?

25    A    I had one coming, yeah.

78

KIM A. BROOKS, OFFICIAL COURT REPORTER

```
 1        Q    Was it already earned?

 2        A    Yes, sir.

 3        Q    You just had to go get it?

 4        A    Yeah.  But I couldn't get it until Friday when he

 5   paid everybody.

 6        Q    Okay.  You knew about this store and

 7   Mr. Pontremoli, right?

 8        A    Yes.

 9        Q    You had knowledge of this?

10        A    Yes.

11        Q    Russell had no idea who this guy was, right?

12        A    No.  I've sold him -- I've sold him cans and

13   stuff before.

14        Q    Right.  And you knew about Mr. Pontremoli having

15   the money in his pocket, didn't you?

16        A    No, I just knew he sold -- you know, he bought

17   cans.

18        Q    You sold him cans before?

19        A    Yes.

20        Q    Did he give you cash?

21        A    Yes.

22        Q    Or pay you?

23        A    Yes.

24        Q    Did he get the money out of his pocket?

25        A    No, he had it in a little bank bag thing.  This
```

79

1    had been a while back.

2         Q    Did he have a cash register then when he

3    bought --

4         A    Yeah.

5         Q    -- and sold cans to you?

6         A    Yes.

7         Q    And did he operate a cash register on July the

8    28th, 1998?

9         A    No.

10        Q    How -- what kind of money did he have?  How did

11   he have it?

12        A    He just had some ones and some fives, had it in

13   his pocket that day because he pulled it out and was giving

14   me change.

15        Q    How long were you in the store the first time you

16   and Russell went in there?

17        A    About five minutes.

18        Q    Did you look around or did you just go straight

19   to a ratchet and say, that's what I want, how much is it,

20   I'll be back in a minute, or what did you do?

21        A    Well, I looked around for a little bit until I

22   found one and then I found one and I talked to him about

23   the price on it; he told me and I went and got the money

24   from my parents and I came back.  Because when I left, I

25   left the ratchet on the counter the first time, that way I

                                                            80

```
 1    told him I would be back to get it.

 2         Q    Were you sober that day when you went in there?

 3         A    Yes.

 4         Q    Were you on drugs or anything?

 5         A    No.

 6         Q    Not at all?

 7         A    I did some the day before that, but not that day.

 8         Q    Is that why you didn't have any money, you bought

 9    some drugs?

10         A    Well, I bought some beer with some of my money,

11    over there, me and Michael drank some, that was the day

12    before.

13         Q    But you had done some dope the day before?

14         A    Yeah.

15         Q    And did you spend your money to buy dope?

16         A    A little bit of it.

17         Q    Where did you get the rest of it?

18         A    I went and got it from my mom and them.

19         Q    So your mother had made you two loans, one to buy

20    dope and one to buy a ratchet within 48 hours; is that

21    right?

22         A    Yes.

23         Q    Did she know what the dope money was for?

24         A    No.

25         Q    How much did she loan you?
```

81

KIM A. BROOKS, OFFICIAL COURT REPORTER

1    A    Like, 10 bucks because Michael had some money,
2 too, so I just put -- went and got some money from my mom
3 and put with his.
4    Q    And you've been convicted of a forgery which is a
5 felony; is that right?
6    A    Yes, sir.
7    Q    Arson?
8    A    Yes, sir.
9    Q    What did you burn?
10    A    A house.
11         MR. RAY:  Objection, Your Honor, relevant
12 for impeachment.
13         THE COURT:  Sustained.
14 BY MR. WATSON:
15    Q    What misdemeanors have you been convicted of?
16         MR. RAY:  Objection, Your Honor, unless it's
17 shown to be proper for impeachment to be moral turpitude.
18         MR. WATSON:  Well, Your Honor, I don't know
19 until he tells me.
20         THE COURT:  I'll admit it.
21 BY MR. WATSON:
22    Q    You've been convicted of a misdemeanor?
23    A    Yes.
24    Q    What?
25    A    PI.

82

```
 1      Q    What's that?

 2      A    Public intoxication.

 3      Q    And when was that?

 4      A    Oh, man, it's been awhile, it's been awhile.

 5      Q    How many PIs have you been convicted of?

 6      A    Two, three.

 7      Q    What other --

 8      A    Maybe four, I'm not real sure.

 9      Q    I'm sorry?

10      A    Maybe four, I'm not real sure.

11      Q    What other misdemeanors have you been convicted

12 of?

13      A    Driving with suspended license, no driver's

14 license, and stuff like that.

15      Q    What else?

16      A    Huh?

17      Q    What else?

18      A    I think that's -- I think that's about it.

19      Q    Does that pretty well cover it?

20      A    Yeah.

21      Q    You had it in your mind when you went back to

22 that store, didn't you, you were going to rob that old man,

23 didn't you, Jason?

24      A    No, sir.

25      Q    You had that in your mind, didn't you?
```

83

KIM A. BROOKS, OFFICIAL COURT REPORTER

1        A        No, sir.

2        Q        You were high on drugs that day, weren't you?

3        A        No, sir, that was the day before.

4        Q        You didn't make a comment to Michael, something

5    about going down and hitting that man in the head with a

6    hammer?

7        A        No, sir.

8        Q        You don't remember that?

9        A        No, sir.

10       Q        You don't remember talking to me over at the

11   county jail three days ago when you told me that?

12       A        I remember you coming --

13       Q        You don't remember that?

14       A        I remember you coming over there and was trying

15   to ask me about it.

16       Q        Do you remember telling me that you made the

17   comment about hitting that old man in the head with a

18   hammer?  Did you make that comment to me?

19       A        No, sir, I told you that I wasn't going to talk

20   to you.

21       Q        You told me what?

22       A        I told you -- when you came over there the first

23   time, you asked me what happened.  I told you I didn't know

24   and Russell said for me to go --

25       Q        Did you tell --

                                                              84

1           MR. RAY:  Your Honor, I'm going to object.

2   He asked a question, and I want him to have a chance to

3   answer it.

4           THE COURT:  I'll let him answer.

5           THE WITNESS:  Okay.  You come over there

6   and was questioning me with Russell, and I told you I

7   didn't know nothing about it.  And Russell said to go ahead

8   and tell you.

9           MR. WATSON:  Your Honor, that is -- my

10  question was --

11          THE COURT:  All right.  I'll sustain the

12  objection to any answer after that.

13  BY MR. WATSON:

14      Q    Okay.  And you're denying today under oath about

15  your business about telling -- hitting that old man in the

16  head with a hammer, you're denying that?

17      A    Yes.

18      Q    You didn't say that?

19      A    No, I didn't.

20      Q    Did it ever occur to you that if this happened

21  the way you're talking about to stay there and try to help

22  this man?

23      A    I was scared because I almost got hit in the head

24  in the process.

25      Q    Did it occur to you to stay there and help this

                                                        85

```
 1   man?
 2       A     No, because I was scared, I didn't know what to
 3   do.
 4                 MR. WATSON:  I'll pass the witness.
 5
 6                     REDIRECT EXAMINATION
 7   BY MR. RAY:
 8       Q     Just two things.  Did it occur to Russell to stay
 9   there and help the man?
10       A     No, sir.
11       Q     It occurred to Russell to hit him with this pipe
12   wrench, State's Exhibit 8, right?
13       A     Yes, sir.
14       Q     And to steal his money?
15       A     Yes, sir.
16                 MR. RAY:  No further questions.
17
18                    RECROSS-EXAMINATION
19   BY MR. WATSON:
20       Q     Did you -- what kind of change did Mr. Pontremoli
21   give you before you left?
22       A     He gave me some ones and a five.
23       Q     Ones and a five?
24       A     Uh-huh.
25       Q     So you got your seven dollars change?
```

86

```
1        A     Yeah.

2        Q     Is that right?

3        A     Uh-huh.

4        Q     You left with a ratchet?

5        A     He was counting -- he was counting it out and

6    then he got hit and then when we went back to Mike's house,

7    Russell gave me my $10.

8        Q     Did you leave with the ratchet and seven dollars

9    change?

10       A     No, sir, I left with the ratchet.  I had it in my

11   hand when I left.

12       Q     The first time that y'all went over there, did

13   Mr. Pontremoli have an opportunity to talk directly

14   face-to-face with Russell or just make the comment about

15   his pants?

16       A     Well, he just made the comment about his pants.

17       Q     Okay.  So you're the man he was looking at and

18   the man he was dealing with?

19       A     No, he was looking -- yeah, I was dealing with

20   him, but he was looking at Russell and made a comment about

21   his pants because Russell was standing there with him.

22       Q     But he never dealt face-to-face and had a

23   conversation with Russell; is that right?

24             MR. RAY:  Objection, that's not what he

25   said, Your Honor.
```

                                                              87

1    BY MR. RAY:

2        Q    All right.  Did he?

3        A    No.

4        Q    And the second time you went over there, did he

5    have any conversation with Russell?

6        A    No.

7        Q    And as you were buying this ratchet, where was

8    Russell standing?

9        A    Kind of behind me off to the side a little bit.

10       Q    With his back to you?

11       A    No, he was facing me.  I was facing Jim -- the

12   guy paying him for the ratchet.

13       Q    Did Russell have his back to you or was he facing

14   you?

15       A    He was facing me.

16            MR. WATSON:  That's all the questions I

17   have.

18            MR. RAY:  Nothing further of this witness.

19            THE COURT:  That's all, thank you.

20            MR. RAY:  May we approach, Your Honor?

21            THE COURT:  All right.

22            (Conference at the bench.)

23            THE COURT:  We'll recess, it's almost the

24   middle of the afternoon, about 10 minutes, ladies and

25   gentlemen.

88

```
 1                    (Jury out 2:53 p.m.)

 2                    (Jury in 3:06 p.m.)

 3                    MIKE MCALLESTER,

 4    a witness called on behalf of the State, duly sworn to tell

 5    the truth, the whole truth, and nothing but the truth,

 6    testified on his oath as follows:

 7

 8                    DIRECT EXAMINATION

 9    BY MR. RAY:

10         Q    Would you state your name, please?

11         A    Mike McAllester.

12         Q    How are you employed, sir?

13         A    I'm a detective with the Mineral Wells Police

14    Department.

15         Q    And are you a certified peace officer in the

16    state of Texas?

17         A    Yes, sir, I am.

18         Q    How long have you been so certified?

19         A    Fourteen years.

20         Q    And how long is your law enforcement career span?

21         A    Twenty, twenty years.

22         Q    What is your present rank and position

23    assignment?

24         A    I'm a lieutenant and I command the criminal

25    investigation division of the Mineral Wells Police
```

89

1   Department.

2       Q      And is that the division of our Mineral Wells

3   Police Department where the detectives would be assigned?

4       A      Yes, sir, it is.

5       Q      Detective McAllester, were you aware of an

6   aggravated robbery involving a victim named Jim or Jimmie

7   Pontremoli on July 28th, 1998?

8       A      Wasn't aware of that specific offense, but I was

9   aware that an event occurred on the 28th of July involving

10  Mr. Pontremoli.

11      Q      And did you participate in the investigation?

12      A      Yes, sir, I did.

13      Q      Do you know of a person named Michael Dewayne

14  Blair or Dewayne Blair?

15      A      Yes, sir, I do.

16      Q      And as part of the investigation of the robbery

17  of Mr. Pontremoli, did you have an occasion to find him and

18  locate him as to information he might have regarding the

19  case?

20      A      Yes, sir, I did.

21      Q      Did you interview him?

22      A      Yes, sir.

23      Q      Did you take a statement from him?

24      A      Yes, sir, I did.

25      Q      And did you give that statement to me as part of

90

1   my case file?

2       A    Yes, sir, I did.

3       Q    And pursuant to your interview with him and you

4   reporting that to me, to your knowledge did I issue or

5   cause to be issued by the clerk of this court a subpoena

6   for Dewayne Blair, Michael Dewayne Blair?

7       A    Yes, sir.

8       Q    And at my request -- or did I ask you to oversee

9   the service of subpoenas for the various witnesses that

10  might be called to testify during this trial?

11      A    Yes, sir, you did.

12      Q    And did you either serve or oversee or cause a

13  subpoena to be served on Dewayne Blair, Michael --

14          MR. WATSON:  Your Honor, if I may, let me

15  object to that.  I don't see that that's relevant.  As far

16  as procedural matter with the State of Texas or the

17  District Attorney's office and Mineral Wells PD, I think

18  that's immaterial and irrelevant, a subpoena being served

19  as a fact to this case.  We're going to object to that.

20          THE COURT:  All right.  Overruled.  I'll

21  hear it.

22  BY MR. RAY:

23      Q    Was Mr. Blair served?

24      A    Yes, sir, he was.

25      Q    And the later part of last week, did I schedule

91

1    meetings to meet with the various witnesses and to talk to

2    them about the case?

3        A    Yes, sir, you did.

4        Q    And was Mr. Blair instructed to attend a pretrial

5    witness meeting?

6        A    Yes, sir, he was.

7        Q    To your knowledge did he show up or fail to show

8    up at the witness meeting?

9        A    He failed to show up.

10       Q    And this was after he had been served with a

11   subpoena?

12       A    Yes, sir.

13       Q    Let me hand you --

14                    (State's Exhibit No. 11 was marked

15                     for identification by the court

16                     reporter.)

17   BY MR. RAY:

18       Q    -- what has been marked for identification by

19   the court reporter as State's Exhibit No. 11, and I'll ask

20   you what that document is?

21       A    It's a subpoena.  It's the original copy of a

22   subpoena that's issued for witnesses to appear.

23       Q    And does that subpoena -- is that the original or

24   the part that is returned to the court after somebody's

25   been served.

                                                          92

```
 1        A     Yes, this is the part that comes back that's

 2   returned to the court.

 3        Q     And was Dewayne Blair included as one of the

 4   witnesses listed on that subpoena?

 5        A     Yes, sir, he was.

 6        Q     And what time and date was he subpoenaed to be in

 7   court?

 8        A     9:00 a.m. on the 14th day of December.

 9        Q     And is that 1998?

10        A     Yes, sir.

11        Q     Is that today's date?

12        A     Yes, sir, it is.

13        Q     After Mr. Blair didn't show up at the witness

14   meeting late last week, what, if any, efforts were

15   undertaken by the police department to locate him and

16   assure that he would be here this morning?

17        A     Attempted all weekend to locate him and continued

18   all day today, haven't been able to find him.

19        Q     Under your direction have they gone to his

20   residence, the place where he was served with the subpoena,

21   and tried to locate him?

22        A     Yes, sir, they have.

23        Q     Have they been to other locations?

24        A     Yes, sir, they have.

25        Q     Have they been to locations outside of Mineral
```

93

1    Wells and other parts of Palo Pinto County looking for him?

2        A    Yes, sir, the sheriff's office has.

3        Q    Has anybody been able to locate him?

4        A    No, sir.

5        Q    Did he show up this morning at nine o'clock or at

6    any time since that time all day today while this trial has

7    been going on?

8        A    No, sir, he hasn't.

9        Q    Do you any idea where his whereabouts are right

10   now?

11       A    No, sir, I do not.

12       Q    You do know that he knew about the trial and his

13   obligation to be here to testify?

14       A    Yes, sir, he did.

15       Q    And have all reasonable efforts been made to the

16   best of your knowledge to secure his presence and testimony

17   in this trial?

18       A    Yes, sir, they have.

19                MR. RAY:  I'll pass the witness.

20                MR. WATSON:  I have no questions.

21                MR. RAY:  I'll offer 11, Your Honor.

22                THE COURT:  It's admitted.

23                    (State's Exhibit No. 11 was

24                     received into evidence.)

25                MR. RAY:  Your Honor and ladies and

94

```
 1    gentlemen of the jury; the State rests our case.
 2                  THE COURT:  Does the defendant want to make
 3    an opening statement?
 4                  MR. WATSON:  No, Your Honor.  I'll call Dean
 5    Fowler.
 6                         DEAN FOWLER,
 7    a witness called on behalf of the Defense, duly sworn to
 8    tell the truth, the whole truth, and nothing but the truth,
 9    testified on his oath as follows:
10
11                       DIRECT EXAMINATION
12    BY MR. WATSON:
13        Q    Mr. Fowler, state your full name for the jury,
14    please.
15        A    Lowell Dean Crandel Fowler.
16        Q    And, Mr. Fowler, where do you live?
17        A    I live in Pleasant Valley.
18        Q    And are you employed?
19        A    No, sir, not at this time, I'm injured.
20        Q    Okay.  Through your employment?
21        A    No, I was self-employed and got hurt on the job.
22        Q    Okay.  I understand.  Do you know Russell Don
23    Johnson sitting here to my right?
24        A    Yes, sir.
25        Q    How long have you known him?
```

95

```
1      A     All of his life.

2      Q     And is he -- how have you known him, in what --

3      A     Well, he's been to my house to eat a lot of

4   times.  I got a place on the river, he's been down there

5   fishing.

6      Q     Okay.

7      A     He's --

8      Q     Excuse me, I'm sorry, I didn't mean to interrupt

9   you.

10      A     He was always around me, he acted like a

11   gentleman.

12      Q     Do you consider him to be a good boy?

13      A     Yes, sir.

14      Q     Okay.  Do you know that he has a three-year-old

15   son?

16      A     Yes, sir.

17      Q     Do you know that he's been in the Palo Pinto

18   County Jail about five months?

19      A     I didn't know that until yesterday.

20            MR. WATSON:  That's all the questions I

21   have.

22

23                  CROSS-EXAMINATION

24   BY MR. RAY:

25      Q     You indicated that you know him to be a good boy
```

                                                    96

1    I believe you said?

2        A     Yes, sir.

3        Q     And you've been knowing him all of his life?

4        A     (Witness nods.)

5        Q     Are you familiar with any problems he's had with

6    the law?

7        A     No, sir.

8        Q     Are you familiar --

9              MR. WATSON:  Your Honor, excuse me, I'm

10   going to object to any question along those lines.  This is

11   a character witness, those are improper questions where

12   he's going with this.  It assumes facts about any question

13   he might ask.  That is improper cross-examination.

14             MR. RAY:  Door's wide open.

15             THE COURT:  He can test him, overruled.

16   BY MR. RAY:

17       Q     When you told the jury that he's a good boy and

18   you've been knowing him all his life, are you telling them

19   that you know him so well that you would be familiar with

20   whether or not he had any trouble with the law?

21       A     I have not known of him in the last three years.

22       Q     So you don't know whether he's been a good boy in

23   the last three years or not?

24       A     That's -- the last three years is all.

25       Q     Well -- I'm sorry now?

                                                          97

1      A     The last three years, I haven't been acquainted
2   with him that much the last three years.
3      Q     Okay.  So you don't know and you're not telling
4   the jury that he's been a good boy the last three years,
5   are you?
6      A     I don't know that, sir.
7      Q     Okay.  So all you could be talking about would be
8   more than three years ago and it wouldn't have anything to
9   do with anything relevant to July the 28th of 1998, would
10  it?
11     A     I don't -- didn't even know anything.
12     Q     You haven't even been familiar with him for three
13  whole years?
14     A     No, no.
15           MR. RAY:  I don't have any further questions
16  for you.
17           MR. WATSON:  That's all the question I have.
18           THE COURT:  That's all, thank you.
19           MR. WATSON:  Call George Holland.
20           GEORGE HOLLAND,
21  a witness called on behalf of the Defense, duly sworn to
22  tell the truth, the whole truth, and nothing but the truth,
23  testified on his oath as follows:
24
25

98

1        <u>DIRECT EXAMINATION</u>

2   BY MR. WATSON:

3        Q    State your full name, please, sir.

4        A    George Holland.

5        Q    Mr. Holland, where do you live?

6        A    Live out in southeast Mineral Wells.

7        Q    Okay.  Are you employed?

8        A    No, sir, I'm retired.

9        Q    Retired.  Do you know Russell Don Johnson sitting

10  here to my right?

11       A    Yes, I do.

12       Q    How long have you known him?

13       A    All of his life.

14       Q    And have you had an opportunity to have been

15  around him previously?

16       A    Yes.

17       Q    Is he related to you in any way?

18       A    Yes.  His mother is my niece.

19       Q    Okay.  So you've had an opportunity to see him

20  over a period of time?

21       A    Oh, yes.

22       Q    Do you know that he has a three-year-old son?

23       A    Yes.

24       Q    Did you know that he's been in Palo Pinto County

25  Jail for the last five months or so?

                                                            99

1    A    Yes.

2    Q    As a result of this charge we're talking about?

3    A    Yes.

4    Q    Has he always in your presence conducted himself

5  in a proper manner?

6    A    Yes, he has.

7         MR. WATSON:  Pass the witness.

8

9              CROSS-EXAMINATION

10  BY MR. RAY:

11    Q    You're not saying, are you, that he has a good

12  reputation, are you?

13         MR. WATSON:  Objection, Your Honor, that is

14  an improper question.

15         THE COURT:  I'll sustain that objection.

16  BY MR. RAY:

17    Q    How often would you be around him?

18    A    He lived half a mile from me and -- I wouldn't --

19  I don't know, just occasionally when we were together.

20    Q    And so really all you're telling the jury is that

21  when he's been in front of you, he hasn't been doing

22  anything bad; is that right?

23    A    In my presence I've never known of him doing

24  anything bad, no.

25    Q    I understand.  And the extent of -- well, let me

100

1    ask you this:  In the last year and a half, how often have

2    you seen him, total?

3         A    Well, I saw him when his granddaddy passed away.

4         Q    One time?

5         A    (Witness nods.)

6         Q    And in the last year and a half, that would be

7    the extent of your opportunity to see and observe his

8    behavior, is that a fair statement?

9         A    That's all I know.

10                   MR. RAY:  All right.  I don't have any

11   further questions.

12                   MR. WATSON:  I have no further questions.

13                   THE COURT:  Thank you, Mr. Holland.

14                   THE WITNESS:  Thank you.

15                   MR. WATSON:  Call Lonnie Johnson.

16                        LONNIE JOHNSON,

17   a witness called on behalf of the Defense, duly sworn to

18   tell the truth, the whole truth, and nothing but the truth,

19   testified on his oath as follows:

20

21                      DIRECT EXAMINATION

22   BY MR. WATSON:

23        Q    Just have a seat.

24        A    All right.

25        Q    State your full name, please.

                                                         101

1      A     Lonnie C. Johnson, Sr.

2      Q     And where do you live, sir?

3      A     Pleasant Valley.

4      Q     Do you know Russell Johnson sitting here to my

5    right?

6      A     Yes, I do, he's my nephew.

7      Q     And you've known him all his life, I take it.

8      A     I sure have.

9      Q     Are you aware he's been in the county jail for

10   the last five or six months?

11     A     Yes, I have.

12     Q     Five months on this particular charge.  The times

13   he's been around you, has he conducted himself in a proper

14   way?

15     A     He's always been respectful to my wife and I.

16           MR. WATSON:  I'll pass the witness.

17

18                    CROSS-EXAMINATION

19   BY MR. RAY:

20     Q     You don't know how he's acted toward other

21   people, do you?

22     A     He's -- up to about 15, stuck around my house and

23   went fishing with my boys, and he's never give no

24   problems.  And since he's been about 15, up, you know, he's

25   kind of growed away from us and I haven't seen much, but I

                                                          102

1    have never seen him ever be aggressive towards anybody

2    else.

3         Q     And you're not saying that he hasn't, you're just

4    saying you haven't seen it?

5         A     That's right.

6         Q     Is that right?

7         A     I just --

8         Q     And, Mr. Johnson, in the last three years, how

9    often would you have seen him?

10        A     Oh, just a few times a year.

11        Q     Uh-huh.   Couple?

12        A     Yes, sir.

13        Q     And that would be over the last three years?

14        A     Yes, sir.

15        Q     Okay.   In the last year and a half, how long --

16   how many times would you have seen him, total?

17        A     I probably haven't seen him but once.   I think I

18   seen him, it was this summer, in July is the last time I

19   seen him.

20        Q     And you don't know how he's been acting or what

21   he's been doing when he wasn't around you, do you?

22        A     No, sir, I don't.

23             MR. RAY:   I don't have any further

24   questions.

25             MR. WATSON:   That's all the questions we

                                                          103

```
 1    have, Your Honor.
 2                 THE COURT:  All right.
 3                 MR. WATSON:  And we rest, Your Honor.
 4                 MR. RAY:  We're going to close, Your Honor.
 5                 MR. WATSON:  We close.
 6                 THE COURT:  All right.  Ladies and
 7    gentlemen, we'll recess for about -- we'll try to be ready
 8    for you in 20 minutes.  Thank you very much.  Please
 9    remember your instructions.
10                     (Jury out at 3:21 p.m.)
11                 MR. WATSON:  Judge, if I may, I'd like to
12    make a formal request at this time in this Cause No.
13    11,154.  Defendant would request the Court to charge the
14    jury on a lesser charge of aggravated assault.  There's a
15    dispute among the testimony -- or between the witnesses and
16    the testimony regarding any theft or attempted theft by the
17    defendant, Russell Don Johnson.  We think this lesser
18    charge is in this case and request the Court to instruct
19    the jury on the lesser charge of aggravated assault.
20                 THE COURT:  All right.  That objection and
21    request is overruled and denied.
22                 MR. RAY:  The State has no objections to
23    the charge.
24                     (Jury in at 3:41 p.m.)
25                 THE COURT:  Ladies and gentlemen, I will
```

                                                                104

1   read the charge to you in this case, the attorneys will

2   then make their closing remarks and you will retire to

3   deliberate.  During your deliberations you will, of course,

4   have the charge with you to read and reread as many times

5   as you feel you need to.

6                 (Court's charge read.)

7      Gentlemen.

8            MR. RAY:  May it please the Court?

9            THE COURT:  Yes.

10          MR. RAY:  Mr. Watson.  Good afternoon again,

11   ladies and gentlemen.  It did not take us a long time to

12   present the evidence in this case, but that doesn't mean

13   that the case isn't important or that this isn't serious

14   business.  It just means that we were able to move along

15   and present what evidence was available and necessary in a

16   relatively short period of time.

17       I discussed with you during Voir Dire what the

18   elements of the crime of aggravated robbery are.  I

19   discussed with you then in my opening statement earlier

20   this afternoon how we were going to prove each of those

21   elements of the crime to you beyond a reasonable doubt.

22       And now even though we're given 10 or 15 minutes

23   to make our closing remarks, I'm not going to take long.

24   I don't think it takes that long to remind you, that I want

25   to take the opportunity to do now, that we did exactly

1    that.  We've proved every one of those elements of the

2    offense of aggravated robbery to you and we did so in

3    undisputed testimony.  There's just not a single fact in

4    this case that's disputed as we hand the case over the

5    railing to you.

6         What are the elements of aggravated robbery?  The

7    Court sets them out in paragraph five.  Now, if you find

8    from the evidence beyond a reasonable doubt that on or

9    about the 28th day of July, 1998 -- that's the first thing

10   we have to prove to you about when it happened.  There's

11   absolutely no dispute, July 28th, 1998, there's not a

12   single shred of evidence to the contrary.  In Palo Pinto

13   County, Texas -- two or three witnesses, Mr. Pontremoli

14   obviously knows where his store is.  Detective Wiggington

15   went back to that location, both of them testified that

16   it's in Mineral Wells, Palo Pinto County, State of Texas.

17   We've proven venue, this Court is the proper place to bring

18   this trial.

19        Number three, the defendant, Russell Don Johnson.

20   The only fact witnesses who testified about who committed

21   this crime -- you understand there were only three people

22   present and Mr. Pontremoli --

23        MR. WATSON:  Your Honor, I'm going to object

24   to that comment, that's a reference on the fact that this

25   defendant is not testifying.  I'm going to object to that

                                                           106

1    and ask the Court to instruct the jury to disregard that.

2              THE COURT:  I'll overrule that objection.

3              MR. WATSON:  And request a mistrial.

4              THE COURT:  Overruled.

5              MR. RAY:  The victim, Mr. Pontremoli,

6    indicated to you in no uncertain terms, it's unchallenged,

7    who it was that hit him with this weapon, 36-inch pipe

8    wrench, on July 28th; and Jason Olivia Smith, who was

9    present, also indicated to you who hit him.  Mr. Pontremoli

10   indicated that he knew Jason, not by name, but because of

11   selling cans or seeing him go in the store adjacent there,

12   knew him, but he wasn't the one that hit him, that Russell

13   Don Johnson was the one that hit him.  And you have the

14   testimony that's undisputed that Russell Don Johnson is the

15   perpetrator of this crime.

16             Let's move on with the elements.  While in the

17   course of committing theft of property, with the intent to

18   maintain or exercise control of the property.  You have the

19   testimony of Jason Smith, corroborated by Mr. Pontremoli.

20   Mr. Pontremoli indicated to you that he made change out of

21   his pocket -- and I certainly think that y'all don't have

22   any doubt at all about how that gentleman conducted his

23   business and made change and so forth.

24             The simple truth is that when he pulled out a

25   stack of one dollar bills and then a stack of five dollar

                                                            107

1   bills, it was just too much temptation for him to take that

2   man's money.  He's older, he's not able to defend himself,

3   and certainly not with an unprovoked or unwarned attack

4   with an instrument like this.

5           And you know that Mr. Pontremoli indicated to

6   you, approximately, there wasn't any way he would know

7   exactly the penny, but approximately that when he started

8   doing his run that day, that he had approximately 25 ones

9   and 20 fives.  And after Russell Johnson hit him during the

10  robbery, the money all scattered and fell on the floor and

11  blood apparently got on at least two of the bills, that he

12  locked his store, and not the wise thing to do, but to try

13  to catch up to them or give chase, but that's what he

14  decided to try to do.

15          It wasn't successful in doing that and then went

16  back to the store, unlocked it, went in, and gathered

17  together what was left of his money.  And he said -- you

18  remember, he said he had 10 or 12 fives left and about 15

19  ones.  And the only outgo he'd had out of that $125 was to

20  buy 15 pounds of aluminum cans at 25 cents a pound, so you

21  do the math.  He would have expended maybe four bucks,

22  something like that, in buying 15 pounds and should have

23  had $120 or so left there.  And he only had -- if you take

24  the estimates, around $75.  That also coincides with the

25  count of the money that was done at Michael Blair's house

                                                          108

1    when Russell Johnson counted out approximately $60.  You do

2    the math there and take into account that it was just an

3    estimate.  If there were 10 fives, that would be 50, plus

4    15 ones, that would be 65, subtracted would be about 60

5    bucks, in that neighborhood.  Y'all know what happened on

6    July the 28th of 1998, it's undisputed.

7            The rest of the elements have to do with -- it

8    didn't take long, but we brought you the medical evidence.

9    It would have been sufficient, and you know it would have,

10   for common sense to plug in and for Jimmie Pontremoli to

11   tell you that it hurt when Russell Johnson hit him with

12   this pipe wrench.  It didn't have to break his arm, it

13   didn't have to bleed, it didn't have to do anything but

14   hurt.  And you know it did.  It fractured his arm in this

15   case, and the doctor indicated that that would certainly

16   cause physical pain in a human being and Mr. Pontremoli, of

17   course, confirmed that.

18           We don't have to prove serious bodily injury.  I

19   think we did, I think we did, but we don't have to.  We

20   don't have to prove that this is a deadly weapon, but I

21   think it is.  And you heard the testimony of the witnesses,

22   if this is swung at someone's head, and you know how this

23   scene unfolded, if that elderly gentleman had not gotten

24   his arm up, you know what we'd been trying right now; and

25   it wouldn't be a robbery case.  If he hit him in the head

109

1    with this, swung by a man the size and strength and --

2              MR. WATSON:  Your Honor, I'm going object to

3    that as improper argument, that's speculation, that's

4    improper, that's outside of the scope.

5              THE COURT:  You'll be guided by the

6    testimony in this case as you've heard it, ladies and

7    gentlemen.

8              MR. RAY:  You heard Dr. Allensworth's

9    testimony, so that's what I had reference to in summing up

10   the evidence.

11         The element is that he caused bodily injury,

12   regular bodily injury, anything that causes physical pain;

13   the definition is there for you.  And coupled with what

14   last element?  The victim was then and there an individual,

15   a person 65 years of age or older.  Mr. Pontremoli

16   indicated to you, as well as you have it in evidence in the

17   patient history if you want to carry it back there, there's

18   just not any doubt about, 71 years old and in three more

19   days he'll be 72.  Six months ago he still would have been

20   71 years of age, well above 65.

21         The case is simple.  It's important.  It is

22   serious conduct.  It's dangerous conduct.  It's an

23   aggravated robbery and we've proved to you every element

24   beyond a reasonable doubt and we've even proven more than

25   that, and I have reference there to the business of serious

                                                        110

1    bodily injury where his arm just doesn't work right.  He

2    doesn't have the rotation of it, protracted impairment of a

3    bodily member.  We proved way more than a minimum that the

4    law requires.

5            The summary is that you have every element before

6    you beyond a reasonable doubt uncontested.  And your

7    verdict, you know it just as well as we're standing here,

8    it's guilty as charged.  And the verdict form, the last

9    page that Judge Cleveland made reference to is a verdict

10   form, it's a sheet.

11           And there are two possible verdicts on here.  The

12   top half of the page would be -- first of all, y'all would

13   elect a presiding juror, and whomever the presiding juror

14   is would be the one whose signature would be affixed on

15   the line indicating what your unanimous verdict is.

16           The top verdict choice is if you find him not

17   guilty.  And if you think we haven't proved our case, just

18   go back there and find him not guilty.  But if you believe,

19   as I have summarized the evidence, that we've proved all

20   these elements to you beyond a reasonable doubt, it's

21   uncontested, then your verdict, ladies and gentlemen, is

22   the second choice, we, the jury, find the defendant guilty

23   of aggravated robbery as alleged in the indictment and the

24   foreperson would affix his or her signature to the second

25   verdict form.

111

1    That's your verdict based on the evidence.  We

2    told you we'd prove it to you, we did, now we're turning it

3    over to you.  Thank you very much.

4              MR. WATSON:  May it please the Court?

5    Mr. Ray.

6              THE COURT:  Yes, sir.

7              MR. WATSON:  Ladies and gentlemen, I want to

8    thank all of y'all for taking the time out to be a juror in

9    this case.  I'll be very brief, I want to cover some things

10   with you.

11             Mr. Pontremoli -- we have two people that we're

12   dealing with, Mr. Pontremoli and Jason Smith.  I suggest

13   initially Mr. Pontremoli's concern -- the only time that I

14   recall that he paid attention to Mr. Johnson was he made a

15   comment about his pants.  I don't think that's important

16   except for the fact that I think that's what his reference

17   was in dealing with this second person.  I think that's

18   important.  The person he was dealing with was Mr. Smith.

19             Mr. Smith is a convicted person, he's got two

20   felonies here, a bunch of misdemeanors.  He has done dope

21   within 24 hours, borrowed the money from his mother to buy

22   dope.  He had some sort of job, I'm not sure I understood

23   what he did.

24             The identification by Mr. Pontremoli, wouldn't

25   you feel a little bit better if someone had come in here

112

1    and testified, hey, we went out there and talked to that

2    man that day and here he identified Russell Johnson right

3    there, that day?

4            Now, let's look at this common-sense wise.  Mr.

5    Pontremoli comes to court, who is he going to identify as a

6    person that was involved in a robbery?  The only person

7    that doesn't have on a coat and tie that's sitting inside

8    this courtroom is Russell Johnson.  The deputy sheriff is

9    certainly not involved in the case.  Who is he going to

10   identify?  Russell Johnson.  There's not one word of

11   identification previous to today by Mr. Pontremoli.  That

12   could have been very simple to do.  Hey, we want to make

13   sure this is who we're talking about.  We want to make

14   positive we're talking about the same person.  It was not

15   done until today.

16           Mr. Pontremoli, can you identify -- do you see a

17   person; sitting right there.  Who else is he going to pick

18   out?  He's not going to pick out Mr. Ray, the court

19   reporter.  He presumes that I wasn't involved, I've got on

20   a coat and tie.  Think about that.  I think that's

21   important as far as identification by Mr. Pontremoli.

22           Three or four witnesses came here and told you

23   they had known Russell previously and he had behaved

24   appropriately in their presence.  I think that's

25   appropriate.

113

1      Jason -- in the event you believe that this

2 robbery was conducted by my client, Jason acted

3 appropriately as far as someone who is guilty of an offense

4 as well if you look at it that way, if you look at the

5 conduct.  It's what he did, how he acted and how he

6 reacted.

7      As far as this witness Blair, I don't know who he

8 is or where he is.  I don't think that it's important,

9 necessarily, the State of Texas made a great effort to get

10 this guy in here.  I don't know what he is or who he is.

11 Mr. Ray felt compelled to tell you that they tried to get

12 him in here to confirm something, I don't know.  That

13 they've got subpoena power, he was subpoenaed.  Apparently

14 he could have been arrested and brought into court to

15 testify.  He wasn't brought in here to tell you

16 something.  But I think it's extremely important the only

17 ID you heard was today.

18      There's a dispute about whether or not

19 Mr. Johnson took any money.  He couldn't believe he hit

20 him, took any money; Mr. Pontremoli said, I don't know.

21 And if you believe Jason Smith under this definition beyond

22 a reasonable doubt, I think there's a problem.  He's the

23 person you have to believe that Mr. Johnson took the money

24 in order for this to be a robbery case.

25      In order for this to be a robbery, you've got to

114

1    say in the course of committing theft he did an act and

2    took money.  Now, reasonable doubt is a doubt based on

3    reason and common sense after a careful and impartial

4    consideration of all the evidence in the case.  It is the

5    kind of doubt that would make a reasonable person

6    hesitate to act in the most important of his own affairs.

7    Would you conduct your daily affairs based on Jason Smith's

8    testimony is the question.  Would you want to wake up in

9    the morning to go deal with Jason Smith, have him tell you

10   what he's going to tell you and then go about your business

11   based on what he told you?  That is the only evidence even

12   if you believe this man hit Mr. Pontremoli, that's the only

13   evidence that he took any money which has to be a part of

14   this element of offense is what Jason Smith told you.

15          And I suggest to you that Jason Smith could have

16   been charged with robbery just as well, but he wasn't.

17   Why?  You use our own judgment on that.  I think

18   he got cut some slack somewhere.

19          I don't think Mr. Pontremoli was paying any

20   attention to Russell Johnson, he was trying to sell a

21   three-dollar ratchet to Jason Smith.  I don't think he had

22   time to properly focus on who this other guy was to say

23   that's who did this, that's who did that to me.  I think

24   that's important.  He was trying to make three dollars.

25          And Jason Smith borrows money from his mother to

                                                          115

1   go buy dope.  I'm sorry, that's just beyond me.  That's the

2   person the state of Texas is bringing up here to rely upon

3   to prove to you that he committed a robbery, that

4   Mr. Russell Johnson committed a robbery.  That's who

5   they're trying to get you to rely upon to convict him of

6   this.  Very serious offense, no question about it.

7           You cannot believe what Jason Smith told you.

8   He's in jail, he's a convicted criminal of many, many

9   counts of various and sundry charges.  He escaped this

10   particular charge, I don't know how.  But he's up here

11   giving you information that I suggest to you is just flat

12   not true.

13           And one other time, Mr. Pontremoli -- wouldn't

14   you feel a little better if somebody came up here and said,

15   hey, we talked to that man that day; he said that day

16   Russell Johnson is the guy who hit me with that pipe

17   wrench, not six months later when it's obvious who is

18   sitting in this courtroom and who is on trial.  That's

19   obvious who it is.

20           I think it's important that you not guess or

21   assume things against Mr. Johnson.  I think that's

22   important.  I think it would take a quantum leap, even if

23   you believe he hit him, to believe that he stole this money

24   to get this to a robbery case.  Reasonable doubt is defined

25   for you.

116

1      And if you believe Jason Smith -- you can think

2   he did this robbery and stole the money, if you believe

3   Jason Smith.  But he's the only person who can say he took

4   any money which would complete a robbery case.  It's just

5   not there.  It's that important.

6      I agree we're not talking about a speeding

7   ticket, we're talking about a very serious matter, and

8   that's even more important that it be correct and that you

9   be right about what you're doing because it is that

10  important.

11      Ask yourself this question when you go back

12  there.  You have a charge to the jury, you heard the

13  testimony, would you think it's fair if somebody -- if a

14  jury convicted you of this offense based on what you've

15  heard?  Ask yourself that question.

16      Jason Smith, he's the only thing on the whole

17  thing as far as the robbery case is concerned.  Would you

18  think it's fair that a jury convict you -- if you're

19  sitting over there and heard all this, would you think it

20  was fair if the jury believed Jason Smith and convicted you

21  of this offense?  This can put this man in prison for 99

22  years.  Would that be fair based on what you've heard?    I

23  ask you to ask yourself that question.

24      Do you have doubts about that.  You vote

25  individually, you owe no responsibility to anybody else.

117

1    You're 11 -- 12 individuals, you vote individually.  You

2    have no responsibility to say anything else to anybody

3    else.  And I'm going to ask you to do that.  Think about

4    what you heard, think about the testimony.

5         If you believe Jason Smith, fine.  I don't think

6    you can.  But he's the only one that can give you evidence

7    that this was a robbery by the law and by definition.

8    Mr. Pontremoli doesn't know, Jason said he did, he's not

9    believable.

10        On the back page here, it's -- there's a form at

11   the top of the page where it says not guilty.  Based on the

12   evidence you heard, you-all promised this morning you would

13   follow the law and only find someone guilty in the event

14   the State proved each and every element beyond a reasonable

15   doubt.  There is no proof beyond a reasonable doubt of any

16   theft of this case, none unless you believe Jason Smith,

17   and he is not believable.

18        When you go back to the back, remember, ask

19   yourself that question, would this be fair if you got

20   convicted based on what you've heard by a jury.  When you

21   go back there, there will be a foreman elected, I ask you

22   or suggest to you based on the evidence, and I ask you to

23   find my client not guilty.  Thank you.

24        MR. RAY:  Ladies and gentlemen, I have just

25   a few minutes for what's call rebuttal, and I sure want to

                                                        118

1   take advantage of that opportunity given the some of the

2   comments that we're just made.

3        First of all, many times during that argument you

4   heard Mr. Watson say, I don't think, I don't think, I don't

5   think.  And you know what I told you, is what I think and

6   what I say to you is not evidence.  It doesn't matter, it

7   doesn't add up to a hill of beans to what Jerry Ray

8   thinks.  And by the same token, it doesn't matter one whit

9   what Mr. Watson thinks.  What matters is what you think,

10  using your good common sense and your observations power.

11       Let's talk about some of the things he

12  mentioned.  First of all, it would be understandable to put

13  Jason Smith on trial, but the truth is you can throw

14  Jason's Smith testimony out the damn window and just listen

15  to what Mr. Pontremoli told you and every element of this

16  crime is proved just as sure as we are standing here.  He

17  has absolutely no reason to lie to you folks.  He is the

18  victim.

19       As far as who would be witnesses, well, you know,

20  except for the victim, it's rare that a nice person, a

21  law-abiding citizen, would be invited to an aggravated

22  robbery, think about that.  And Mr. Smith is certainly on

23  his way to prison, which is where he belongs, and that's

24  certainly true enough.  And based on the evidence in this

25  case, that's where Russell Don Johnson belongs too.

119

KIM A. BROOKS, OFFICIAL COURT REPORTER

1          As far as the identification, I can't patch this
2     up.  Y'all heard the testimony.  When I asked
3     Mr. Pontremoli about this identification business, if he'd
4     ever seen or looked at any pictures and so forth.  And you
5     remember who objected to that?  Mr. Watson objected to
6     that.  And so then he wants to get up here and say to
7     you-all that there hasn't been any prior identification of
8     the defendant, Russell Don Johnson.  He can't have it both
9     ways.

10          MR. WATSON:  Your Honor, I'm going to object
11     to that, that's improper.  He is trying to insinuate or
12     imply that certain evidence does exist and it doesn't exist
13     in this record, I'm going to object to it.  He's outside
14     the bounds of proper argument.

15          THE COURT:  I'll overrule the objection, and
16     you'll be guided by the testimony, ladies and gentlemen.

17          MR. RAY:  With regard to the three witnesses
18     that you heard from that Mr. Watson made reference to that
19     he behaved appropriately in their presence, well, you know
20     none of them were at Mr. Pontremoli's junk store on July
21     the 28th of 1998.  And you also know that one of those
22     witnesses had only seen him one time -- no, hadn't seen him
23     in three years, and another one had seen him one time in
24     the last year and a half and the last witness, Lonnie
25     Johnson, family, had only seen him an average of once or

120

1    twice in three whole years.  Now, are those competent

2    witnesses to tell y'all what happened on July the 28th of

3    1998?  It's like talking about anything and everything

4    except what the trial is about.  And it's about his conduct

5    on July the 28th of 1998.

6          About Mr. Blair.  I brought Detective McAllester

7    to testify because I wanted y'all to know and I didn't want

8    Mr. Watson to be able to comment that we were afraid of

9    some evidence that we had.  Detective McAllester, in doing

10   and following up on the investigation, located him, took a

11   statement from him, gave it to me, and I put him on the

12   witness list.  And we saw to it that he got served with a

13   subpoena.  And we didn't know he wasn't going to be here

14   until he doesn't show up.  And we've been looking under

15   every rug in the county trying to find him.  I would love

16   for you to get to hear his testimony.  But he wasn't here

17   and rather than asking --

18          MR. WATSON:  Your Honor, I'm going to object

19   to that as improper comment about what a particular witness

20   would testify to.

21          MR. RAY:  Response to his --

22          MR. WATSON:  That is improper, out of bounds

23   of proper argument.

24          THE COURT:  Overruled.

25          MR. RAY:  Mr. Watson is the one that

                                                        121

1  commented about Mr. Blair not being here, and I want you to

2  know that we did everything we could to get him here.

3       Basically those are the things I wanted to

4  rebut.  Ladies and gentlemen, simple case, you've got the

5  evidence.  The charge tells you what you have to find

6  happened.  We've proved it to you, now it's our turn to

7  give it to you.  Godspeed in your deliberations.

8            THE COURT:  All right.  Ladies and

9  gentlemen, will you go with the bailiff to the jury room,

10  please?

11                 (Jury out at 4:07 p.m. to deliberate

12                  on guilt/innocence.)

13                 (Jury in at 4:45 p.m.)

14            THE COURT:  All right.  Has the jury reached

15  a verdict?

16            PRESIDING JUROR:  Yes, we have.

17            THE COURT:  We, the jury, find the

18  defendant, Russell Don Johnson, guilty of the offense of

19  aggravated robbery as alleged in the indictment.  Is that

20  the unanimous verdict of the jury and so say you all?

21            THE JURY:  Yes.

22            THE COURT:  I will accept your verdict,

23  ladies and gentlemen.  It now becomes necessary to conduct

24  the punishment phase of the trial.  We'll do that tomorrow,

25  and we should finish this case tomorrow.  Please remember

                                                      122

1   your instructions.   It's important that you not discuss

2   this case with anyone at home, your wife or husband or with

3   anyone else.   Don't discuss even among yourselves if you

4   happen to be early in the morning at the courthouse and as

5   you gather.   With that, we'll see you at 9:00 in the

6   morning.   Thank you very much.

7                     MR. RAY:   Thank you, ladies and gentlemen.

8                     (Jury out at 4:46 p.m.)

9

10

11

12        (Whereupon, the proceedings were concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          123

```
 1 | THE STATE OF TEXAS     ) (
 2 | COUNTY OF PALO PINTO   ) (
 3 |
 4 |      I, Kim A. Brooks, Official Court Reporter for the 29th
 5 | Judicial District of Palo Pinto County, State of Texas, do
 6 | hereby certify that the above and foregoing contains a true
 7 | and correct transcription of all portions of evidence and
 8 | other proceedings requested in writing by counsel for the
 9 | parties to be included in the reporter's record in the
10 | above-styled and numbered cause, all of which occurred in
11 | open court or in chambers and were reported by me.
12 |      I further certify that this transcription of the
13 | proceedings truly and correctly reflects the exhibits, if
14 | any, offered by the respective parties.
15 |      I further certify that the total charges for the
16 | transcript, including any exhibits, is $ 1130.50.
17 |      WITNESS my hand this the 9th day of February,
18 | 1999.
19 |
20 |                         _Kim A. Brooks_____
21 |                         Kim A. Brooks, CSR, RPR
                            Official Court Reporter
22 |                         29th Judicial District
                            Palo Pinto County, Texas
23 |
   | Certification No: 4650
24 | Date of Expiration: 12/31/99
   | Business Address: P.O. Box 187
25 |                   Palo Pinto, Texas  76484
   |                   (940) 659-1226
```

124

KIM A. BROOKS, OFFICIAL COURT REPORTER

# E X H I B I T S



State's
Exhibit
No. 1



State's
No. 2



State's
No. 3



State's
No. 4



State's
No. 5



State's
No. 6



State's
No. 7

**State's Exhibit No. 8**


**36-inch pipe wrench**

CHART COPY

**PALO PINTO GENERAL HOSPITAL**
S.R. 400 S.W. 25th Ave.   MINERAL WELLS, TEXAS 76067

EMERGENCY DEPT. RECORD

PONTREMOLI, JIMMIE R
1910 SE 13TH ST
MINERAL WELLS, TX 76067

PATIENT OCCUPATION-EMPLOYER-ADDRESS
RETIRED

MAIDEN/OTHER NAME:

| ADMIT DATE | ADMIT TIME | AGE | SEX | RACE | M/S | DATE OF BIRTH | S.S. # | RELIGION | F/C |
|---|---|---|---|---|---|---|---|---|---|
| 07/28/98 | 1425 | 71 | M | CA | D | 12/17/26 | 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 | OTHER | MCRA |

PERSON TO NOTIFY IN EMERGENCY-RELATION-ADDRESS-TELEPHONE
PONTREMOLI, BILL          BR          (940)682-4276

NAME AND ADDRESS          RELATION   TELEPHONE          OCCUPATION-EMPLOYER-ADDRESS-TELEPHONE
PONTREMOLI, JIMMIE R          (940)325-3153          RE
1910 SE 13TH ST
MINERAL WELLS, TX 76067

ADMITTING DIAGNOSIS   LACERATION TO ARM

MEDICARE PARTS A AND B   PONTREMOLI, JIMMIE R   POL# 455304567A   GROUP NO.

AARP PRUDENTIAL-PA   PONTREMOLI, JIM SR   5768386011   0101442

SPOUSE ADDRESS (IF NONE, NAME OF FATHER OR MOTHER)          EMPLOYER-ADDRESS

| EMERGENCY DEPT. DOCTOR | ATTENDING DOCTOR | NOTIFIED | TIME CALLED | TIME RESPONSE | NOTIFIED | | MEDICATION & IV |
|---|---|---|---|---|---|---|---|
| ALLRO | EVAED | ☐YES ☐NO | | | ☐FAMILY PHYSICIAN ☐POLICE ☐RELATIVE ☐OTHER ☐CORONER | TIME INI | |

PHYSICIAN EXAM:   ALLERGIES: NKDA

1453 LC DT 0.5CC
1725 DS Ancef 1gm IVPB

EKG

X-RAY 1421 FforEARn

**STATE'S EXHIBIT #9**

LAB

RESP.

| CODE | DIAGNOSIS | Nondisplaced fracture of Left ulna c large hematoma |
|---|---|---|
| 813.82 | DIAGNOSIS | |
| | DIAGNOSIS | |

DISPOSITION  ☒TREATED AND RELEASED ☐POLICE ☐EXPIRED ☒ADMITTED ☐TRANSFER  ☐REFER TO PHYSICIAN ☐CORONER ☐AMA  RM#____ TO____  CONDITION ON RELEASE Stable  EXIT MODE  DISCHARGE TIME 1845

OTHER INSTRUCTIONS  1) Wear splint/sling  2) Keflex 500mg po BID #14  3) Vicodin 1-2 po q4hrs prn pain  4) Ice/Elevate  5) FU Dr Evan

FOLLOW UP INSTRUCTIONS
1 X-RAY DIAGNOSIS
2 HEAD INJURIES
3 CUTS SKINNED AREAS
4 SPRAINS FRACTURES

PALO PINTO GENERAL HOSPITAL
Mineral Wells, Texas

JOB: 440
PT: PONTREMOLI, JIMMIE R.  V7343/M91939  7-28-98  1425 HOURS

CHIEF COMPLAINT:
Left arm injury.

HISTORY OF PRESENT ILLNESS:
The patient is a 71-year-old white male who was assaulted by another man who
was wielding about a 36-inch pipe wrench. Apparently the man was getting
ready to strike the patient in the head when the patient was able to see him
and he raised his left arm to protect his head and he was struck in the
mid-forearm by the wrench. He now presents to the emergency department for
evaluation and treatment of left forearm pain.

PAST MEDICAL HISTORY:
Hypertension. Diabetes.

CURRENT MEDICATIONS:
He takes medications but he does not know what they are.

PHYSICAL EXAMINATION:
Vital signs: Temperature 98.4. Pulse 53, regular. Respiratory rate 18.
Blood pressure 161/85.
General: This is a well-developed, well-nourished white male on a stretcher
in no obvious distress.
Extremities: Examination of the left arm is remarkable for a large hematoma
to the mid-forearm overlying the ulna. He does have a small abrasion. I do
not believe that this is a sutural laceration. It appears to be simply an
abrasion by where he was actually struck by the pipe wrench. The patient has
full range of motion of the forearm but he does have tenderness to palpation
at the midshaft of the ulna.

LABORATORY/X-RAY:
An x-ray of the left forearm was obtained and this is remarkable for a
non-displaced fracture of the midshaft of the ulna.

DIAGNOSIS:
Non-displaced fracture of left ulna with large hematoma.

****CONTINUED****


REPORT:    ED REPORT
DATE:      7-28-98  1425 HOURS
PATIENT:   PONTREMOLI, JIMMIE R.
HIM MR:    V7343/M91939
LOCATION:  ED
PHYSICIAN: *R.C. Allensworth, MD*
           R.C. ALLENSWORTH, MD

PALO PINTO GENERAL HOSPITAL
Mineral Wells, Texas

PAGE 2
JOB: 440
PT:   PONTREMOLI, JIMMIE R.

TREATMENT:
In the emergency department the patient was given tetanus prophylaxis. He was
also given Ancef 1 gram IV piggyback. A posterior splint with a sugar-tong
splint was applied to the left forearm and he was placed in a sling.

DISPOSITION:
I attempted to call Dr. Evans regarding this but was unable to get in touch
with Dr. Evans. I did speak to Dr. Dave regarding the case and he suggested
that the patient be placed with a posterior splint and a sugar-tong splint.
Dr. Dave will see the patient on Monday in his office. I have asked the
patient to certainly call Dr. Evans as well and he will do that tomorrow.

DISCHARGE INSTRUCTIONS:
1. Wear splint and sling.
2. Keflex 500 mg tablets, to be taken 1 tablet b.i.d. for 1 week.
3. Vicodin tablets, to be taken 1-2 tablets every 4 hours p.r.n. pain.
4. Ice and elevate tonight.
5. Follow-up with Dr. Evans or Dr. Dave on Monday.

RCA/jkb
d 7-28
t 7-29
c Dr. Evans
c Dr. Dave

REPORT:     ED REPORT
DATE:       7-28-98   1425 HOURS
PATIENT:    PONTREMOLI, JIMMIE R.
HIM MR:     V7343/M91939
LOCATION:   ED
PHYSICIAN:  *Robert C. Allensworth MD*
            R.C. ALLENSWORTH, MD

Palo Pinto General Hospital, Mineral Wells, Texas
Emergency Department Nurses Note
Circle all that pertain. All bold print must be addressed

ADDRESSOGRAPH

PONTREMOLI, JIMMIE R
H91939      V7343
PONTREMOLI, JIMMIE R
1917786   02-28 SR
ALLENSWORTH, EVANS, ED
M 71Y O  H91939      V7343

DATE 2-28 TIME 1405 With Whom _Self_

NAME _Jim Pontremoli SR._ AGE: _71_ (M)/F

MOA: (Private Car) (Walk) Carried W/C Other _____
EMS: IV Stretcher CID Backboard C-collar CPR
Pre Hospital Meds _____

TRIAGE:   EMERGENT   URGENT   (NON-URGENT)

Pt presents to ER c̄ complaint of possible Fx (L) forearm after being attacked & struck c̄ 36" pipe wrench @ 12³⁰ today. Forearm swollen c̄ what looks like small puncture wound.

TRIAGE NURSE SIGNATURE _Jim Mitchell RN_

ALLERGIES: _NKA_

GLASGOW PEARL: YES NO   IMMUNIZATION: UTD/NUTD
SEE TRAUMA FLOW SHEET   SEE CODE SHEET

| ADULT TIME | //// | | | | | PEDIATRICS TIME | //// | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Spontaneous | 4 | 4 | 4 | 4 | E | Spontaneous | 4 | 4 | 4 | 4 |
| Voice | 3 | 3 | 3 | 3 | Y | Voice | 3 | 3 | 3 | 3 |
| Pain | 2 | 2 | 2 | 2 | E | Pain | 2 | 2 | 2 | 2 |
| None | 1 | 1 | 1 | 1 | S | None | 1 | 1 | 1 | 1 |
| Oriented | 5 | 5 | 5 | 5 | E | Babbles/smiles/oriented | 5 | 5 | 5 | 5 |
| Confused | 4 | 4 | 4 | 4 | R | Disorient/inapp cry | 4 | 4 | 4 | 4 |
| Inappropriate | 3 | 3 | 3 | 3 | B | Inapp words/scream | 3 | 3 | 3 | 3 |
| Incomprehensible | 2 | 2 | 2 | 2 | A | Incomp sounds/moans | 2 | 2 | 2 | 2 |
| None | 1 | 1 | 1 | 1 | L | None | 1 | 1 | 1 | 1 |
| Obeys command | 6 | 6 | 6 | 6 | M | Obeys/Normal | 6 | 6 | 6 | 6 |
| Localizes pain | 5 | 5 | 5 | 5 | O | Resists with pain | 5 | 5 | 5 | 5 |
| Withdraws pain | 4 | 4 | 4 | 4 | T | Flexion/withdraws | 4 | 4 | 4 | 4 |
| Flexion pain | 3 | 3 | 3 | 3 | O | Flexion/posturing | 3 | 3 | 3 | 3 |
| Extension | 2 | 2 | 2 | 2 | R | Extension/posturing | 2 | 2 | 2 | 2 |
| None | 1 | 1 | 1 | 1 | | None | 1 | 1 | 1 | 1 |
| TOTAL | | | | | | | | | | |

PAST MEDICAL HISTORY AND MEDS: ☐ Meds unknown
Hx. HTN, Diabetes

SEE ADDITIONAL NOTES: _14/85_
TRIAGE VS: BP: _14/85_ P _53_ R _16_ T _98.4_ AX O T R PO ___
WT: ___ HT: ___ HEAD CIRC: ___
TO ROOM: _9_ TIME: _14/10_ WITH WHOM: _nurse 1_
MONITORS: NIBP CARDIAC PULSE OX RESPIRATIONS TEMP
OXYGEN: ___L N/C 100% NON-REBREATHER FACE MASK
VENTILATOR AMBU BAG UPDRAFT ___X1 ___X2 ___X3

EDUCATION: (Exam) Lab IV Procedures (X-ray) Med
Monitors Oxygen Pelvic Sutures Dressings Updating: Busy ED
Busy Lab/x-ray All procedures explained
SAFETY: bed: up/(down) Railings: up/down Call light: Y/N

NURSING DIAGNOSIS:
ALTERATION IN _comfort_

| | INTAKE | OUTPUT |
|---|---|---|
| AIRWAY OBSTRUCTION | IV ___ | FOLEY ___ |
| ALTERATION IN comfort | ORAL ___ | NG ___ |
| IMPAIRED ___ | OTHER ___ | VOIDED ___ |
| ANXIETY/FEAR KNOWLEDGE DEFICIT | | IV De'd ___ |
| DECREASED CARDIAC OUTPUT | OTHER NURSING DX ___ | |
| FLUID VOL DEFICIT/OVERLOAD | | |

AIRWAY: (Non-labored) Labored Wheezing Retracting Apnic None

BREATH SOUNDS (Bilateral) (CTA) Diminished Exp/Insp Wheeze (L)(R)

ABDOMEN (Non-tender) Tender area ___ Soft Firm Obese BS x4
Distended Other ___ Last food ___ Last BM ___ (if applies)

REPRODUCTIVE LMP ___ Hyst Tubal Grav ___ Para ___ AB ___ EDC ___

URINARY (WNL) Urgency Frequency Pain Hesitancy Retention Blood in urine

MUSCULOSKELETAL MAE (AMB) Steady/non-steady gait Non-ambulatory

SKIN (Warm) (Dry) Cool Moist Clammy Cyanotic Flushed Jaundice Pale Impaired

CIRCULATION (WNL) Pedal Pulse R/L Edema area ___ cap refill <2sec >2sec

PSYCHOSOCIAL Age appropriate Occupational Hx Level of Education
Lives Alone Smoker Non-Smoker Anxious Tearful (Calm) Flat Affect
Slurred Speech (Cooperative)
OTHER

Dr. Evans
Per page D. Longan
Cold compress applied
elevation, ice pack to
(L) FA. (R) radial pulse
& c̄ brisk cap. refill. IV
1405 D.C Deltoid for IM
Inj., Min. Wells.  LC
1430 Assault reported to
Nina R, MW Police Dept. LC
1530 (L) radial pulse & &
brisk cap. refill. LL

TO X-RAY _1453_ FROM X-RAY _1459_

| TIME | BP | HR | R | T ax or t | PULSE OX |
|---|---|---|---|---|---|
| 1620 | 160/90 | 64 | | | |
| | | | | | |
| | | | | | |

SEE ADDITIONAL NOTE   SEE RHYTHM STRIP SHEET

MEDICATIONS AND TREATMENTS

| TIME | MED OR TREATMENT | EFFECT | NURSE |
|---|---|---|---|
| 1453 | PT 0.5 cc IM | | |
| | (R) Deltoid | ___ | LC |
| 1600 | (L) radial pulse & & | | LL |
| | brisk cap. refill | | LL |
| 1725 | Dep Left Sig (L) forearm | | |
| | of small swelling DVR | | |
| | Dep Left DC cath IV | | |
| | intact | | |

ADMITTED ___ ROOM ___ REPORT TO ___ W/C Stretcher
TRANSFERRED TO ___ REPORT CALLED TO ___
EXPIRED TIME ___ SEE ADDITIONAL SHEET FOR EXPIRED
DISMISSED TIME _1845_ WITH WHOM _Son_ Carried w/c amb
SEE AFTER CARE INSTRUCTION SHEET - GIVEN INFO SHEET
DISMISSED BY WHOM _R. Shaw RN_

**PALO PINTO GENERAL HOSPITAL**   400 S.W. 25TH AVENUE   MINERAL WELLS, TX 76067   817-325-7891

| | | |
|---|---|---|
| *PATIENT* | PONTREMOLI, JIMMIE R. | *X-RAY#* 24891 |
| *PHYSICIAN* | EVANS | *B.D.* 12-17-26 |
| *ORDERED BY* | ALLENSWORTH | *HOSP#* 91939 ER *RM#* |

*CLINICAL HISTORY:*    HIT WITH PIPE WRENCH

*ROENTGEN INTERPRETATION*

LEFT FOREARM:  7-28-98  15:00

There is nondisplaced fracture through the mid ulna with marked soft tissue swelling. The radius is intact.

IMPRESSION:          Nondisplaced fracture through the mid ulna.

RAB/dh  7-28-98  4:06 p.m.

Roger A. Baker, M.D.

(Preliminary report until signed by the interpreting physician.)



400 Southwest 25th Avenue
Mineral Wells, Texas 76067
(817) 325-7891

**Palo Pinto
General Hospital**

PONTREMOLI,JIMMIE R
MS1935          V7343
PONTREMOLI,JIMMIE R
12171926    07   R
ALLENSWORTH EVANS,ED
M 21Y 0  MS1935       V7343

# Vaccine Administration Record

Patient Name _____

Birthdate _____

Record # _____

"I have been provided a copy, and have read or have had explained to me, information about the diseases and he vaccines listed below. I have had a chance to ask questions that were answered to my satisfaction. I believe I understand the benefits and risks of the vaccines cited and ask that the vaccine(s) listed below be given to me or to the person named above (for whom I am authorized to make this request),"

| Vaccine | Date Given m / d / y | Age | Site | Vaccine Manufacturer | Vaccine Lot Number | **Handout Publ. Date | ***Initials | Signature of Parent or Guardian |
|---|---|---|---|---|---|---|---|---|
| DTP 1 | | | | | | | | |
| DTP 2 | | | | | | | | |
| DPT 3 | | | | | | | | |
| DTP / DT P4 | | | | | | | | |
| DTP / DT P5 | | | | | | | | |
| DT | | | | | | | | |
| DTP / HIB 1 | | | | | | | | |
| DTP / HIB 2 | | | | | | | | |
| DTP / HIB 3 | | | | | | | | |
| DTP / HIB 4 | | | | | | | | |
| TD | 7-28 | 71 | | TETANUS AND DIPHTHERIA TOXOIDS ADSORBED FOR ADULT USE ALUMINUM PHOSPHATE ADSORBED (0.5 ML FILL) FOR IM USE | 849,801 6/99 LOT | EXP | | Jim Pontremoli |
| OPV / IPV 1 | | | | | | | | |
| OPV / IPV 2 | | | | | | | | |
| OPV / IPV 3 | | | | | | | | |
| OPV / IPV 4 | | | | | | | | |
| MMR 1 | | | | 849,801 6/99 | EXP | | | |
| MMR 2 | | | | | | | | |
| HIB 1 | | | | | | | | |
| HIB 2 | | | | | | | | |
| HIB 3 | | | | | | | | |
| HIB 4 | | | | | | | | |
| HEP B 1 | | | | | | | | |
| HEP B 2 | | | | | | | | |
| HEP B 3 | | | | | | | | |

*** INITIALS        SIGNATURE OF VACCINE ADMINISTRATOR

_____

_____

(Use reverse side if more signatures are needed)

**Site Given Legend**

RA - Right Arm
LA - Left Arm
RT - Right Thigh
LT - Left Thigh
O - Oral

| PATIENT NAME | | ADMITTING DX |
|---|---|---|
| PONTREMOLI, JIMMIE R  M0000091939 | | LACERATION TO ARM |

| ADMITTING PHYSICIAN  M00000073848 | AGE  7 | SEX  M | DOB | VISIT  19261217 |
|---|---|---|---|---|

Allensworth, Robert

| DATE & TIME  07/28/98 | TIME TRIAGED | CHIEF COMPLAINT  *Nondisplaced fx of Ulna, with Large Hematoma* |
|---|---|---|

**1. ABDOMINAL PAIN AND VOMITING**
Do not eat any food, milk or milk products. Take only ice chips or sips of water until vomiting and diarrhea stops or slows down. Progress to 7-up, Gingerale, sweetened tea, Kool-Aid, or apple juice. When your stools become soft formed, progress to broth, applesauce, skimmed milk, or crackers. Drink fluids frequently.

**2. HEAD INJURY**
1. Allow the patient to sleep as he normally does.
   However, awake him every _____ hour(s) and make sure he knows his name, where he is and the date.
2. Observe for persistent nausea and/or vomiting.
3. Observe for weakness or lack of coordination in his arms and/or legs.
4. Observe for blurred or double vision.
5. Observe for persistent or increasing headache or unusual restlessness.
6. Observe for any abnormal drainage from the ears or nose.
7. Observe for convulsions or seizures.
8. Take only Tylenol for headache unless other medication is ordered.

If any of these symptoms should occur in the next 24 to 36 hours, please contact your family doctor at once or return to the Emergency Department immediately.

**3. SUTURES and CUTS**
1. Keep the dressing dry. If it should become wet, have the dressing changed immediately with dry dressing or call your family physician.
2. If there is unusual pain, bleeding, swelling, and/or redness of the wound report to your doctor or return to the Emergency Department immediately.
3. Keep your wound comfortably elevated as much of the time as possible for the next few days.
4. Have your sutures removed in _____ days.
5. Change dressing in _____ days.

**SPRAINS FRACTURES**
1. If a foot or leg is injured, keep it elevated on two pillows while lying down for 24-28 hours.
2. Apply ice bags intermittently to the injured area for the first 24 hours. Use a towel or cloth between the ice bag and skin to prevent frostbite.
3. Persistent pain and disability for more than 72 hours are caution signs indicating that you should see physician for further evaluation.
4. If a cast, splint or elastic wrap is applied, it is important to elevate the injured extremity. Check fingers and toes for paleness, numbness, or extreme pain. If this occurs, call the Emergency Department or your physician immediately.

**FEVER**
1. Do not dress or cover warmly.
2. Encourage to drink clear fluids.
3. Give lukewarm bath for fever above 102 degrees. F.
4. Antibiotics do not cure fever and fever medication may need to be taken for at least two more days.
5. Give Tylenol every 3-4 hrs. after taking temperature.
   Children over 10 yrs. old may take 2 adult Tylenol.
   Children over 5 yrs. old may take 1 adult Tylenol.
   Children under 5 yrs. as recommended by your doctor.
   Advil or Childrens Motrin may also be recommended.

**BACK or NECK INJURIES**
1. Complete or relative rest, avoid painful positions.
2. Ice or warmth, whichever feels better.
3. Gentle but firm massage permitted.
4. If given time off from work, do not try to work at home.
5. Contact doctor if not better in 5-7 days, sooner if worse.

**CORNEAL ABRASION**
If given a patch, wear it for 24 hrs. A patch helps healing by reducing motion of the eyelids and reduces discomfort.

Keep it clean and dry. Be careful with a patch; it affects depth perception, so no driving, stairs, or power tools. If not better in 24 hrs., contact a doctor; sooner if worse. After patch is off, watch next 10 days for change in vision, matting of eyelids or discharge, persistent eye pain or headache. See a doctor for any of the above.

**Medications and Special Instructions**
IF CONDITION WORSENS, RETURN TO THE EMERGENCY DEPARTMENT
1. Wear Splint and Sling
2. Refill Tylenol #1
   Tab #24 #24 #1
3. Vicodin 1-2 tablets every 4 hrs as needed for pain
4. Ice pack
5. Keep elevated as much
6. Follow up with Dr. Singh. Please call his office on Thursday morning

CAREGIVER SIGNATURE: _R. Shawshaw_

**SEE ADDITIONAL INSTRUCTION SHEET FOR FURTHER INFORMATION REGARDING YOUR DIAGNOSIS.**
✓ GIVEN PRESCRIPTIONS                    ___ GIVEN WORK / SCHOOL EXCUSE
___ PRESCRIPTIONS CALLED TO PHARMACY      ✓ VERBALIZES UNDERSTANDING OF ACI.

PGH EMERGENCY DEPARTMENT AFTERCARE INSTRUCTION SHEET. FOR QUESTIONS PLEASE CALL: 817-328-6435

# MEDICAL RECORD

| PATIENT INFO | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| PONTREMOLI,JIMMIE R 067-Y | | | | | | | | | |
| 1910 SE 13TH ST | | | | | | | | | RETIRED |
| MINERAL WELLS,TX 76067 | | | | | | | | | |

MAIDEN/OTHER NAME

| ADMIT DATE | ADMIT TIME | AGE | SEX | RACE | M/S | DATE OF BIRTH | SS# | RELIGION | F/C |
|---|---|---|---|---|---|---|---|---|---|
| 10/14/98 | 1654 | 71 | M | CA | D | 12/17/26 | 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 | OTHER | MCRA |

PERSON TO NOTIFY IN EMERGENCY - RELATION - ADDRESS - TELEPHONE

PONTREMOLI,BILL          BR          (940)682-4276

| RESP PARTY | NAME AND ADDRESS | RELATION | TELEPHONE | OCCUPATION - EMPLOYER - ADDRESS - TELEPHONE |
|---|---|---|---|---|
| | PONTREMOLI,JIMMIE R | SP | | RE |
| | 1910 SE 13TH ST | | (940)325-3153 | |
| | MINERAL WELLS,TX 76067 | | | |

ADMITTING DIAGNOSIS:

| INSURANCE PARTY OF KIN | INSURANCE COMPANY | POLICY HOLDER | REL | POLICY NO. | GROUP NO. |
|---|---|---|---|---|---|
| | MEDICARE PARTS A AND B | PONTREMOLI,JIMMIE R | | 455304567A | |
| | AARP PRUDENTIAL-PA | PONTREMOLI,JIMMIE R | | 576838601 | 010442 |

SPOUSE ADDRESS (IF NONE, NAME OF FATHER OR MOTHER)          EMPLOYER - ADDRESS

| ADMITTING DOCTOR | ATTENDING DOCTOR | NOTIFIED | TIME CALLED | TIME RESPONSE | NOTIFIED | CONDITION ON ARRIVAL | MEANS OF ARRIVAL |
|---|---|---|---|---|---|---|---|
| DAVKI | DAVKI | ☐ YES ☐ NO | | | ☐ FAMILY PHYSICIAN ☐ RELATIVE ☐ OTHER ☐ POLICE ☐ CORONER | ☐ ACUTE ☐ NON-URGENT ☐ URGENT ☐ D.O.A. | ☐ AUTO ☐ AMB ☐ WALK IN ☐ W/ CHAIR ☐ STRETCH BROUGHT BY ☐ SELF ☐ AMB ☐ POLICE ☐ RELATIVE ☐ OTHER |

IF ACCIDENT STATE WHERE, WHEN, AND HOW INJURED: IF ILLNESS DESCRIBE

CURRENT MEDICATIONS

**VITAL SIGNS**

| TIME | | | | |
|---|---|---|---|---|
| TEMP | | | | |
| PULSE | | | | |
| RESP | | | | |
| B.P. | | | | |

ALLERGIES: ☐ NKA          LAST TETANUS

EXAM

| TIME | MEDICATIONS |
|---|---|

PT

STATE'S
EXHIBIT
#10

X-RAY

LAB

TREATMENT

EKG

CARDIO PULMONARY

$13.43

DIAGNOSIS

| TOTAL CHARGE | |
|---|---|
| PHYSICIAN CHARGE | |

| DISPOSITION | ☐ TREATED AND RELEASED ☐ POLICE ☐ EXPIRED ☐ ADMITTED ☐ TRANSFER | CONDITION ON RELEASE | EXIT MODE / WITH WHOM | DISCHARGE TIME |
|---|---|---|---|---|
| | ☐ REFER TO PHYSICIAN ☐ CORONER ☐ AMA RM # ___ TO ___ | | | |

OTHER INSTRUCTIONS

| VALUABLES DISPOSITION | ☐ SAFE ☐ WITH PATIENT ☐ TO FAMILY | FOLLOW UP INSTRUCTIONS: |
|---|---|---|
| | | 1 X-RAY DIAGNOSIS |
| | | 2 HEAD INJURIES |
| | | 3 CUTS SKINNED AREAS |
| | | 4 SPRAINS FRACTURES |
| | | 5 BURNS |

PHYSICIAN SIGNATURE          NURSE SIGNATURE

**PALO PINTO GENERAL HOSPITAL**
**AUTHORIZATION/ACKNOWLEDGMENT RECORD**

*Pontremoli, Jimmie*

*M-91939   V-15220*

**\*AUTHORIZATION FOR MEDICAL TREATMENT:** Authorization is hereby given to the attending physician and whomever he may designate as his assistant to administer such medications and treatments as is necessary, and such operations or procedures as are considered therapeutically necessary on the basis of findings in my case. I also consent to the administration of such anesthetics as are necessary **\*AUTHORIZATION TO RELEASE INFORMATION AND ASSIGNMENT OF BENEFITS:** I hereby authorize PALO PINTO GENERAL HOSPITAL to release the information requested by the insurance company or companies. I hereby assign and authorize payment directly to PALO PINTO GENERAL HOSPITAL of all hospitalization benefits and guarantee to pay any balance at the time of discharge. Copies of this authorization are considered valid. I understand that insurance does not relieve my obligation for the account and at the option of the hospital, the balance may be made current and due. I hereby authorize Social Service Department to contact and provide appropriate information to outside community resources and deemed necessary. **\* GUARANTOR STATEMENT:** I, (guarantor), assume financial responsibility for the payment of all charges for services rendered to the above patient. **\*WAIVER OF RESPONSIBILITY:** has been explained to me that the hospital is not responsible for any items of personal property, money or any other valuables which I have in my possession or which may be brought to me at the hospital. The hospital maintains a safe for safekeeping of money and valuables and the hospital shall not beliable for the loss or damage to any money, personal valuables, or other articles unless deposited with the cashier for safekeeping.

**\*HEALTH MAINTENANCE ORGANIZATION NOTIFICATION:** Most Health Maintenance Organizations (HMO's) have certain requirements that a member must satisfy in order to have benefit coverage for emergency care. These may include but are not limited to any or all of the following considerations: 1) Notification of a Primary Care Physician and/or 2) Use of participating facilities and providers and/or 3) Treatment of a condition considered to be of an emergent nature according to the HMO definition specified in the members' group benefit agreement and/or 4) required services were not available at the Primary Care Physician's office and/or required services were indicated outside of physician office hours. It is the responsibility of the patient/insured to follow the prescribed coverage requirements in order to ensure full benefit coverage under their HMO program. Failure to do so may result in a reduction or denial of benefit coverage in which case financial responsibility must be assumed by the patient/insured party. **Any applicable co-payments are due at the time that services are rendered.** This notice is provided as a reminder for patients to assist them in coordinating with their respective HMO payor. Hospital Emergency Services are available to all patients who request such care. The Hospital cannot be responsible for pre-certification requirements associated with these services although we can assist you by submitting your claim to the HMO payor. Your familiarity and compliance with your HMO plan guidelines will help to ensure payment for your covered emergency services.

**\*SIGNATURE OF MEDICARE RECIPIENT OR LEGAL REPRESENTATIVE:** I request that the payment under Federally Medical Insurance Programs (Medicare) be made directly to PALO PINTO GENERAL HOSPITAL on any unpaid bill for services furnished me by the hospital during the period of _____ to _____. I authorize any holder of medical records or other information about me to release to the Social Security Administration or its intermediaries or carriers any information needed for this or a related Medicare claim.

**\*MEDICAID ACKNOWLEDGMENT:** I understand that, in the opinion of Palo Pinto General Hospital District operating under the name of Palo Pinto General Hospital, the services or items that I have requested to be provided to me on _____ may not becovered under the Texas Medical assistance program as being reasonable and medically necessary for may care. I understand that the Texas Department of Human Services if its health insurance agent determines the medical necessity of the services or items I request and receive. I also understand that I am responsible for payment of the services or items I request and receive if these services or items are determined not to be reasonable and medically necessary for my care. I understand that Palo Pinto General Hospital District operating under the name of Palo Pinto General Hospital may bill me for the following: 1) Any services that is not a benefit of the Texas Medicaid Program (e.g., personal care items). These include but are not limited to the following: Personal Care Items, Take-Home Drugs, Private Room Difference (Elective), Cots, Television, Base-Line Studies (Lab), Durable Medical Equipment (Crutches, Splints, Slings, Etc.), Dental services, Immunizations, Drug/Alcohol Detoxification. 2) All services incurred on non-covered days due to eligibility or spell of illness limitation. Total patient liability will be determined by reviewing the itemized statement and identifying specific charges incurred on the non-covered day(s). 3) The reduction in payment due to the medically needy spend down. The recipient's potential liability would be equal to the amount of total charges applied to the spend down. Charges to recipients for services provided on ineligible days must not exceed the charges to spend down. This does not waive any rights that I may be entitled to, or under the law, or Medicaid regulations.

**\*PRIVATE ROOM AGREEMENT:**
I request a private room and agree to pay the $ _____ per day room difference.

**\*PATIENT RIGHTS AND RESPONSIBILITIES:**
I have received a copy of the patient's rights and responsibilities pamphlet.

X *Jimi Pontremoli Sr*  _____  *JRiley 10-14-98*
Signature of Patient or Representative | Relationship, if other than patient | Witness | Date

# PALO PINTO GENERAL HOSPITAL
## ORDER FOR OUTPATIENT SERVICES

Date _____  Appt. Time (if applicable) _____  Pre-Cert Y or N _____

Patient Name _____  Pre-Cert Contact _____

Pre-Cert # _____

☐ Call Results to Physician
☐ Fax Results to Physician #
☐ Standing Order Times _____

## LABORATORY

| | | |
|---|---|---|
| ☐ CBC | ☐ FBS | ☐ ABGs |
| ☐ H&H | ☐ Random BS | ☐ Digoxin |
| ☐ ESR | ☐ 2 Hr PP Sugar | ☐ Theophylline |
| ☐ Protine | ☐ Chem 1 | ☐ Dilantin |
| ☐ PTT | ☐ Chem 2 | ☐ PSA |
| ☐ RPR | ☐ Electrolytes | ☐ CEA |
| ☐ Mono | ☐ Lipid Profile | ☐ HIV |
| ☐ Strep A | ☐ Liver Profile | ☐ Urinalysis |
| ☐ RA | ☐ Hepatitis Profile | ☐ Urine Culture |
| ☐ Pregnancy, Serum | ☐ Thyroid Profile | ☐ Throat Culture |
| ☐ Quantitative βhCG | ☐ TSH | ☐ Culture, _____ |
| ☐ Other Test _____ | | |

## RADIOLOGY

| | | |
|---|---|---|
| ☐ Chest PA & Lateral | ☐ Diagnostic Mammogram | |
| ☐ UGI | ☐ Screening Mammogram | |
| ☐ GB | ☐ CT | |
| ☐ IVP | ☐ Nuclear Medicine | |
| ☐ BE | ☐ Ultrasound | |
| ☐ MRI | | |
| ☐ Other Test _____ | | |

## CARDIOPULMONARY

| | | |
|---|---|---|
| ☐ EKG | ☐ Echocardiogram | |
| ☐ Pulmonary Function Test | ☐ EEG | |
| ☐ Caroid Duplex | ☐ Other Test _____ | |

PHYSICIAN/NURSE PRACTITIONER SIGNATURE _____

## DIAGNOSIS

| | |
|---|---|
| ☐ 285.9 Anemia, Unspecified | ☐ 244.9 Hypothyroidism |
| ☐ 280.9 Anemia, Iron Def. | ☐ 487.1 Influenza |
| ☐ 413.9 Angina | ☐ 564.1 Irritable Bowel Syn |
| ☐ 716.90 Arthritis | ☐ 464.0 Laryngitis |
| ☐ 493.90 Asthma | ☐ 724.2 Low Back Pain |
| ☐ 490 Bronchitis NOS | ☐ 846.9 Lower Back Strain |
| ☐ 466.0 Bronchitis, Acute | ☐ 722.93 Lumbar Disc Syn |
| ☐ 491.0 Bronchitis, Chronic | ☐ 847.2 Lumbar Strain |
| ☐ 485 Bronchopneumonia | ☐ 626.2 Menorrhagia |
| ☐ 682.9 Cellulitis | ☐ 728.85 Muscle Spasm |
| ☐ 722.91 Cervical Disc Syn | ☐ 787.0 Nausea/Vomiting |
| ☐ 847.0 Cervical Strain | ☐ 733.00 Osteoporosis |
| ☐ 786.50 Chest Pain | ☐ 382.9 Otitis media |
| ☐ 625.9 Chronic Pelvic Pain | ☐ 614.9 Pelvic Inflam Disease |
| ☐ 558.9 Colitis | ☐ 533.90 Peptic Ulcer Disease |
| ☐ 564.0 Constipation | ☐ 462 Pharyngitis, Acute |
| ☐ 786.2 Cough | ☐ 486 Pneumonia |
| ☐ 428.0 CHF | ☐ 601.9 Prostatitis |
| ☐ 595.9 Cystitis | ☐ 443.9 Peripheral Vasc Dis |
| ☐ 453.8 Deep Vein Thrombosis | ☐ 569.3 Rectal Bleeding |
| ☐ 250.00 Diabetes, Non Insulin | ☐ 714.0 Rheumatoid Arthritis |
| ☐ 250.01 Diabetes, Insulin Dep | ☐ 461.9 Sinusitis |
| ☐ 558.9 Diarrhea | ☐ 845.00 Sprain, Ankle |
| ☐ 562.11 Diverticulitis | ☐ 848.9 Sprain/Strain |
| ☐ 492.8 Emphysema | ☐ 463 Tonsillitis |
| ☐ 530.10 Esophagitis | ☐ 435.9 T.I.A. |
| ☐ 780.6 Fever and Chills | ☐ 465.9 Upper Resp Infection |
| ☐ Fracture | ☐ 599.0 Urinary Tract Infec |
| ☐ 535.50 Gastritis | ☐ 454.9 Varicose Veins |
| ☐ 558.9 Gastroenteritis | ☐ 780.4 Vertigo |
| ☐ 784.0 Headache | ☐ 079.9 Viral Syndrome |
| ☐ 599.7 Hematuria | ☐ 780.7 Weakness |
| ☐ 272.4 Hyperlipidemia | ☐ 783.2 Weight Loss |
| ☐ 401.9 Hypertension | |

☐ Other Diagnosis _____

MR 0207-1 8/96

PALO PINTO GENERAL HOSPITAL          400 S.W. 25TH AVE.          MINERAL WELLS, TX 76067

PONTREMOLI,JIMMIE R                                       M      V00000015220

Dave',Kiran                                 REG REF    RAD        M000091939

Dave',Kiran                       12/17/1926 71      10/14/1998 024891


    EXAMS: 000003221 FOREARM- 2VIEW

Reason for Exam:FX.ULNA
Exam Date/Time: 10/14/1998 1942

There is a fracture of the mid ulna, there is good alignment of the
proximal and distal fragments, some callous formation is noted, how-
ever there is no significant bony bridging of the fracture site.


       -------(---)-------------------
       REPORTED BY: Roger A. Baker,M.D.


CC: Dave',Kiran; Evans,Edmond

TECHNOLOGIST: NEAL, SHARON
TRANSCRIBED DATE/TIME: 11/02/1998 (1105)
TRANSCRIPTIONIST: RAD2
PRINTED DATE/TIME: 11/02/1998 (1518)

PAGE 1                    SIGNED FINAL

State's
No 11

**SUBPOENA**

NO.   11154

THE STATE OF TEXAS VS.   RUSSELL DON JOHNSON

TO ANY SHERIFF, CONSTABLE OR PEACE OFFICER OF THE STATE OF TEXAS-GREETINGS:

YOU ARE HEREBY COMMANDED TO SUMMON--

JIMMIE PONTREMOLI;  JASON OLIVIA SMITH;
DUANE BLAIR;  MIKE MCALLESTER

To be and personally appear at 9:00 AM o'clock on the 14TH day of DECEMBER, 1998 before the Honorable 29th Judicial District Court of Palo Pinto County, Texas to be held within and for said County at the Court House thereof, in Palo Pinto, Texas, then and there to testify and the truth to speak on behalf of the STATE in the above styled and numbered cause, now pending in said Court, and there to remain from day to day, and from term to term until discharged by said Court.   Said above named witness is further commanded to produce at said time and place above set forth the following books, papers, documents or other tangible things to wit:

Herein Fail Not, but of this Writ make due return, showing how you have executed the same.

Witness my official signature, at Palo Pinto, Texas on this day, December 09, 1998

HELEN SLEMMONS, DISTRICT CLERK
29TH DISTRICT COURT
PALO PINTO COUNTY, TEXAS

By _Linda D. Hensinger_, Deputy

*************************** OFFICER'S RETURN ***************************

Came to hand the _____ day of _December_ A.D., 19 _96_, at _8_ o'clock _A_ M., and executed by reading this Subpoena in the presence and hearing of each of the within named witnesses at the following times and places, to-wit:

NAMES          TIME DATE          PLACE & DISTANCE          MILEAGE $

and not executed as to the witnesses _____ for the following reasons _____.

I actually and necessarily traveled _____ miles in the service of this Subpoena, in addition to any other mileage I may have traveled in the service of other process in this cause during the same trip.
FEES:_____                _____ SHERIFF
MILEAGE:_____            _Palo Pinto_ COUNTY, TEXAS
TOTAL:_____         BY: _M. McAlester MWPD_, DEPUTY