

COURT OF APPEALS CAUSE NO. 11-99-00001-CR

TRIAL COURT CAUSE NO. 11,154

| STATE OF TEXAS | ) ( | IN THE DISTRICT COURT |
| | ) ( | |
| VS. | ) ( | PALO PINTO COUNTY, TEXAS |
| | ) ( | |
| RUSSELL DON JOHNSON | ) ( | 29TH JUDICIAL DISTRICT |

---

PUNISHMENT PHASE

SENTENCING OF THE DEFENDANT

VOLUME 5 OF 5

DECEMBER 15, 1998

---

APPEARANCES:

    ATTORNEY FOR STATE:

        Mr. Jerry Ray, District Attorney
        Palo Pinto County
        P.O. Box 340
        Palo Pinto, Texas   76484
        SBOT No. 16604500

· FILED
IN COURT OF APPEALS
ELEVENTH DISTRICT

FEB 1 6 1999

SHERRY WILLIAMSON, CLERK
By _____ Deputy
TRAP 9

    ATTORNEY FOR DEFENDANT:

        Mr. Robert Watson
        Attorney at Law
        P.O. Box 1308
        Mineral Wells, Texas   76068
        SBOT No. 20961000

---

    On the 15th day of December, 1998, the
above-entitled and numbered cause came on to be heard for
trial in the said Court, Honorable David Cleveland, Judge
Presiding, and the following proceedings were held, to wit:



ORIGINAL

I N D E X

VOLUME 5 - PUNISHMENT PHASE

PAGE

Opening Statement by the State...................... 4


| STATE'S WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jack Hunter | 15 | | | |
| Darrell Carey | 33 | 36 | | |
| Sam Bell | 38 | | | |
| Scott Cienega | 45 | 48 | 49 | |
| John Arenz | 50 | | | |
| Henry Williams | 57 | | | |
| Kirby Wiggington | 60 | | | |
| Matt Windham | 61 | | | |
| Mike McAllester | 63 | 64 | 66 | |
| Ronald Edwards | 67 | | | |


State rests......................................... 80


| DEFENDANT'S WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kathy Johnson | 80 | 88 | | |


Defense rests....................................... 91
State/Defense close................................. 91
Closing Arguments by the State...................... 93

2

Closing Arguments by the Defense..................... 103

Final Arguments by the State......................... 110

Jury out to Deliberate............................... 112

Verdict of the Jury.................................. 112

Sentencing of the Defendant.......................... 113

Reporter's Certificate............................... 114

- - - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBIT INDEX

STATE'S

| NO. | DESCRIPTION | MARKED | OFFERED | ADMITTED |
|-----|-------------|--------|---------|----------|
| 12 | Letter by Hunter | 20 | | |
| 13 | Stipulation of Evd. | 22 | 27 | 27 |
| 14 | Judgment, No. 444 | | | |
| | on Juvenile Record | 22 | 27 | 27 |
| 15 | TYC Commitment | 22 | 27 | 27 |
| 16 | Juvenile Statement | 22 | 27 | |
| 17 | Judgement, No. 10,690 | 69 | 70 | 71 |
| 18 | Probation Revocation | | | |
| | in No. 10,690 | 78 | 78 | 79 |

DEFENDANT'S

| NO. | DESCRIPTION | MARKED | OFFERED | ADMITTED |
|-----|-------------|--------|---------|----------|
| 1 | Order of Parentage | 92 | 93 | 93 |

3

KIM A. BROOKS, OFFICIAL COURT REPORTER

```
 1                    P R O C E E D I N G S

 2               (Jury in at 9:12 a.m.)

 3               THE COURT:  Good morning, ladies and

 4    gentlemen.  In the punishment phase of this trial, is the

 5    State ready to proceed?

 6               MR. RAY:  State's ready, Your Honor.

 7               THE COURT:  Is the defendant ready?

 8               MR. WATSON:  Yes, sir, we're ready, Judge.

 9               THE COURT:  Does the State want to make an

10    opening statement?

11               MR. RAY:  Yes, Your Honor.  May it please

12    the Court?

13               THE COURT:  Yes.

14               MR. RAY:  Mr. Watson.  Good morning, ladies

15    and gentlemen.  I want to thank you for your verdict at the

16    conclusion of the guilt/innocence phase of this trial.  It

17    was a verdict that was clearly justified by the quality and

18    quantity of the evidence against the defendant.

19               That having been done, as we indicated during

20    Voir Dire, we now move to the second phase of the trial

21    which is called the punishment phase of the trial.  And

22    there the -- as I indicated to you Monday morning, we don't

23    forget about the nature of the crime that you found

24    Mr. Johnson guilty of, but the focus changes remembering

25    that -- to a more focus on what should be done.  And in
```

4

1   some sense this is probably the most important part of this

2   trial.

3        And in focusing on disposition, I want to direct

4   your attention and ask you to remember the oath that you

5   took and the commitment that you made is that you would be

6   the kind of people who would wait until you've heard all of

7   the evidence and then decide in a proper case what the

8   punishment should be and have the kind of courage to

9   consider -- the willingness to consider the entire range of

10  punishment and the courage to consider stiff punishment if

11  the facts and circumstances warrant it.

12       Now, during this phase of the trial we are

13  allowed, for the first time, to share with you additional

14  information about the defendant, not just what he did to

15  Mr. Pontremoli, an extremely dangerous situation there, but

16  other things that focus on his reputation, his character,

17  and other crimes, bad acts, wrong conduct committed by him

18  that we can bring evidence forth.  So I want to do that.

19  And here's what we want to present to you so that you will

20  know the rest of the story about Russell Don Johnson.

21       The story starts back in August, August the 17th

22  of 1995 at Mineral Wells High School.  Russell Don Johnson

23  had had some problems with a fellow student named Raymond

24  Vargas.  And out at Mineral Wells High School right when

25  school was starting, it was probably orientation week or

5

```
 1    administration week, August the 17th, that outside of the
 2    auditorium out at the high school, Russell Don Johnson
 3    confronted Raymond Vargas.  Raymond Vargas thought they
 4    were going to fight, and all of a sudden Russell Don
 5    Johnson produced a pair of scissors and stabbed Raymond
 6    Vargas twice in the arm.  Darrell Carey, one of the
 7    teachers out there, and another lady named Marcie Carroll
 8    were witnesses to the incident and helped break it up and
 9    seized the scissors and see that Mr. Vargas got taken to be
10    treated.

11          We can prove that to you in one of two ways; we
12    may do a little of each.  But what we're going to offer as
13    evidence to prove that will be the fact that after
14    Mr. Johnson was taken into custody, he was at that time --
15    he was born in 1980, September of 1980, so he would have
16    been almost 16 years of age -- no, let's see, he would have
17    been right at 15 years of age.  So when that happened, he
18    was, of course, handled in our juvenile system.  He was
19    arrested and he was put into detention.  And the juvenile
20    system moves very rapidly.

21          The evidence is going to be presented through
22    Mr. Jack Hunter, who is the juvenile probation officer for
23    our county, that he was placed in detention over in Parker
24    County, it's called the Parker County Emergency Youth
25    Shelter.  It's a facility that's approved to house
```

6

KIM A. BROOKS, OFFICIAL COURT REPORTER

1   juveniles, can't mix them with adult prisoners except under

2   certain circumstances.

3          The evidence is going to show that there was a

4   trial held downstairs 13 days later.  The trial on the

5   juvenile proceedings are called an adjudication hearing.

6   It's the substitute of what we're going through now in

7   adult court.  And the adjudication hearing is called that

8   because one is adjudicated to have engaged in delinquent

9   conduct rather than found guilty of committing a crime.

10  It's just the terminology that applies to juvenile

11  proceedings.

12         But even before then, in the 12 days that

13  sandwiched between August 17th when he stabbed Raymond

14  Vargas and to get him into the courtroom downstairs, there

15  were, I believe, three assaultive incidents at the Parker

16  County Emergency Youth Shelter where he would assault

17  peers, other young people that are being detained there.

18         And that the trial was held.  We'll introduce a

19  stipulation of evidence that's signed by Russell Johnson

20  under oath wherein he admits to the stabbing of Raymond

21  Vargas and committing what in adult court is called an

22  aggravated assault on another human being.  We'll introduce

23  the judgment where he was adjudicated as having engaged in

24  that conduct and the commitment that sent him away to

25  what's called TYC, Texas Youth Commission.  He was

7

1    sentenced to one year in TYC.

2           So Russell was gone for a year and then he comes

3    back.  And when he gets back to Mineral Wells, let's pick

4    up the chronology this way.  He gets back here sometime

5    around the middle of September of 1996, approximately a

6    year after his commitment to the youth facility, and that

7    in the month of September, one week after he got back,

8    Mineral Wells High School had a disciplinary procedure set

9    up and he was -- because of violence and gang activity, was

10   disciplined -- Mr. Sam Bell, who is one of the assistant

11   principals out at the high school, will, in all likelihood,

12   be here to testify this morning and will confirm for you

13   under his job he keeps the disciplinary records of the

14   district and that he was sent to what's called AEC, that's

15   Alternative Education Campus.  When people are not able to

16   be in the regular population in our schools because of

17   their conduct and interrupting the educational atmosphere,

18   they're not kicked out, they're given a chance to continue

19   their education in the AEC program.  And so he was

20   disciplined by being sent to AEC because of assaultive and

21   gang activity.

22          Then that lasted for approximately 25 days, he

23   made it in AEC, and then he was expelled from AEC on

24   October the 18th of 1996 for a period that would not expire

25   until May the 27th of 1997.  In other words, about a

8

1   seven-month period of time there that would have been the

2   end of the school term, end of May, he was expelled for the

3   balance of that school year because of his conduct at AEC.

4   Okay.  That gets us to October 18th of 1996, he was

5   expelled.

6            And then we're going to hear evidence that on

7   November the 11th, that's going to be about 22 days that he

8   made it this time, we're going to present evidence that at

9   a street stop sign over by the junior high, he was walking

10  across the street and a fellow that was in a car named

11  Scott Cienega and they had words.  Scott Cienega had just

12  had his windows tinted and, therefore, couldn't roll down

13  the window.  And so he opened his door and stepped out of

14  the car and Russell Don Johnson slammed the car door up

15  against his legs, knocking him back.  Scott Cienega got out

16  of the car, and before that was over with, Russell Don

17  Johnson had produced a screwdriver and stabbed Scott

18  Cienega with the blow coming down towards his left chest

19  area and Scott Cienega turning and the stab wound going

20  into the upper rear part of the shoulder; stabbed Raymond

21  Vargas with scissors and then went away and came back and

22  on the 11th of November, stabbed Scott Cienega with a screw

23  driver.

24           And then before that case could be brought to

25  court, we're going to move forward, not far, 27 days this

9

1 time, to December the 5th of 1996.  And on December 5th of

2 1996, the evidence is going to show that Russell Don

3 Johnson, one of his friends really, one of his running

4 buddies, Robert Joe Perez, I think Russell had broken up

5 with a girlfriend or something and Robert started dating

6 her and Russell took offense at that and with no

7 provocation whatsoever over at a friend's house, the

8 evidence is going to show that Russell Don Johnson, on

9 December the 5th of 1996, produced a knife and stabbed

10 Robert Joe Perez in the back four times, one of the wounds

11 missing his spine by about a quarter of an inch.

12   And the evidence is going to show that at that

13 time Russell Don Johnson was still 16 years of age, and you

14 don't get brought into adult court until you're 17 except

15 under the certain circumstances.

16   The evidence is going to show after the Scott

17 Cienega incident and the Robert Joe Perez stabbing incident

18 that, at my request, proceedings were held downstairs in

19 the juvenile court where Russell Don Johnson was certified

20 by that court to be tried as an adult in the aggravated

21 assault of Robert Joe Perez.

22   The evidence is going to show that soon

23 thereafter a trial was held in this court where he was

24 brought upstairs to be tried as an adult, given his age and

25 the kind of activities that he'd been involved in, and that

10

1  we had a jury trial in this court; and that pursuant to a

2  jury trial, the evidence is going to show that Russell Don

3  Johnson was convicted by a jury just like you of stabbing

4  Robert Joe Perez in the back.

5         The evidence is going to show, however, that

6  during the punishment phase of that trial, because of

7  testimony during the trial that Russell Don Johnson was

8  hopped up on drugs and he really wouldn't have stabbed

9  Robert Joe Perez had it not been for the drugs, that the

10  jury decided that a 16-year-old, maybe let's don't send him

11  to prison; even though all this violence, maybe let's don't

12  send him to prison.  So they gave him 10 years and probated

13  it.  They recommended probation to Judge Cleveland.

14         And the evidence is going to show 10 years is the

15  most punishment that you can give someone if you're going

16  to probate it.  If you sentence them to more than 10 years,

17  it cannot be probated.  That jury struggled with the

18  decision, but recommended probation.  Because of the

19  evidence heard during the trial, you're going to hear

20  evidence that the Court made a finding based on that

21  evidence that the criteria existed to find that there was a

22  drug involvement that underlied the stabbing incident.  And

23  so this Court addressed that and sent Russell Don Johnson

24  to the most intensive, the longest and the strongest drug

25  rehabilitation program that we have available in the court

11

1   systems in Texas.  I don't know what you can buy with

2   private money, but this is a nine-month to twelve-month

3   program at prison.  It's inside the prison walls, but it's

4   in a unit that he is separated from the other convicts,

5   substance abuse felony punishment facility.  And this Court

6   entered an order sending Russell Don Johnson as a condition

7   of his probation to go to the Substance Abuse Felony

8   Punishment Facility and deal with this matter.

9           And so the evidence is going to show that Russell

10  Don Johnson went to the SAFPF, Substance Abuse Felony

11  Punishment, an anagram, sAFPF goes to SAFPF.  The evidence

12  is going to show that after he got out of SAFPF after

13  spending those months gone and in kind of a lockup

14  facility, that the program requires that you go to a

15  halfway house, an aftercare facility, a transition facility

16  to get out of the substance abuse prison facility, work

17  your way back into society and hopefully be a good guy.

18          And the evidence is going to show that Russell

19  Don Johnson did not even successfully complete that

20  program, that he messed up at the halfway house out in

21  Midland and was discharged unsuccessfully, did not complete

22  the program.  The evidence is going to show that that

23  happened on June the 14th of 1998 after being gone for

24  approximately a year at SAFPF.

25          The evidence is going to show that on June the

                                                        12

1   14th, he was discharged or kicked out of the facility and

2   that he comes back here and, of course, he's on probation

3   even though he got kicked out, and we haven't had time yet

4   to file any motions to take away his probation or anything,

5   but three days later, one of the probation officers

6   downstairs that works for Mr. Ron Edwards, who is your

7   chief of the adult probation officer in Palo Pinto County,

8   requested a urine sample.

9          And the evidence is going to show that Russell

10  Don Johnson, after we spent a year working on this problem

11  at the halfway house, within three days, turns up with a

12  dirty urinalysis.  And then I filed a motion to revoke his

13  probation, to take away his probation because of repeated

14  violations.

15         And then you know that before we can even get him

16  arrested on the probation violation allegation, what

17  happened 30 days later, approximately, when he attacks

18  Mr. Pontremoli with this 36-inch pipe wrench and you heard

19  Dr. Allensworth's testimony.  And that brings us to now.

20         And then we've presented that evidence -- and

21  it'll take us a couple of three hours to put on the

22  evidence, perhaps.  Some of it will be documentary

23  evidence, some of it will be testimonial evidence, but you

24  will have evidence on all of these things that I shared

25  with you so that you will know who you are sentencing when

                                                          13

1   you next retire to consider your verdict.

2          And we will -- if we prove these things to you,

3   then we'll reserve our comments about what that might

4   generate in terms of appropriate punishment to you for a

5   violent person like this.  You deserve to know about the

6   person that you're sentencing.  Thank you very much.

7          THE COURT:  Does the defendant want to make

8   an opening statement?

9          MR. WATSON:  Not at this time, Your Honor.

10          THE COURT:  Who will you have sworn,

11   gentlemen, who have not already been sworn?

12          MR. RAY:  John Arenz, Jack Hunter, Henry

13   Williams, and Scott Cienega that have not already been

14   sworn.

15          THE COURT:  Defendant have anyone?

16          MR. WATSON:  Yes, sir, he's getting her.

17          (Pause in proceedings.)

18          MR. WATSON:  Your Honor, she is not on the

19   floor, we can swear her later.

20          (Witnesses sworn.)

21          THE COURT:  You'll have to remain outside

22   the courtroom until called to testify.  Don't discuss this

23   case or your testimony with anyone or let anyone discuss it

24   with you except for the attorneys.  Who will you have

25   first?

14

1              MR. RAY:  Mr. Jack Hunter.

2                   P.E. "JACK" HUNTER,

3  a witness called on behalf of the State, duly sworn to tell

4  the truth, the whole truth, and nothing but the truth,

5  testified on his oath as follows:

6

7                   DIRECT EXAMINATION

8  BY MR. RAY:

9       Q    Would you state your name, please?

10      A    P.E. Hunter.

11      Q    Mr. Hunter, how are you employed?

12      A    I'm Chief Juvenile Probation Officer for the

13 County of Palo Pinto.

14      Q    How long have you been serving us in that

15 capacity?

16      A    A little over 20 years.

17      Q    Mr. Hunter, are you familiar with an individual

18 known as Russell Don Johnson?

19      A    Yes, sir, I am.

20      Q    Is Russell Don Johnson in the courtroom today?

21      A    Yes, sir, he is.

22      Q    Would you point him out and identify him for the

23 record?

24      A    (Pointing) He's the young man with the burr

25 haircut seated to the immediate right of Mr. Watson at the

                                                      15

1    counsel table.

2              MR. RAY:  Let the record reflect that the

3    witness has identified the defendant, Russell Don Johnson.

4    BY MR. RAY:

5         Q    Mr. Hunter, were you serving in the same capacity

6    that you've indicated to the jury back on August the 17th

7    of 1995 and continuously since that time?

8         A    Yes, sir, I was.

9         Q    Did you become familiar with an incident

10   involving someone who was a juvenile named Russell Don

11   Johnson on or about August the 17th of 1995?

12        A    Yes, sir, I did.

13        Q    And what is that called when your office gets a

14   report?

15        A    It's called a referral.

16        Q    There is -- is it fair to say that there is kind

17   of a unique dictionary or menu of terms that apply to

18   juvenile proceedings that are different than adult

19   proceedings?

20        A    Yes, sir.

21        Q    And instead of case reports, we have referrals;

22   and instead of having a trial, we have adjudication

23   hearings; and instead of being found guilty of a crime,

24   you're found as having engaged in delinquent conduct, just

25   for example, true?

                                                           16

```
 1        A     That's correct.

 2        Q     Okay.  Is a finding by a court or jury in

 3   juvenile court that someone has engaged in delinquent

 4   conduct the same thing as a guilty verdict if compared to

 5   the adult court proceedings?

 6        A     Yes, sir.

 7        Q     The nature of the referral that you received

 8   about the defendant, Russell Don Johnson, on August 17th of

 9   '95, what was that?

10        A     It was a delinquent conduct referral in which it

11   would have been an aggravated assault causing serious

12   bodily injury.

13        Q     All right.  Did that referral result in charges

14   being brought, a petition being filed against the

15   defendant?

16        A     Yes, sir.

17        Q     And what are the rules that apply to the

18   detention of juveniles when they're charged with delinquent

19   conduct?  Can they be put in just any jail?

20        A     No, sir.

21        Q     What's the rule there?

22        A     The general rule is that they have to be

23   separated from adults; and under the federal mandate of the

24   Deinstitutionalization Act passed several years ago, we now

25   have to use what is referred to as a juvenile detention
```

17

1   facility or an emergency shelter for juveniles.

2       Q    And are those facilities that have been approved

3   as being in compliance with or a way to comply with that

4   requirement?

5       A    That's correct.

6       Q    Do we have a juvenile detention facility in Palo

7   Pinto County?

8       A    No, sir.

9       Q    What are the nearest ones that we utilize from

10  time to time?

11      A    We utilize Johnson County pretty regular, Johnson

12  County Juvenile Detention Center.  We utilize Parker County

13  Youth Emergency Shelter.  We've utilized Nolan County in

14  Sweetwater, Denton County, and that's about the ones.

15      Q    Was Mr. Johnson detained in a youth facility?

16      A    Yes, sir, he was.

17      Q    Which one?

18      A    Parker County Youth Emergency Shelter in

19  Weatherford.

20      Q    And how many days went by before y'all could have

21  the actual trial or adjudication hearing downstairs in the

22  county court?

23      A    From the 17th to August the 30th of '95.

24      Q    All right.  Some approximately 12 days would have

25  sandwiched in between the date of the incident and the date

                                                              18

1  of the trial?

2      A    That's correct.

3      Q    During that time was the defendant detained in

4  the Parker County Youth Shelter?

5      A    Yes, sir, he was.

6      Q    Prior to the time that you could get him to

7  trial, did you receive any reports of assaultive conduct or

8  violence at the Parker County Shelter?

9      A    Yes, sir.

10               MR. WATSON:  Your Honor, I'm going to object

11  to that as hearsay.

12               THE COURT:  I'll sustain the objection as to

13  hearsay.

14  BY MR. RAY:

15      Q    Well, Mr. Hunter, tell us the result of the

16  adjudication trial or hearing that was held August 30th,

17  1995.

18      A    In the adjudication phase of the hearing,

19  Mr. Johnson plead true to the charge that was filed on the

20  petition and he was found true.

21      Q    Okay.  And finding true is the tantamount to

22  finding guilty of the conduct?

23      A    That's correct.

24      Q    After -- similar to the process we're here in

25  right now where we're having the punishment phase of this

19

1   trial, what is the punishment phase of a juvenile

2   proceeding called?

3       A   It's called a dispositional hearing.

4       Q   And that's where the focus changes to what to do,

5   right?

6       A   That's correct.

7       Q   What disposition.  What disposition was made by

8   the Court in the case of where Russell Don Johnson was

9   charged with stabbing Robert Vargas?

10      A   He was committed to the care, custody, and

11   control of the Texas Youth Commission facility.

12      Q   For how long?

13      A   There is no set period of time, it can be up

14   until age 21.

15      Q   After he was committed or when he was

16   committed -- did you make any particular recommendation to

17   the Texas Youth Commission Administration with regard to

18   what kind of facility would be appropriate for Mr. Johnson

19   based on your investigation and familiarity with his

20   background and the case?

21      A   Yes, sir, I did.

22               (State's Exhibit No. 12 was marked

23                 for identification by the court

24                 reporter.)

25   BY MR. RAY:

20

1        Q     Let me hand you what's been marked for

2   identification as State's Exhibit 12 and ask if you can

3   identify that?

4        A     Yes, sir, I can.

5        Q     What is State's 12?

6        A     It's a letter to the staff of the Texas Youth

7   Commission written by myself and signed by myself on August

8   the 30th, 1995.

9        Q     Does it pertain to the disposition of the case

10  against Russell Don Johnson in juvenile court about which

11  you've been testifying?

12       A     Yes, sir, it does.

13       Q     And in -- did you make -- write that letter and

14  make the recommendation contained therein based upon your

15  knowledge of the defendant --

16              MR. WATSON:  Excuse me, Your Honor, I'm

17  going to object.  This letter contains information that is

18  hearsay and I don't think is appropriate for the -- to be

19  considered by the jury, and I'm going to object to this

20  letter and any comments by Mr. Hunter on that letter.

21              THE COURT:  Let me see it.

22         (Court reviews State's Exhibit No. 12.)

23              THE COURT:  I'll sustain that objection at

24  this point.

25  BY MR. RAY:

                                                          21

1    Q    Mr. Hunter, without saying anything that somebody

2    else told you, what recommendation did you make to the

3    Texas Youth Commission?

4    A    That he be placed in the Giddings State School

5    Facility of TYC.

6    Q    And why would someone -- why would you recommend

7    that he be placed into the Giddings school, what is unique

8    about the Giddings State School?

9    A    The Giddings State School is what we commonly

10   refer to as the maximum security unit for the TYC

11   facilities.

12                        (State's Exhibit Nos. 13, 14, 15, and

13                        16 were marked for identification by

14                        the court reporter.)

15   BY MR. RAY:

16   Q    Mr. Hunter, are you familiar with the proceedings

17   conducted in a case number, Cause No. 444 in the juvenile

18   court or the County Court of Palo Pinto County sitting as a

19   juvenile court?

20   A    Yes, sir, I am.

21   Q    Is that the case where the delinquent conduct,

22   stabbing Raymond Vargas was heard?

23   A    Yes, sir, it is.

24   Q    Are you familiar with the court documents that

25   were generated as part of the adjudication hearing and the

22

1    resulting judgment and commitment?

2         A    Yes, sir, I do.

3         Q    Let me hand you what have been marked as State's

4    Exhibits 13, 14, 15, and 16 and ask you if you will look at

5    those and see if you can identify them?

6         A    Yes, sir, I can.

7         Q    What is State's 13?

8         A    State's Exhibit No. --

9              MR. WATSON:  Your Honor, I see -- excuse me,

10   these documents, as far as Mr. Hunter is concerned, would

11   be hearsay.  I don't think he can properly prove up these

12   documents.

13             MR. RAY:  Your Honor, if I might respond

14   before you rule?

15             THE COURT:  Yes.

16             MR. RAY:  First of all, the -- prior to the

17   time that I offer the -- there will be evidence that they

18   are, in fact, certified copies, certified as being correct

19   by Bobbie Smith, County Clerk of Palo Pinto County.  And,

20   secondly, prior to the time that they are offered, I will

21   offer testimony through Mr. Hunter that they do pertain to

22   the defendant in this case and, therefore, under rules 901

23   and 902, they being certified copies of government

24   documents, that they would be offered with that kind of

25   foundation.

                                                    23

1          THE COURT:  Yes, I'll overrule that

2   objection.

3   BY MR. RAY:

4          Q     Mr. Hunter, again, what is State's Exhibit 13,

5   sir?

6          A     State's Exhibit 13 is entitled Stipulation of

7   Evidence in Cause No. 444.

8          Q     And that case is in the matter of whom?

9          A     In the Matter of Russell Don Johnson.

10         Q     And is that the same Russell Don Johnson that

11  you've pointed out and identified as the defendant in our

12  case?

13         A     Yes, it is.

14         Q     Is State's 13 certified by the county clerk of

15  Palo Pinto County?

16         A     Yes, it is.

17         Q     And can it -- is it signed by the defendant,

18  Russell Don Johnson?

19              MR. WATSON:  Your Honor, I have the same

20  objection.  Mr. Hunter cannot prove up these documents.

21  He's not the custodian of these records, he cannot do this.

22  We will object.

23              THE COURT:  All right.  They're certified,

24  I'll overrule that objection.

25  BY MR. RAY:

                                                          24

```
 1        Q     Is it signed by Russell Don Johnson?

 2        A     Yes, it is.

 3        Q     And is it signed under oath in the presence of

 4   Bobbie Smith, County Clerk of Palo Pinto County?

 5        A     That's correct.

 6        Q     And is it approved by Judge Harold Couch who was

 7   then sitting as the judge of that court?

 8        A     That's correct.

 9        Q     Move now to State's Exhibit 14.   What is State's

10   14?

11        A     State Exhibit 14 is entitled Judgment, Cause No.

12   444, In the Matter of Russell Don Johnson.

13        Q     Is that the same Russell Don Johnson that's the

14   defendant in our case?

15        A     Yes, sir, it is.

16        Q     Is State's Exhibit 14 certified by the county

17   clerk of Palo Pinto County?

18        A     Yes, sir, it is.

19        Q     And when was that judgment entered?

20        A     August the 30th of 1995.

21        Q     And, again, does Russell Johnson's signature

22   appear on that document as an attestation that he's

23   received a copy of it?

24        A     Yes, it does.

25        Q     Move to State's Exhibit 15.   What is State's 15?
```

25

1     A    State's Exhibit 15 is the Order of Commitment in

2  Cause No. 444, In the Matter of Russell Don Johnson.

3     Q    And is that the same Russell Don Johnson that is

4  the defendant in the case that's here on trial?

5     A    Yes, sir.

6     Q    And is State's Exhibit 15 certified by the county

7  clerk of Palo Pinto County?

8     A    Yes, it is.

9     Q    And is it signed by Harold Couch, the then

10  sitting judge of that court?

11     A    Yes, sir, it is.

12     Q    State's Exhibit 16, what is 16?

13     A    State's Exhibit 16, there's a three-page

14  document, it is the Magistrate's Determination of

15  Juvenile's Competency To Make a Confession.  Page two is

16  the warning to the juvenile offender, and Page 3 is the

17  statement that Russell Don Johnson gave.

18     Q    And were those filed in Cause No. 444, In the

19  Matter of Russell Don Johnson?

20     A    Yes, they were.

21     Q    Is that the same Russell Don Johnson that's the

22  defendant in our case that's on trial?

23     A    Yes, it is.

24     Q    Is that the document certified by the county

25  clerk of Palo Pinto County, Bobbie Smith?

26

1     A    Yes, it is.

2     Q    And does Russell Don Johnson's signature appear

3 on the Warning To Juvenile By Magistrate given to him by

4 Judge Byars?

5     A    Yes, it does.

6     Q    And does his signature appear at the bottom of

7 the statement giving the statement under oath?

8     A    Yes, it does.

9            MR. RAY:  We offer State's 13, 14, 15, and

10 16.

11           MR. WATSON:  Your Honor, we'd object to 13,

12 14, 15, and 16 for the reasons stated that this --

13 Mr. Hunter cannot properly prove these up.  The third page

14 of No. 16 contains matters I would like for the Court to

15 examine that relate to proper predicate for the third page

16 being introduced into evidence.  I would like the Court to

17 look at that before any ruling is made.

18           THE COURT:  All right.

19           MR. RAY:  Your Honor, I'll withhold 16 for

20 the time being, Your Honor, and have you rule on 13, 14,

21 and 15.

22           THE COURT:  All right.  I'll overrule the

23 objection on 13, 14, and 15, and they are admitted.

24              (State's Exhibit Nos. 13, 14 and 15

25              were received into evidence.)

27

1  BY MR. RAY:

2      Q    Mr. Hunter, looking there on the original

3  documents that have been admitted into evidence, with

4  reference to State's Exhibit 13, the Stipulation of

5  Evidence, is it true that that document stipulates, the

6  last paragraph, that on or about the 17th day of August,

7  1995, the said child, that being Russell Don Johnson,

8  violated a penal law of this state punishable by

9  imprisonment, confinement in jail, to-wit, Article 22.02 of

10  the Texas Penal Code in that he did then and there in the

11  County of Palo Pinto and State of Texas intentionally,

12  knowingly, and recklessly cause serious bodily injury to

13  Raymond Vargas by then and there stabbing him with a pair

14  of scissors on the wrist and upper left arm?

15      A    Yes, sir.

16      Q    And is that stipulated to in writing and signed

17  by the defendant, Russell Don Johnson?

18      A    Yes, it is.

19      Q    Moving now to the State's Exhibit 14, the

20  judgment, does that judgment adjudicate him as having

21  committed that conduct?

22      A    Yes, it does.

23      Q    And then State's Exhibit 15, would that be the

24  document, if the jury wanted to examine that evidence, that

25  committed him to the Texas Youth Commission?

28

1     A     That's correct.

2     Q     Okay.  Mr. Hunter, aside and apart -- you're

3   aware that this jury has convicted Russell Don Johnson of

4   aggravated robbery of an elderly gentlemen named Jimmie

5   Pontremoli on July the 28th of 1998, are you not?

6     A     Yes, I am.

7     Q     For the moment I want to ask you to disregard

8   that.  Excluding that conduct that the jury has found him

9   guilty of, forget about that, are you familiar with the

10  reputation that Russell Don Johnson has earned in the

11  community wherein he resides for being a peaceable and law

12  abiding citizen?

13    A     Yes, I am.

14    Q     Is that reputation good or bad?

15    A     Bad.

16    Q     Mr. Hunter, later did you have an occasion to

17  again come in contact with -- well, when did he get out of

18  TYC, if he did?

19    A     He was released from TYC in September of '96; and

20  I believe it would have been along about the 13th or the

21  14th of September, which would have been a Friday or

22  Saturday, we had entered a contractual agreement with TYC

23  to pick up supervision and he reported to the office of

24  juvenile department on September the 16th.

25    Q     So y'all would have picked up your supervision of

29

1  him again in mid September, about a year later, in 1996; is

2  that correct?

3      A    That's correct.

4      Q    Did you have any occasion to receive any

5  additional referral or referrals on Russell Don Johnson

6  thereafter?

7      A    Yes, I did.

8      Q    Tell us about that.

9      A    Received a referral on Russell Johnson in

10  December of that same year for another aggravated --

11            MR. WATSON:  Your Honor, excuse me, that

12  would be based on hearsay information provided to Mr.

13  Hunter.  We're going to object to that.

14            THE COURT:  Well, I'll overrule the

15  objection if it's something he has personal knowledge of.

16  BY MR. RAY:

17      Q    Well, did you receive a referral without regard

18  to whether it was true or not?

19      A    Yes, I did.

20      Q    And when was that?

21      A    It was in December.

22      Q    Of '96?

23      A    Yes, sir.

24      Q    All right.  And as a result of that, were any new

25  charges filed against Mr. Johnson?

30

1           MR. WATSON:  Your Honor, excuse me, he's

2    talking about personal knowledge of the incident or

3    personal knowledge of the referral?  The incident obviously

4    he could not have personal knowledge of, so it would have

5    to be what someone else told him in order for him to accept

6    a referral.

7           THE COURT:  All right.  Well, I don't know,

8    I haven't heard.  If it's something someone told him, he

9    can't testify to it.  But he can testify to the fact that

10   there was a referral if he knows that of his own knowledge.

11   BY MR. RAY:

12      Q   Well, you are aware of a referral of your own

13   personal knowledge?

14      A   Yes, sir, I am.

15      Q   Not what happened, I'm not saying you were a

16   witness to the incident, but that you did receive a

17   referral?

18      A   Yes, sir, I did.

19      Q   What did you do in response to it?

20      A   I proceeded to handle Russell Don Johnson as a

21   juvenile offender again.

22      Q   And was another petition filed against him?

23      A   Yes, sir, another petition was filed.

24      Q   Charging him with what kind of conduct?

25      A   Delinquent conduct.

31

1      Q      What kind of underlying offense?

2      A      Aggravated assault, another aggravated assault

3  offense.

4      Q.     Similar to the same kind of conduct he was

5  charged with in the Raymond Vargas case?

6      A      That's correct.

7      Q      And was an adjudication hearing held in juvenile

8  court pertaining to that allegation?

9      A      No, sir, there wasn't.

10     Q      What happened instead?

11     A      After the filing of the petition through

12 Mr. Garrett, we also filed what's called a waiver asking

13 the court, the juvenile court, to waiver its exclusive

14 jurisdiction and try him as an adult.

15     Q      And the result of those proceedings, if you

16 would?

17     A      They were -- a hearing was held in juvenile court

18 in which a waiver was entered, and he was moved to adult

19 court.

20     Q      And the alleged victim in that case, if you

21 recall?

22     A      Robert Joe Perez.

23            MR. RAY:  Pass the witness.

24            MR. WATSON:  I have no questions of Mr.

25 Hunter.

                                                        32

1          THE COURT:  That's all, thank you.

2          MR. RAY:  Call Darrell Carey.  He'll need to

3  be sworn.

4                  DARRELL CAREY,

5  a witness called on behalf of the State, duly sworn to tell

6  the truth, the whole truth, and nothing but the truth,

7  testified on his oath as follows:

8

9                  DIRECT EXAMINATION

10 BY MR. RAY:

11     Q    Would you state your name, please?

12     A    Curtis Darrell Carey.

13     Q    And Curtis would be regular spelling,

14 C-u-r-t-i-s?

15     A    Yes.

16     Q    Spell Darrell.

17     A    D-a-r-r-e-l-l.

18     Q    And your last name?

19     A    C-a-r-e-y.

20     Q    Okay.  Thank you, that always helps the court

21 reporter when there's multiple spellings.  Mr. Carey, how

22 are you employed, sir?

23     A    I teach math at Mineral Wells High School.

24     Q    And how long have you been teaching out at

25 Mineral Wells High School?

                                                    33

1        A     For 24 years.

2        Q     All right.  And then may we assume that you were

3   similarly engaged and employed on August the 17th of 1995?

4        A     Yes, sir.

5        Q     Would it be fair to assume that August 17th of

6   1995 would be probably very early in the beginning of the

7   fall term of school?

8        A     Probably within the first week.

9        Q     Did anything happen on August the 17th of 1995

10  involving a student who got hurt named Raymond Vargas?

11       A     Yes, sir.

12       Q     Were you there when that incident unfolded?

13       A     Yes, sir.

14       Q     About what time of the day was it?

15       A     Oh, 8:15, the bell had just rung.

16       Q     And is the location where this occurred in Palo

17  Pinto County, Texas?

18       A     Yes, sir.

19       Q     What were you doing at that time of morning?

20       A     I had early morning duty and the bell had just

21  rung and I was on my way to class.

22       Q     Okay.  What part of the school campus did your

23  route take you to?

24       A     We had duty in the cafeteria and were on our way

25  back across what we call the breezeway, the front sidewalk,

                                                              34

1    toward D building where my classroom is.

2        Q    What incident, if any, did you come upon?  Would

3    you describe that for us?

4        A    Mrs. Carroll and I had had duty in the cafeteria,

5    and we normally would walk the back sidewalk.  She needed

6    to go by the office, so we walked -- we headed for the

7    front sidewalk and a student called to us and said there

8    was a fight going on in front of the auditorium there.  We

9    went out that door and there were two young men in a fight,

10   one of them, I thought was -- had a knife, it turned out to

11   be a pair of scissors.  And we tried to break the fight

12   up.  I kept hollering at the kids because that usually will

13   separate them.  One of them was very agitated and kept

14   stabbing at the other one.  We finally got them separated

15   and I noticed blood on the shoulder on the one that was not

16   armed.  We got him away.  Another fellow came out of the

17   group of students that had been there and actually pushed

18   the student with the scissors away.  He threw those down

19   and the two of them ran.

20       Q    Okay.  And who recovered the scissors?

21       A    Mrs. Carroll.

22       Q    Okay.  And was the injured individual taken for

23   treatment as far as you know?

24       A    Yes.  We got him away and that's when we observed

25   the blood on his left shoulder and saw that he had been

                                                          35

1    stabbed and we started -- I started to the office with him

2    and met the then principal, Mr. Pectol, and he took him.

3        Q    And, Mr. Carey, just briefly, you have testified

4    in this courtroom previously about the same incident back

5    over a year ago; isn't that correct?

6        A    Yes, sir.

7        Q    And at that time you knew that this gentleman to

8    my left, Russell Don Johnson, was -- you didn't know his

9    name at the time of the stabbing, didn't you?

10       A    No.

11       Q    But you identified him as being the one with the

12   scissors?

13       A    Students identified him for us, we did not know

14   either -- we didn't know any of the three.

15       Q    And when the efforts were made to separate

16   Mr. Johnson from the stabbing victim, did he willingly stop

17   or from what you saw did he keep jabbing and slashing?

18       A    No, he did not stop until the third kid actually

19   separated them.

20               MR. RAY:   Pass the witness.

21

22                      CROSS-EXAMINATION

23   BY MR. WATSON:

24       Q    Who was the other person involved in this fight,

25   Mr. Carey?

                                                              36

```
 1        A    At the time I knew none of their names, sir.

 2        Q    Was there three people involved in the fight or

 3   two?

 4        A    No, there was two people involved in a fight and

 5   then the third one came out of the bystanders basically to

 6   help us separate them.

 7        Q    Do you know what started this fight?

 8        A    I have no idea, sir.

 9        Q    So as far as you know, the other party could have

10   been the one that started the fight; is that correct?

11        A    I have no idea, I just know that the two of them

12   were fighting and the third one came out of the bystanders.

13              MR. WATSON:  Okay.  That's all the questions

14   I have.

15              MR. RAY:  Nothing further of this witness.

16              THE COURT:  That's all.  Thank you,

17   Mr. Carey.

18              MR. RAY:  Call Sam Bell.  May this witness

19   be excused?

20              THE COURT:  Yes, sir, you may leave.

21                    SAM BELL,

22   a witness called on behalf of the State, duly sworn to tell

23   the truth, the whole truth, and nothing but the truth,

24   testified on his oath as follows:

25
```

37

<u>DIRECT EXAMINATION</u>

BY MR. RAY:

Q    Would you state your name, please?

A    Sam Bell.

Q    And what kind of work do you do, Mr. Bell?

A    Assistant principal at Mineral Wells High School.

Q    And how long have you been serving in that capacity?

A    This is my third year.

Q    In that capacity as an assistant principal, what duties, if any, do you have with regard to the maintenance and keeping secure and track of records of students who are enrolled at Mineral Wells High School?

A    We have two types of records.  We have discipline records which are kept for three years after that, and then we have a student's accumulative record which are kept forever.  Okay.  I'm in charge of the discipline, I have been for the last three years.  I had some help this year, but my main priority has been discipline for the last three years.

Q    Are those discipline records maintained by the school under your direction in the ordinary course of business of the high school?

A    Yes.

Q    And are those records made by people who have

38

1    personal knowledge of the matters set forth therein?

2         A    Yes.

3         Q    And are they made, the written memoranda made at

4    a time that is close in proximity to when the events occur?

5         A    Yes.

6         Q    And then you maintain and preserve and are the

7    custodian of those records; is that correct?

8         A    Yes.

9         Q    At my request did you examine and locate the

10   discipline records of Mineral Wells High School pertaining

11   to Russell Don Johnson?

12        A    Yes.

13        Q    And can you -- directing your attention to

14   September the 23rd of 1996, can you tell us what, if

15   anything -- what disciplinary action was taken pertaining

16   to Russell Don Johnson at that time?

17        A    Okay.  I'm going to refer to my notes here.  I

18   went back to -- several years back prior to that, I went

19   back to junior high school.

20             MR. WATSON:  Excuse me, Your Honor, I'm

21   going to object to any -- that's nonresponsive.  He asked

22   him a question about September the 23rd, 1996.

23             THE COURT:  Yes, sir.

24   BY MR. RAY:

25        Q    Well, first, let's just -- we'll deal with that

                                                    39

1   in a minute maybe, but first in the fall of 1996, if you

2   could address that for us.

3        A    Okay.  In September of that year, he got in a

4   fight with another student.  Let me go back one year,

5   September 3rd of that year, I met Russell Don Johnson --

6                 MR. WATSON:  Excuse me, Your Honor.  He's

7   asked the question about September 23rd of 1996.

8                 MR. RAY:  Well, I rephrased --

9                 MR. WATSON:  Now he's wanting to go back to

10  the other --

11                MR. RAY:  I rephrased it to the fall of

12  1996, Your Honor.

13                MR. WATSON:  Well, the fall covers three or

14  four months, I'd would like to know what he's talking

15  about.

16                THE COURT:  All right.  Sustained.

17  BY MR. RAY:

18       Q    All right.  Mr. Bell, after -- when did school

19  start, approximately, in 1996?

20       A    August of that year.

21       Q    Okay.  Starting in August of that year and moving

22  into September, tell us what the discipline records reflect

23  about this man to my left, Russell Johnson.

24       A    Okay.  I met with Russell and his mom upon their

25  enrollment into Mineral Wells High School and just

                                                        40

1   discussed just student code of conduct, had to do with all

2   students, went over the student handbook and things of that

3   nature.  And at that time I also had both of them, all

4   three of us signed a contract just saying that he would

5   abide by the school code and school conduct while he was on

6   our campus.

7        Q    Okay.

8        A    On 9/3 I met with them, the contract was signed

9   by all of us and on 9/11 he got in a fight with another

10  student.  He was placed in ISS at that time.

11       Q    Now, what is ISS?

12       A    In-school suspension.

13       Q    Leaves him on the campus --

14       A    Yes, sir.

15       Q    -- but in a special environment?

16       A    Yes, sir.  Pulls him out of regular classroom,

17  puts him in a more restrictive environment on our campus

18  where he can be better supervised.

19       Q    And that was because of a fight on September the

20  11th?

21       A    Yes, sir.

22       Q    All right.  Go ahead, what's next?

23       A    Further questioning with Russell, he said he was

24  in a gang.  He said it wasn't school-related and therefore

25  none of my business.  He was referred to alternative school

41

KIM A. BROOKS, OFFICIAL COURT REPORTER

1   for gang affiliation and gang activity.

2       Q    Now, what is alternative education?   Describe

3   that for us.

4       A    Alternative education is a stricter environment.

5   It's a whole other campus off of our campus across town on

6   the north side of campus.   They lose some privileges and

7   some rights at that time.   It's very restrictive.   They're

8   supervised, highly supervised, and we place students over

9   there for a variety of activities.   And one of his -- or

10   the reason he was placed was for gang activity.   He said he

11   was in a gang at that time.

12       Q    All right.   Now, that happened on what date that

13   he was referred to AEC?

14       A    AEC hearing was on September 23rd.   We had the

15   actual hearing on that date.   He was placed in alternative

16   school on September 25th for a time of 20 days.   Twenty

17   days is the minimum placement for students that go to

18   alternative school, up to the remainder of the school year

19   or calendar year.   He was placed in a minimum stay.   I

20   don't determine the day of those placements, all I do is --

21           MR. WATSON:   Your Honor, excuse me, I'm

22   going to object to -- Mr. Bell is rambling, best I can

23   tell, he's not answering questions, he's going over the

24   chart.

25           THE COURT:   Just answer the question.

```
 1    BY MR. RAY:
 2        Q    What happened next, Mr. Bell, from the discipline
 3    records of Russell Don Johnson?
 4        A    He was placed in alternative school September
 5    25th for 20 days.  He was expelled from --
 6                    MR. WATSON:  Excuse me, Your Honor.
 7                    THE COURT:  Okay.  Just answer the
 8    question.  Limit your answer to the questions.
 9                    THE WITNESS:  Placed in alternative school
10    September 25th.
11    BY MR. RAY:
12        Q    All right.  And after he was placed in
13    alternative school, what happened next in regards to the
14    discipline matters pertaining to Mr. Johnson?
15        A    He was expelled from alternative school on
16    October 18th through May 29th for persistent misconduct
17    while in AEC; specifically, profanity, leaving school,
18    arguing with another student, threatening another student.
19        Q    All right.  And that happened October the 18th of
20    '96 and would have covered the balance of that academic
21    school year, correct?
22        A    Yes, sir.
23        Q    Do your records show anything after that
24    expulsion on October the 18th of 1996?
25        A    No.
```

43

```
 1        Q    Okay.  That was the last dealings y'all had with
 2   him as far as you know?
 3        A    Yes.
 4             MR. RAY:  Pass the witness.
 5             MR. WATSON:  No questions.
 6             THE COURT:  That's all.  Thank you, Mr.
 7   Bell.
 8             MR. RAY:  May Mr. Bell be excused to go back
 9   to school, Your Honor?
10             THE COURT:  Yes, sir, you may leave.
11             MR. RAY:  Call Scott Cienega.
12             MR. RAY:  Mr. Bell -- may I have Mr. Bell
13   back just briefly for just one question?
14             THE COURT:  Yes.
15
16             DIRECT EXAMINATION (cont.)
17   BY MR. RAY:
18        Q    Mr. Bell, I may have forgotten to ask you this,
19   I can't recall, I want to make sure.  Do you know the
20   person seated immediately to my left at the counsel table?
21        A    Russell, I guess.  It's been awhile since I've
22   seen him.
23        Q    But the person that you've been talking about on
24   all of these records is Russell Don Johnson, the defendant
25   in this case?
```

44

```
 1        A     Uh-huh, yes.
 2              MR. RAY:  Nothing further.
 3              MR. WATSON:  Your Honor, if I may,
 4   Mr. Bell, apparently is under the Rule.  I don't know if
 5   he's going to be --
 6              THE COURT:  All right.  I excused him.  If
 7   you don't need him to be back, he can stay.
 8                     SCOTT CIENEGA,
 9   a witness called on behalf of the State, duly sworn to tell
10   the truth, the whole truth, and nothing but the truth,
11   testified on his oath as follows:
12
13                  DIRECT EXAMINATION
14   BY MR. RAY:
15        Q     Would you state your name, please?
16        A     Scott Cienega.
17        Q     Where do you live, Mr. Cienega?
18        A     1211 Southeast 4th Avenue, Mineral Wells.
19        Q     And are you employed?
20        A     Yes, sir.
21        Q     Where do you work?
22        A     At Whataburger.
23        Q     And how long have you work worked at Whataburger?
24        A     About four months.
25        Q     Do you know -- now, do you know a fellow named
```

                                                                45

1   Russell Don Johnson?

2       A    Yes, sir.

3       Q    Is he in the courtroom today?

4       A    Yes, sir.

5       Q    Would you point at him and give a verbal

6   description of some article of clothing that he's wearing

7   so we'll know who you're pointing at?

8       A    (Pointing)  Long-sleeved white shirt.

9               MR. RAY:  Let the record reflect that the

10  witness has identified the defendant, Russell Don Johnson.

11  BY MR. RAY:

12      Q    Mr. Cienega, prior to November the 11th of 1997,

13  did you know Russell Don Johnson?

14      A    No, sir.

15      Q    Had you had anything to do with him at all?

16      A    No, sir.

17      Q    Did anything happen on November the 11th of 1996

18  that was extraordinary or unusual?

19      A    Yes.

20      Q    What happened to you?

21      A    Russell tried to stab me.

22      Q    Did he, in fact, stab you?

23      A    Not exactly, no.

24      Q    Well, tell us what happened to you.

25      A    Well, I pulled up to a four-way stop and I seen

46

1   him coming off the curb and I proceeded to the stop

2   sign.  And he come out, you know, almost walking into my

3   car, you know, and then, you know, came fairly close.  And

4   he, you know, threw his hands up.  So, you know, I got out

5   of the car.  And I said --

6       Q    Why didn't you roll your windows down?

7       A    My windows had just been tinted, you know, I

8   couldn't roll them down so, you know, I just opened the

9   door, just stepped out, you know, took one step out and

10  stood up.

11      Q    What happened next?

12      A    I asked him, you know, I said, what's your

13  problem, you know.  So he says, he says, you're my problem.

14  You know, I said, well, I said, you better watch out, you

15  know, walking out in the street like that; you're going to

16  get hurt, you know.  So he says, no, you're the one that's

17  fixing to get hurt.  So he pulls his fist back like he's

18  fixing to hit me.  And I said, don't hit me, you know, I'm

19  on probation, I said, you know, I don't want any trouble.

20  So he pushed my door into my legs and I fell back in the

21  seat.  And I got -- stood back up and when I did, he come

22  at me with a screwdriver.

23      Q    Okay.  What happened with the screwdriver?

24      A    He come down with it like he was fixing to stab

25  me in the chest, so I turned and, you know, it stuck me in

47

1   my shoulder.

2       Q    Okay.  What happened after he stuck you in the

3   shoulder with the screwdriver?

4       A    I started running back towards, he just kept

5   coming, you know, about four or five times.  You know, I

6   ran around the car trying to get away.  And I made it back

7   to my car and I had a crowbar and I pulled it out and he

8   ran away.

9       Q    Have you had any dealings with him since?

10      A    No, sir.

11      Q    You testified previously in court when he was on

12  trial before?

13      A    Yes, sir.

14      Q    That's the only dealings you ever had with him?

15      A    Right.

16           MR. RAY:  Pass the witness.

17

18                    <u>CROSS-EXAMINATION</u>

19  BY MR. WATSON:

20      Q    You said you were not exactly stabbed, what did

21  you mean by that?

22      A    He just stuck me in the shoulder, you know; it

23  didn't penetrate the skin.

24      Q    And you're on probation?

25      A    Yes, sir.

                                                        48

1    Q    For what?

2    A    For possession of a weapon on a school campus.

3    Q    Okay.  And how old are you?

4    A    I'm 22.

5    Q    What weapon did you have?

6    A    It was a .25 automatic.

7    Q    High school?

8    A    Yes, sir.

9    Q    And when did that happen?

10   A    Five years ago.

11   Q    And you're on probation for how long?

12   A    Six years.

13              MR. WATSON:  Okay.  That's all the questions

14   I have.

15

16                   REDIRECT EXAMINATION

17   BY MR. RAY:

18   Q    Have you had any referrals or problems since you

19   got put on probation five years ago?

20   A    No, sir.

21   Q    You're almost finished with your probation?

22   A    Yes, sir.

23   Q    And if you finish it out, will you even receive a

24   conviction?

25   A    No, sir.

                                                    49

1      Q     Okay.  Any problems with the law at all since
2 then?
3      A     No.
4      Q     You didn't do anything to Russell Don Johnson on
5 November 11th to provoke that?
6      A     No, sir.
7                MR. RAY:  That's all I have.
8                THE COURT:  Anymore questions?
9                MR. WATSON:  No, I have no questions.
10               THE COURT:  That's all, you may step down.
11               THE WITNESS:  Okay.
12               MR. RAY:  May he be released, Your Honor?
13               THE COURT:  Yes, you may leave.
14               MR. RAY:  Call John Arenz.
15                   JOHN JOSEPH ARENZ,
16 a witness called on behalf of the State, duly sworn to tell
17 the truth, the whole truth, and nothing but the truth,
18 testified on his oath as follows:
19
20                  DIRECT EXAMINATION
21 BY MR. RAY:
22     Q     Would you state your name, please?
23     A     My name is John Joseph Arenz.
24     Q     And would you spell your last name?
25     A     A-r-e-n-z.

                                                      50

1    Q    And how are you employed, Mr. Arenz?

2    A    I'm a police officer for the City of Colleyville.

3    Q    How long have you been working for Colleyville?

4    A    One year.

5    Q    And where did you work prior to that?

6    A    I was a police officer for the City of Mineral

7    Wells for 10 years.

8    Q    And is it true that part of your tenure with

9    Mineral Wells Police Department you served in the capacity

10   as one of their detectives?

11   A    Yes, it was.

12   Q    Do you know an individual named Russell Don

13   Johnson?

14   A    Yes, I do.

15   Q    Is he in court today?

16   A    Yes, he is.

17   Q    Would you point him out and identify him, please?

18   A    He is at the defense table wearing a white shirt.

19        MR. RAY:  Let the record reflect that the

20   witness has identified the defendant, Russell Don Johnson.

21   BY MR. RAY:

22   Q    Officer Arenz, are you aware that we are here in

23   the punishment phase of the trial where Russell Don Johnson

24   has been convicted by this jury of the offense of

25   aggravated robbery that occurred in July of this year?

51

```
 1        A    Yes, I am.

 2        Q    For the moment I want you to put that fact out of

 3   your head, in other words, exclude that conduct.   Prior to

 4   that and not including that, are you familiar with the

 5   reputation earned by Russell Don Johnson in the community

 6   where he resides for being a peaceable and law-abiding

 7   citizen?

 8        A    Yes, I am.

 9        Q    Is that reputation good or bad?

10        A    It is bad.

11        Q    Detective Arenz, did you participate in your

12   capacity as a detective with -- well, were you a detective

13   back in August of 1995?

14        A    Yes, I was.

15        Q    And did you participate in the investigation of a

16   stabbing out at the high school involving Mr. Johnson

17   stabbing a fellow named Raymond Vargas?

18        A    Yes, I did.

19        Q    Did you take a statement from Russell Don Johnson

20   under the juvenile rules and provisions?

21        A    Yes, I did.

22   BY MR. RAY:

23        Q    Let me hand you what's been marked for

24   identification as State's Exhibit No. 16 and ask you if you

25   will examine that three-page document and see if you can
```

                                                              52

1    identify it?

2        A    Yes, sir, this is the statement I took from Mr.

3    Johnson.  Attached to it is the proper juvenile warnings

4    administered by the judge.

5        Q    Was that statement taken pursuant to the rules of

6    the juvenile code about how you can take a statement from a

7    juvenile in custody?

8        A    Yes, it was.

9        Q    And was he given his magistrate's warning as

10   required by this statute?

11            MR. WATSON:  Your Honor, I'm going to object

12   to these three documents.  These documents are hearsay as

13   to Mr. Arenz.  He cannot prove up these documents, Your

14   Honor, we're going to object to it.  Apparently the person

15   that took the statement is not even Mr. Arenz.

16            MR. RAY:  It's not true, Your Honor.

17            THE COURT:  I think, gentlemen -- I think we

18   need a Jackson-Denno hearing before a statement is admitted

19   even though it's a part of the record.  I'll sustain that

20   objection.

21   BY MR. RAY:

22       Q    Okay.  Detective Arenz, after the Vargas trial

23   where Mr. Vargas got stabbed by Mr. Russell Don Johnson was

24   over with, did you participate in another investigation

25   wherein he was charged with a crime?

                                                        53

```
 1        A     Yes, I did.

 2        Q     And what did that involve?

 3        A     I investigated two more stabbings he was involved

 4    in; one was the stabbing of Mr. Cienega and one was the

 5    stabbing of Robert Perez.

 6        Q     And about when did the Robert Joe Perez stabbing

 7    incident occur?

 8        A     I believe it was December of 1996.

 9        Q     All right.  When that case unfolded, was

10    Mr. Johnson taken into custody?

11        A     He was taken into custody after stabbing

12    Mr. Perez, yes, sir.

13        Q     And at that time he was still a juvenile?

14        A     Yes, he was, sir.

15        Q     While he was at the station and not being

16    questioned by the police officer, did he ask anything about

17    the stabbing victim, Robert Joe Perez?

18        A     Yes, he did.

19        Q     And what did he ask?

20        A     He asked what Mr. Perez's condition was.

21        Q     And was he advised what Mr. Perez's condition was

22    at the time?

23        A     Yes, he was.

24        Q     And what did that include?

25        A     He was advised that Mr. Perez was in critical
```

                                                                    54

1    condition at the hospital.  If one of the stab wounds had

2    been a quarter of an inch to the right, it would have

3    severed Mr. Perez's spine.

4         Q     And in response to that, did Russell Don Johnson

5    express any remorse?

6         A     No, he did not.

7         Q     Instead what did he say?

8         A     He made a statement that if he had not been

9    knocked off of him by another individual, he would have

10   stabbed him a fifth time right in the middle of the back.

11        Q     And did he refer to his victim by any profane

12   label?

13        A     Yes, he did.

14        Q     And would you give us the initials of what he

15   referred to his victim as?

16        A     MF.

17        Q     Okay.  So instead of expressing remorse, he says

18   he wished he could have got him a fifth time in the middle

19   of the back?

20        A     Yes.  He said if he had not been knocked off by

21   Mr. Reyes, he would have stabbed him a fifth time in the

22   middle of the back.

23        Q     Did you -- which detention facility was the

24   defendant, Russell Johnson, held in or transferred to?

25        A     Patrolman Lawrence Henry and I then transported

```
 1    him to Johnson County Juvenile Detention Facility in

 2    Cleburne.

 3        Q    And on that ride to the detention center, again,

 4    not pursuant to any question that any police officer would

 5    have asked him, did he make any comments to you about his

 6    interests, what he was concerned about?

 7        A    Yes, he did.  He -- I had seized his gang rag,

 8    it's a handkerchief that gang members use to identify

 9    themselves, and he expressed great interest in getting back

10    his gang rag.  He also at one point mentioned how the

11    Mineral Wells gangs wanted to go to Los Angeles and become

12    a gang member there because the Mineral Wells gang were not

13    real enough for him.

14                  MR. RAY:  Pass the witness.

15                  MR. WATSON:  No questions.

16                  THE COURT:  That's all.  Thank you,

17    Mr. Arenz.

18                  MR. RAY:  Call Henry Williams.

19                  THE COURT:  Were you sworn earlier?

20                  MR. WILLIAMS:  Yes, sir.

21                  THE COURT:  All right.  Just have a seat.

22                       HENRY WILLIAMS,

23    a witness called on behalf of the State, duly sworn to tell

24    the truth, the whole truth, and nothing but the truth,

25    testified on his oath as follows:
```

                                                              56

<u>DIRECT EXAMINATION</u>

BY MR. RAY:

    Q    Good morning.  Would you state your name, please?

    A    Henry Earl Williams.

    Q    And where do you live, Mr. Williams?

    A    In Fort Worth.

    Q    Okay.  And how are you employed?

    A    I'm with Parker County Emergency Youth Shelter.

    Q    And what's your job duty or description there at the youth shelter?

    A    To make sure that the kids are safe and not causing harm to other kids, not escaping, and following the program.

    Q    Okay.  There's been some testimony that back in the latter two weeks of August of 1995, a man named Russell Don Johnson, or a juvenile at that time, was committed to or detained in the Parker County Youth Emergency Shelter. Were you working there at that time?

    A    Yes, sir.

    Q    Do you remember Russell Don Johnson?

    A    Yes, sir.

    Q    Is he in the courtroom today?

    A    Yes, sir.

    Q    Would you point him out and identify him for the

57

1    record?

2         A     (Pointing)  Right there.

3         Q     Okay.  Would you give a description of some

4    article of clothing that he's wearing so the court reporter

5    can take down who you're pointing at?

6         A     Um, cream-colored flannel shirt -- I mean, not

7    flannel, but thermal.

8               MR. RAY:  Let the record reflect that the

9    witness has identified the defendant, Russell Don Johnson.

10   BY MR. RAY:

11        Q     Mr. Williams, during the time that Russell Don

12   Johnson was detained at the Parker County Youth Facility

13   and you were working there, did y'all have any problems

14   with him that involved violence or assaultive conduct?

15        A     Yes, sir.

16        Q     Can you describe that for us?

17        A     Well, the incident that I was involved in, it

18   happened in the cafeteria.  He hit a kid with a chair two

19   times in the head.

20        Q     After that incident occurred, did you have any

21   direct interaction with the defendant, Russell Johnson?

22        A     Well, I walked him down to the timeout room.

23        Q     And what happened in the time-out room?

24        A     Well, when I got in the time-out room, he was

25   still upset and he stated that the kid stole some of his

                                                        58

1   clothes or something.  And I told him he should have -- you

2   know, he should have came to one of us first before he took

3   the actions that he took.  And then he got mad and came at

4   me and I restrained him.

5       Q    So he was aggressive toward you --

6       A    Yes, sir.

7       Q    -- in the time-out room?

8            MR. RAY:  Pass the witness.

9            MR. WATSON:  No questions.

10           THE COURT:  That's all.  Thank you,

11  Mr. Williams.

12           THE WITNESS:  Thank you.

13           MR. RAY:  May this witness be excused?

14           THE COURT:  Yes, sir, you may leave.

15           THE WITNESS:  Thank you.

16           MR. RAY:  Call Kirby Wiggington.

17           THE COURT:  Will this witness be very long?

18           MR. RAY:  No, sir.

19           THE COURT:  We'll recess after this

20  witness.

21               KIRBY WIGGINGTON,

22  a witness called on behalf of the State, duly sworn to tell

23  the truth, the whole truth, and nothing but the truth,

24  testified on his oath as follows:

25

59

DIRECT EXAMINATION

BY MR. RAY:

    Q    Would you state your name, please?

    A    Kirby Wiggington.

    Q    Are you the same Kirby Wiggington who testified yesterday in these same proceedings?

    A    Yes, sir.

    Q    You understand you're still under oath?

    A    Yes, sir.

    Q    And, again, you indicated to the jury you serve as a detective with the criminal investigations division of the City of Mineral Wells Police Department; is that correct?

    A    Yes, sir.

    Q    You understand, Detective Wiggington, that the jury last evening convicted Russell Don Johnson of the offense of aggravated robbery, are you not?

    A    Yes, sir.

    Q    And you've indicated you participated in that investigation.  For the moment I want you to set that aside.  Not including the aggravated robbery of Mr. Pontremoli on July 28th, were you, prior to that time, familiar with the reputation earned by the defendant, Russell Don Johnson, in the community in which he resides for being a peaceable and law-abiding citizen?

60

```
 1        A    Yes, sir.

 2        Q    And is that reputation good or bad?

 3        A    It's bad.

 4             MR. RAY:  Pass the witness.

 5             MR. WATSON:  No questions.

 6             THE COURT:  That's all, thank you.  All

 7   right.  We're about halfway through the morning, let's take

 8   about 10 minutes, ladies and gentlemen.

 9                  (Jury out at 10:22 a.m.)

10                  (Jury in at 10:39 a.m.)

11             MR. RAY:  Call Matt Windham.

12                  MATT WINDHAM,

13   a witness called on behalf of the State, duly sworn to tell

14   the truth, the whole truth, and nothing but the truth,

15   testified on his oath as follows:

16

17                  DIRECT EXAMINATION

18   BY MR. RAY:

19        Q    Would you state your name, please?

20        A    Matt Windham.

21        Q    How are you employed, Mr. Windham?

22        A    City of Mineral Wells police officer.

23        Q    And how long have you been a police officer with

24   the city of Mineral Wells?

25        A    One year.
```

61

1       Q     And were you a reserve officer prior to that

2  time?

3       A     Yes, sir.

4       Q     Are you a certified peace officer?

5       A     Yes, sir.

6       Q     Do you know Russell Don Johnson?

7       A     Yes, sir.

8       Q     Is he in the courtroom today?

9       A     Yes, sir.

10      Q     Would you point at him and give some verbal

11  description of an article of clothing that he's wearing so

12  that the court reporter can take down your identification?

13      A     Yes, sir.  (Pointing)  Subject right there

14  wearing a long-sleeved beige -- or shirt.

15            MR. RAY:  Let the record reflect that the

16  witness has identified the defendant, Russell Don Johnson.

17  BY MR. RAY:

18      Q     Officer Windham, you're aware that the defendant

19  has -- was convicted late yesterday by this jury of

20  aggravated robbery of a man named Mr. Pontremoli on July

21  28th of 1998, are you not?

22      A     Yes, sir.

23      Q     Excluding that conduct, forget about that, prior

24  to that that time, were you familiar with his reputation in

25  the community in which he resides for being a peaceable and

                                                            62

```
 1   law-abiding citizen?

 2        A     Yes, sir.

 3        Q     Is that reputation good or bad?

 4        A     Bad.

 5              MR. RAY:  Pass the witness.

 6              MR. WATSON:  No questions.

 7              THE COURT:  That's all, thank you.

 8              MR. RAY:  Call Detective Mike McAllester.

 9                   MIKE MCALLESTER,

10   a witness called on behalf of the State, duly sworn to tell

11   the truth, the whole truth, and nothing but the truth,

12   testified on his oath as follows:

13

14                   DIRECT EXAMINATION

15   BY MR. RAY:

16        Q     Would you state your name, sir?

17        A     Mike McAllester.

18        Q     Are you employed?

19        A     I'm a detective with the a police department in

20   Mineral Wells.

21        Q     Are you the same Mike McAllester that testified

22   yesterday in these proceedings?

23        A     Yes, sir, I am.

24        Q     Do you understand you're still under oath?

25        A     Yes, sir, I do.
```

63

1    Q    You've indicated before the jury in previous

2    testimony that you are familiar with Russell Don Johnson,

3    the defendant in this case, and you pointed out and

4    identified him for the record, did you not?

5    A    Yes, sir.

6    Q    You are aware that the jury convicted Mr. Johnson

7    of aggravated robbery yesterday, are you not?

8    A    Yes, sir.

9    Q    Exclusive of that conduct that's the subject of

10   this trial, were you, prior to that time, familiar with his

11   reputation in the community in which he resides for being a

12   peaceable and law-abiding citizen?

13   A    Yes, sir.

14   Q    Was that reputation a good or a bad one?

15   A    Bad one.

16        MR. RAY:  Pass the witness.

17

18                    CROSS-EXAMINATION

19   BY MR. WATSON:

20   Q    Mr. McAllester, do your records reflect that

21   except for this robbery case that Mr. Johnson was convicted

22   of yesterday, that these matters took place while he was a

23   juvenile?

24   A    Yes, sir.

25   Q    Do you know his date of birth?

                                                        64

```
 1        A    `Sir?

 2        Q    Do you know his date of birth?

 3        A    Not offhand.

 4        Q    If it's September 29th, 1980, he would be what,

 5   18 as of a couple of months ago?

 6        A    Yes, sir.

 7        Q    Had he been 16 at the time this one happened, he

 8   would have been handled as a juvenile?

 9        A    That's possible, yes, sir.

10        Q    That's what I mean, it starts in juvenile court?

11        A    Yes, sir.

12        Q    And the range of punishment for aggravated

13   robbery is five to ninety-nine or life; is that right?

14        A    Yes, sir, it is.

15        Q    And up to a $10,000 fine?

16        A    Yes, sir.

17        Q    And it's the same punishment for murder, isn't

18   it?

19        A    Yes, sir.

20        Q    There's no difference?

21        A    Yes, sir.

22             MR. WATSON:  Okay.  That's all the questions

23   I have.

24

25
```

                                                             65

<u>REDIRECT EXAMINATION</u>

BY MR. RAY:

    Q    It's the same punishment for breaking into somebody's home under certain circumstances, too, isn't it?

    A    Yes, sir, it is.

    Q    Same punishment for sexual assault, aggravated sexual assault, too, isn't it?

    A    Yes, sir, it is.

    Q    Serious felony then, fair enough?

    A    Yes, sir.

    Q    Mr. McAllester, given what you know about the defendant, Russell Don Johnson, and the incidents that you're familiar with that help form his reputation about which you've testified, when he was 16 years old or 17 years old for that matter, do you have an opinion of whether or not he -- well, when he was 16 years old, if he engaged in an act of violence, could he hurt somebody just as badly as a 40-year-old man?

    A    Yes, sir.

    Q    And has?

    A    Yes, sir, he has.

              MR. RAY:  No further questions.

              MR. WATSON:  I have no further questions.

              THE COURT:  That's all, thank you.

              MR. RAY:  Call Ron Edwards.

                                                    66

```
 1                        RONALD EDWARDS,

 2    a witness called on behalf of the State, duly sworn to tell

 3    the truth, the whole truth, and nothing but the truth,

 4    testified on his oath as follows:

 5

 6                       DIRECT EXAMINATION

 7    BY MR. RAY:

 8         Q    Would you state your name, please, sir?

 9         A    Ronald Edwards.

10         Q    How are you employed, sir?

11         A    I'm the director of the Community Supervision and

12    Correction Department for the 29th District Court, Palo

13    Pinto County.

14         Q    How long have you worked for this county in that

15    capacity?

16         A    Since March 1st, 1975.

17         Q    Mr. Edwards, in your capacity as the director of

18    the Community Supervision and Correction Department -- oh,

19    by the way, is that the new legal code language for what we

20    all used to refer to as the probation, Adult Probation

21    Department?

22         A    Yes, it is.

23         Q    Okay.  Are you familiar with an individual known

24    as Russell Don Johnson?

25         A    Yes, I am.
```

                                                                   67

1      Q      Is he in court today?

2      A      Yes, he is.

3      Q      Would you point him out and identify him for the

4   record?

5      A      He's seated at the counsel table to his

6   attorney's right.

7              MR. RAY:   Let the record reflect that the

8   witness has identified the defendant, Russell Don Johnson.

9   BY MR. RAY:

10      Q      Mr. Edwards, are you aware that the jury in the

11   case has convicted him of the first degree felony of

12   aggravated robbery?

13      A      Yes.

14      Q      Set that aside for the moment, forget about

15   that.   Excluding that conduct and that conviction, prior to

16   that time were you familiar with his reputation in the

17   community in which he resides for being a peaceable and

18   law-abiding citizen?

19      A      Yes.

20      Q      Was that reputation good or bad?

21      A      Bad.

22      Q      Mr. Edwards, were you serving in the capacity

23   that you've indicated at all times relevant to proceedings

24   held in this court, the 29th Judicial District Court of

25   Palo Pinto County, Texas, in Cause No. 10,690, styled the

68

1   State of Texas versus Russell Don Johnson?

2        A     Yes.

3        Q     Are you familiar with a judgment on jury verdict

4   of guilt entered in that cause April 15th of 1997?

5        A     Yes.

6        Q     Are you also familiar -- well, were you in court

7   when he was adjudicated guilty or found guilty by the jury

8   in that case?

9        A     Yes, I was.

10       Q     And what offense was he convicted of?

11       A     Aggravated assault.

12       Q     And did that include an affirmative finding that

13  a deadly weapon was used in the commission of that

14  aggravated assault?

15       A     Yes, it did.

16       Q     And did that involve the stabbing of Robert Joe

17  Perez in the back four times with a knife?

18       A     Correct.

19                    (State's Exhibit No. 17 was marked

20                     for identification by the court

21                     reporter.)

22  BY MR. RAY:

23       Q     Mr. Edwards, let me hand you what's been marked

24  for identification by the court reporter as State's Exhibit

25  No. 17 and ask you if you can identify that exhibit?

69

1    A    Yes, I can.

2    Q    What is State's 17?

3    A    It's a judgment on jury verdict of guilty and

4  punishment fixed by the court and probation granted in

5  Cause No. 10,690, the State of Texas versus Russell Don

6  Johnson.

7    Q    And is the Russell Don Johnson who is the subject

8  of State's Exhibit 17, that judgment of guilt, one and the

9  same person as the Russell Don Johnson that you've

10 identified as being known to you and being present in court

11 today?

12   A    He is one and the same person.

13   Q    Mr. Edwards, is State's Exhibit 17 a certified

14 copy of the original of that document?

15   A    Yes, it is.

16   Q    And is it certified to by Mrs. Helen Slemmons

17 known to you to be the district clerk of this jurisdiction?

18   A    Yes, it is.

19        MR. RAY:  We offer State's 17, Your Honor.

20        MR. WATSON:  Now, was the question he

21 identified this as a judgment?

22        MR. RAY:  A certified copy of the original

23 judgment entered in that cause.

24        MR. WATSON:  Right.  Well, there's more than

25 that here is the reason I ask.

70

1          MR. RAY:  Well, there's orders that are part

2    of the judgment.

3          MR. WATSON:  I don't have any objection.

4          THE COURT:  It's admitted.

5              (State's Exhibit No. 17 was

6                received into evidence.)

7    BY MR. RAY:

8      Q    Mr. Edwards, is it true that the jury, as

9    reflected by State's Exhibit 17, not only found the

10   defendant, Russell Don Johnson, guilty of aggravated

11   assault with an affirmative finding as to the use of a

12   deadly weapon, but they also assessed his punishment at

13   10 years in prison?

14     A    Correct.

15     Q    And did they suspend the confinement in prison

16   part of that judgment and recommend to the Court that he be

17   placed on probation or community supervision?

18     A    That is correct.

19     Q    Mr. Edwards, during the course of that trial, to

20   your knowledge was testimony offered before this Court that

21   the reason Russell committed the offense of stabbing Robert

22   Joe Perez in the back was that he was on drugs at the time?

23     A    That is correct.

24     Q    And based upon that testimony and that offer of

25   evidence by the defendant, did Judge Cleveland make any

71

1    specific findings of criteria that are relevant to that

2    kind of subject matter?

3         A    Yes, he did.

4         Q    Examining State's Exhibit 17, what is in that

5    exhibit that would reflect what kind of finding or criteria

6    that the Court found to be true?

7         A    He found that there was an affirmative finding

8    that drugs or alcohol contributed to the commission of this

9    offense.

10        Q    And when a jury recommends probation, as was done

11   in that Cause No. 10,690, who set the terms and conditions

12   of probation?

13        A    The judge.

14        Q    All right.  And what is contained in State's

15   Exhibit 17, the judgment of guilt and the order placing him

16   on probation, that would evidence that the judge decided to

17   try to work on that problem?

18        A    There's a special condition of community

19   supervision.

20        Q    And what was that special condition?

21        A    Russell Don Johnson was ordered into the

22   Substance Abuse Felony Punishment Facility, which is a drug

23   treatment program.

24        Q    And is the Substance Abuse Felony Punishment

25   Facility known by the shorthand anagram of SAFPF?

72

1        A      Correct.

2        Q      So Russell got sent to SAFPF by the Court, right?

3        A      Yes.

4        Q      Tell us about SAFPF.  How would that program

5   compare to the other remedial measures tried by your

6   department when somebody is involved in drugs?

7        A      It's the most restrictive comprehensive treatment

8   program that we have available to us.

9        Q      Is it located at the various prison facilities

10  sprinkled throughout the state of Texas?

11       A      Yes, is it.

12       Q      Is the facility itself set apart from the other

13  inmate population such that only people that are -- have

14  been sent to the SAFPF program are housed in that same

15  building?

16       A      That is correct.

17       Q      About how long is that program, Mr. Edwards?

18       A      The average stay is nine months.

19       Q      Is there an aftercare requirement if somebody

20  goes to the SAFPF program at prison?

21       A      Yes.

22       Q      And what does that consist of?

23       A      That's what we call a transition treatment

24  center, commonly referred to as the TTC.  And the average

25  stay there is three months.

73

1      Q     Did Mr. Johnson get committed to a SAFPF

2    facility?

3      A     Yes.

4      Q     About when did he finish up at the SAFPF

5    facility, Mr. Edwards?

6      A     It was in April of '98.

7      Q     All right.  And then after he completed that stay

8    at the prison SAFPF, where did he go next?

9      A     Did you say when did he finish the SAFPF?

10     Q     Yes.

11     A     Yes, that was in April of '98.  And from there he

12   bent to the TTC in Midland, Texas.

13     Q     And when he went to the aftercare program in

14   Midland, was he able to successfully complete that program?

15     A     He was not.

16     Q     And when was he discharged after being

17   unsuccessful in completing that program?

18     A     In June of '98.

19     Q     When somebody is discharged from that facility

20   after unsuccessfully completing what the Court has ordered

21   him to do, what would you typically do?

22     A     I file a violation report with your office.

23     Q     All right.  In June, middle of June of 1998, did

24   your office have any additional contact with him after he

25   got back from after being kicked out of the Midland

74

1    facility?

2         A    Yes.

3         Q    And directing your attention to June the 17th of

4    1998 -- first let me lay the groundwork by asking you

5    whether or not the judgment, State's Exhibit 17, contains

6    in it an order setting forth all the terms and conditions

7    of probation or supervision?

8         A    Yes, it does.

9         Q    Is one of those conditions that the defendant,

10   while he is on probation, will refrain from the use,

11   possession, or consumption of controlled substances,

12   marijuana, and so forth?

13        A    That is correct.

14        Q    And does that order also require that the

15   probationers, including Mr. Johnson, if requested by you or

16   a member of your staff, one of the other probation

17   officers, to submit on a random, unannounced basis, samples

18   of urine from their body for the purpose of having it

19   chemically analyzed?

20        A    Yes, that's correct.

21        Q    Was such a request made of Russell Don Johnson

22   that he give a sample of urine to be tested at the lab

23   after he got back here from Midland -- being kicked out of

24   the Midland facility?

25        A    Yes.

75

1     Q     On what date was that request made?

2     A     That was June the 17th, 1998.

3     Q     All right.  When a sample like that is taken,

4  what happens to the sample to have it checked?

5     A     It's sent to the lab that I have a contract with,

6  Pharmchem Laboratory out of Fort Worth.

7     Q     And does your contract with Pharmchem include a

8  requirement that they generate a written report showing the

9  results of the urinalysis testing?

10    A     Yes, it does.

11    Q     As a result did you receive such a written report

12 in the case of Russell Don Johnson's urine sample taken on

13 June 17th of 1998?

14    A     Yes, I did.

15    Q     As a result of receiving that report, did you

16 make an additional violation report to my office regarding

17 an alleged violation of his probationary terms?

18    A     Yes, I did.

19    Q     And to your knowledge was a motion subsequently

20 filed by my office to revoke his probation?

21    A     Yes.

22    Q     And you are aware, are you not, that the offense

23 of which he has now been convicted occurred July 28th,

24 1998, about a little over a month after the urine sample

25 was taken?

76

1      A      That is correct.

2      Q      Prior to the time that you could get the sample

3  report back and get the motion filed and get him arrested,

4  he was still out and that's when the robbery was committed,

5  correct?

6      A      That is correct.

7      Q      Mr. Edwards, after that motion was filed by my

8  office to revoke his probation in the Robert Joe Perez

9  stabbing case, was a hearing held on that motion?

10     A      Yes.

11     Q      And was it held in this court on September the

12  11th of 1998?

13     A      Yes, it was.

14     Q      And were you present in court when the defendant,

15  Russell Don Johnson, entered a plea as to the allegation

16  contained in that motion?

17     A      Yes, I was.

18     Q      And with regard to the allegation that he

19  consumed a controlled substance, to-wit; marijuana, on or

20  about June the 17th of 1998, what plea did he enter before

21  the Court?

22     A      He pled true.

23     Q      And as a result of the hearing that was held on

24  that day, what action, if any, was taken by the Court?

25     A      His probation was revoked and he was sentenced to

                                                          77

1   10 years in the Institutional Division.

2                (State's Exhibit No. 18 was marked

3                   for identification by the court

4                   reporter.)

5   BY MR. RAY:

6      Q   Let me hand you what's been marked for

7   identification by the court reporter as State's Exhibit No.

8   18 and ask if you can identify that document?

9      A   Yes, I can.

10     Q   What is State's 18?

11     A   It's a Judgment Revoking Community Supervision in

12   Cause No. 10,690, styled the State of Texas versus Russell

13   Don Johnson.

14     Q   And is the Russell Don Johnson that is the

15   subject of that judgment, State's Exhibit 18, one and the

16   same person as the Russell Don Johnson that you've

17   identified as being present in court today?

18     A   He is one and the same person.

19             MR. RAY:  We'll offer State's 18, Your

20   Honor.

21             MR. WATSON:  No objection, Your Honor.

22             THE COURT:  Eighteen is admitted.

23               (State's Exhibit No. 18 was

24                 received into evidence.)

25   BY MR. RAY:

78

1    Q    Mr. Edwards, directing your attention to part of

2    the community supervision order, is it true that the Court

3    entered an amendment to the original probation order in

4    this case?

5    A    Yes.

6    Q    And does the Court do that in many cases from

7    time to time when subject matter arises that's appropriate

8    subject?

9    A    Yes.

10   Q    And was the defendant, Russell Don Johnson,

11   ordered as part of the judge's rules to legitimate a child

12   that he had, in other words, to give it legal standing with

13   him as the father?

14   A    Yes.

15   Q    To your knowledge was any effort made by

16   Mr. Johnson to do that?

17   A    Not to my knowledge.

18   Q    Okay.  When the Court enters an order telling

19   somebody to legitimate a child, would that only be done if

20   there was evidence indicating that they had become the

21   parent of an illegitimate child?

22   A    Yes.

23        MR. RAY:  Pass the witness.

24        MR. WATSON:  I have no questions of

25   Mr. Edwards.

79

1          THE COURT:  That's all, thank you.

2          MR. RAY:  Your Honor, the State rests as to

3    the punishment phase.

4          MR. WATSON:  Call Kathy Johnson.

5                KATHY JOHNSON,

6    a witness called on behalf of the Defense, duly sworn to

7    tell the truth, the whole truth, and nothing but the truth,

8    testified on her oath as follows:

9

10                DIRECT EXAMINATION

11   BY MR. WATSON:

12   Q     Kathy, tell the jury your full name, please.

13   A     It's Kathy Johnson.

14   Q     And where do you live?

15   A     4119 Farm Road 1195, Mineral Wells, Texas.

16   Q     And you're Russell's mother?

17   A     Yes.

18   q     And what is Russell's birthday?

19   A     September the 29th, 1980.

20   Q     So he was 18 here three or four months ago?

21   A     Uh-huh.

22   Q     Okay.  Where was he born?

23   A     Here in Mineral Wells.

24   Q     Palo Pinto County?

25   A     Uh-huh.

                                                      80

```
 1        Q    And who is his father?

 2        A    Richard Ledell Johnson.

 3        Q    And is Mr. Johnson alive?

 4        A    No.

 5        Q    He died, what, in 1987?

 6        A    Yes, sir.

 7        Q    How old was Russell?

 8        A    He was six years old.

 9        Q    Did -- after that, did he have -- did Russell

10   have anyone in the home as a father figure for any period

11   of time?

12        A    A stepfather.

13        Q    And who was that?

14        A    Weldon Burt Ross.

15        Q    And you two are now divorced?

16        A    Yes.

17        Q    Where did he go to school initially, Russell,

18   grade school, first grade?

19        A    It was Travis.

20        Q    Travis?

21        A    Uh-huh.

22        Q    And what is that, through the sixth grade?

23        A    Uh-huh, yes, sir.

24        Q    And then junior high?

25        A    Yes, sir.
```

81

1    Q    Then high school.  What grade did Russell go

2 through in high school, if you know?

3    A    Ninth.

4    Q    Did he eventually get his GED?

5    A    Yes.

6    Q    He currently has that certificate; is that

7 correct?

8    A    Yes.

9    Q    Prior to Russell being 14 or 15 years of age,

10 what kind of young man was he as far as your being a

11 parent?

12    A    He's always been a good son.  Out of my three

13 children, I had the least problems with Russell.  He was

14 always the one -- he always did the yard for me, he

15 always -- anything I needed done, I could ask Russell to do

16 it for me.  He was always -- everybody in the family,

17 Russell was always a hard worker.  He was always -- he was

18 just my good kid.  He made good grades in school, the

19 teachers all -- you know, I'd come in and they'd tell me,

20 you know, how good he did.  And he just -- I didn't have

21 any problems with Russell.  He was --

22    Q    That was until he was like 15 years of age?

23    A    Uh-huh.

24    Q    Did something happen about that time when he was

25 about 15 that you noticed a change in his life?

82

1    A    Yeah.  He -- yes, sir, he -- I found out that he

2  was doing drugs.

3    Q    Okay.  And that's about when he was 15 roughly;

4  is that correct?

5    A    Yes, about 14 actually, it was 14.

6    Q    And you're aware of all the problems that Russell

7  has had, aren't you?

8    A    Yes, sir.

9    Q    You may not know all the details, but you know

10  basically the specific incidents that he has been involved

11  in?

12    A    Yes, sir.

13    Q    The jury has heard all of this today?

14    A    Yes, sir.

15    Q    You're not saying that drugs are an excuse, are

16  you?

17    A    No, sir, they're not an excuse at all.  They

18  cause a lot of -- they destroy people's lives, but it's not

19  an excuse for the type of behavior that Russell -- Russell

20  has been involved in.  Russell knows this.  Russell knows

21  how I feel about it.  He knows that I love him more than

22  anything in this world, but the things he's done are

23  unacceptable.  And he just -- he just, even though drugs

24  are not an excuse, I honestly, honestly believe that this

25  child would have never done the things that he's done if he

83

1    had not been on drugs.

2         Q    So basically his problems started when he started

3    doing drugs?

4         A    Yes, sir.

5         Q    Whatever the connection may be?

6         A    Yes, sir.

7         Q    Do you believe that people should be punished for

8    their actions?

9         A    Yes, sir.

10        Q    You understand that Russell is going to go to

11   prison?

12        A    Yes, sir.

13        Q    Sometime, more than likely today, this jury is

14   going to sentence him to prison for some number of years.

15   You understand that?

16        A    Yes, sir.

17        Q    As a mother, do you sometimes get disappointed in

18   life about your children?

19        A    Yes, sir.

20        Q    And we're not always able to do what we want to

21   with our kids, are we?

22        A    No, sir.

23        Q    Sometimes things don't turn out the way we like;

24   is that correct?

25        A    Yes, sir.

84

1    Q     Is that basically the situation here with

2  Russell?

3    A     Yes, sir.

4    Q     You're not here to make excuses for him, are you?

5    A     No, there's no excuse for Russell's behavior.

6    Q     And you've been informed or told at some point or

7  at some point in time all of these violent acts that

8  Russell has committed, you know these things, don't you?

9    A     Yes, sir.

10   Q     And as result of this, he's going to pay for it

11  today?

12   A     Yes, sir.

13   Q     You understand that?

14   A     Yes, sir.

15   Q     Are you asking the jury to consider basically

16  where he's been and what he's done as far as his life is

17  concerned, as far as punishment is concerned?

18   A     Yes, sir.

19   Q     As far as his age is concerned, are you asking

20  them to consider that?

21   A     Especially his age, he's 18 years old.  There's

22  always, always hope, always somewhere there has to be --

23  you can't give up an on an 18-year-old boy.  The past three

24  years he's been involved in some terrible things, he's done

25  some terrible, horrible things that he knows how I feel

85

1    about them.  I can't stand it that he's done these things,

2    but he's 18 years old.

3         For the past three years he's been involved with

4    people that do, things they shouldn't do and drugs.  Before

5    that he's always been -- he was a good person.  He's got a

6    good heart, he's a good person, he's a good son.  This boy

7    gives me so much love.  He just -- he loves me so how much,

8    he's so good to me.  He gives me so much respect.  And to

9    see what has happened to him in the past three years --

10   he's 18 years old, and I know what he's done is wrong.

11        I know -- for me to sit here and say -- I'm a

12   mother, and I know he has to go to prison, I know he has to

13   pay for what he's done, but he's 18 years old and he has to

14   pay for what he has done, but there's -- he's got to have

15   a -- at some point there has to be hope that he can -- he's

16   going to -- whatever he gets, he's going to grow, he's

17   going to have time to be away from the things that he's

18   gotten involved with.

19             MR. RAY:  Excuse me just a minute.  Your

20   Honor, I'm going to interpose an objection.  It long ago

21   stopped being a responsive answer and became a speech.

22             MR. WATSON:  I agree, Your Honor.

23             THE WITNESS:  I'm sorry, I'm sorry.

24   BY MR. WATSON:

25        Q    I know.  Just answer the question.  Mr. Ray is

                                                              86

1  correct about that.  Are you asking the jury to consider

2  the situation about his age as far as any punishment is

3  concerned?

4      A    Yes, sir.

5      Q    Are you asking the jury to consider and be

6  reminded that prior to him getting involved with certain

7  people and certain substances, he was not a problem child

8  at all?

9      A    Yes, sir.

10     Q    Are you asking him to consider a reasonable sum

11 of time that would allow him to get out of prison and get

12 back and try to lead a constructive life?

13          MR. RAY:  Your Honor, I'm going to object,

14 that question -- the answer would invade the province of

15 the jury in deciding.

16          THE COURT:  Well, I'll permit the question

17 and answer.

18 BY MR. RAY:

19     Q    Are you asking them to consider a reasonable sum,

20 something other than life in prison for this young man?

21     A    Yes, sir.

22     Q    So when he did get out of prison he could

23 hopefully come back and live a constructive life?

24     A    Yes, sir.

25          MR. WATSON:  That's all the questions I

87

1   have.

2

3                      CROSS-EXAMINATION

4   BY MR. RAY:

5        Q     Ms. Johnson, back in April of 1997, you

6   participated in the proceedings where Russell was tried for

7   stabbing Joe Perez in the back four times, did you not?

8        A     Yes, sir.

9        Q     And did you testify in those proceedings?

10        A     Yes, sir.

11        Q     And, specifically, did you ask that jury to

12   consider Russell's age, I mean, very similar to what you

13   asked today?

14        A     Yes, sir.

15        Q     And, specifically, did you ask them to take that

16   into account and the drug business into account and so

17   forth?

18        A     Yes, sir.

19        Q     Right?  And you know that after they basically

20   gave Russell a chance, that almost zero time goes by, a

21   month, from the time that he gets out that he is already

22   engaged in aggravated assault and robbery of an old man

23   nearly 72 years of age?  Do you know that?

24        A     Yes, sir.

25        Q     And you also know that even though you ask the

                                                              88

1   jury to consider the drug involvement, that within three

2   days of the time he was released from the most intensive

3   drug treatment and rehabilitation program available to the

4   courts in the state of Texas, that he was immediately,

5   within three days, back engaged in substance abuse again?

6   Are you aware of that?

7        A    Yes, sir.

8        Q    And even though you asked the previous jury to

9   consider those things, and they apparently did, this may be

10  a difficult question for you, but it would be fair to

11  conclude, wouldn't it, that Russell just didn't benefit by

12  being given that break by that jury, that we're back with

13  extremely violent, dangerous conduct and substance abuse

14  immediately?  Fair enough?

15       A    Yes, sir.

16       Q    And are you aware that the testimony of the

17  victim in this case and the medical professional who

18  treated him, that but for the grace of God and the old man

19  getting his arm up just in time, this 36-inch pipe wrench

20  would have smashed into that old man's head?  Are you aware

21  of that?

22       A    Yes, sir.

23       Q    Do you recall testifying previously, Ms. Johnson,

24  downstairs in the hearing when Russell was certified to be

25  tried as an adult in the Robert Joe Perez stabbing?  Do you

                                                          89

1    remember testifying down there?

2         A    Yes, sir.

3         Q    And, similarly, in your testimony in that trial,

4    do you recall testifying that when Russell got back from

5    TYC after being gone for a year that he had immediately

6    violated his juvenile probation and if only the cops had

7    done their job and gotten him picked -- or Mr. Hunter had

8    done their job and gotten him picked up and arrested, then

9    he wouldn't have been out of jail and therefore he couldn't

10   have stabbed Robert Perez?  Do you remember basically

11   talking about that?

12        A    Yes, sir.

13        Q    Well, from that, even though it would be

14   difficult for his mother, would you agree with me that even

15   you recognize that Russell is somebody that has to be

16   locked up or there is this fear that he will engage in

17   violence?

18        A    Yes, sir.

19             MR. RAY:  I have no further questions,

20   ma'am.

21             MR. WATSON:  That's all the questions I

22   have.

23             THE COURT:  That's all.  Thank you,

24   Ms. Johnson.

25             MR. WATSON:  That's all the testimony we

                                                      90

1   have, Your Honor.

2                    MR. RAY:  State closes, Your Honor.

3                    MR. WATSON:  We close.

4                    THE COURT:  That concludes the evidence in

5   the case, ladies and gentlemen.  I have a charge about

6   ready to you -- ready to give to you.  We can go ahead with

7   this case this morning, I'll need to recess, oh, 10 or 15

8   minutes, then the charge would be read to you and the

9   attorneys would make brief closing remarks.  That would

10  bring us close twelve o'clock.

11          Once you begin deliberations on the case, the law

12  requires that I keep you together.  So you'd either have to

13  start deliberating right then and stay together or I'd have

14  to keep you together while you eat, you can go across the

15  street or we could recess now until say 12:30, and you

16  could come back -- you could separate now and you could

17  come back and we could finish at 12:30.  Do you have a

18  feeling about which way you'd rather go?

19                    PRESIDING JUROR:  I think we would prefer to

20  recess.

21                    THE COURT:  You would like to recess?  Is

22  that generally the consensus?

23                    THE JURY:  Yeah.

24                    THE COURT:  All right.  We'll recess then.

25  Please remember your instructions.  Even though the

                                                            91

```
 1    evidence is completed, you can't discuss this case.  And

 2    let's meet back at 12:30 and finish the case.  Thank you

 3    very much.

 4                    (Jury out at 11:15 a.m.)

 5              THE COURT:  Objections to the charge?

 6              MR. RAY:  State doesn't have any objection,

 7    Your Honor.

 8              MR. WATSON:  Judge, I don't have any

 9    either.

10                    (Defendant's Exhibit No. 1 was

11                     marked for identification by the court

12                     reporter.)

13                    (Jury back at 12:28 p.m.)

14              THE COURT:  Ladies and gentlemen, I will

15    read the charge to you, the attorneys will then --

16              MR. WATSON:  Your Honor, excuse me --

17              THE COURT:  Oh, excuse me, excuse me.  All

18    right.

19              MR. WATSON:  I didn't mean to interrupt the

20    Court.  Your Honor, with the Court's permission, I would

21    like to have the opportunity to reopen briefly.

22              THE COURT:  Yes, sir.

23              MR. WATSON:  The defendant and the State

24    have entered into a stipulation of evidence that on

25    September the 2nd of 1998, in this court, an order was
```

KIM A. BROOKS, OFFICIAL COURT REPORTER

 1 | entered establishing the parent-child relationship between
 2 | Russell Don Johnson and the minor child, Antonio Miguel
 3 | Reyes.  This matter came up previous and we were not aware
 4 | of this, but I did want to get that before the jury today.
 5 | MR. RAY:  It is so stipulated, Your Honor.
 6 | MR. WATSON:  I would offer No. 1.
 7 | THE COURT:  All right.  It's admitted as
 8 | Defendant's 1.
 9 | (Defendant's Exhibit No. 1 was
10 | received into evidence.)
11 | MR. WATSON:  That's all we have, Your Honor,
12 | we close.
13 | MR. RAY:  We close.
14 | THE COURT:  All right.  Again, I will read
15 | the charge to you and the attorneys will briefly address
16 | you and you will retire to deliberate the punishment in
17 | this case.
18 | (Court's charge read.)
19 | And, again, there is a form for your verdict on
20 | the last page of if charge.  Gentleman.
21 | MR. RAY:  May it please the Court?
22 | THE COURT:  Yes, sir.
23 | MR. RAY:  Mr. Watson.  Ladies and gentlemen,
24 | as the judge indicated, we had have a few minutes making
25 | our closing remarks before you assess punishment in this

93

1    case.  The legal issues are quite simply stated and

2    summarized this way.

3         The range of punishment for the offense of which

4    you have convicted Russell Don Johnson is from either life

5    or any term of years not less than five, nor more than

6    ninety-nine, and the option of assessing a fine of any

7    amount not to exceed $10,000.  There is no option on the

8    punishment number of years, there is a choice on the fine.

9    It can be zero or any amount in between zero and $10,000.

10        The issue is what, within that wide range of

11   punishment, would be appropriate for you to assess in this

12   case given the facts and circumstances that have been

13   proven to you.  During Voir Dire you were each qualified on

14   the following foundation; that is that in a proper case for

15   it, you would be the kind of person who would, if the facts

16   warranted it, consider the lower range of punishment.  And

17   if the facts and circumstances warranted it, you would be

18   the kind of person who would have the courage to assess all

19   the way up to and including the maximum punishment of life

20   in prison or ninety-nine years. What should you do in this

21   case based on the evidence?

22        During my opening statement prior to the

23   punishment phase, I indicated to you that we would prove to

24   you the rest of the story so that you would know about

25   Russell Don Johnson and his propensity for violence.  This

94

1    is not, as you well know now, an isolated instance of

2    violence.  This is the culmination of an entire track

3    record of violence.

4         The things that I suggested to you that would be

5    proven to you are not so because I said that we would prove

6    them to you, they are so because you have now heard the

7    irrefuted evidence that they are so.  You have the

8    documents and the eyewitness testimony, where appropriate,

9    as to a menu of violence.  You stop and think about what

10   this man's conduct tells you about him.

11        One could argue that Russell Don Johnson is 18

12   years old, and he is.  One could argue that you ought to

13   say, oh, he's 18 years old, let's give him 10 or 15, 20

14   years in prison, the lower end of the range of punishment.

15        One could argue that, but in response to that I

16   want to challenge you to use your good common sense and ask

17   yourself, is it reasonable to think that simply because he

18   is 18 years old he can't hurt a citizen just as badly or

19   even kill somebody by violent conduct just because he's 18

20   years old?  That doesn't make sense.  He is a violent

21   individual repeatedly after time after time after time.

22   How much does it take for us to finally say that it is time

23   to remove someone for a significant period of time so that

24   society is protected?  There are people like that.  You

25   have the evidence before you that demonstrates that Russell

95

1    Don Johnson is exactly that kind of seed.

2          Now, the things that we've proved to you during

3    the punishment phase of the trial show you unequivocally

4    that on at least nine occasions, eight of which are

5    violent, that Russell Don Johnson has engaged in the kind

6    of conduct that alone would be worthy of significant

7    punishment.  When you add all of that up, it is simply too

8    much.

9          We talk about punishment.  What are the goals of

10   punishment?  What should you-all think about when you're

11   deliberating your verdict?  You can think about

12   rehabilitation, that's one of the goals certainly of

13   punishment.  And I would suggest to you that a jury

14   impaneled much like you has tried that.  This Court has

15   tried that.

16         There has been some recognition of the fact that

17   he was young.  There was some finding and recognition of a

18   claim by him that, oh, I wouldn't have done this if I

19   hadn't been on drugs.  And what was tried?  A

20   rehabilitative effort that was tried to remove him for nine

21   months to a year in the most intensive lengthy

22   strength-filled restrictive program that is available to

23   the court system.  And what good did it do?  He didn't even

24   finish the aftercare, the halfway house follow-up care

25   before he violates enough rules to get kicked out of that.

96

1          Does he demonstrate that he's a person worthy of

2     or that he's a good risk for rehabilitation.  No.  And then

3     you know within three days of the time he got out kicked

4     out of that facility in Midland that he's back substance

5     abusing again after that was the whole purpose for why he

6     was sent away for a year was let's address this problem.

7     Let's say, okay, you're young.  Let's say, okay, you got

8     involved in drugs.  Let's bring the programs to the table.

9     Let's be lenient, let's try 10 years with him and let's

10    watch him.  Didn't work, folks, and you know it.

11         And when he got out, it lasted about a month

12    before all that he had learned from being removed and

13    locked up is demonstrated when he takes this weapon, and

14    with no regard for Mr. Pontremoli, swings it viciously in a

15    direction towards the part of Mr. Pontremoli's body that

16    encompasses his brain.

17         And you heard the testimony of Dr.

18    Allensworth.  But for the grace of God and that arm

19    intervening, you know what that doctor told you was most

20    likely to have happened to Mr. Pontremoli.

21         He says, give me a break, I'm young.  Did he care

22    anything about Mr. Pontremoli?  Did he give him any break

23    or give any consideration to that old gentleman?  Not in

24    the least.

25         And what did you have plotting the trend line of

97

 1   the collision between Russell Don Johnson and society?  You

 2   have a stabbing of Raymond Vargas, an unarmed Raymond

 3   Vargas, on August the 17th of 1995.  Before he can even get

 4   to court 12 or 13 days later, you have the instance where

 5   he's already involved in violence slamming a chair up

 6   against a peer's head over in Parker County Juvenile

 7   Facility.  And not only that, he demonstrated that

 8   aggressive tendency that he had -- you saw the size of

 9   Henry Williams that was on the staff over at the facility.

10   He even charges at him and has to be restrained.  Does that

11   sound like somebody that's a good risk?

12         And then what benefit did it do when he got sent

13   away to TYC for a year, remove him for a year?  He gets

14   back and, folks, he gets back September of 1996.  Plot this

15   trend line with me.  September the 11th of 1996, within

16   days of the time he gets back, he's already in a fight out

17   at school and removed from the regular classroom

18   environment and put in ISS, in-school suspension.  That's

19   within days, folks, of being given the benefit of what we

20   have in our system to try to save somebody.

21         Oh, let's pay attention that he's young.  Okay.

22   We did.  And he gets out and he's already in a fight.  Next

23   thing that happens is that on September the 23rd, 12 days

24   later, he is removed from ISS on the regular campus to

25   alternative education for why, assaultive conduct and gang

                                                          98

1   activity.  Days, 11, 12 days.  September 23rd is when that

2   happened.

3          How long did he last at AEC?  October the 18th,

4   continued misbehavior, not showing up, walking, leaving,

5   fights, whatever, he's expelled on October the 18th of

6   1996.  Okay.  He's not in school anymore.

7          And then from October the 18th, we make it 23

8   more days before the incident with Scott Cienega and the

9   screwdriver.  And you know that screwdriver was pommeling

10  down toward Scott Cienega's left chest area.  He had no

11  regard for Scott Cienega.  He brought the weapon, and he

12  used it.  This is after we've tried remedial work.  Okay.

13  November the 11th, before he's even arrested for that

14  incident, December the 5th, 24 more days is all that goes

15  by before he stabs his buddy, Robert Joe Perez, in the back

16  four times with a knife and barely missing his spine by a

17  quarter of an inch.  And he was certified to be tried as an

18  adult and was and was convicted.  And that jury heard the

19  same appeal, the same appelation, oh, he's young.  How much

20  does it take, folks, before you know that he is absolutely

21  a danger to society?

22         Rehabilitation, I suggest to you unequivocally,

23  has been tried.  It didn't work.  It doesn't take him days

24  to start reoffending and hurting folks.

25         What else?  Retribution.  Retribution is a

                                                          99

1  punishment philosophy that deals with punishing the
2  conduct.  What worse conduct could you have than that you
3  have in this case?  But for Mr. Pontremoli's arm, how much
4  worse could it get?  So little he could have taken that old
5  man's money without hurting him, he didn't care to.  He
6  didn't care about the human being there.  So little regard
7  for other people's bodies and lives.  Retribution certainly
8  is something you ought to think about.  This is a serious
9  crime, the potential for harm to that man is the most.

10        Deterrence, punishment is about deterrence.  Let
11  whatever you choose in your punishment be sufficient to
12  deter or warn others that this kind of conduct will not be
13  tolerated.  What you do today matters.  It sends out a
14  message.  Please think about that when you're assessing
15  punishment.  Please help us deter crime.

16        It is bad enough what young people do to each
17  other with shootings and stabbings and so forth, but
18  somehow we have let them in this country.  The thugs and
19  the violent people take away our neighborhoods, our
20  schools, and we're held prisoner by that violence.  And the
21  only way to take it back was to say we won't stand for it.

22        You're the only jury that's working today in Palo
23  Pinto County.  What kind of a message will you send out
24  about violence in our society?  Will you say, I've had
25  enough, you're not going to take the safety of my streets.

                                                          100

1    You can't walk into Mr. Pontremoli's store and pommel with

2    a 36-inch pipe wrench to steal money from him or just

3    because your PO'd about a comment about wearing baggy

4    britches, so little regard with life.

5            And, finally, I think that punishment is

6    ultimately, in this case, with as many as incidents of

7    violence as you have, about the protection of society.

8    Some people demonstrate that they cannot be rehabilitated.

9    Russell Don Johnson is one of those.  And when he's out, he

10   will hurt you.  Even his mother has to concede to that.

11   And she knows him better than anyone else, certainly better

12   than you could know him inside of two days.

13           Bless her heart, she's a victim of Russell Don

14   Johnson as well as Mr. Pontremoli.  She knows she answered

15   that question, that if only the police would have locked

16   him up, he wouldn't have been out where he could stab

17   Robert Joe Perez.  Well, does that mean to you that this is

18   a person that has to be locked up in order for society to

19   be protected?

20           There is no excuse for that kind of conduct, and

21   it is unacceptable in our society.  The issue is what will

22   you do about it, what will you do about it?  You have a

23   wide range.  I would like to suggest to you that we have

24   tried rehabilitation and it is time to protect society and

25   to deter others from this kind of violence, the stabbings,

101

1    the bludgeonings.

2            On the last page of the verdict form, ladies and

3    gentlemen -- or the last page of the charge is a verdict

4    form.  I've suggested that you consider, because of the

5    evidence, not anything else -- Mr. Ray if you bring me a

6    proper case for it, I'll have the courage.  In a proper

7    case for it, I will consider stiff punishment if you prove

8    to me that it is deserved; and we've done just that.  Eight

9    separate incidents of violence alone.

10           I'm going to suggest to you that you consider the

11   range of 40 years up to 99 or life if you choose to assess

12   that.  And the matter of a fine in this case is not about

13   money, although they certainly rob -- or Russell Don

14   Johnson certainly robbed Mr. Pontremoli, but the case is

15   not about money.  If you want to assess a fine, please feel

16   free to do so, you pick the number anywhere between zero

17   and $10,000.  A parole officer someday may make him pay $50

18   a month or $100 a month as a reminder, but that's up to

19   you.  I would suggest to you because of the evidence that

20   you've heard and the commitment that you made that in a

21   proper case for it, you're the kind of people that could

22   consider stiff punishment.  He deserves it, society needs

23   protection from him.  People will be hurt if Russell Don

24   Johnson is not locked up for it.

25           The previous jury made that gamble about turning

                                                              102

1  him loose to walk among us.  You trust that volatile temper

2  and that propensity for violence in your neighborhood or

3  adjacent to your family?  Please don't do that, help us to

4  protect society and increase and define the quality of life

5  in Palo Pinto County by your verdict.  The evidence demands

6  that you do that.  Thank you very much.

7         MR. WATSON:  If it please the Court?

8         THE COURT:  Yes, sir.

9         MR. WATSON:  Mr. Ray.  Ladies and gentlemen,

10 briefly I want to go over some things.  Under Mr. Ray's

11 recommendation to you, Mr. Johnson would be either 38 or 48

12 years of age when he was eligible for parole under the

13 guidelines here.  It says he must serve one-half of the

14 sentence, whichever is less.  Under 40 to 99, he would

15 either be 38 or 48 depending on what number you were to

16 pick, if that's what you were to decide.  I don't think

17 that's appropriate.

18         We're not using youth as an excuse, we're using

19 it as the truth, it's what we have.  We're not making up

20 these numbers, he is 18 years of age.  He has had a very

21 violent checkered life in three years.  You heard three

22 people testify they knew him prior to his 15th birthday or

23 14th birthday, he was a good kid.  They didn't know much

24 about him since then.  You know much about him since then

25 because he was doing dope.  Not an excuse, but it's true.

1   The problems he has is not -- we're not talking

2   about a 40-year-old man who has done this over a 25-year

3   period.  We're talking about a young man who got into some

4   problems, he's paying for it.  He did whatever he did in a

5   three-year span, all between 14 and 17 years of age.  I

6   think that's important.  We are not trying to create his

7   age, that's just the facts we have to deal with.

8   You heard his mother testify.  I think she's very

9   candid with you, very honest.  She doesn't like this, but

10  he's still her son.  She's asking you to consider giving

11  him an opportunity to get out at a decent age and come back

12  and try to do something with his life.  He's got this

13  three-year-old son that we've found out has been

14  legitimized, which is what the Court ordered, we weren't

15  aware of that.  That's a step.

16  If he's given 99 years or 40 years, this child

17  will be gone before he's eligible -- he won't even see him,

18  no opportunity to see this child.  I don't think that's

19  right.  Again, age is simply a fact, we have to deal with

20  it.

21  No one disputes his conduct, especially his

22  mother.  She said, I did what I could and it didn't work.

23  All of us who have children hope that our children do what

24  we want them to do.  They don't always do that.  You sit

25  there and see your kids when they're three or four years of

104

1    age, sometimes they do right, sometimes they don't.  We've
2    got a situation where a mother is coming up here not asking
3    you to do any favors, she's asking you to consider what
4    this young man is going to be doing for the rest of his
5    life.

6         He has never been anywhere other than on
7    probation, if you will.  The prior jury had a probation
8    available to him, you don't.  Probation was available, they
9    took that chance.  He's going to go to prison, there's no
10   question about that.

11        Ms. Johnson, she works.  Like she said, he was
12   the least problems of all her kids until he started doing
13   dope.  And, you know, we all read about dope.  Dope is a
14   bad thing, don't misunderstand me.  I deal with it in these
15   courts all the time.  There's nothing good about it, but
16   that is also a fact about this case that I can't ignore.
17   It's in it, it's here.  It is probably the reason he did
18   some of these things.  And it doesn't excuse it, it's not a
19   defense, but it is an explanation of how he's lived his
20   life for the last three years.  I think that's important.

21        You know I would be -- I would not feel
22   comfortable with Ms. Johnson getting up there and saying,
23   hey, my son is a good kid, don't do anything to him at
24   all.  That's not right, you know that, y'all heard the
25   evidence.  She didn't tell you that.  She just said, I want

                                                          105

1    you to consider, give him an opportunity when he gets out.

2    Don't make him an old man when he gets out of here, give

3    him a chance.  That's what I'm asking you to do.

4         Now, I think it's very important, as I mentioned

5    to you, his conduct was as a freshman, sophomore -- or,

6    actually, eighth-grader and freshman and sophomore in high

7    school, that age.  He'd still be in high school if he

8    wasn't in jail, that's his age limit we're talking about.

9    That's important.

10        Another thing that we talked about.

11   Mr. McAllester mentioned this morning, I asked him a

12   question.  Let's assume Mr. Ray's scenario that

13   Mr. Pontremoli does not put up his hand, he's killed.  He

14   couldn't get any more for that than Mr. Ray is asking for

15   this offense.  It's the same punishment range.  That's not

16   right.  I don't think that's appropriate to say we're going

17   to give him 40 or 99 years when you couldn't give him more

18   than that for murder if the man had died.  I don't think

19   that's appropriate at all.

20        Kids have to make decisions; he obviously made

21   many, many bad ones.  The first one, he was getting

22   involved with people that use dope, therefore, he used

23   dope.  That's the first decision he made that was bad.  He

24   got into some violent confrontations with other people,

25   those obviously were bad.

106

1    We didn't always -- our children don't always

2   make decisions we want them to make necessarily in spite of

3   what age they may be.  I'm sure Mineral Wells has a lot of

4   people that have kids that are now 25 and 30 and 35 years

5   year of age that might have had problems similar to this,

6   perhaps, and they got through it without this.  And they

7   probably go to bed at night and say, we're thankful that

8   this happened, that our child is not going to go prison

9   like Russell Johnson.  There's a lot of folks out there

10   that are probably very thankful.

11    They did what they could.  And maybe it works out

12   better for others -- for some others more than

13   Mr. Johnson.  Unfortunately, the children don't always make

14   the right choices.  Some pay more than others and Mr.

15   Johnson has to pay, there's no question about it.  He's

16   going to pay.

17    Eighteen years of age with a possibility of

18   spending 30 years in prison, 30 years flat, day for day,

19   that's what this charge tells you.  I don't think that is

20   appropriate based on what you've heard.

21    Everything was laid out for you, you heard all

22   the evidence, you heard everything he did.  His mother told

23   you about his conduct, I don't think that's appropriate.

24   I'm going to ask you to consider 15 to 20 years.  Even

25   after seven and a half, he'll be 15, day for day; 20 years

107

1   will be 10, that's a long time.  We're not talking about

2   paying a $200 fine on a speeding ticket.  We're talking

3   about 10 years even under my scenario, day for day.

4         When he's 29 years of age, he comes out, his kid

5   is 13, his child will be the same age as when he started

6   all his problems.  You put that in that perspective.  I

7   think these things are important.

8         Nobody is asking you to do anything magic about

9   trying to undo all of this, I realize that can't be

10  done.  But you can consider the circumstances and give some

11  thought to what this boy is going to be doing in the next

12  few years, however long he's going to be in prison.  Those

13  of you that have children, just think about that.

14  Fortunately, I'm sure y'all didn't have these problems.

15  And I'm not blaming y'all for not having them, I'm not

16  blaming Ms. Johnson for having them, these things happen

17  sometimes.  And I just ask you to consider that.

18        Here's a mother who comes up here -- we've

19  talked, she and I spent a lot of time visiting.  She said,

20  I'll be the first one to tell you, I don't like a thing

21  that he did.  I'm not proud of any of it, but this is my

22  son and I want to do what I can to help this jury

23  understand how he has lived the last three years of his

24  life.  And that's what I'm asking you to consider.  If you

25  give him 15 or 20 years, he's going to be gone at least

                                                        108

1    seven and a half years.

2    The fine, I was appointed by the judge to

3    represent him, he has no money, whatever you think is

4    appropriate there.

5    But on page -- the last page, let me just read

6    this briefly.  Under the law applicable to this case, the

7    defendant is sentenced to a term of imprisonment, he will

8    not become eligible for parole until the actual time served

9    equals one-half or 30 years, whichever is less.  Now,

10   that's the basic starting point with whatever punishment

11   you put on this young man.  I'm just asking you to

12   consider, again, the short period of time in which he did

13   his business compared to a 40-year-old man who's been doing

14   this for 20 years, all of his adult life, think about that.

15   And, you know, it may be a blessing.  It may be a

16   blessing that we're here today.  It very well may be

17   because I think his mother told you, and basically, this

18   had to stop.  There's no question about it.  And you're

19   going to be the ones who decide what's going to happen.  It

20   may be a blessing that he's here today, if you will, not

21   trying to be flippant, to get this over with.  It had to

22   stop somewhere.  But when you consider that you're going to

23   make the final decision on this, remember these things,

24   remember his age, remember the time period involved,

25   remember what happened, how it happened.  It's not an

109

1    excuse, but it is an explanation of what he did and why he

2    did it.

3         I'm asking you to consider 15 to 20 years, and I

4    think that's appropriate under this case.  But, like I

5    said, if the man had been killed, he couldn't have gotten

6    more than this.  That doesn't make sense.

7         On the back page it says, form of verdict.  I'm

8    asking you to fill in 15 to 20 years and no fine, he

9    couldn't pay the fine anyway.  I think that's appropriate

10   under these circumstances.  Thank you.

11        MR. RAY:  Ladies and gentlemen, just briefly

12   I want to make about four points in rebuttal.  One, it may

13   be a blessing we're here today, this has to stop.  We've

14   been here before with this guy, and it didn't do any good

15   at all.  It only took him a month of freedom to swing this

16   at Mr. Pontremoli's head.

17        Second point.  The only reason given to you to

18   suggest that you should not assess punishment in the range

19   that I have suggested, supported by the evidence, is that

20   he is 18 years old.  Counsel says he is a young man.  He is

21   a young man that can kill you or injure you just as deadly

22   and just as surely as someone who is 40 or 50 years old.

23   That requires nothing more than common sense when you are

24   triggered by and have a fuse like he's demonstrated.

25        Number three, Mr. Watson says that he couldn't

110

1  get punished any more for murder than he can for aggravated

2  robbery or aggravated sexual assault.  Well, that's

3  true, but you know what?  It's not Russell Don Johnson's

4  fault that Mr. Pontremoli didn't get hurt more seriously or

5  killed.  He is the same actor.  It is the same conduct.  It

6  is the same swing of this weapon that would do both of

7  those results.  Don't you see that it's not his fault that

8  we're not trying a murder case.  He didn't care.  He didn't

9  have to hurt that old man, he just doesn't care.  He's mean

10  and he will hurt you.

11       Point four, don't punish me, I'm young.  He chose

12  the way of life that he's been living, repeated and

13  underscored eight or nine times with violence.  Listen to

14  this, quote, his mother, she did what she could, and it

15  didn't work.  You know, Mr. Hunter did what he could, and

16  it didn't work.  Texas Youth Commission did what they

17  could, and it didn't work.  The previous trial jury did

18  what they could, and it didn't work.  This Court did what

19  it could, and it didn't work.  Mr. Edwards and his office

20  did what they could, and it didn't work.  For whatever it's

21  worth, I did what I could, and it didn't work.  It's time

22  to be held accountable.  He is a violent individual.

23       Don't let him go down that path anymore.  Don't

24  let him hurt anybody else.  How would you feel?  You're the

25  only ones that can stop it by your verdict -- should be

111

1  somewhere in that range, 40 to 99 years would be

2  appropriate for this much violence.  Thank you very much.

3              THE COURT:  Will you go with the bailiff

4  again to the jury room, ladies and gentlemen?

5                  (Jury out at 1:01 p.m. to

6                   deliberate on punishment.)

7                  (Jury in at 3:20 p.m.)

8              THE COURT:  All right.  Mr. Barrett, has the

9  jury reached a verdict?

10             PRESIDING JUROR:  Yes, sir, we have.

11             THE COURT:  We, the jury, having found the

12  defendant, Russell Don Johnson, guilty of the offense of

13  aggravated robbery as alleged in the indictment, assess his

14  punishment at 30 years confinement and no fine.  Is that

15  the unanimous verdict of the jury and so say you all?

16             THE JURY:  It is.

17             THE COURT:  I will accept your verdict in

18  the case, ladies and gentlemen.  I appreciate your service

19  in this case and your willingness to help us this week.

20  You were sworn to secrecy at the beginning of the trial;

21  you're now released from that oath.  You may discuss this

22  case or not discuss it as you see fit.  Your checks will be

23  mailed to you.  If any of you need a certificate for your

24  employer, you may get one in the clerk's office.  Again,

25  thank you very much and merry Christmas.

                                                      112

1          (Jury dismissed at 3:21 p.m.)

2          THE COURT:  All right.  Any reason why the

3   defendant should not now be sentenced, Mr. Watson?

4          MR. WATSON:  No, Your Honor.

5          THE COURT:  You having been found guilty,

6   Mr. Johnson, by jury verdict of the offense of aggravated

7   robbery, the Court having accepted that verdict, the jury

8   having assessed punishment at 30 years confinement in the

9   Institutional Division of the Department of Criminal

10  Justice, and the Court having accepted that verdict, it is

11  therefore the judgment of the Court that you're guilty of

12  the offense alleged in the indictment, aggravated robbery,

13  and you're sentenced to confinement in the Institutional

14  Division for 30 years.  You're given credit on that

15  sentence as required by law for the time you've been in

16  jail since you were arrested for this offense.  Your

17  custody is remanded to the sheriff.

18          MR. WATSON:  Thank you, Your Honor.

19

20

21

22          (Whereupon, the proceedings were concluded.)

23

24

25

113

1  THE STATE OF TEXAS      )(

2  COUNTY OF PALO PINTO    )(

3

4      I, Kim A. Brooks, Official Court Reporter for the 29th

5  Judicial District of Palo Pinto County, State of Texas, do

6  hereby certify that the above and foregoing contains a true

7  and correct transcription of all portions of evidence and

8  other proceedings requested in writing by counsel for the

9  parties to be included in the reporter's record in the

10  above-styled and numbered cause, all of which occurred in

11  open court or in chambers and were reported by me.

12      I further certify that this transcription of the

13  proceedings truly and correctly reflects the exhibits, if

14  any, offered by the respective parties.

15      I further certify that the total charges for the

16  transcript, including any exhibits, is $ 130⁰⁰        .

17      WITNESS my hand this the 9th day of February,

18  1999.

19

20                        Kim A. Brooks
                          Kim A. Brooks, CSR, RPR
21                        Official Court Reporter
                          29th Judicial District
22                        Palo Pinto County, Texas

23

   Certification No: 4650
24  Date of Expiration: 12/31/99
   Business Address: P.O. Box 187
25                   Palo Pinto, Texas  76484
                     (940) 659-1226

                                              114

# E X H I B I T S

*HML*

## STIPULATION OF EVIDENCE

### CAUSE NO. 444

STATE OF TEXAS

COUNTY OF PALO PINTO

IN THE COUNTY COURT
OF PALO PINTO COUNTY
SITTING AS A JUVENILE COURT

IN THE MATTER OF **RUSSELL DON JOHNSON**

COMES NOW **RUSSELL DON JOHNSON**, the respondent in the above entitled and numbered cause, in writing and in open court, and consents to the stipulation of the evidence in this case and in so doing expressly waives the appearance, confrontation and cross-examination of witness. I further consent to the introduction of testimony by affidavits, written statements of witnesses and other documentary evidence. Accordingly, having waived my Federal and State constitutional rights against self-incrimination and after having been sworn, upon oath, I judicially confess to the following facts and agree and stipulate that these facts are true and correct and constitute the evidence in this case:

The said child engaged in delinquent conduct, to-wit: That on or about the 17th day of August, A.D. 1995, the said child violated a penal law of this State punishable by imprisonment/confinement in jail, to-wit: Article 22.02 of the Texas Penal Code, in that he did then and there in the County of Palo Pinto and State of Texas, intentionally, knowingly and recklessly cause serious bodily injury to Raymond Vargas by then and there stabbing him with a pair of scissors on the wrist and upper left arm.

_Russell Johnson_
Respondent

_Chase O'Mudd_
Attorney for the Respondent
Stat Bar # 18526950

True and correct
copy of original
filed in the Palo Pinto
County Clerks Office
_Bobbie Smith_ 12-11-98

STATE'S
EXHIBIT
# 13

Px 2

Sworn and subscribed to before me the undersigned authority on this the 30th day of August, A.D. 1995.

*Bobbie Smith*
Clerk, Juvenile Court of
Palo Pinto County, Texas

Approved by the Court:

*Harold M. Couch*
Judge of the County Court
Palo Pinto County, Texas
Sitting As a Juvenile Court of
Said County

**FILED**
At 11:45 O'Clock A. M.

AUG 3 0 1995
*Bobbie Smith*
Clerk of the County Court
Palo Pinto County, Texas

By _____ Deputy

True and correct
copy of original
filed in the Palo Pinto
County Clerks Office
*Bobbie Smith* 12-11-98

## JUDGMENT

## CAUSE NO. 444

STATE OF TEXAS

COUNTY OF PALO PINTO

IN THE COUNTY COURT
OF PALO PINTO COUNTY
SITTING AS A JUVENILE COURT

IN THE MATTER OF **RUSSELL DON JOHNSON**

ON THIS the 30th day of August, A.D. 1995, in this Court sitting as a Juvenile Court, there was called a hearing for consideration of the matters in the above styled and numbered cause, wherein by proper petition the said **RUSSELL DON JOHNSON** is alleged to have engaged in delinquent conduct.

And after due notice had been served on all parties for the time required by law, came and appeared the petitioner by its County Attorney and announced ready for such hearing. And thereupon also came the child, who appeared in person, with his attorney Mike Smiddy appointed also being present, and with his parents Kathy Johnson also being present; and the child and his attorney having waived the ten (10) days for preparation for such hearing, and the right to a trial by jury, in writing; and all parties announced ready for such hearing; and thereupon the Court after hearing the pleadings of all the parties and after hearing the evidence and argument of counsel, finds beyond a reasonable doubt that the following allegations in the petition filed herein are true and supported by the evidence:

The said child engaged in delinquent conduct, to-wit: That on or about the 17th day of August, A.D. 1995, the said child violated a penal law of this State punishable by imprisonment/confinement in jail, to-wit: Article 22.02 of the Texas Penal Code in that he did then and there in the County of Palo Pinto and State of Texas, intentionally, knowingly and recklessly cause serious bodily injury to Raymond Vargas by then and there stabbing him with a pair of scissors on the wrist and upper left arm.

The Court also finds that said child was born on the 29th day of September , A.D. 1980.

IT IS THEREFORE CONSIDERED AND ADJUDGED BY THE COURT THAT **RUSSELL DON JOHNSON** has engaged in delinquent conduct within the meaning of Section 51.03 of the Texas Family Code.



True and correct
copy of original
filed in the Palo Pinto
County Clerks Office
_12-31-98_
_Bobbie Smith_

STATE'S
EXHIBIT
#14

Dispositional hearing for this case is set for the 30th day of August, 1995, at 12:05 o'clock P.M. in the County Courtroom of Palo Pinto County, Texas.

SIGNED AND ENTERED on this the 30th day of August, A.D. 1995.

_Harold M. Forrich_
Judge of the County Court
Palo Pinto County, Texas
Sitting as a Juvenile
Court in Said County

**FELONY OFFENSE ONLY**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

True and correct copy of original filed in the Palo Pinto County Clerks Office
_Bobbie Smith_ 12-11-98

I, the undersigned child, have read, understand and received a copy of the above styled and numbered Judgment.

_Russell Johnson_
Signature of Child

Date: 8-30-95

On entry of the above and foregoing order, the Court instructed the attorney for the child to advise the child and his parents, guardian, or guardian ad litem of the child's right to appeal, of the child's right to representation by counsel on appeal, and of the child's right to appointment of an attorney for appeal if an attorney cannot be obtained because of indigency. The attorney was instructed that if the child, his parents, guardian, or guardian ad litem express a desire to appeal, the attorney shall file a notice of appeal with this Court and inform the Court whether or not he will handle the appeal.

**FILED**
At 1155 O'Clock A. M.

AUG 3 0 1995
_Bobbie Smith_
Clerk of the County Court
Palo Pinto County, Texas

By _____ Deputy

## ORDER OF COMMITMENT

### CAUSE NO. 444

| | |
|---|---|
| STATE OF TEXAS | IN THE COUNTY COURT |
| COUNTY OF PALO PINTO | OF PALO PINTO COUNTY |
| | SITTING AS A JUVENILE COURT |

IN THE MATTER OF **RUSSELL DON JOHNSON**

ON THIS the 30th day of August A.D. 1995, came on to be heard for disposition the above numbered and entitled cause. The above-named child was adjudged to have engaged in delinquent conduct in a hearing held by this Court on the 30th day of August A.D. 1995.

And after due notice had been served on all parties as required by law, came and appeared the Petitioner by its County Attorney and announced ready for such hearing. And thereupon also came the child, who appeared in person with his attorney Mike Smiddy (appointed) also being present, and with his parents Kathy Johnson also being present; and all parties announced ready for such hearing; and thereupon the Court, after hearing the pleadings of all parties and after hearing the evidence and argument of counsel, finds that the child is in need of rehabilitation and that the protection of the public requires that disposition be made. The Court also finds that the said child was, at the time of this hearing, 14 years of age, having been born on the 29th day of September A.D. 1980.

It further appears to the Court that the best interest of the child and the best interest of society will be served by committing him to the care, custody and control of the Texas Youth Commission for the following reasons:

The said child engaged in delinquent conduct, to-wit: That on or about the 17th day of August, A.D. 1995, the said child violated a penal law of this State punishable by imprisonment/confinement in jail, to-wit: Article 22.02 of the Texas Penal Code in that he did then and there in the County of Palo Pinto and State of Texas, intentionally, knowingly and recklessly cause serious bodily injury to Raymond Vargas by then and there stabbing him with a pair of scissors on the wrist and upper left arm.

True and correct copy of original filed in the Palo Pinto County Clerks Office

12-11-98

Bobbie Smith

STATE'S
EXHIBIT
#15

The Court finds that all reasonable efforts were made to prevent or eliminate the need for the childs removal from the home and to make it possible to return to his home.

IT IS THEREFORE CONSIDERED AND ADJUDGED BY THE COURT THAT THE said **RUSSELL DON JOHNSON** be and is hereby committed to the care, custody and control of the Texas Youth Commission in accordance with Article 5143d, Vernon's Annotated Texas Civil Statutes for an indeterminate period of time not to exceed the time when he shall be Twenty One (21) years of age or until duly discharged in compliance with the provisions of Article 5143d, Vernon's Annotated Texas Civil Statutes. The child is ordered placed in custody of the Sheriff of Palo Pinto County and the Juvenile Probation Officer pending transportation to the proper Texas Youth Commission facility.

The Clerk of this Court will furnish the child a copy of this Order.

SIGNED AND ENTERED ON THIS the 30th day of August A.D. 1995.

Harold M. Couch
Harold M. Couch
Judge of the County Court
Of Palo Pinto County, Texas
Sitting as a Juvenile Court
In Said County

On entry of the above and foregoing order, the Court instructed the attorney for the child to advise the child and his parents, guardian, or guardian ad litem of the child's right to appeal, of the child's right to representation by counsel on appeal, and of the child's right to the appointment of an attorney for appeal if an attorney cannot be obtained because of indigency. The attorney was instructed that if the child, and his parent, guardian, or guardian ad litem express a desire to appeal, the attorney shall file a notice of appeal with this Court and inform this Court whether or not he will handle the appeal.

Harold M. Couch
Juvenile Court Judge

CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS
COUNTY OF PALO PINTO

FILED

_____ O'Clock ____ M.

AUG 3 0 1995

_____ Smith
Clerk of the County Court
Palo Pinto County, Texas

By _____ Deputy

True and correct
copy of original
filed in the Palo Pinto
County Clerks Office
12-11-96
Bobbie Smith

STATE'S EXHIBIT #17

NO. 10,690

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| VS. | * | PALO PINTO COUNTY, TEXAS |
| RUSSELL DON JOHNSON | * | 29TH JUDICIAL DISTRICT |

### JUDGMENT ON JURY VERDICT OF GUILTY
### PUNISHMENT FIXED BY COURT OR JURY - PROBATION GRANTED

JUDGE PRESIDING: Honorable David Cleveland

DATE OF JUDGMENT: April 15, 1997

ATTORNEY FOR STATE: Jerry D. Ray, District Attorney; Brenda Vickers, Assistant District Attorney;

ATTORNEY FOR DEFENDANT: Mike A. Smiddy, appointed

OFFENSE CONVICTED OF: Aggravated Assault with a Deadly Weapon, an offense defined in Art. 42.12, Sec. 3g(a)(2), Texas Code of Criminal Procedure

DEGREE: Second

DATE OFFENSE COMMITTED: December 5, 1996

CHARGING INSTRUMENT: Indictment

PLEA: Not Guilty

JURY VERDICT: Guilty

PRESIDING JUROR: Gary Arthur Lindley

PLEA TO ENHANCEMENT PARAGRAPH: N/A

JURY VERDICT ON ENHANCEMENT PARAGRAPH(S): N/A

FINDINGS ON USE OF DEADLY WEAPON: Affirmative, (as alleged in the indictment, to-wit: a knife which in the manner of its use and intended use is capable of causing death or serious bodily injury).

PUNISHMENT ASSESSED BY: Jury

DATE SENTENCE IMPOSED: April 15, 1997

COSTS: $146.50 court costs; $1,200.00 atty fee; $10,000.00 fine; $3,483.00 restitution

PUNISHMENT AND PLACE OF CONFINEMENT: Ten (10) years I.D.T.D.C. suspended

DATE TO COMMENCE: April 15, 1997

TIME CREDITED: N/A



FILED
APR 17 1997
HELEN SLEMMONS
DIST. COURT, PALO PINTO CO., TEXAS
AT 4:00 PM-AM



A CERTIFIED COPY
ATTEST: 12-1-5 19 98
Helen Slemmons
District Clerk, Palo Pinto
County, Texas
Deputy

TOTAL AMOUNT OF RESTITUTION/REPARATION:   $14,829.50

RESTITUTION TO BE PAID TO:  Palo Pinto General Hospital, Mineral Wells, Texas
Concurrent Unless Otherwise Specified:

On the 14th day of April , 1997, this cause was called for trial, and the State appeared by the above named attorney, and the Defendant appeared in person in open Court, the above named counsel for Defendant also being present, and the said Defendant having theretofore been duly arraigned, and it appearing to the court that Defendant is mentally competent to stand trial, both parties announced ready for trial and thereupon a jury, to-wit: the above named presiding juror and eleven others were duly selected, impaneled and sworn, and the Indictment was read before the jury and the Defendant's plea thereto was entered as shown above, and the evidence having been submitted, and the jury having been duly charged by the Court, retired in charge of the proper officer to consider the verdict, and afterward were brought into open Court, the Defendant and Defendant's counsel being present, and returned into open Court the verdict set forth above, which was received by the Court and is herenow entered upon the minutes of the court as shown above.

Thereupon, the Defendant elected to have punishment assessed by the jury and the jury was called back and heard evidence relative to the question of punishment and having been duly charged by the Court, they retired to consider such question, and after having deliberated they returned into court the verdict shown under punishment above.

IT IS THEREFORE ORDERED AND ADJUDGED by the Court, and it is the judgment of the Court, that the Defendant is guilty of the offense as alleged in the indictment, and that the Defendant by punished by confinement in the Institutional Division of the Texas Department of Criminal Justice for the term of ten (10) years, and by a fine as shown above, that the State of Texas do have and recover of said Defendant costs as shown above for which execution may issue; but that imposition of confinement is suspended and Defendant is placed on community supervision for the period shown above from date hereof, upon the following terms and conditions, that during said term of community supervision he shall:

(a) Neither commit nor be convicted of any offense against the laws of this State or any other State or the United States:
(b) Avoid injurious or vicious habits:
(c) Avoid persons or places of disreputable or harmful character:
(d) Report to the Community Supervision Officer of Palo Pinto County, Texas, twice each month, within the first five days of each month and between the 15th and 20th of each month during said term of community supervision, beginning upon release from the substance abuse treatment facility and at such other times as directed by the Court or Community Supervision Officer;
(e) Permit the Community Supervision Officer to visit him at home or elsewhere;
(f) Work faithfully at suitable employment as far as possible;
(g) Remain within Palo Pinto County, Texas, during said term of community supervision unless given permission in writing by the Court or Community Supervision Officer to leave said county (except

absences not to exceed 48 hours shall be allowed without securing permission);

(h) Support the dependents you now have or acquire during said term.

(i) Advise the Community Supervision Officer of any change of address or employment within 5 days after such change;

(j) Refrain use, possession or consumption of marijuana or any other controlled substances, or alcohol;

(k) Submit to periodic testing for use or consumption of marijuana or any controlled substance, and pay for such testing;

(l) Work faithfully at a Community Service task for 600 hours under the direction of the Community Supervision Department, said work shall begin and shall be completed by a date determined by the Court upon release from the substance abuse treatment facility.

(m) Pay to and through the Community Supervision Office of Palo Pinto County, Texas, the following:

| | | |
|---|---|---|
| 1. | $ 146.50 | Court Costs |
| 2. | $ 3,483.00 | Restitution - to Palo Pinto General Hospital |
| 3. | $10,000.00 | Fine |
| 4. | $ 1,200.00 | Attorney Fee |
| 5. | $ N/A | Other - |

Making a total sum of $14,829.50, and said total sum shall be paid as follows, to the Community Supervision Office of Palo Pinto County, Texas, to-wit:

Amount per month to be determined by the Court and beginning on a date to be determined by the Court upon release from the substance abuse treatment facility.

Each monthly payment shall be credited and applied in the following manner, (1) to Restitution, until fully paid, and then (2) to Court Costs, until fully paid, and then (3) to the Fine, until fully paid, and then (4) Attorney Fees, until fully paid, and then (5) to Other, if any, until fully paid.

THE ABOVE TERMS OF PROBATION MAY BE ALTERED, INCREASED OR DECREASED AT ANY TIME BY THE DISTRICT COURT, in accordance with Art. 42.12 of the Texas Code of Criminal Procedure.

6. In addition to the above, Community Supervision fees in the amount of $25.00 per month during the period of community supervision, beginning date to be determined by the Court upon release from the substance abuse treatment facility.

7. $20.00 to the Palo Pinto County Crime Stoppers Program payable on or before determination by the Court upon release from the substance abuse treatment facility.

(n) Remain in custody of the Palo Pinto County Sheriff's Department until such time as you are transported to the substance abuse felony punishment facility as hereinafter provided.

(o) Remain in the substance abuse felony punishment facility established in Sec. 493.009, Government Code, and operated by the Community Justice Assistance Division of the Texas Department of Criminal Justice for not less than 90 days nor more than one (1)

year, The defendant shall comply with all rules, regulations and treatment programs and remain in such facility until discharged by the Court.

(p) Attend and successfully complete the Palo Pinto County Drug Offender Education program and pay the required fee to sponsoring agent. Such attendance to begin at a date to be determined by the Court upon release from the substance abuse treatment facility.

(q) Attend, participate and successfully complete H.O.P.E. Plan of Action and Continuum of Care. Enrollment shall be on or before determination by the Court after release from the substance abuse treatment facility and remain enrolled in said program during the period of supervision unless released by the Court.

SIGNED AND ORDERED this 16th day of April, 1997.

(Right)/Left Thumb print of Defendant:



_____
DISTRICT JUDGE
29th Judicial District

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Russell Don Johnson, defendant in the above cause hereby acknowledge that I understand the conditions of my community supervision, and further understand that the Court may at any time, during the period of community supervision, alter or modify these conditions, and that the Court has authority to revoke my community supervision for violation of any of the above conditions, further, that a copy of the above order setting out the terms and conditions of my community supervision was delivered to me on the 17 day of _____APRIL_____, 1997.

_____
Defendant

ATTEST:

_____
DISTRICT CLERK
PALO PINTO COUNTY, TEXAS

BY_____, Deputy

NO. 10690

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE 29TH JUDICIAL |
| VS. | * | DISTRICT COURT OF |
| RUSSELL DON JOHNSON | * | PALO PINTO COUNTY, TEXAS |

## AMENDMENT TO COMMUNITY SUPERVISION

Whereas on the 15th day of April, 1997, Russell Don Johnson was placed on community supervision in the above cause for a term of Ten (10) years, and

Whereas on he 15th day of April, 1997, the Court is of the opinion and finds that conditions "R", "S", "T", "U" & "V" of said supervision should be amended, and is amended to read, as follows:

"R"   You shall be in your house each night at 9:00 p.m. and not leave until 7:00 a.m. each morning during the term of community supervision.

"S"   Legitimize your child within Ninety (90) days after being released from the Substance Abuse Punishment Facility.

"T"   Do not possess a knife with blade longer than 2 inches and do not possess a firearm during the term of community supervision..

"U"   Obtain a High School diploma or a GED during the term of community supervision.

"V"   Abstain from sex outside of marriage during the term of community supervision.

All other terms and conditions of said community supervision order shall remain in full force and effect.

Signed and ordered, entered this the _12_ day of _April_, 1997.

FILED

APR 17 1997

HELEN SLEMMONS
DIST. COURT, PALO PINTO CO., TEXAS
AT _3:30_ PM-AM

DAVID CLEVELAND, JUDGE
29TH JUDICIAL DISTRICT
PALO PINTO COUNTY, TEXAS

A copy of the above order received and read by the undersigned defendant on this the
_17_ day of ___APRIL___, 1997.

Russell Johnson
DEFENDANT

ATTEST:

Jerry Ford
SUPERVISION OFFICER
29TH JUDICIAL DISTRICT
PALO PINTO COUNTY, TEXAS

CAUSE NO. ___ 10690 ___

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| | * | |
| VS. | * | ___ 29TH ___ JUDICIAL DISTRICT |
| | * | |
| RUSSELL DON JOHNSON | * | ___ PALO PINTO ___ COUNTY, TEXAS |

## SPECIAL CONDITION OF COMMUNITY SUPERVISION

Pursuant to Art. 42.12 C.C.P., Section 14, the Court finds: (1) this defendant has been placed on community supervision under this Article; (2) the defendant is charged with or convicted of a felony other than a felony or criminal attempt of a felony under Sec. 21.11, 22.011, or 22.021 of the Penal Code; and (3) the Court affirmatively finds that (a) drugs or alcohol abuse significantly contributed to the commission of the crime or violation of community supervision; and (b) the defendant is a suitable candidate for treatment, as determined by the suitability criteria established by the Texas Board of Criminal Justice under Section 493.009(b) of the Government Code.

As a condition of community supervision, the defendant is required to serve a term of confinement and treatment in a substance abuse treatment facility under this section, abiding by all rules and regulations of said program for a term of not less than 90 days or more than 1 year. Upon release, the defendant is required to participate in a drug or alcohol abuse continuum of care treatment plan as developed by the Texas Commission on Alcohol and Drug Abuse, abiding by all rules and regulations of said treatment plan until discharged by the staff of the continuum of care program.

SIGNED this ___ 16th ___ day of ___ April ___, 199_7_.

FILED

APR 1 7 1997
HELEN SLEMMONS
DIST. COURT, PALO PINTO CO., TEXAS
AT ___ 3:30 ___ PM-AM

JUDGE PRESIDING

In the ___ 29th ___ Judicial District Court of
Palo Pinto County, Texas

VOL. __39__   PAGE __573__

I acknowledge receipt of a copy of the SPECIAL CONDITION OF COMMUNITY SUPERVISION and fully understand same.



RIGHT THUMB

_Rsell Johnson_ _____
Adult Probationer

A copy of this Order was delivered to the above named probationer by a Deputy District Clerk on this the __17__ day of __APRIL__, 199_9_.

DIRECTOR, _____
Community Supervision and Corrections Department

BY: _Jerry Ford_ _____
Supervision Officer

STATE'S
EXHIBIT
#18

NO. 10690

| THE STATE OF TEXAS | * | IN THE 29TH JUDICIAL |
| VS. | * | DISTRICT COURT OF |
| RUSSELL DON JOHNSON | * | PALO PINTO COUNTY, TEXAS |

## JUDGMENT REVOKING COMMUNITY SUPERVISION

Judge Presiding:               Honorable David Cleveland

Date of Judgment:             September 11, 1998

Attorney for State:            Jerry Ray

Attorney for Defendant:      Mike Smiddy

Offense Convicted of:         Aggravated Assault with a Deadly Weapon

Plea:                          True

Degree:                        Second

Date Offense Committed:      December 5, 1996

Date of Community Supervision:   April 15, 1997

Paragraph Violated and Grounds for Revocation:

**FILED**

SEP 1 4 1998
HELEN SLEMMONS
DIST. COURT, PALO PINTO CO., TEXAS
AT   9:10   PM-AM

"2"   That the said Russell Don Johnson, on or about the 17th day of June, 1998, did consume
a controlled substance, to-wit:  Marijuana.

As set out in State's   Original  Petition to Revoke Community Supervision.

Original Punishment Assessed:   Ten (10) years in the Institutional Division of the Texas
                                Department of Criminal Justice

Findings of Use of Deadly Weapon:   Affirmative, (as alleged in the indictment, to-wit: a knife,
which in the manner of its use and intended use is capable of causing death or serious bodily
injury).

A CERTIFIED COPY
ATTEST: 12-15-1998
Helen Slemmons
District Clerk, Palo Pinto
County, Texas
By _____ Deputy Clerk

VOL. _44_ PAGE _719_

Punishment Imposed and Place of Confinement:  Ten (10) years in the Institutional Division of the Texas Department of Criminal Justice

Date of Sentence:   September 11, 1998

Costs:   $146.50 Court costs; $3,483.00 Restitution; $10,000.00 Fine; $1,200.00 Attorney fee; $350.00 Attorney fee for MTR.

Time Credited: January 2, 1997 to April 15, 1997; August 3, 1998 to September 11, 1998.

TOTAL JAIL CREDIT:  144 days

Total amount of Restitution/Reparation:    $15,179.50

Concurrent Unless Otherwise Specified:

Restitution to be paid to: Palo Pinto General Hospital, Mineral Wells, Texas

On this the 11h day of  September, 1998, the  Original Motion of the State to Revoke Community Supervision in this cause (filed on the 31st day of July, 1998) came on for hearing; and came the State of Texas, by its above named attorney, and the Defendant appeared in person and by the above named attorney for Defendant, and announced ready for hearing, the Defendant having been heretofore served with a copy of said Motion to Revoke Community Supervision having been read in open Court in the presence of the Defendant and his attorney, and the Defendant having entered a plea thereto as set out above, and the Court after considering the pleading's and hearing the evidence offered by both the State and Defendant and the arguments of counsel, is of the opinion and finds that since the time Defendant was placed on Community Supervision herein and within the terms and conditions of such Community Supervision as set out above, and the Court finds from a preponderance of the evidence that the grounds for revocation of Community Supervision set out above are true, and the Court finds that Community Supervision herein should be revoked.

Therefore the Defendant is hereby, adjudged to have violated the terms and conditions of Community Supervision in this cause in the manner set forth above, and the Order Suspending the Imposition of Sentence, and Placing Defendant on Community Supervision heretofore entered in this cause should be, and the same is hereby, REVOKED, and it is hereby ORDERED by the Court that the Defendant be now sentenced herein, in accordance with the Judgment heretofore in this cause and in compliance with this order.

IT IS, THEREFORE ORDERED BY THE COURT, in the presence of said Defendant and his attorney, that the Judgment and Order of the Court Revoking Community Supervision entered herein be in all things approved confirmed and the Defendant, who has been adjudged guilty in the Judgment heretofore entered, is sentenced to a term of  Ten (10) years in the Institutional Division of the Texas Department of Criminal Justice, and Defendant shall be

delivered by the Sheriff of this county to the Director of the Institutional Division of the Texas Department of Criminal Justice, or other person legally authorized to received such convicts, to serve the punishment assessed in said judgment, and the said Defendant shall be confined for the above named terms in accordance with the provisions of the laws governing such punishment and according to the rules and regulations of the Institutional Division of the Texas Department of Criminal Justice.

And the Defendant is remanded to jail until said Sheriff can obey the directions of said judgment, this order and sentence.

DAVID CLEVELAND, JUDGE

DATE SIGNED

_____

DATE OF APPEAL



Fingerprint from
Right thumb
finger of Defendant

CAUSE NO. 37,295

IN THE INTEREST OF

ANTONIO MIGUEIL REYES,

A CHILD

IN THE DISTRICT COURT

PALO PINTO COUNTY, TEXAS

29TH JUDICIAL DISTRICT

## ORDER OF PARENTAGE

On September 2, 1998, the Court heard this case.

IREZ CHAVEZ REYES, Petitioner, appeared in person and through attorney of record, MIKE A. SMIDDY, and announced ready for trial.

RUSSELL DON JOHNSON, the biological father of the child, waived issuance and service of citation by waiver duly filed and appeared in person.

The Court, after examining the record and hearing the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All persons entitled to citation were properly cited.

A jury was waived, and all questions of fact and of law were submitted to the Court.

The record of testimony was duly reported by Kim Brooks, Official Court Reporter for the 29th Judicial District.

The Court finds that the following child is the subject of this suit:

NAME:     ANTONIO MIGUEIL REYES
BIRTHPLACE: Mineral Wells, TX
PRESENT RESIDENCE: With Petitioner
HOME STATE: Texas

SEX: Male
BIRTHDATE: November 16, 1995
SSN:

# FILED

SEP 2 ~ 1998

*Helen Slemmons*

HELEN SLEMMONS
DIST. COURT, PALO PINTO CO., TEXAS
AT _____ 9:25 _____ P.M.-A.M.

*By L Hunsinger, Deputy*

1

DEFENDANT'S
EXHIBIT
#1

The Court finds that RUSSELL DON JOHNSON has executed a statement of paternity for the child the subject of this suit in form and substance as provided by law, that a copy of the statement has been filed in this case, and that the facts recited in the statement are true.

The Court, after considering the pleadings, the evidence, the argument of counsel, and the circumstances of the parties and of the child, finds that the following orders are in the best interest of the child and are proper.

IT IS ORDERED that ANTONIO MIGUEIL REYES, a child born to IREZ CHAVEZ REYES at Mineral Wells, Palo Pinto County, Texas on November 16, 1995, is adjudicated the child of RUSSELL DON JOHNSON and that RUSSELL DON JOHNSON is adjudicated a parent of that child and that the parent-child relationship exists between the father and the child for all purposes.

IT IS ORDERED that the child formerly known as ANTONIO MIGUEIL REYES shall hereafter be named ANTONIO MIGUEIL JOHNSON.

The Court finds that the following orders are in the best interest of the child.

IT IS ORDERED that IREZ CHAVEZ REYES is appointed a parent sole managing conservator and RUSSELL DON JOHNSON is appointed a parent possessory conservator of the following child: ANTONIO MIGUEIL JOHNSON.

IT IS ORDERED that, at all times, IREZ CHAVEZ REYES, as a parent sole managing conservator, and RUSSELL DON JOHNSON as a parent possessory conservator, shall each have the following rights and duty:

1. the right to receive information from the other parent concerning the health, education, and welfare of the child;

2

2.    the duty to inform the other parent in a timely manner of significant information concerning the health, education, and welfare of the child;

3.    the right to confer with the other parent to the extent possible before making a decision concerning the health, education, and welfare of the child;

4.    the right of access to medical, dental, psychological, and educational records of the child;

5.    the right to consult with a physician, dentist, or psychologist of the child;

6.    the right to consult with school officials concerning the child's welfare and educational status, including school activities;

7.    the right to attend school activities;

8.    the right to be designated on the child's records as a person to be notified in case of an emergency;

9.    the right to consent to medical, dental, and surgical treatment during an emergency involving an immediate danger to the health and safety of the child; and

10.    the right to manage the estate of the child to the extent the estates have been created by the parent or the parent's family.

IT IS ORDERED that, during their respective periods of possession, IREZ CHAVEZ REYES, as a parent sole managing conservator, and RUSSELL DON JOHNSON as a parent possessory conservator, shall each have the following rights and duties:

1.    the duty of care, control, protection, and reasonable discipline of the child;

2.    the duty to support the child, including providing the child with clothing, food, shelter, and medical and dental care not involving an invasive procedure;

3.    the right to consent for the child to medical and dental care not involving an invasive procedure;

4.    the right to consent for the child to medical, dental, and surgical treatment during an emergency involving immediate danger to the health and safety of the child; and

5.    the right to direct the moral and religious training of the child.

IT IS ORDERED that IREZ CHAVEZ REYES, as parent sole managing conservator, shall have the following exclusive rights and duty:

1.    the right to establish the primary residence of the child;

2.    the right to consent to medical, dental, and surgical treatment involving invasive procedures and to consent to psychiatric and psychological treatment of the child;

3.    the right to receive and give receipt for periodic payments for the support of the child and to hold or disburse these funds for the benefit of the child;

4.    the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child;

5.    the right to consent to marriage and to enlistment in the armed forces of the United States;

6.    the right to make decisions concerning the child's education;

7.    the right to the services and earnings of the child;

8.    except when a guardian of the child's estate or a guardian or attorney ad litem has been appointed for the child, the right to act as an agent of the child in relation to the child's estate if the child's action is required by a state, the United States, or a foreign government; and

9.    the duty to manage the estate of the child to the extent the estates have been created by community property or the joint property of the parents.

The Court finds that the application of the guidelines as set out in the Standard Possession Order of the Texas Family Code § 153.311 and following would be unworkable and inappropriate under the circumstances.

The following orders as to access and possession for the Possessory Conservator are found to be in the best interest of the child. More specific orders are found not to be in the best interest of the child.

Possessory Conservator shall have access to the child at reasonable times and places under

4

the supervision of the sole Managing Conservator or someone designated to supervise visits by the sole Managing Conservator.

IT IS ORDERED that before any party files suit for modification of the terms and conditions of conservatorship, possession, or support of the child, except in an emergency, that party shall attempt to mediate in good faith the controversy as provided in chapter 153 of the Texas Family Code.

IT IS ORDERED that Respondent, RUSSELL DON JOHNSON pay to Petitioner, IREZ CHAVEZ REYES, for the support of ANTONIO MIGUEIL JOHNSON an amount that is reasonable.

IT IS ORDERED that all payments shall be made through the Registry of the 29th Judicial District Court, Palo Pinto County, P. O. Box 189, Palo Pinto, Texas 76484, and then remitted by that agency to IREZ CHAVEZ REYES for the support of the child.

The information required for each party by section 105.006(a) of the Texas Family Code is as follows:

Name:        IREZ CHAVEZ REYES (mother)
Social Security Number:  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
Driver's License Number and issuing state:  TX
Current Residence Address:   4119 FM 1195, Mineral Wells, TX  76067
Mailing Address:     Same.
Home Telephone Number:   (940) 325-5338
Name of Employer:  Diamond Supermarket
Address of Employer:  100 S.E. 27th Ave, Mineral Wells, TX
Work Telephone Number: (940) 325-9549

Name:        RUSSELL DON JOHNSON  (father)

Social Security Number:     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

Driver's License Number and issuing state: none.

Current Residence Address:     c/o Palo Pinto County Jail, Palo Pinto, TX  76484

Mailing Address:       c/o P. O. Box 506, Palo Pinto, TX  76484.

Home Telephone Number:   None

Name of Employer:   None

Address of Employer:        None

Work Telephone Number:  None


Name:        ANTONIO MIGUEIL JOHNSON  (child)

Social Security Number:   _____

Driver's License Number and issuing state:  none.

Current Residence Address:    4119 FM 1195, Mineral Wells, TX  76067

Mailing Address:       Same.

Home Telephone Number:   (940) 325-5338

Name of Employer:   None

Address of Employer:        None

Work Telephone Number:  None


EACH PERSON WHO IS A PARTY TO THIS ORDER IS ORDERED TO NOTIFY
EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY OF ANY
CHANGE IN THE PARTY'S CURRENT RESIDENCE ADDRESS, MAILING ADDRESS,
HOME TELEPHONE NUMBER, NAME OF EMPLOYER, ADDRESS OF EMPLOYMENT,
DRIVER'S LICENSE NUMBER, AND WORK TELEPHONE NUMBER.  THE PARTY IS
ORDERED TO GIVE NOTICE OF AN INTENDED CHANGE IN ANY OF THE REQUIRED
INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE

REGISTRY ON OR BEFORE THE 60TH DAY BEFORE THE INTENDED CHANGE. IF THE PARTY DOES NOT KNOW OR COULD NOT HAVE KNOWN OF THE CHANGE IN SUFFICIENT TIME TO PROVIDE 60-DAY NOTICE, THE PARTY IS ORDERED TO GIVE NOTICE OF THE CHANGE ON OR BEFORE THE FIFTH DAY AFTER THE DATE THAT THE PARTY KNOWS OF THE CHANGE.

THE DUTY TO FURNISH THIS INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY CONTINUES AS LONG AS ANY PERSON, BY VIRTUE OF THIS ORDER, IS UNDER AN OBLIGATION TO PAY CHILD SUPPORT OR ENTITLED TO POSSESSION OF OR ACCESS TO A CHILD.

FAILURE BY A PARTY TO OBEY THE ORDER OF THIS COURT TO PROVIDE EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY WITH THE CHANGE IS THE REQUIRED INFORMATION MAY RESULT IN FURTHER LITIGATION TO ENFORCE THE ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR SIX MONTHS, A FINE OF UP TO $ 500.00 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

Notice shall be given to the other party by delivering a copy of the notice to the party by registered or certified mail, return receipt requested. Notice shall be given to the Court by delivering a copy of the notice either in person to the Clerk of this Court or by registered or certified mail addressed to the clerk. Notice to the state case registry shall be given according to procedures for notification published by the title IV-D agency under section 105.006(g) and chapter 234 of the Texas Family Code.

7

Warnings to Parties

FAILURE TO OBEY A COURT ORDER FOR CHILD SUPPORT OR FOR POSSESSION OF OR ACCESS TO A CHILD MAY RESULT IN FURTHER LITIGATION TO ENFORCE THIS ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR UP TO SIX MONTHS, A FINE OF UP TO $500 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

FAILURE OF A PARTY TO MAKE A CHILD SUPPORT PAYMENT TO THE PLACE AND IN THE MANNER REQUIRED BY A COURT ORDER MAY RESULT IN THE PARTY'S NOT RECEIVING CREDIT FOR MAKING THE PAYMENT.

FAILURE OF A PARTY TO PAY CHILD SUPPORT DOES NOT JUSTIFY DENYING THAT PARTY COURT-ORDERED POSSESSION OF OR ACCESS TO A CHILD. REFUSAL BY A PARTY TO ALLOW POSSESSION OF OR ACCESS TO A CHILD DOES NOT JUSTIFY FAILURE TO PAY COURT-ORDERED CHILD SUPPORT TO THAT PARTY.

IT IS ORDERED that costs of court are to be borne by the party who incurred them.

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

SIGNED on September 2, 1998.

_____
DAVID CLEVELAND, Judge Presiding

8